UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTOPHER CHANDLER, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 18-cv-02136 (APM) |
| DONALD BERLIN, et al., | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

I.

This libel action comes before the court on a second round of summary judgment briefing. In this round the court is asked to resolve the narrow question of whether Plaintiff's libel claim predicated on Defendants' alleged defamatory publication of a report to a third party in 2003 is time barred. The court finds that it is and grants Defendants' motion for summary judgment.

II.

Plaintiff Christopher Chandler claims that Defendants Donald Berlin, a private investigator, and his various affiliated companies are responsible for harm caused by the publication of a 134-page document he calls the "Pitch." Redacted Compl., ECF No. 20 [hereinafter Compl.], ¶¶ 3–4. Berlin prepared the Pitch, which is dated February 24, 2003, for Robert Eringer, a resident of Monaco and friend of Prince Albert II. *Id.*; Compl., Ex. 1, ECF No. 20-1 [hereinafter Pitch]. The Pitch contains allegations that Plaintiff and his brother were engaged in money laundering, organized crime, and espionage for Russia. *See* Pitch; Compl. ¶¶ 4–8. In 2004, Eringer used the Pitch to write a document that Plaintiff calls the "Eringer Report," Compl. ¶ 10, from which he created a "Fake Dossier," *id.* ¶ 12. In November 2017, Eringer disclosed the

first 34 pages of the Pitch and the Fake Dossier to the British media, and in December, the media began running articles about Plaintiff which contained allegations from the Fake Dossier. Pl.'s Decl., ECF No. 22-2 [hereinafter Pl.'s Decl.], ¶¶ 4–9; *see also* Compl. ¶¶ 12–13.

Eringer also published other purportedly false statements about Plaintiff traceable to the Pitch prior to 2017. In 2009, Eringer filed a lawsuit in California against Prince Albert; the complaint in that case mentioned Eringer's investigation and accused Plaintiff of criminal activity in Monaco. Objections & Responses to Defs.' Asserted Facts, ECF No. 22 [hereinafter Pl.'s Resp. to Facts], ¶ 8; Defs.' Mot. to Dismiss or, in the Alternative Mot. for Summ. J., ECF No. 21 [hereinafter Defs.' Mot. to Dismiss], Ex. 6, ECF No. 21-7 [hereinafter Eringer Compl.], ¶ 13 ("Eringer intensively investigated . . . a commodity trading company headquartered in Monaco . . . and its principals Richard and Christopher Chandler . . . who[] it was suspected were engaged in money laundering for Russian interests. (Eringer possesses documents on this matter.)"). In 2014, Eringer published a book, "The Spymaster of Monte Carlo," in which he repeated many of the accusations contained in the Pitch. Statement of Material Facts Not in Dispute, ECF No. 21-8 [hereinafter Defs.' Facts], ¶¶ 9–10; Pl.'s Resp. to Facts ¶¶ 9–10; Defs.' Mot. to Dismiss, Ex. 2, ECF No. 21-3 [hereinafter Eringer book]. Lastly, in 2016, Eringer posted an online article entitled "The Art of the Ruse: Richard and Christopher Chandler," which seemed to contain excerpts from his book. Defs.' Facts ¶ 11; Pl.'s Resp. to Facts ¶ 11; Defs.' Mot. to Dismiss, Ex. 3, ECF No. 21-4 [hereinafter Eringer Article].

In September 2018, Plaintiff filed suit against Defendants, asserting two counts of libel *per se*. *See generally* Compl. and Demand for Jury Trial, ECF No. 1, ¶¶ 60–88. The court granted in part Defendants' Motion to Strike, *see* Order, ECF No. 14, and Plaintiff filed a redacted Complaint, *see* Compl. Defendants then filed a Motion to Dismiss, or in the alternative, Motion

for Summary Judgment. *See* Defs.' Mot. to Dismiss. Defendants argued that (1) Eringer's republication of contents of the Pitch in 2017 was not reasonably foreseeable and therefore Defendants cannot be liable for those statements, Defs.' Mem. of Law in Support of Their Mot. to Dismiss, ECF No. 21-1, at 8–10, 12–13; and (2) any claim pertaining to the initial disclosure of the Pitch to Eringer in 2003 is time barred under the District of Columbia's one-year statute of limitations, because Plaintiff could have, through reasonable diligence, learned about Berlin's authorship of the Pitch well before Plaintiff filed suit, *id.* at 10–11, 13–18.

The court granted summary judgment as to the 2017 republication, finding that it was not foreseeable in 2003 that Eringer would republish contents of the Pitch nearly a decade and a half later. Mem. Op. & Order, ECF No. 24 [hereinafter Mem. Op.], at 6–9. With respect to the initial publication of the Pitch in 2003, the court found that Defendants' limitations argument had "some appeal" but it "rest[ed] on a predicate assumption for which there is no evidentiary support on the present record—namely, that Plaintiff actually knew about any of the three publications in question or that circumstances dictated that he should have known about them." Mem. Op. at 9–10. Accordingly, the court ordered "limited" discovery "as to whether Plaintiff's claim with respect to the original publication of the Pitch in 2003 is time barred." *Id.* at 10.

Defendants have now established that Plaintiff learned of Eringer's California lawsuit, book, and website, each sourced to the Pitch's contents, more than a year prior to filing this case. In discovery, Plaintiff admitted that (1) "on January 11, 2010, he received an email containing a link to a complaint that Eringer had filed against Prince Albert II"; (2) "in November of 2015, he was aware of Eringer's self-published book, *The Spymaster of Monte Carlo*"; and (3) "[n]o later than November 6, 2015, Plaintiff Chandler learned about Eringer's website entitled 'Eringer: The Art of the Ruse. Richard and Christopher Chandler,' including its references to Plaintiff

3

Chandler." Defs.' Suppl. Mem. in Support of Their Mot. for Summ. J., ECF No. 32-2 [hereinafter Defs.' Suppl. Mem.], Ex. 1, Pl.'s Responses & Objections to Defs.' First Set of Requests for Admis., ECF No. 32-3 [hereinafter Ex. 1]. Discovery also revealed that Plaintiff contemplated suing Eringer but ultimately declined to do so. After learning of Eringer's California lawsuit, Plaintiff wrote his brother in January 2010: "Pity to see this type of unfounded assertion/allegation in a court filing, effectively as a sworn statement. Not good for our reputation, even though we know it to be false. Makes me wonder if we should sue this guy (Robert Eringer) to force him to prove the comment or retract it." Defs.' Suppl. Mem., Ex. 2, ECF No. 32-4. Plaintiff did not file suit. Two years later, in July 2012, Plaintiff received an email message in which the sender, referring to Eringer's blog, wrote: "I can't imagine you wish to undertake any action in response." *Id.*, Ex. 4, ECF No. 32-6 [hereinafter Ex. 4]. Plaintiff concurred, replying, "[a]s you suggest, we can carry on with our lives and leave the curiosity to others." *Id.*

III.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is only considered "genuine" if a reasonable fact-finder could find in favor of the nonmoving party, and a fact is "material" only if it is capable of affecting the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In assessing a motion for summary judgment, the court considers all relevant evidence presented by the parties, *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008), looks at the facts in the light most favorable to the nonmoving party, and draws all justifiable inferences in that party's favor, *Anderson*, 477 U.S. at 255. If the court determines that "no reasonable jury" could reach a verdict in favor of the nonmoving party, then summary judgment is appropriate. *Wheeler v. Georgetown*

*Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). The court will "not . . . make credibility determinations or weigh the evidence." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

IV.

Both parties agree that Plaintiff learned of Eringer's California lawsuit in January 2010, Eringer's book in November 2015, and Eringer's website and article in November 2015. Ex. 1. The parties also agree on the relevant legal framework. The District of Columbia's one-year statute of limitations for libel claims bars any claim based on the 2003 publication of the Pitch to Eringer, unless there is a basis for tolling the limitations period. *See* D.C. Code § 12-301(4). The discovery rule is an available basis for tolling in defamation cases. Defs.' Suppl. Mem. at 8; Pl.'s Mem. in Opp'n to Defs.' Renewed Mot. for Summ. J., ECF No. 34 [hereinafter Pl.'s Opp'n], at 4. "Under the discovery rule, the running of a limitations period may in some circumstances be tolled until the plaintiff knows or reasonably should have known of the injury." *Wright v. Howard Univ.*, 60 A.33d 749, 751 n. 1 (D.C. 2013) (internal quotation marks omitted). Accordingly, the limited question before the court is whether the discovery rule saves Plaintiff from his failure to file his lawsuit within one year of discovering Eringer's California lawsuit, book, or website, each of which contained allegations from the Pitch.

The D.C. Court of Appeals has adopted a single standard for all cases in which the discovery rule applies. While "[i]n every case, the plaintiff has a duty to investigate matters affecting her affairs with reasonable diligence under all of the circumstances," if the discovery rule applies the applicable limitations period beings to run only "[o]nce the plaintiff actually knows, or with the exercise of reasonable diligence would have known, of some injury, its cause-in-fact, and some evidence of wrongdoing . . . measured from the date of her acquisition of the actual or imputed knowledge." *Diamond v. Davis*, 680 A.2d 364, 381 (D.C. 1996). Further, "the plaintiff's

5

knowledge of wrongdoing on the part of one defendant [does] not cause accrual of his action against another, unknown defendant responsible for the same harm, unless the two defendants [are] closely connected, such as in a superior-subordinate relationship." *Id.* at 380. The question of "whether the relationship of the defendants is sufficiently close to cause accrual should generally be considered as a question of fact which may be imputed to the plaintiff by the same standard of reasonable diligence under the circumstances." *Id.* However,

> [i]n some circumstances, . . . the relationship of the defendants, together with other facts, may establish as a matter of law that a reasonable plaintiff with knowledge of the misconduct of one would have conducted an investigation as to the other. If that investigation would, as a matter of law, have revealed some evidence of wrongdoing on the part of the other defendant, then the cause of action will have accrued as to both.

*Id.*

Plaintiff argues that, for three reasons, the limitations period as to the 2003 publication began to accrue only when he first learned of Berlin's identity as the author of the Pitch in May 2018, and not earlier when he learned of Eringer's republication of the Pitch's contents. First, he contends, Defendants cannot be considered "closely connected" with Eringer for purposes of the discovery rule; second, Defendants have not offered sufficient evidence to show that a reasonable investigation would have put Plaintiff on actual notice of his claims against Defendants; and third, the Pitch is a different publication by a different author and therefore gives rise to a distinct harm for which Plaintiff was not put on inquiry notice by virtue of Eringer's separate harmful statements. *See* Pl.'s Opp'n at 4–5. The court addresses each argument in turn.

A.

Plaintiff contends that "knowledge of Eringer did not accrue the Plaintiff's claims against the defendants because the defendants are not closely connected, such as in a superior-subordinate

6

relationship with Eringer, but are persons of influence in a different center of power." Pl.'s Opp'n at 5. Defendants counter that Eringer and Berlin had exactly the type of close relationship that could have been uncovered with "reasonable diligence" by Plaintiff. *See* Defs.' Suppl. Mem. at 13, 14; Defs.' Reply in Supp. of Summ. J., ECF No. 36 [hereinafter Defs.' Reply], at 2–3. The parties agree that the most closely analogous case is the D.C. Circuit's decision in *Fitzgerald v. Seamans*, 553 F.2d 220 (D.C. Cir. 1977),[1] but they disagree as to how it applies to the present case, *see* Defs.' Suppl. Mem. at 12–14; Pl.'s Opp'n at 6–7.

In *Fitzgerald*, a civilian employee of the Air Force sued Air Force officials for an alleged conspiracy to deprive him of his job in retaliation for testimony he gave before a congressional subcommittee. *Fitzgerald*, 553 F.2d at 223–25. The plaintiff filed suit in 1974, more than three years—the applicable statute of limitations—after his termination. *Id.* at 223. The plaintiff argued that the limitations period should be tolled due to fraudulent concealment by Air Force employees of the conspiracy. *Id.* at 223; 228–29. The D.C. Circuit applied "the discovery-diligence standard," under which time begins to run when the plaintiff "discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." *Id.* at 228. Applying this standard, the circuit held that Fitzgerald's letter to the Civil Service Commission ("CSC") appealing his termination demonstrated that "by 1970, he had facts in hand sufficient to put him on notice of the conspiracy by the Air Force appellees to retaliate against him for his congressional testimony." *Id.* By that point, the plaintiff "not only had a strong suspicion of the 'real' reason for his termination, he knew that immediately after his testimony he was ostracized within the Air Force, his duties were shifted, and he was given no new responsibilities." *Id.* He also knew of a memorandum advocating for his removal, an investigation of him, and false charges made against him to Congress. *Id.* at 228–

---

[1] Although *Fitzgerald* was decided well before *Diamond*, the D.C. Court of Appeals in *Diamond* endorsed the D.C. Circuit's reading of the discovery rule. 680 A.2d at 380.

29. The circuit held that "this was sufficient to put appellant on notice of the conduct by some Air Force officials which is now asserted as the basis for the lawsuit." *Id.* at 229. The court also found that Plaintiff's lack of knowledge of certain officials' identities, including an Air Force informant, did not save him from the limitations bar as to those defendants. *Id.* The plaintiff, the court explained, "failed to bring timely action against the higher Air Force and Defense officials, although he knew of their actions and statements and had at least constructive knowledge of grounds for the late lodged suit." *Id.* Accordingly, "it would be anomalous and unjust to allow appellant to begin an action against lesser fry merely because their identity and participation were earlier unknown." *Id.* "The matter would stand differently if [the plaintiff] had proceeded with diligence within the 3-year period by suing those conspirators known to him at the time, and later sought to add other participants whose identity he learned in the course of that suit." *Id.*

The *Fitzgerald* court came to a different conclusion, however, with respect to a White House official involved in the alleged conspiracy. The circuit held that the White House official "was not a lesser fry in the Air Force but a person of influence in a different center of power." *Id.* at 229. Further, "[n]othing in the CSC letter indicate[d] that [the plaintiff] had any knowledge of any White House involvement in his removals," and the official's "role emerged by happenstance during the Watergate hearings." *Id.* The plaintiff's claim against the White House official therefore was not time barred. *Id.*

Defendants argue that "[l]ike the plaintiff in *Fitzgerald*, Plaintiff in this case knew that he had a cause of action against a known defendant," i.e., Eringer, Defs.' Suppl. Mem. at 12, and "Defendants supplied information to Eringer, just as the informant in *Fitzgerald* supplied information to the known defendants in that case," *id.* at 14. Therefore, Defendants contend, the discovery rule did not halt accrual of the limitations period as to claims against them. Plaintiff

8

reads *Fitzgerald* differently. He contends that "Defendants . . . are like the White House aide, not the Air Force subordinate. Neither ICI nor Donald Berlin are subordinates of Robert Eringer; rather, just like the White House aide, Berlin is 'a person of influence in a different center of power.'" Pl.'s Opp'n at 6.

Defendants have the better reading of *Fitzgerald*. Similar to the Air Force employees who allegedly worked together to remove the plaintiff from his position, Defendants here are "closely connected" because Eringer hired them to produce the Pitch. This client-investigator relationship is no less "closely connected" than the superior-subordinate relationship cited in *Diamond*. *See* 680 A.2d at 380. Defendants took instruction and direction from Eringer for a fee; a subordinate would do the same for a superior, albeit for a salary. The different forms of compensation are irrelevant. What matters is that Eringer and Defendants were working in lockstep to develop adverse information about Plaintiff. For that reason, they are "closely connected." The White House aide in *Fitzgerald* was in a different position. He not only worked for a different "center of power"—the White House versus the Air Force—but his role was limited to drafting a memorandum to a superior within the White House (not the Air Force) and the role of the White House was obscured through the claim of executive privilege. *See Fitzgerald*, 553 F.2d at 225, 229. The aide's role emerged only by "happenstance." *Id.* at 229. Even then, the D.C. Circuit took no position on whether "factual development [on remand] may show that with diligence plaintiff should have known of White House involvement." *Id.* Here, no further factual development is necessary to conclude that reasonable diligence would have enabled Plaintiff to discover Defendants' role. Had Plaintiff filed suit against Eringer when he learned of Eringer's California lawsuit, book, or website, he easily would have learned of Defendants' role through the

9

ordinary tools of discovery. Berlin and Eringer were two players in the same game, and an investigation would have exposed as much.

Plaintiff suggests that, for purposes of the discovery rule, *Diamond requires* a superior-subordinate relationship to place a plaintiff on inquiry notice of an unknown actor's wrongdoing based on a known actor's conduct. *See* Pl.'s Opp'n at 6–7, 9–10. Plaintiff reads *Diamond* too narrowly. The *Diamond* court held that a plaintiff's knowledge of wrongdoing by one defendant does not cause the accrual of the limitations period against a second defendant "unless the two defendants were closely connected, *such as* in a superior-subordinate relationship." *Diamond*, 680 A.2d at 380 (emphasis added). The court's use of "such as" demonstrates that the "superior-subordinate" relationship was offered as one example of a connection close enough to start the limitations clock. Nothing in *Diamond* suggests that it is the only possible "close connection."

In fact, case law divulges just the opposite. As Defendants point out, courts have "routinely give[n] parties the benefit of the *Diamond* rule even when no superior-subordinate relationship exists." Defs.' Reply at 3. For example, in *Nader v. Democratic National Committee*, the plaintiff's notice of a claim against the Democratic National Committee ("DNC") also started the clock against the Kerry-Edwards campaign. 567 F.3d 692, 702 (D.C. Cir. 2009). The D.C. Circuit explained that, "given the relationship between the Kerry Campaign and the DNC at the time of the 2004 election, we cannot see how the campaign would have fallen outside the zone of reasonable suspicion after that." *Id.* In *Kubicki v. Medtronic, Inc.*, the plaintiff's knowledge of a possible product-related defect created an "obligation to examine timely all of the aspects of the allegedly defective product for statute of limitations purposes." 293 F. Supp. 3d 129, 162–63 (D.D.C. 2018). Accordingly, the plaintiff's awareness of a claim against one manufacturer of a component of the medical device at issue started the accrual of claims against the manufacturer of

10

another component part. *Id. See also Gardel v. SK & A Structural Eng'rs PLLC*, 286 F. Supp. 3d 120, 125–28 (D.D.C. 2017) (holding that the plaintiff's knowledge of a claim against a property owner was "sufficient to start the statute of limitations clock" for claims against the engineering firm and construction company); *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 115–16 (D.D.C. 2015) (holding that the plaintiff's knowledge of wrongdoing by a law firm put her on inquiry notice of misconduct on the part of the firm's bank due to "the close working relationship" between the two, thereby starting the accrual of any claims against the bank). As the case law demonstrates, the proper factual inquiry for this court is simply whether Defendants and Eringer were closely connected. Defendants have sufficiently established such a connection.

B.

Next, Plaintiff argues that "Defendants have failed to present any evidence that a reasonable investigation would have led to notice of the Plaintiff's claims against them." Pl.'s Opp'n at 7. Under *Diamond*, Plaintiff says, accrual begins only if a reasonable investigation would have put Plaintiff on *actual notice* of his claims against Defendants. *Id.* at 7–8 (quoting *Diamond*, 680 A.2d at 372 ("[A] cause of action accrues . . . when the plaintiff has either actual notice of her cause of action or is deemed to be on inquiry notice because if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice.")). Defendants counter that "because Eringer's publications gave Plaintiff inquiry notice of potential claims against Defendants, those claims are also barred." Defs.' Suppl. Mem. at 10. They add, "Defendants do not contend that Plaintiff had actual knowledge before May 2018 of [the Pitch] or of Mr. Berlin's role in its preparation," but "by failing to sue Eringer within the limitations period, Plaintiff failed to learn

what he would have learned in such a lawsuit, *i.e.*, that Defendants had given Eringer [the Pitch] in 2003." *Id.* at 11. The court agrees with Defendants.

Once again, Plaintiff reads *Diamond* too narrowly. Since *Diamond*, the D.C. Court of Appeals has reiterated that, under the discovery rule, "[i]n order for the statute of limitations to begin to run, it is only necessary that the plaintiff have inquiry notice of the existence of a cause of action." *Ray v. Queen*, 747 A.2d 1137, 1141 (D.C. 2000). "The critical question in assessing the existence *vel non* of inquiry notice is whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him." *Id.* at 1141–42. Although Plaintiff insists that known facts must lead to actual notice for the discovery rule to apply to closely connected actors, the D.C. Court of Appeal's decision in *Cevenini v. Archbishop of Washington*, 707 A.2d 768 (1998), erases any doubt that inquiry notice is sufficient. In that case, the D.C. Court of Appeals explained that,

> *Diamond* makes clear that while knowledge of misconduct on the part of one defendant will not automatically create inquiry notice of claims against a potential co-defendant, such notice may be charged to the plaintiff if (1) a reasonable plaintiff would have conducted an investigation as to the co-defendant, and (2) such an investigation would have revealed some evidence of wrongdoing.

*Id.* at 773. Thus, inquiry notice is all that is required to trigger accrual of the limitations period, even as it is applied to the wrongdoing of a co-defendant.

In this case, Plaintiff was put on inquiry notice of Defendants' role when he learned of Eringer's publications. The 2009 complaint filed by Eringer against Prince Albert, which Plaintiff learned of in January 2010, states that "Eringer intensively investigated . . . a commodity trading company headquartered in Monaco . . . and its principals Richard and Christopher Chandler . . . who[] it was suspected were engaged in money laundering for Russian interests" and "*Eringer possesses documents on this matter*." Eringer Compl. ¶ 13 (emphasis added). In Eringer's book

12

he uses "we" and "our" when referring to his investigation into the Chandler brothers, *see* Eringer Book, and the same goes for his online article, *see* Eringer Article. Eringer's book, for instance, states "[t]he deeper *we dug* into their activities," "*we recruited*" someone to surveil the brothers, "*[w]e discussed* various options with the Prince on how to counter the Chandler brothers," and "*we agreed* to commence . . . an overt investigation that would send clear signals to the brothers that their activities were under scrutiny." Eringer Book at 3–5 (emphasis added). Eringer's article contains nearly identical pronouncements. Eringer Article at 4–5. These obvious clues ought to have alerted Plaintiff to the possibility that Eringer was not acting alone and that others could have supplied Eringer with the false information he was publishing. Had Plaintiff filed suit against Eringer based on these suspicions, he surely would have discovered the Pitch and that Berlin was its author. *See Fitzgerald*, 553 F.2d at 229 (observing that "[t]he matter would stand differently if [the plaintiff] had proceeded with diligence within the 3-year period by suing those conspirators known to him at the time, and later sought to add other participants whose identity he learned in the course of that suit"). Serving basic interrogatories and document requests easily would have sussed out such information and more.

Plaintiff counters that, even if he had followed up with Eringer, "Defendants have not put forth any evidence that Eringer would have cooperated in any investigation or identified the Defendants voluntarily," Pl.'s Opp'n at 9; however, such speculation does not excuse Plaintiff from his responsibility to investigate with reasonable diligence, which he failed to do. He opted instead to "carry on with our lives and leave the curiosity to others." Defs.' Suppl. Mem., Ex. 4. His lack of curiosity is fatal to his claim.

Plaintiff's reliance on *Richards v. Mileski*, 662 F.2d 65 (D.C. Cir. 1981), is also misplaced. *See* Pl.'s Opp'n at 8. In that case, a government agency forced the plaintiff to resign based on a

13

false allegation of homosexual behavior that the plaintiff understood originated from an informant; over two decades later, the plaintiff discovered through an open records request that the informant had not actually misled the agency, but that agency investigators had concocted the accusation with the informant's help. *See id.* at 67–68. The court held that, although the plaintiff knew that the initial charge of homosexuality was false at the time of his resignation, his claims were nonetheless timely, calling it "no mere 'detail'" that the false charges "had been fabricated as part of a deliberate conspiracy against him, or that his own superiors rather than an unknown informant were the source of his misery." *Id.* at 69. The court concluded that the plaintiff's new claims "are entirely separate" from the claims of wrongful discharge or coerced resignation that he could have possibly earlier raised. *Id.* Here, in sharp contrast to *Richards*, Defendants' initial publication of the Pitch before Eringer's later republications does "not alter the fundamental nature of the wrong at issue." *Nader*, 567 F.3d at 701. The claims against Eringer and Defendants emerge from the same set of false claims, and there is no allegation here that the true nature of the harm caused was fraudulently concealed by its perpetrators. Once Plaintiff learned of Eringer's publications, the nature of his claim was obvious—libel—and had he sued Eringer when he first learned of those statements, nothing about a suit against Eringer would have changed except "adding a new target." *Id.* Therefore, unlike in *Richards*, Plaintiff's later actual discovery of Defendants' role does not excuse his late-filing of suit against them.

C.

Lastly, Plaintiff contends that his claim based on Defendants' publication of the Pitch to Eringer in 2003 is not time barred because that initial publication gave rise to a harm different than the injuries arising from Eringer's later republications. Pl.'s Opp'n at 10. Citing language from *Diamond* that "the plaintiff's knowledge of wrongdoing on the part of one defendant [does] not

14

cause accrual of his action against another, unknown defendant responsible for the *same harm*, unless the two defendants [are] closely connected," *Diamond*, 680 A.2d at 380 (emphasis added), Plaintiff asks the court to hold that a close connection will not suffice to impute responsibility to exercise reasonable diligence when the actors and the alleged harms caused are different, Pl.'s Opp'n at 10.

The court agrees that Eringer's republications of the Pitch constitute different harms than the initial publication of the Pitch itself in 2003. *Cf. Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1087 (D.C. Cir. 2007) ("Copies of the original are still part of the single publication but republication in a new edition creates a new publication on the rationale that the intent is to reach a new audience."). Nonetheless, Plaintiff is not relieved of his responsibility to investigate with reasonable diligence. It would create an anomalous result if the discovery rule failed to preserve Plaintiff's claims as to Eringer's republications of the Pitch in 2009 and 2015 but left available a claim as to the initial publication in 2003, even when Plaintiff could have easily uncovered its existence. The discovery rule protects a plaintiff from nonobvious or obscured evidence of wrongdoing; it does not to allow him to turn a blind eye when an investigation would otherwise turn up evidence of a co-defendant's transgressions, even if a separate but related "harm." *See Nader*, 567 F.2d at 701 (holding that discovery rule would not save an otherwise untimely claim where the late discovery of a co-defendant's acts "does not alter the fundamental nature of the wrong at issue"); *cf. Cevenini*, 707 A.2d at 773 (stating that "*Diamond* makes clear that" a plaintiff will be charged with inquiry notice of claims against a potential co-defendant when "(1) a reasonable plaintiff would have conducted an investigation as to the co-defendant, and (2) such an investigation would have revealed *some evidence* of wrongdoing" (emphasis added)).

Accordingly, that Defendants' publication of the Pitch to Eringer constitutes a different legal harm provides no relief from the limitations bar in this case.

V.

For the foregoing reasons, the court grants Defendants' Renewed Motion for Summary Judgment, ECF No. 32. A final, appealable Order accompanies this Memorandum Opinion.

Dated: January 30, 2020

Amit P. Mehta
United States District Court Judge