# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHANDLER, CHRISTOPHER<br>Plaintiff,<br><br>     v.<br><br>BERLIN, DONALD<br>21851 Laurel Wood Court<br>Leesburg, VA 20175,<br><br>INVESTIGATIVE CONSULTANTS, INC.<br>21851 Laurel Wood Court<br>Leesburg, VA 20175,<br><br>INVESTIGATIVE CONSULTANTS, INC.<br>2020 Pennsylvania Ave. NW, Ste. 813<br>Washington, D.C. 20006,<br><br>and<br><br>INVESTIGATIVE CONSULTANTS, INC.<br>OF WASHINGTON, D.C.<br>2020 Pennsylvania Ave. NW, Ste. 813<br>Washington, D.C. 20006,<br><br>     Defendants. | **Case No. 1:18-cv-02136-APM** |

## <u>FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

1.     Plaintiff brings this libel action against Donald Berlin and his web of Defendant corporate entities doing business as Investigative Consultants, Inc. ("ICI"), which Berlin uses to defraud people seeking investigative services.  To entice its clients into paying tens of thousands of dollars for worthless background reports containing explosive fake accusations about targeted individuals, ICI exaggerates Mr. Berlin's credentials and makes baseless claims regarding ICI's

investigative abilities.  In reality, Berlin manufactured imaginary human intelligence sources to back up his demonstrably false lies.

2.      ICI is essentially a front for Berlin's fraudulent activities and has no employees other than Berlin.  Rather than providing legitimate investigative services, Berlin (through ICI) defrauds consumers by inventing salacious narratives from his own imagination and weaving those false narratives together with manipulated information from the public domain.

3.      In 2002 and 2003, Berlin attempted to defraud Prince Albert II of Monaco (through Robert Eringer) into paying for fake background checks on a number of successful expats living in Monaco, including Plaintiff Christopher Chandler ("Mr. Chandler") and his brother.

4.      To entice payment of tens of thousands of dollars for fake reports containing "derogatory, negative or negative-inference data" about the Chandler brothers, Berlin concocted false accusations that the Chandlers had engaged in money laundering, organized crime, Russian espionage, and a conspiracy to commit tortious interference.  Defendants published these accusations in two documents: (1) a proposal dated October 17, 2002 (the "Proposal") and (2) a pitch dated February 24, 2003 (the "Pitch") (collectively, the "False Reports").[1]

5.      To falsely accuse the Chandler brothers of money laundering and organized crime, Berlin falsely conflated the Chandlers' Monaco-based personal investment company—Sovereign Asset Management Limited ("Chandler Sovereign")—with a Bristol-based company called Sovereign Forex Ltd ("Bristol Sovereign") and Swiss-based companies called Sovereign Forex Ltd, Sovereign Finance Group Ltd, Sovereign Capital Management AG, Sovereign Finance Group Ltd, and Sovereign Bank Corporation Ltd (the "Swiss Sovereign

---

[1] Pitch at 18, *passim* (Ex. 1).  On information and belief, the complete Pitch contains 134 pages, but Plaintiff possesses only the first 34 pages, which are attached as Exhibit 1.  The additional 100 pages of the Pitch are referred to as the "Additional Pages."

Companies"), which were reportedly engaged in wrongdoing, but which have never had any relationship or affiliation of any kind with the Chandlers.  Indeed, Sovereign Forex was apparently incorporated in Switzerland in 1977,[2] when Mr. Chandler and his brother were teenagers living in New Zealand.

6.     The Pitch contains verbatim excerpts from news articles Berlin found on the Internet (that have nothing to do with the Chandlers), which Berlin manipulated to support his false narrative and then falsely attributed to human intelligence sources.[3]

7.     The False Reports also contain extended descriptions of a legal dispute between Swiss banking giant Credit Agricole Indosuez ("CAI") and Russia-based National Reserve Bank ("NRB"), plus wholly fabricated accusations tying the Chandlers to the dispute by asserting that they had engaged in a conspiracy with CAI to commit tortious interference against NRB.[4]  But as court records and passport documents show, the Chandler brothers had nothing to do with the dispute between CAI and NRB, were not in Switzerland when Berlin claims they were there meeting with CAI, and have never had any relationship or dealings of any kind with CAI.[5]  The False Reports attribute Berlin's fanciful conspiracy accusations to "sources that have direct access to quality intelligence in both Switzerland and Russia."[6]  ***But Berlin has since admitted that he had no Swiss or Russian human intelligence sources.***  He simply copied large portions of the False Reports relating to CAI from a report he had previously written for another client-victim, pasted those portions into the Pitch, and then made up and added fake accusations—falsely

---

[2] *Id.* at 21.

[3] Compare, e.g., *Swiss Court Closes Firm in Money Laundering Probe*, Tax-News.com (Oct. 10, 2002), available at https://www.tax-news.com/news/Swiss_Court_Closes_Firm_In_Money_Laundering_Probe____9642.html (Ex. 2) with Pitch at 3 (Ex. 1).

[4] Pitch at 1, 11, *passim* (Ex. 1).

[5] For example, the Pitch claims that Chandler met with CAI in Geneva, Switzerland in May 1996 and in July 2002 (*Id.* at 2, 15), but Chandler's passport shows that he did not travel to Switzerland in those years.

[6] *Id.* at 1.

attributed to non-existent human sources—in an effort to smear the Chandler brothers with false connections to CAI, so that he could sell expensive fake reports.

8.     On information and belief, Berlin's False Reports also falsely accused the Chandler brothers of being Russian spies, based in part on false assertions that: (1) in 1999, Mr. Chandler's brother was awarded a "third class" Russian order "For Service to the Fatherland"; and (2) in 2002, Mr. Chandler had organized multiple "dead drops" in France to transfer secret documents, short wave radios, and large sums of money.  The accusations of Russian espionage are absolutely false and, on information and belief, were simply made up by Berlin.

9.     Yet because Berlin lacks the Russian expertise and Russian sources he claims to have, he included sloppy details that someone remotely familiar with the subject matter at hand never would have included.  *First*, in 1999, it appears that there was no such title as "third class" order for Russia's "For Service to the Fatherland."[7]  *Second*, it appears that the Soviet Union ceased to manufacture and issue shortwave radios in 1989,[8] and it would have been impractical and ridiculous to utilize such obsolete technology in 2002, more than ten years after smartphones were invented.  Apparently, Berlin uses outdated spy novels as inspiration for his stories.

10.    Around November 2004, Eringer used the fake information from Berlin's False Reports as the basis for his own writeup about the Chandler brothers, which he provided to the Prince of Monaco (the "Eringer Report").[9]  Indeed, the Eringer Report makes reference to this arrangement, saying "At this point we were willing, at considerable expense, to commission a

---

[7] *See* **Государственные награды Российской Федерации -** назад **медаль ордена "За заслуги перед Отечеством" [State awards of the Russian Federation – Medal of the Order "For Services to the Fatherland"]**, https://orel-region.ru/index.php?head=59&part=55&op=3&id=m2 (Ex. 3).

[8] *See* Spy Radio, *Стриж* [Strizh], CRYPTO MUSEUM, http://www.cryptomuseum.com/spy/r394/strizh.htm  (Ex. 4).

[9] Report: The Chandler Brothers (Nov. 2004) (Ex. 5).

report from special sources with a proven ability to access the Russian SVR's registry.  Here

follows the substance of that report: . . ."  (*Id.* at 5.)

11.    Neither of Berlin's False Reports were reported publicly before May 2018.

12.    On information and belief, in November 2017, Eringer sent the documents he

received from Berlin and the Eringer Report (the "Fake Dossier") to members of the British press.

13.    In May 2018, British media outlets began falsely reporting that Mr. Chandler had

been involved in Russian money laundering and espionage, based on the false assertions contained

in Berlin's Pitch and the Eringer Report (collectively, the "Fake Dossier").



14.    Mr. Chandler brings this action to prevent Berlin and ICI from defrauding others

with worthless fake background reports, to set the record straight, to vindicate his reputation, and

to obtain compensatory and punitive damages of at least $17,500,000.00.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because

there is complete diversity of citizenship between Plaintiff and Defendants and the amount in

controversy exceeds $75,000.00, exclusive of interest and costs.

16.     This Court has personal jurisdiction over all Defendants pursuant to § 13-423 of the District of Columbia Code because Defendants: (i) transacted business within the District of Columbia; (ii) caused tortious injury in the District of Colombia by acts committed within the District of Columbia; (iii) caused tortious injury in the District of Colombia by acts committed outside the District of Columbia while regularly doing business within, engaging in persistent conduct within, and deriving substantial revenue from goods consumed and services rendered within the District of Columbia; and (iv) had an interest in, used, or possessed real property within the District of Columbia.

17.     The exercise of personal jurisdiction over Defendants comports with the Due Process Clause of the United States Constitution for the reasons set forth above.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District and because Defendants are subject to the Court's personal jurisdiction in this District.

## PARTIES

19.     Plaintiff Christopher Chandler is an accomplished businessman and investor.  He is a citizen of New Zealand and currently resides in the United Arab Emirates.

20.     Defendant Donald Berlin is the principal, owner, and registered agent of the web of Defendant corporate entities that have done business as Investigative Consultants, Inc. ("ICI") out of an office in Washington, D.C. since 1996.  Berlin is domiciled in Leesburg, Virginia.  At all times relevant to this Complaint, Berlin acted through and as an agent of ICI.

21.     Defendant Investigative Consultants, Inc. is an Illinois corporation with its principal place of business at 2020 Pennsylvania Avenue, NW, Ste. 813 in Washington, D.C.

22.     Defendant Investigative Consultants, Inc. of Washington, D.C., is a Wisconsin corporation with its principal place of business at 2020 Pennsylvania Avenue, NW, Ste. 813 in Washington, D.C.

23.     Defendant Investigative Consultants, Inc. is a Virginia corporation with its reported office located at Mr. Berlin's home address of 21851 Laurel Wood Court, Leesburg, Virginia. However, on information and belief, this Defendant's principal place of business is at 2020 Pennsylvania Avenue, NW, Ste. 813 in Washington, D.C.

**FACTUAL ALLEGATIONS**

24.     Since 1977, Donald Berlin has owned, operated, and acted as an agent for a web of corporate entities doing business as ICI, which purports to be an investigations firm.

25.     In or around 1996, Berlin fled Chicago and set up his illicit ICI operation in Washington, D.C.

26.     Berlin and ICI scam consumers by falsifying ICI's expertise, resources, and abilities, and by churning out expensive fake background reports containing salacious false claims concerning their research targets.

27.     ICI's website claims it compiles reports by relying on "proprietary artificial intelligence" and "30 years [sic] experience in data interpretations, criminal investigations, [and] psychology."[10]

28.     Berlin is ICI's only employee.

29.     Berlin's writing is disorganized and riddled with spelling and grammatical errors. A few such examples follow:

Indeeed [sic], upon rechecking, we learned that CAI was seeking to have

---

[10] *See* Investigative Consultants Inc., *About Us*, https://www.icioffshore.com/about/dynamicindex5/ (last visited Sept. 10, 2018).

Mr. Zyakhirev . . . withdraw from an agreement.[11]

The net result was GazProm decided to no longer back NRB's capital stock, where it is believe [sic] that they had a 30% position.  It is believe [sic] that Mr. Chandler is being assisted by an elusive individual . . . .[12]

The Chandler's [sic] were able to provide assistance . . . .[13]

E) Chandler's [sic] Links to Organized Crime[14]

The Chandler's [sic] told this unidentified vice president that their company, Sovereign [sic] Forex represented the interests of former Russian nationals . . . .[15]

The Chandlers were deeply involved in real estate in Hong King [sic].[16]

### After Working as a Tabloid Writer and Barkeep, Robert Eringer Dubs Himself the "Spymaster" of Monaco.

30.     After working as a tabloid writer and barkeep, Eringer moved to Monaco.  During his time in the city-state, he ingratiated himself to Prince Albert II and, in 1999, told the Prince that he could unmask traitors in Monaco and expose individuals who were concealing fraudulent financial activity and money laundering.

31.     In 2002, Eringer christened himself "Agent 001" and dubbed his unsolicited work for Prince Albert as the "Monaco Intelligence Service."  According to Prince Albert, Eringer's so-called "Monaco Intelligence Service" never existed administratively or legally.

### Berlin and ICI Use the Pitch in an Effort to Defraud the Prince of Monaco out of Tens of Thousands of Dollars.

32.     Before 2002, Berlin knew Eringer, and was familiar with his activities and character, including that Eringer was a working journalist.

---

[11] Pitch at 8 (Ex. 1).
[12] *Id.* at 1.
[13] *Id.* at 2.
[14] *Id.* at 3.
[15] *Id.* at 7.
[16] *Id.* at 16.

33.     Eringer contacted Berlin and ICI in the fall of 2002 to conduct background investigations into Mr. Chandler and his brother.

34.     Berlin drafted and published the Pitch to Eringer on February 24, 2003, to entice payment of tens of thousands of dollars for fake information about Mr. Chandler and his brother. From ICI's website:

> At ICI, we never charge for any proposals for our clients.  Our proposals will provide you a few details regarding your subject.  It is done this way to insure [sic] that we have targeted the correct person and therefore, can provide you an accurate estimate to do the full **Global Scan**® Service search.[17]

35.     The Pitch marketed the following products:

| Investigative Consultants Inc.'s Product[18] | Cost |
|---|---|
| Homeland Human Intelligence Asset Scan (Russia & Monaco) | $29,000 |
| Homeland Human Intelligence Asset Scan (New Zealand, Australia, Nauru, & Hong Kong) | $19,300 |
| Global Scans of Mr. Chandler and his brother | $25,600 |
| Global Scan of Chandler-Controlled Company | $19,200 |
| Archive Data | $4,590 |
| **TOTAL:** | **$97,690** |

36.     To entice payment of the prices set forth above, the Pitch falsely accused Mr. Chandler and his brother of engaging in money laundering, organized crime, and conspiracy to commit tortious interference.

37.     To support his false accusations of money laundering and organized crime, Berlin's False Reports falsely assert that the Chandler brothers control various companies with the word "Sovereign" in their names, which reportedly engaged in wrongdoing: (1) a Bristol-based company called Sovereign Forex Ltd ("Bristol Sovereign"); (2) Swiss-based companies called Sovereign

---

[17] *See* Investigative Consultants Inc., *Our Products/Global Scan,* *http://www.icioffshore.com/product/dynamicindex10/* (last visited Sept. 10, 2018).
[18] Pitch at 18 (Ex. 1).

Forex Ltd, Sovereign Finance Group Ltd, Sovereign Capital Management AG, Sovereign Finance Group Ltd, and Sovereign Bank Corporation Ltd (the "Swiss Sovereign Companies"). The Pitch also falsely asserts that "the Chandler brothers directly or indirectly control" certain companies that the Pitch claims "are related to Sovereign Fourex," one of the companies reportedly engaged in wrongdoing.

38.     For example, the Pitch says:

> Sovereign Fourex [sic] is another company that is owned by the Chandlers . . . . The company is very complex, and is basically a front for Russians . . . . Our sources indicate[d] that Sovereign Fourex [sic] is a major money-laundering source for the Chandlers.[19]

39.     Mr. Chandler and his brother have no ownership or affiliation of any kind with Sovereign Forex. When Sovereign Forex was founded in Switzerland in 1977, the brothers were teenagers living in New Zealand. Although the brothers' personal investment company had the word "Sovereign" in its name, neither brother, nor any company affiliated with them has ever had any affiliation or relationship of any kind with Sovereign Forex, Bristol Sovereign, or the Swiss Sovereign Companies.

40.     According to Berlin's Pitch, one of his purported international human sources with connections to "authorities in Switzerland" informed him that Swiss authorities shut down "Sovereign Finance Group" because of money laundering activities.[20] In reality, Berlin lied about having such a source, and simply copied that information ***verbatim*** from a Tax-News.com article he found on the internet (which was about the Swiss Sovereign Companies that are totally unrelated to the Chandlers):

---

[19] *Id.* at 19.
[20] *Id.* at 13.

| Tax-News.com Article[21] | Berlin's Pitch[22] |
|---|---|
| Dow Jones Newswires reported on Tuesday that a Swiss court has ordered the Zurich-based Sovereign Finance Group to close following **alleged money laundering activities in Russia and the Caribbean.** The news agency revealed **that the Swiss Federal Banking Commission ruled at the end of September that the group should be shut down.** | On October 7th [sic] 2002, the Swiss investigation resulted in a number of legal actions against Sovereign Finance Group when a Swiss court ordered the company closed because of **alleged money laundering activities in Russia and the Caribbean.** It is our understanding from this source **that the Swiss Federal Banking Commission ruled at the end of September that the group should be shut down.** |

41.     Similarly, on April 2, 2002, French daily newspaper *Le Monde* published an article detailing how two men named Arkady Gaydamak and Pierre-Joseph Falcon—who have zero connections to the Chandlers—plundered millions of dollars of funds that were earmarked to repay Angolan debt to Russia.  Although the *Le Monde* article had nothing to do with the Chandlers, Berlin copied a portion of it and then manipulated the information to substitute Mr. Chandler and his brother for the alleged wrongdoers and make it appear as though the brothers were laundering money for Russians.

| Le Monde Article[23] | Berlin's Pitch[24] |
|---|---|
| Mr. Falcone opened **accounts** in 1998 with the names of three **Panamanian companies** (**Dramal, Camparal and Tutorial**), **at the International Bank of Luxembourg (BIL).** | [Credit Agricole] has been opening **accounts** for them [the Chandlers] in the name of **Panamanian** registered **companies** such as **Dramal, Camparal, and Tutoral** [sic] **at the International Bank of Luxembourg (BIL).** |

[21] *Swiss Court Closes Firm in Money Laundering Probe*, Tax-News.com (Oct. 10, 2002), https://www.tax-news.com/news/Swiss_Court_Closes_Firm_In_Money_Laundering_Probe____9642.html (Ex. 2).

[22] Pitch at 3 (Ex. 1).

[23] *Fabrice Lhomme & Piotr Smolar, Le règlement de la dette angolaise aurait donné lieu à des détournements de fonds* [Angolan debt settlement allegedly embezzled funds], Le Monde (April 2, 2002), https://www.lemonde.fr/archives/article/2002/04/03/le-reglement-de-la-dette-angolaise-aurait-donne-lieu-a-des-detournements-de-fonds_4243463_1819218.html?xtmc=russo_angolais&xtcr=6 (Ex. 6).

[24] Pitch at 5 (Ex. 1).

11

42.     In reality, neither Mr. Chandler nor his brother has ever laundered money and they have no affiliation of any kind with Gaydamak, Falcone, Dramal, Camparal, or Tutorial.

43.     The Pitch also falsely accuses the Chandlers of "conspiracy to commit tortious interference," based on an imaginary relationship between the Chandler brothers, on the one hand, and CAI, on the other hand.  In essence, the Pitch claims that CAI recruited the brothers to help drive NRB out of business.   These accusations are totally false; the Chandler brothers never engaged in conspiracy to commit tortious interference and they never had any relationship or dealings of any kind with CAI.  While the Pitch claims that Mr. Chandler met with CAI in Geneva, Switzerland in May 1996 and in July 2002, Mr. Chandler's passport shows that he did not travel to Switzerland in those years.

44.     On information and belief, in the Additional Pages, Berlin falsely accused Mr. Chandler of money laundering and organized crime, based on the false premise that Mr. Chandler and his brother are affiliated with Sovereign Forex, Bristol Sovereign, and the Swiss Sovereign Companies.

45.     On information and belief, in the Additional Pages, Berlin also falsely accused the Chandlers of being Russian spies, based in part on: (1) false accusations that Mr. Chandler and his brother participated in "dead drops" (including of short wave radios in 2002); and (2) the false accusation that in 1999, Mr. Chandler's brother was awarded a "third class" Russian order "For Service to the Fatherland."

46.     These accusations are totally false.  The Chandler brothers have never been spies for any nation, let alone Russia.

47.     In 1999, there was apparently no such thing as a "third class" order for Russia's "For Service to the Fatherland."[25]

48.     On information and belief, Russian intelligence agencies did not use short wave radios 2002 because, at that point, short-wave radios were outdated and had been supplanted by more modern technology.

### *Eringer Writes a Fake Report Based on the False Information Berlin and ICI Manufactured and Provided.*

49.     In November of 2004, Eringer used the fake information from Berlin's Pitch and the Proposal as the basis for the Eringer Report and gave the Eringer Report to the Prince of Monaco.

50.     The Eringer Report states that Eringer decided "to commission a report from special sources with a proven ability to access the Russian SVR's registry" and that he did so "at considerable expense."  On information and belief, this refers to the purchase of the false information from Berlin and ICI.

51.     In the Eringer Report, Eringer repeats the bogus claims made in Berlin's False Reports about Mr. Chandler.

52.     In January 2018, Donald Berlin and Robert Eringer exchanged emails to discuss potential ways to monetize the False Reports.  Berlin and Eringer proposed selling the information to the highest bidder, with the understanding that it could be helpful to Donald Trump.  To date, Berlin has been unable to explain any connection between their files on the Chandler brothers and Donald Trump or Christopher Steele.  Because there is none.

---

[25] *See* **Государственные награды Российской Федерации -** назад **медаль ордена "За заслуги перед Отечеством" [State awards of the Russian Federation – Medal of the Order "For Services to the Fatherland"],** https://orel-region ru/index.php?head=59&part=55&op=3&id=m2 (Ex. 3).

## Re: The BROTHERS

| | |
|---|---|
| From | **Donald Berlin** <dberlin@icioffshore.com> |
| To | **Robert Eringer** <eringer33@aol.com> |
| Sent | Saturday, January 20, 2018 at 12:14 PM |
| Encrypted | No |
| Signed | No |

R

Book writing and wonderings is definitely your side of the street - I am only good for catchy quips.

Meanwhile, let's talk over the phone when able today.

I have some potential ideas over how to better monetize this, assuming what I shared before: it's either helpful to POTUS in someway; or unhelpful and bad for Chris Steele and Fusion GPS.

I would have to get a better sense of how the puzzle box looks.

Send me your Mud Line - sorry Cell Line.

Best Regards,


Donald M. Berlin
CEO/Chairman of the Board
Investigative Consultants, Inc.

53.     A short time later Berlin followed through on his plan by contacting one of Trump's allies, Rich Higgins—a former Pentagon official who served as Director of Strategic Planning for the National Security Council—to try to sell the disinformation about Mr. Chandler set forth in the False Reports.

54.     Defendants' false accusations have caused enormous harm to Mr. Chandler.

### COUNT ONE – LIBEL *PER SE*
#### *The First 34 Pages of the Pitch*
#### *(Against All Defendants)*

55.     Mr. Chandler repeats and re-alleges each of the paragraphs in this First Amended Complaint as if set forth fully herein.

56.     On or before February 24, 2003, Berlin composed the Pitch for Eringer for the purpose of enticing Eringer's "ultimate client" – Prince Albert II – to pay tens of thousands of

14

dollars for fake reports containing false "derogatory, negative or negative-inference data" about Mr. Chandler.[26]   At all relevant times, Berlin had actual knowledge that he was working on behalf of Eringer's "ultimate client," and Berlin knew that Eringer was not working alone.

57.     On or about February 24, 2003, Berlin sent the Pitch to Eringer, and Eringer shared the Pitch with Prince Albert II a short time later.  Berlin knew in 2002 that Robert Eringer was a working journalist based on their previous work together.  Thus, Berlin is liable for this and all other instances Eringer republished the Pitch that were reasonably foreseeable to Berlin.

58.     Berlin's False Reports were not publicly available, published online, or published by any media outlet before May 2018.

59.     Personally, and through his agents, Mr. Chandler regularly monitors the press for articles that mention him.  Although Mr. Chandler first learned of the false accusations of Russian espionage and money laundering in November 2017, he did not receive a copy of the first 34 pages of the Pitch or the Eringer Report until May 2018.  He did not receive a copy of the Proposal until October 2021.

60.     The False Reports contains the following libelous false accusations about Mr. Chandler: that he engaged in "money laundering," "laundering money," and a "money-laundering scheme;" worked for and was involved with "organized crime." The Pitch further claims that Mr. Chandler engaged in "conspiracy to commit tortious interference."  The Pitch repeatedly and falsely accuses Mr. Chandler of these crimes, both directly and through false purported affiliations with companies that Mr. Chandler is not affiliated with in any way, including: (1) Bristol Sovereign, (2) the Swiss Sovereign Companies, and (3) CAI (Bristol Sovereign, the Swiss Sovereign Companies, and CAI are referred to collectively as the "Unrelated

---

[26] Pitch at 18 (Ex. 1).

Companies").

61.     The libelous false statements in the Pitch are of and concerning Mr. Chandler, who is: (1) one of two subjects of the Pitch, (2) repeatedly identified by name throughout the Pitch, and (3) identified in the Pitch as the owner, controller, or affiliate of the Unrelated Companies that the Pitch accuses of being used for criminal activities.  Berlin intended that any reader of the Pitch would understand the libelous false statements—including the statements about the Unrelated Companies—to be of and concerning Mr. Chandler, and the statements were so understood by those who read them.  Indeed, Berlin's Pitch appears to have been the source of some of the false statements in the Eringer Report titled: "Report: The Chandler Brothers," showing that Eringer understood the statements in Berlin's Pitch to be of and concerning Mr. Chandler and his brother.

62.     The statements are libelous *per se* because they falsely impute the commission of indictable offenses involving moral turpitude that injure one's social standing.

63.     The libelous statements are false.  Mr. Chandler and his brother have never—either directly or indirectly through the use of companies—engaged in money laundering, organized crime, or conspiracy to commit tortious interference.  More specifically:

  (a)  ***Companies with the word "Sovereign" in their names.***  Mr. Chandler and his brother did not fund—and have never had any relationship of any kind with—Sovereign Forex, Bristol Sovereign, or the Swiss Sovereign Companies, nor did they have any involvement in the nefarious activities that the Pitch claims those companies were engaged in.  When Sovereign Forex was incorporated in Switzerland in 1977, Mr. Chandler and his brother were teenagers living in New Zealand.[27]  Although the Chandler brothers invested through a company that had the word "Sovereign" in its name ("Chandler Sovereign"), that company has never had any relationship of any kind with Sovereign Forex, Bristol Sovereign, or the Swiss Sovereign Companies.  Chandler Sovereign was originally formed in Monaco and later relocated to Dubai.  The only connection between the Chandler Sovereign, on the one hand, and Sovereign Forex, Bristol Sovereign, and the Swiss Sovereign Companies, on the other hand, is a simple coincidence: they happen to have the word "Sovereign" in their

---

[27] *See* Pitch at page 21.

names.  Chandler Sovereign is not a "front company," nor is it controlled by Gazprom.  Chandler Sovereign never purchased any Gazprom shares on behalf of any Gazprom senior executives, nor was it ever intended the Chandler Sovereign would do so.

(b)     ***Organized Crime.***  Mr. Chandler and his brother have never worked for or enjoyed the "protection" of any Russian organized crime group, the Solnetsevo Group, the Far Eastern Group, Vladimir Putin, or Boris Yeltsin. The brothers never created any offshore companies to represent the interests of Russian organized crime members.

(c)     ***Money Laundering.***  Mr. Chandler and his brother have never engaged in money laundering.  Neither of the brothers nor their companies have relationships—let alone money-laundering relationships—with the senior management of Lukoil or UES.  The Chandlers do not, either directly or through their companies, launder money or hold shares for BP/Amoco, Total/Fina/Elf, or the Trump Group.  CAI never forwarded any funds to companies created by the Chandler brothers on behalf of their customers in cash haven countries, such as Nauru, Cayman Islands, British Virgin Islands, or other localities.  Mr. Chandler and his brother never created any such companies on behalf of any customers.

(d)     ***Vladimir Putin.***  The Chandler brothers never used Sovereign Forex to buy $10 million worth of Yukos and Gazprom shares for Russian President Vladimir Putin.   They do not know, have never communicated with, and have never done any work for Putin.  As set forth above, they have never had any affiliation of any kind with Sovereign Forex.

(e)     ***Mikhail Kasyanov.***  Mr. Chandler and his brother never acquired $4 million worth of Gazprom shares for Russian Prime Minister Mikhail Kasyanov. They do not know, have never communicated with, and have never done any work for Kasyanov.

(f)     ***Igor Ivanov.***  Mr. Chandler and his brother never acquired $1 million worth of Lukoil shares for Russian Foreign Minister Igor Ivanov.  They do not know, have never communicated with, and have never done any work for Ivanov.

(g)     ***Col. Donald Scott.***  Mr. Chandler and his brother do not know and have never communicated with or been assisted by Col. Donald Scott or Pasteur Enterprises.

(h)     ***CAI.***  Mr. Chandler and his brother have never had any relationship of any kind with CAI, nor did they have any involvement in the nefarious activities that the Pitch claims that company was engaged in.  The Chandlers have never met or communicated with representatives from CAI about NRB, Gazprom, Sovereign Forex, or channeling money from Russian clients

17

through Switzerland to offshore accounts. The Chandlers have never communicated with anyone from CAI. The brothers have never had any relationship with CAI and have never received any fees from CAI. The Chandlers never worked with an International Vice President (or any other employee) of CAI, nor did CAI ever grant Mr. Chandler and his brother access to its Geneva facility. Mr. Chandler and his brother have never been to CAI's Geneva facility. As Mr. Chandler's passport shows, he did not travel to Switzerland in 1996 or 2002, years when the Pitch claims he met with CAI in Geneva, Switzerland. The brothers did not broker the introduction of Credit Agricole Swiss to senior officials of the Libyan government or arrange to transfer $18 million from Libya to various Russian banks via Credit Agricole Swiss. They have never had any communications with anyone from Credit Agricole Swiss about anything to do with the Libyan government, nor do they know or have any communications with any officials of the Libyan government.

(i) ***Gazprom.*** Mr. Chandler and his brother historically held a minority stake in Gazprom. Although the Chandlers—along with a consortium of Western investors—supported the corporate governance reform of electing Russia's well-respected former minister of finance, Boris Fyodorov, to Gazprom's board of directors in 2000, they have never worked for Fyodorov. Neither Fyodorov nor other Gazprom executives have ever been customers of the Chandlers, or their companies. The Chandlers have never been "front men" or "front men financiers" for former officials of Gazprom. The brothers never created any offshore companies to represent the interests of high-level former Gazprom executives. They never attempted to influence Rem Vyakhirev (the former president of Gazprom) in the hopes that Vyakhirev would decide that Gazprom would not act as a 30% guarantor of NRB's registered capital, nor did they ever plan to do so. The brothers never had any communications of any kind about NRB with Vyakhirev. Mr. Chandler and his brother do not have the "protection" of any Gazprom officials or Gazprom board members. They have never made any payments to any former Gazprom officials, either to "secret accounts" created by Sovereign Forex or otherwise. The Chandlers never acquired $47.5 million worth of Gazprom shares for Total/Fina/Elf, nor did they receive $1.2 million for handling such acquisition. They never bought $25 million worth of Gazprom shares for the Bank Credit Agricole Swiss, nor did they receive $750,000 for such efforts.

64. Berlin and ICI acted with actual malice in publishing the libelous statements in the Pitch. Evidence of their actual malice includes the following:

- Berlin has admitted, under oath, that the accusations are unverified, uncorroborated, and that they are not reliable. He has also admitted that he cannot testify that the accusations are true.

- From the beginning, Berlin knew he did not have Swiss or Russian human intelligence or other sources and expertise required to provide an accurate background report on the Chandlers, so he set out to prepare fictitious reports about them.

- Berlin intentionally invented salacious accusations about the Chandler brothers in an effort to entice his marks to pay tens of thousands of dollars for additional fake reports about them.

- To this day, even after being informed that his false accusations have caused considerable harm to Mr. Chandler's reputation, Berlin has refused to repudiate the false accusations and set the record straight.

- At all relevant times, Berlin was acting as an agent of ICI, and his actions and evidence of his actual malice is therefore attributable to ICI.

65.    Defendants made the libelous statements intentionally, willfully, maliciously, and in conscious disregard of Mr. Chandler's rights and reputation and of the truth.

66.    Defendants had no applicable privilege or legal authorization to publish these false and libelous statements.

67.    Defendants have failed and refused to retract their defamatory falsehoods about Mr. Chandler – despite having actual knowledge that their accusations are demonstrably false, including correspondence from law enforcement entities that have confirmed Mr. Chandler's innocence.

68.    In addition to injuries presumed by law, these libelous falsehoods have injured—and will continue to injure—Mr. Chandler in at least the following ways:

(a)    By accusing Mr. Chandler of serious crimes;

(b)    By impugning Mr. Chandler's reputation;

(c)    By ascribing to Mr. Chandler conduct that would adversely affect his fitness for proper conduct as a businessman; and

(d)    By causing Mr. Chandler damages in other ways yet to be determined.

69.    Defendants are liable to Mr. Chandler for compensatory damages arising out of their defamation of Mr. Chandler.

70.     Defendants are also liable to Mr. Chandler for punitive damages because of the wanton and outrageous nature of their conduct.

### COUNT TWO – LIBEL *PER SE*
### *The Additional Pages*
### *(Against All Defendants)*

71.     Mr. Chandler repeats and re-alleges each of the paragraphs in this First Amended Complaint as if set forth fully herein.

72.     On information and belief, on or before February 24, 2003, Berlin composed the Pitch es for the purpose of enticing payment of tens of thousands of dollars for fake reports containing false "derogatory, negative or negative-inference data" about Mr. Chandler.[28]

73.     On information and belief, on or about February 24, 2003, Berlin privately sent the Pitch to Eringer.

74.     On information and belief, in November 2017, Eringer first sent the Fake Dossier to members of the media.  The British press began publishing the false accusations from the Fake Dossier in May 2018.  On information and belief, the Fake Dossier was not publicly available, published online, or  published by any media outlet before May 2018.

75.     Personally, and through his agents, Mr. Chandler regularly monitors the press for articles that mention him.  Although Mr. Chandler first learned of the false accusations of Russian espionage and money laundering in November 2017, he did not obtain a copy of the first 34 pages of the Pitch, the Eringer Report, or the Fake Dossier until May 2018.  He has not yet obtained a copy of the Additional Pages.  On information and belief, the Additional Pages are not publicly available.

76.     On information and belief, Additional Pages contain the following libelous false

---

[28] Pitch at 18 (Ex. 1).

accusations about Mr. Chandler: that he engaged in money laundering, organized crime, and Russian espionage.  The Additional Pages falsely accuse Mr. Chandler of these crimes, both directly and through false, purported affiliations with the Unrelated Companies.

77.     The libelous false statements in the Additional Pages are of and concerning Mr. Chandler, who is: (1) one of two subjects of the Additional Pages, (2) repeatedly identified by name throughout the Additional Pages, and (3) identified in the Additional Pages as the owner, controller, or affiliate of the Unrelated Companies that the Additional Pages accuse of being used for criminal activities.  Berlin intended that any reader of the Additional Pages would understand the libelous false statements—including the statements about the Unrelated Companies—to be of and concerning Mr. Chandler, and the statements were so understood by those who read them. Indeed, the Additional Pages appear to have been the source of some of the false statements in the Eringer Report titled: "Report: The Chandler Brothers," showing that Eringer understood the statements in the Additional Pages to be of and concerning Mr. Chandler and his brother.

78.     The statements are libelous *per se* because they falsely impute the commission of indictable offenses involving moral turpitude that injure one's social standing.

79.     The libelous statements are false.  Mr. Chandler and his brother have never—either directly or indirectly through the use of companies—engaged in money laundering, organized crime, or Russian espionage.  More specifically:

(a)     ***Companies with the word "Sovereign" in their names.***  Mr. Chandler and his brother did not fund—and have never had any relationship of any kind with—Sovereign Forex, Bristol Sovereign, or the Swiss Sovereign Companies, nor did they have any involvement in the nefarious activities that the Pitch claims those companies were engaged in.  When Sovereign Forex was incorporated in Switzerland in 1977, Mr. Chandler and his brother were teenagers living in New Zealand.[29]   Although the Chandler brothers invested through a company that had the word "Sovereign" in its name ("Chandler Sovereign"), that company has never had any relationship

---

[29] *See* Pitch at 21 (Ex. 1).

of any kind with Sovereign Forex, Bristol Sovereign, or the Swiss Sovereign Companies. Chandler Sovereign was originally formed in Monaco and later relocated to Dubai. The only connection between the Chandler Sovereign, on the one hand, and Sovereign Forex, Bristol Sovereign, and the Swiss Sovereign Companies, on the other hand, is a simple coincidence: they happen to have the word "Sovereign" in their names. Chandler Sovereign is not a "front company," nor is it controlled by Gazprom. Chandler Sovereign never purchased any Gazprom shares on behalf of any Gazprom senior executives, nor was it ever intended the Chandler Sovereign would do so.

(b)     ***Organized Crime.*** Mr. Chandler and his brother have never worked for or enjoyed the "protection" of any Russian organized crime group, the Solnetsevo Group, the Far Eastern Group, Vladimir Putin, or Boris Yeltsin. The brothers never created any offshore companies to represent the interests of Russian organized crime members.

(c)     ***Money Laundering.*** Mr. Chandler and his brother have never engaged in money laundering. Neither of the brothers nor their companies have relationships—let alone money-laundering relationships—with the senior management of Lukoil or UES. The Chandlers do not, either directly or through their companies, launder money or hold shares for BP/Amoco, Total/Fina/Elf, or the Trump Group. CAI never forwarded any funds to companies created by the Chandler brothers on behalf of their customers in cash haven countries, such as Nauru, Cayman Islands, British Virgin Islands, or other localities. Mr. Chandler and his brother never created any such companies on behalf of any customers.

(d)     ***Vladimir Putin.*** The Chandler brothers never used Sovereign Forex to buy $10 million worth of Yukos and Gazprom shares for Russian President Vladimir Putin. They do not know, have never communicated with, and have never done any work for Putin. As set forth above, they have never had any affiliation of any kind with Sovereign Forex.

(e)     ***Mikhail Kasyanov.*** Mr. Chandler and his brother never acquired $4 million worth of Gazprom shares for Russian Prime Minister Mikhail Kasyanov. They do not know, have never communicated with, and have never done any work for Kasyanov.

(f)     ***Igor Ivanov.*** Mr. Chandler and his brother never acquired $1 million worth of Lukoil shares for Russian Foreign Minister Igor Ivanov. They do not know, have never communicated with, and have never done any work for Ivanov.

(g)     ***Col. Donald Scott.*** Mr. Chandler and his brother do not know and have never communicated with or been assisted by Col. Donald Scott or Pasteur Enterprises.

(h)  ***CAI.***  Mr. Chandler and his brother have never had any relationship of any kind with CAI, nor did they have any involvement in the nefarious activities that the Pitch claims that company was engaged in.  The Chandlers have never met or communicated with representatives from CAI about NRB, Gazprom, Sovereign Forex, or channeling money from Russian clients through Switzerland to offshore accounts.  The Chandlers have never communicated with anyone from CAI.  The brothers have never had any relationship with CAI and have never received any fees from CAI.  The Chandlers never worked with an International Vice President (or any other employee) of CAI, nor did CAI ever grant Mr. Chandler and his brother access to its Geneva facility.  Mr. Chandler and his brother have never been to CAI's Geneva facility.  As Mr. Chandler's passport shows, he did not travel to Switzerland in 1996 or 2002, years when the Pitch claims he met with CAI in Geneva, Switzerland.  The brothers did not broker the introduction of Credit Agricole Swiss to senior officials of the Libyan government or arrange to transfer $18 million from Libya to various Russian banks via Credit Agricole Swiss.  They have never had any communications with anyone from Credit Agricole Swiss about anything to do with the Libyan government, nor do they know or have any communications with any officials of the Libyan government.

(i)  ***Gazprom.***  Mr. Chandler and his brother historically held a minority stake in Gazprom.  Although the Chandlers—along with a consortium of Western investors—supported the corporate governance reform of electing Russia's well-respected former minister of finance, Boris Fyodorov, to Gazprom's board of directors in 2000, they have never worked for Fyodorov.  Neither Fyodorov nor other Gazprom executives have ever been customers of the Chandlers, or their companies.  The Chandlers have never been "front men" or "front men financiers" for former officials of Gazprom.  The brothers never created any offshore companies to represent the interests of high-level former Gazprom executives.  They never attempted to influence Rem Vyakhirev (the former president of Gazprom) in the hopes that Vyakhirev would decide that Gazprom would not act as a 30% guarantor of NRB's registered capital, nor did they ever plan to do so.  The brothers never had any communications of any kind about NRB with Vyakhirev.  Mr. Chandler and his brother do not have the "protection" of any Gazprom officials or Gazprom board members.  They have never made any payments to any former Gazprom officials, either to "secret accounts" created by Sovereign Forex or otherwise.  The Chandlers never acquired $47.5 million worth of Gazprom shares for Total/Fina/Elf, nor did they receive $1.2 million for handling such acquisition.  They never bought $25 million worth of Gazprom shares for the Bank Credit Agricole Swiss, nor did they receive $750,000 for such efforts.

(j)  ***Russian espionage.***  Mr. Chandler and his brother have never been spies or engaged in espionage for any country, let alone Russia.  They have never

23

participated in dead drops.  Mr. Chandler's brother was never awarded a Russian order "For Service to the Fatherland" or otherwise.

80.     Berlin and ICI acted with actual malice in publishing the libelous statements in the Additional Pages.  Evidence of their actual malice includes the following:

- From the beginning, Berlin knew he did not have the Swiss or Russian human intelligence sources or other sources and expertise required to provide an accurate background report on the Chandler brothers, so he set out to prepare fictitious reports about them.

- Berlin intentionally invented salacious accusations about the Chandlers in the fake reports, in order to justify the tens of thousands of dollars he had received for the fake reports.

- Berlin has admitted, under oath, that the accusations are unverified, uncorroborated, and that they are not reliable.  He has also admitted that he cannot testify that the accusations are true.

- To this day, even after being informed that his false accusations have caused considerable harm to Mr. Chandler's reputation, Berlin has refused to repudiate the fake reports and set the record straight.

- At all relevant times, Berlin was acting as an agent of ICI, and his actions and evidence of his actual malice is therefore attributable to ICI.

81.     Defendants made the libelous statements intentionally, willfully, maliciously, and in conscious disregard of Mr. Chandler's rights and reputation and of the truth.

82.     Defendants have failed and refused to retract their defamatory falsehoods about Mr. Chandler – despite having actual knowledge that their accusations are demonstrably false, including correspondence from law enforcement entities that have confirmed Mr. Chandler's innocence.

83.     Defendants had no applicable privilege or legal authorization to publish these false and libelous statements.

84.     In addition to injuries presumed by law, these libelous falsehoods have injured— and will continue to injure—Mr. Chandler in at least the following ways:

(k)     By accusing Mr. Chandler of serious crimes;

(l)     By impugning Mr. Chandler's reputation;

(m)     By ascribing to Mr. Chandler conduct that would adversely affect his fitness for proper conduct as a businessman; and

(n)     By causing Mr. Chandler damages in other ways yet to be determined.

85.     Defendants are liable to Mr. Chandler for compensatory damages arising out of their defamation of Mr. Chandler.

86.     Defendants are also liable to Mr. Chandler for punitive damages because of the wanton and outrageous nature of their conduct.

## COUNT THREE– LIBEL *PER SE*
### *The Proposal*
### *(Against All Defendants)*

87.     Mr. Chandler repeats and re-alleges each of the paragraphs in this First Amended Complaint as if set forth fully herein.

88.     On or before October 17, 2002, Berlin composed the Proposal for Eringer for the purpose of enticing Eringer's "ultimate client" – Prince Albert II – to pay tens of thousands of dollars for fake reports containing false "derogatory, negative or negative-inference data" about Mr. Chandler.[30]  At all relevant times, Berlin had actual knowledge that he was working on behalf of Eringer's "ultimate client," and Berlin has admitted under oath that he did not believe that Eringer was working alone.

89.     On or about October 17, 2002, Berlin sent the Proposal to Eringer, and Eringer shared the Proposal with Prince Albert II a short time later.   Berlin knew in 2002 that Robert Eringer was a working journalist based on their previous work together.   Thus, Berlin is liable for this and all other instances Eringer republished the Pitch that were reasonably foreseeable

---

[30] Pitch at 18 (Ex. 1).

to Berlin.

90.     Defendants represented that the Pitch was the only document they created regarding Mr. Chandler.  But Eringer produced the Proposal in October 2021.  This is when Mr. Chandler first learned of its existence.

91.     The Proposal contains the following libelous false accusations about Mr. Chandler: that he "set up a series of off shore facilities to hide their own money and to assist other Russian-based elements in the secretion of their funds too," that Mr. Chandler was tied to "corruption," "organized crime," associated with "[m]urder, extortion, blackmail," that the Chandler brothers' company "engaged in illegal activities, both commercial and criminal in nature," and that the Chandler brothers "pose[d] as foreign investors [to] buy up GazProm shares on behalf of GazProm senior executives" who were "connected to Russian organized crime persons."

92.     The libelous false statements in the Proposal are of and concerning Mr. Chandler, who is: (1) one of two subjects of the Proposal, (2) repeatedly identified by name throughout the Proposal, and (3) identified in the Proposal as the owner, controller, or affiliate of the Unrelated Companies that Berlin accuses of being used for criminal activities.  Berlin intended that any reader of the Proposal would understand the libelous false statements—including the statements about the Unrelated Companies—to be of and concerning Mr. Chandler, and the statements were so understood by those who read them.  Indeed, Berlin's Proposal appears to have been the source of some of the false statements in the Eringer Report titled: "Report: The Chandler Brothers," showing that Eringer understood the statements in Berlin's Proposal to be of and concerning Mr. Chandler and his brother.

93.     The statements are libelous *per se* because they falsely impute the commission of indictable offenses involving moral turpitude that injure one's social standing.

94.     The libelous statements are false.  Mr. Chandler and his brother have never—either directly or indirectly through the use of companies—engaged in money laundering or organized crime.  More specifically:

(o)     ***Companies with the word "Sovereign" in their names.***  Mr. Chandler and his brother did not fund—and have never had any relationship of any kind with—Sovereign Forex, Bristol Sovereign, or the Swiss Sovereign Companies, nor did they have any involvement in the nefarious activities that the Pitch claims those companies were engaged in.  When Sovereign Forex was incorporated in Switzerland in 1977, Mr. Chandler and his brother were teenagers living in New Zealand.  Although the Chandler brothers invested through a company that had the word "Sovereign" in its name ("Chandler Sovereign"), that company has never had any relationship of any kind with Sovereign Forex, Bristol Sovereign, or the Swiss Sovereign Companies.  Chandler Sovereign was originally formed in Monaco and later relocated to Dubai.  The only connection between the Chandler Sovereign, on the one hand, and Sovereign Forex, Bristol Sovereign, and the Swiss Sovereign Companies, on the other hand, is a simple coincidence: they happen to have the word "Sovereign" in their names.  Chandler Sovereign is not a "front company," nor is it controlled by Gazprom.  Chandler Sovereign never purchased any Gazprom shares on behalf of any Gazprom senior executives, nor was it ever intended the Chandler Sovereign would do so.

(p)     ***Organized Crime.***  Mr. Chandler and his brother have never worked for or enjoyed the "protection" of any Russian organized crime group, the Solnetsevo Group, the Far Eastern Group, Vladimir Putin, or Boris Yeltsin.  The brothers never created any offshore companies to represent the interests of Russian organized crime members.

(q)     ***Money Laundering.***  Mr. Chandler and his brother have never engaged in money laundering.  Neither of the brothers nor their companies have relationships—let alone money-laundering relationships—with the senior management of Lukoil or UES.  The Chandlers do not, either directly or through their companies, launder money or hold shares for BP/Amoco, Total/Fina/Elf, or the Trump Group.  CAI never forwarded any funds to companies created by the Chandler brothers on behalf of their customers in cash haven countries, such as Nauru, Cayman Islands, British Virgin Islands, or other localities.  Mr. Chandler and his brother never created any such companies on behalf of any customers.

(r)     ***Gazprom.***  Mr. Chandler and his brother historically held a minority stake in Gazprom.  Although the Chandlers—along with a consortium of Western investors—supported the corporate governance reform of electing Russia's well-respected former minister of finance, Boris Fyodorov, to Gazprom's

board of directors in 2000, they have never worked for Fyodorov.  Neither Fyodorov nor other Gazprom executives have ever been customers of the Chandlers, or their companies.  The Chandlers have never been "front men" or "front men financiers" for former officials of Gazprom.  The brothers never created any offshore companies to represent the interests of high-level former Gazprom executives.  They never attempted to influence Rem Vyakhirev (the former president of Gazprom) in the hopes that Vyakhirev would decide that Gazprom would not act as a 30% guarantor of NRB's registered capital, nor did they ever plan to do so.  The brothers never had any communications of any kind about NRB with Vyakhirev.  Mr. Chandler and his brother do not have the "protection" of any Gazprom officials or Gazprom board members.  They have never made any payments to any former Gazprom officials, either to "secret accounts" created by Sovereign Forex or otherwise.  The Chandlers never acquired $47.5 million worth of Gazprom shares for Total/Fina/Elf, nor did they receive $1.2 million for handling such acquisition.  They never bought $25 million worth of Gazprom shares for the Bank Credit Agricole Swiss, nor did they receive $750,000 for such efforts.

95.     Berlin and ICI acted with actual malice in publishing the libelous statements in the Proposal.  Evidence of their actual malice includes the following:

- From the beginning, Berlin knew he did not have Swiss or Russian human intelligence or other sources and expertise required to provide an accurate background report on the Chandlers, so he set out to prepare a fictitious report about them.

- Berlin intentionally invented salacious accusations about the Chandler brothers in an effort to entice his marks to pay tens of thousands of dollars for additional fake reports about them.

- To this day, even after being informed that his false accusations have caused considerable harm to Mr. Chandler's reputation, Berlin has refused to repudiate the Proposal and set the record straight.

- Berlin has admitted, under oath, that the accusations are unverified, uncorroborated, and that they are not reliable.  He has also admitted that he cannot testify that the accusations are true.

- At all relevant times, Berlin was acting as an agent of ICI, and his actions and evidence of his actual malice is therefore attributable to ICI.

96.     Defendants made the libelous statements intentionally, willfully, maliciously, and in conscious disregard of Mr. Chandler's rights and reputation and of the truth.

97.     Defendants had no applicable privilege or legal authorization to publish these false and libelous statements.

98.     Defendants have failed and refused to retract their defamatory falsehoods about Mr. Chandler – despite having actual knowledge that their accusations are demonstrably false, including correspondence from law enforcement entities that have confirmed Mr. Chandler's innocence.

99.     In addition to injuries presumed by law, these libelous falsehoods have injured— and will continue to injure—Mr. Chandler in at least the following ways:

     i.    By accusing Mr. Chandler of serious crimes;

     ii.    By impugning Mr. Chandler's reputation;

     iii.    By ascribing to Mr. Chandler conduct that would adversely affect his fitness for proper conduct as a businessman; and

     iv.    By causing Mr. Chandler damages in other ways yet to be determined.

100.     Defendants are liable to Mr. Chandler for compensatory damages arising out of their defamation of Mr. Chandler.

101.     Defendants are also liable to Mr. Chandler for punitive damages because of the wanton and outrageous nature of their conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Chandler respectfully requests that the Court enter an award and judgment in his favor, and against all Defendants jointly and severally, as follows:

     i.    awarding Mr. Chandler compensatory damages of not less than $12,500,000.00;

     ii.    awarding Mr. Chandler punitive damages of not less than $5,000,000.00;

     iii.    awarding Mr. Chandler all expenses and costs, including attorneys' fees; and

     iv.    such other and further relief as the Court deems appropriate.

## **JURY DEMAND**

Mr. Chandler demands a trial by jury on all claims and issues so triable.


Date:   August 30, 2022

<div style="text-align: right">

_/s/ Thomas A. Clare, P.C_
Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Megan L. Meier (D.C. Bar No. 985553)
Daniel P. Watkins (_pro hac vice_)
Mark L. Thomson
Nicholas L. Brechbill
10 Prince Street
Alexandria, VA 22314
(202) 628-7400
tom@clarelocke.com
megan@clarelocke.com
daniel@clarelocke.com
_Attorneys for Plaintiff Christopher Chandler_

</div>

# Exhibit 1

# Exhibit 1

## INTRODUCTION AND OVERVIEW
## RICHARD CHANDLER LIMITED GLOBAL SCAN

This aspect of the investigation is related to a limited background search of Richard Chandler as indicated by the client in one recent email query. Throughout this memo and others that will follow, we have sewn into the document the answers to the specific questions posed below. After we complete our research, we will provide a one page document to the client that will summarize the answers to these questions. Specifically, the client is most interested in obtaining the following details:

1. **Personal & business addresses**
2. **Personal & business tel numbers**
3. **Fax number**
4. **Cell phone number.**
5. **E-mail address**
6. **Litigation check.**
7. **Nationality. He was born in NZ. Is he now a UK subject**
8. **Passport: On what country's documents does he travel**
9. **Driving license: Issued by which country**

### EXECUTIVE BACKGROUND SUMMARY - LIMITED GLOBAL SCAN

#### *A) Conspiracy to Commit Tortious Interference Against NRBT Involving CAI*

Richard and Christopher Chandler, are major investors in Russia and elsewhere and have links to a number of organized crime groups in Russia and elsewhere. Today, they are suspected of a massive money-laundering scheme, principally for high-level political types in Russia, as well as organized crime groups in that country. Their present focus is in buying up property in Monaco and elsewhere as a conduit for these elements.

With regard to this matter, we are told by informed sources that have direct access to quality intelligence in both Switzerland and Russia that the Chandler brothers have direct links to Credit Agricole Indosuez (Geneva Branch) in that they were paid by the bank to harm the relationship of NRB and one of its "partners" GazProm. This was done by utilizing a scheme and artifice to pay a fee to the Chandlers to urge former high-ranking officials of GazProm to contact their sources within GazProm and cause the company to terminate or significantly alter their relationship with NRB.

The Chandlers caused some of the fee to be paid to the former high-ranking officials of GazProm in the form of deposits to their secret accounts at Credit Agricole that were created for their benefit by Sovereign Forex, the front company used by the Chandlers to benefit former GazProm executives. The net result was GazProm decided to no longer back NRB's capital stock, where it is believe that they had a 30% position. It is believe that Mr. Chandler is being assisted by an elusive individual known as Col. Donald Scott, formerly a high-ranking military intelligence specialist who was once posted in areas that focused on Russia. It is believed that Col. Scott and his company, Pasteur Enterprises are working closely with Messrs. Chandler and their clients.

In 1998, representatives of CAI approached the Chandlers with a business proposition regarding a problem that they had with a "partner bank". The contact (believed to be the same vice-president that began the relationship with the Chandlers in May 1996) proposed that the Chandlers assist the bank in harming NRB by lobbying one of its largest customers, GazProm, in hopes that they would change its relationship with NRB regarding the backing of its stock.

Specifically, the plan was to have GazProm reconsider its "relationship" with NRB and no longer guarantee a 30% position of its registered capital. In the first scenario, there was no insistence that GazProm become a CAI customer, as that was not the primary objective of the operation. In short, this was not a campaign to steal customers more than it was to strip a competitive bank of its supporting partners.

Indeed, the main mission – as we are told by this same source – was to "cause disruption and harm to NRB and weaken it as a banking facility in Russia." The Chandlers went to Geneva and after meeting and discussing the specific problem, agreed to help for a fee of $10 million. The Chandler's were able to provide assistance because, as stated above, Sovereign Forex is actually a front company for former officials at GazProm who apparently still had influence with high ranking officials of the company.

In around September 2000, the Chandlers and their contact person at CAI met once again and all had agreed that the Chandlers objectively performed the specific task as outlined above entitling them to their fee of $10 million. It is understanding that the money was paid at that time. It is believe that the funds were paid by CAI to the Chandlers via another front company and then split by them with its client, the former GazProm executive.

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 3 of 134**

### E) Chandler's Links to Organized Crime

In the fall of 2002, Russian authorities learned that the Chandlers were involved in laundering money for two notorious Russian organized criminal groups, the Solnetsevo Group in Moscow and the Far Eastern Group centered in Vladivostok and Nakhodka. This news alarmed the high-level "protectors" of the Chandlers, and in September the brothers were told that if they wanted to continue their lucrative activities in Russia, they would have to sever their ties with the Russian underworld. The Chandlers agreed to do so, but there is some question if they actually fulfilled the agreement.

Indeed, authorities in Switzerland and elsewhere have suspected the Chandlers and CAI have been engaged in systematic money laundering on behalf of both organized crime members and others in Russia and elsewhere. On October 7th 2002, the Swiss investigation resulted in a number of legal actions against Sovereign Finance Group when a Swiss court ordered the company closed because of alleged money laundering activities in Russia and the Caribbean. It is our understanding from this source that the Swiss Federal Banking Commission ruled at the end of September that the group should be shut down.

Following their decision, police searches and other sweeps commenced at the Zurich offices of Sovereign (Forex) Ltd., Sovereign Capital Management AG, Sovereign Finance Group AG and the Zurich branch of Sovereign Bank Corp. Ltd. Following the initial police actions, a "closure order" was issued by the Swiss magistrate.

Following the police action and the judicial investigation, it was determined that separate from the alleged money laundering activities, it was revealed that Sovereign did not have a banking license. Our source reported that part of the evidence recovered during the raids in early October, was specific and credible evidence that Sovereign Forex had used Credit Agricole Indosuez's offices in Geneva as one of the main money laundering entry ports for Chechen organized crime elements, as well as for its clients who were former high-ranking officials in the Russian government.

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Scan Investigation
February 24, 2003
Page 4 of 134

### F) Political Protection for the Chandlers

The Chandler brothers and their activities have the blessing and protection of the most influential political circles in Russia. They include former Gazprom officials such as Chenomyrdin and Vyakhirev; current Gazprom board member and former deputy prime minister and finance minister Boris Fyodorov; former President Yeltsin and members of his family; and, finally, President Putin and members of his inner circle.

As a result of their relationships with these powerful individuals, the Chandlers are virtually "untouchable" by Russian police and regulatory bodies. In the period 2001-2002, Russian authorities tried three times to open criminal investigations into the Chandlers and their businesses in Russia. On all three occasions they were ordered not to proceed.

### G) Relationship with Credit Agricole

The relationship between the Chandler brothers and Credit Agricole began in 1996. In May of that year the older brother, Richard, entered into a "gentlemen's agreement" with an unidentified vice-president of Credit Agricole in Geneva. Under the terms of the agreement, the Sovereign Group would use the bank to channel money of its Russian clients through Switzerland to offshore accounts around the world. This arrangement has been very successful and is still in force today.

## ACTIVITIES OF THE CHANDLER BROTHERS IN 2001-02

As stated above, the Chandlers have been very busy in 2001-02 and many of their activities center on their relationship with Credit Agricole. The highlights include:

**April 2001**—The Chandlers discreetly acquired $47.5 million worth of Gazprom shares for Total/Fina/Elf. The Chandlers received $1.2 million for handling this acquisition.

**August 2001**—The brothers bought $25 million worth of Gazprom shares for the Bank Credit Agricole Swiss. They received $750,000 for their efforts.

**December 2001**—The brothers brokered the introduction of Credit Agricole Swiss to senior officials of the Libyan government and arranged to transfer $18 million from Libya to various Russian banks via Credit Agricole Swiss. Since that time Credit Agricole has been conducting discreet financial operations on behalf of the current Libyan leadership. In February of 2002, Credit Agricole Swiss paid the Chandlers $1 million for arranging this introduction.

**March 2002**—Using Sovereign Forex, the brothers bought $10 million worth of Yukos and Gazprom shares for Russian President Vladimir Putin and deposited them in the Bern branch of Credit Agricole Swiss.

**September 2002**—The brothers acquired $4 million worth of Gazprom shares for Russian Prime Minister Mikhail Kasyanov. They deposited these shares in the Bank of the Bahamas.

**September 2002**—The brothers acquired $1 million worth of Lukoil shares for Russian Foreign Minister Igor Ivanov and deposited them in the Bank of Zurich.

1. Counsel should also be aware that Credit Agricole has been involved in a number of highly suspect transactions and deeds that – if brought to light under the right circumstances – might encourage official investigation in Switzerland and elsewhere. These include:

2. A number of senior Russian officials and leading businessmen have used the bank to launder money and to secretly transfer funds into offshore accounts. Among these individuals are former President Yeltsin and members of his family; Chief of the Presidential Administration Alexander Voloshin; and Minister for Emergency Situations Sergey Shoigu.

3. The bank has been opening accounts for them in the name of Panamanian registered companies such as Dramal, Camparal, and Tutoral at the International Bank of Luxembourg (BIL). In 2001 Credit Agricole transferred US $48 million for Mr. Yeltsin, US $12 million for Mr. Voloshin and US $17.8 million for Mr. Shoigu.

4. Oleg Deripaska and Mikhail Chernoy, well known aluminum magnates, regularly use the bank to launder money extracted from the aluminum business in Russia and from assets of failing companies they control.

5. Kazak President Nursultan Nazarbayev uses the bank to deposit funds from oil revenues, bribes and weapons sales into offshore accounts.

6. A number of suspicious transactions between May 1997 and September 1998 that involved the channeling of funds through numbered accounts of the bank belonging to senior Kazak officials and their families. The funds in question came from payments made from the US bank accounts of Exxon/Mobil and BP/Amoco and from direct transfers from the Kazak State Treasury.

7. Canley, an offshore company that sells and trades oil abroad on behalf of the Russian oil company TNK, uses Credit Agricole as its bank. Canley is also used by TNK executives to launder money from oil sales in Western Europe and funnel it into private numbered accounts in the British Virgin Isles, Gibraltar and the Isle of Man. Russian experts estimate that in 2001 some US $80-90 million was laundered in this way.

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Scan Investigation
February 24, 2003
Page 6 of 134

8. On behalf of Canley, Credit Agricole is paying secret commissions to several German and Swiss companies, namely Sunimex AG; Raffinachem AG; Simpson, Spence and Young; Finnish Crudex and Russoil.

9. There is considerable evidence of connections between Credit Agricole and Islamic fundamentalists in the Caucasus, Central Asia and beyond. The bank has been an active participant in schemes to transfer cash to the accounts of Al-Haramayn, ostensibly an Islamic charitable organization. In fact, this 'charity" provides financial support to Islamic extremists all over the world, including Chechnya, Tajikistan and Uzbekistan.

10. One particular scheme was based on falsified forward contracts with Russian banks and the hard currency obtained was either used to by weapons for the Chechen separatists or transferred directly to Chechnya. The Moscow based Chechen organized crime group was deeply involved in implementing this scheme.

11. An activist associated with Al-Haramayn, Alexis Habib, is also an official representative of Credit Agricole in Latin America.

12. Credit Agricole played a leading role in arranging financing for the scandal-ridden high-speed rail link between Moscow and St. Petersburg. By the time then Russian President Yeltsin ended state support for the project in 1998, US $80 million of state money had disappeared. Investigators believe much of that money went directly into the coffers of Credit Agricole.

## POTENTIAL INVOLVEMENT OF
## RICHARD AND CHRISTOPHER CHANDLER AND CREDIT AGRICOLE

### A) Conspiracy to Commit Tortious Interference Against NRBT Involving CAI

Richard and Christopher Chandler, are major investors in Russia and elsewhere and have links to a number of organized crime groups in Russia and elsewhere. Today, they are suspected of a massive money-laundering scheme, principally for high-level political types in Russia, as well as organized crime groups in that country. Their present focus is in buying up property in Monaco and elsewhere as a conduit for these elements.

With regard to this matter, we are told by informed sources that have direct access to quality intelligence in both Switzerland and Russia that the Chandler brothers have direct links to Credit Agricole Indosuez (Geneva Branch) in that they were paid by the bank to harm the relationship of NRB and one of its "partners" GazProm. This was done by utilizing a scheme and artifice to pay a fee to the Chandlers to urge former high-ranking officials of GazProm to contact their sources within GazProm and cause the company to terminate or significantly alter their relationship with NRB.

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 7 of 134**

The Chandlers caused some of the fee to be paid to the former high-ranking officials of GazProm in the form of deposits to their secret accounts at Credit Agricole that were created for their benefit by Sovereign Forex, the front company used by the Chandlers to benefit former GazProm executives. The net result was GazProm decided to no longer back NRB's capital stock, where it is believe that they had a 30% position.

Richard and Christopher Chandler are originally from New Zealand, but have heavily invested in Russia, the Czech Republic and other Far East countries. They are deemed to be elusive, clandestine and mysterious. The client knows very little about them, but is seeking to obtain as much data as possible through a variety of means.

It is our understanding that the Chandlers are minority owners of GazProm, where they own a 4.3% stake in the company, third only to the German-based Ruhrgas and the Russian government. As the client is aware, GazProm has a notorious background that includes allegations of corruption, organized crime infestation and other claims. Murder, extortion, blackmail and other intrigue are the daily menu at GazProm and it has resulted in much reorganization of the firm.

A second source, who is an expert on Russian matters, indicated that there are definite indications that the Chandler brothers, and a company controlled by them with offices in Monaco, are engaged in illegal activities, both commercial and criminal in nature. The Chandler controlled company is actually a firm that is controlled by GazProm and is, in reality, a front company. ICI has done a significant amount of work on GazProm in the past and we can update our previous investigation, as outlined below, for inclusion in any report on the Chandlers.

One of the main tasks of the Chandler-controlled company is to pose as foreign investors and buy up GazProm shares on behalf of GazProm senior executives. A full investigation will shed light on these suspicions and undoubtedly uncover other Chandler activities and connections. However, the search must include use of sources in Russia and elsewhere and is an expensive endeavor.

In that regard, this second source indicated that the Chandlers have direct connections with Credit Agricole through the Geneva, Switzerland Branch and have been paid by them to assist them in a campaign to harm NRB. The relationship between the Chandlers and the CAI's stated on May 7th, 1996, when they began working with an International Vice President who agreed to allow them access to the Geneva facility to service the needs of their clients.

The Chandler's told this unidentified vice president that their company, Soveriegn Forex represented the interests of former Russian nationals who sought to "wash" money using Sovereign Forex and related companies as a conduit to CAI. The accounts at CAI would then forward the funds on to other companies created by the Chandlers on behalf of their customers in cash haven countries, such as Nauru, Cayman Islands, British Virgin Islands and other localities.

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Scan Investigation
February 24, 2003
Page 8 of 134

In 1998, representatives of CAI approached the Chandlers with a business proposition regarding a problem that they had with a "partner bank". The contact (believed to be the same vice-president that began the relationship with the Chandlers in May 1996) proposed that the Chandlers assist the bank in harming NRB by lobbying one of its largest customers, GazProm, in hopes that they would change its relationship with NRB regarding the backing of its stock. Specifically, the plan was to have GazProm reconsider its "relationship" with NRB and no longer guarantee a 30% position of its registered capital. In the first scenario, there was no insistence that GazProm become a CAI customer, as that was not the primary objective of the operation. In short, this was not a campaign to steal customers more than it was to strip a competitive bank of its supporting partners.

Indeed, the main mission – as we are told by this same source – was to "cause disruption and harm to NRB and weaken it as a banking facility in Russia." The Chandlers went to Geneva and after meeting and discussing the specific problem, agreed to help for a fee of $10 million. The Chandler's were able to provide assistance because, as stated above, Sovereign Forex is actually a front company for former officials at GazProm who apparently still had influence with high ranking officials of the company.

In around September 2000, the Chandlers and their contact person at CAI met once again and all had agreed that the Chandlers objectively performed the specific task as outlined above entitling them to their fee of $10 million. It is understanding that the money was paid at that time. It is believe that the funds were paid by CAI to the Chandlers via another front company and then split by them with its client, the former GazProm executive.

By way of brief background, it is our understanding that the 1998 plan involved the use of the Chandlers to influence one of its clients, Rem Zyakhirev (the former president of GazProm), in hopes of him deciding that GazProm would not act as a 30% guarantor of NRB's registered capital.

Initially, we were informed that the source believed that the Chandlers were told that CAI wanted to "strip" NRB of 30% of its customer base by causing a run on its deposits. Indeeed, upon rechecking, we learned that CAI was seeking to have Mr. Zyakhirev – as CEO of GazProm – withdraw from an agreement to *guarantee 30% of NRB's registered capital.*

We checked the above information with a third source that used a number of Russian-based databases to check out the above claims. These databases are mostly public or open source centers that cull information from registries from within the Deep Web of the Internet. They are deemed reliable because of the advanced technology used to scrape data from disparate and obscure sources.

The source confirmed that GazProm announced on May 23, 2002 that it has sold its share in the registered capital of the National Reserve Bank (NRB). This source reported that GazProm actually inked the agreement on the withdrawal of the company from (NRB) in Moscow around May 4, 2002.

8

The stated reason was that GazProm was attempting to "restructure its non-profitable assets." The fact that public sources reported that this withdrawal occurred in mid-1998 is consistent with source two's information indicating that the Chandler's agreement with CAI begun sometime in 1998.

The source reported that the decision by GazProm was unique and odd in that it was the first time in the history of Russia that a major shareholder had exercised its right to pull out of the registered capital of one of the country's leading banks and capitalize in this fashion. For this reason, pundits claim it is odd that such a stark move was made by GazProm and opine that it was occasioned by reasons that are not consistent with common sense or history. Here again, this source's bewilderment of the decision of GrazProm to back out of the NRB guarantee underlines the corrupt nature of the decision, which was caused by a third party's plan to commit tortuous interference between NRB and GazProm.

We are told by this same source that Russian authorities have an ongoing investigation into former officials of NRB as it relates to insiders who are suspected of "having signed or forged a number of forwarding agreements in an illegal fashion." These forgeries resulted in NRB being obligated to Credit Agricole and has spawned international litigation. This source claims that they are befuddled by the seemingly inconsistent findings and vertdicts between the American courts and that of the Russian over this dispute.

The net result of the Credit Agricole litigation, according to this pundit (an expert on Russian Intelligence investigations and business disputes) is the subordination of the Russian judicial system to the American court system.

Specifically, the source three correctly reported that the Supreme Court of New York prohibited the National Reserve Bank of Russia to execute the decision of the Supreme Court of Russia and to sue the French company *Credit Agricole Indosouez* (CAI) in Belgium and France.

The source claims that this litigation, as well as the Russian investigation pertains to a dispute that arouse in 1998 when Credit Agricole Indosouez concluded 14 forwarding contracts with the National Reserve Bank before the financial crisis in Russia. The Russian bank did not execute the contracts after the default. CAI sought relief from the Supreme Court of New York, which resulted in the seizure of the bank's accounts in Belgium (in the sum of US$500 million) in April of 1999.

However, the National Reserve Bank filed a lawsuit at the Russian Supreme Court, which then ruled that the forwarding transactions were null and void because of the apparent forgeries. The Supreme Court of Russia, ordered damages in favor of NRB and against CAI. Avtobank was notified in July, 2002 that its payment on the forward contract to CAI would be seized in favor of National Reserve Bank because the latter had an act of execution to the French company in the sum of $75 million.

9

The net result of the opposing verdicts is that NRB was probhibited by the New York court to seize the assets of CAI, but CAI was able to levy

National Reserve Bank was retrained from seizing CAI's assets, or permitted from commencing any new proceedings, until after the New York case was resolved. In short, the Supreme Court of New York, a court or original jurisdiction, prohibited the execution of a legal decision by Russian Arbitration Court, which had previously ruled in favor of NRB and levied. $75 million of CAI's assets.

While such a result (the opposing verdicts) is seemingly inexplicable to our sources in Russia, to the best of our knowledge, there has been no agreement signed between Russia and the United States that gives full faith and credit to each jurisdiction's court rulings. This is most especially true regarding civil proceedings at both the state or federal level. According to our research, there appears to be only one recorded agreement, The Agreement of 1936 regarding the order to convey writs.

According to this quasi-treaty or Transnational Agreement, all court decisions are supposed to be conveyed by means of diplomatic mail, with the use of the channels of the ministry for justice. This means that any independent legal action of a Russian citizen can be recorded against a US Citizen in the United States and vice versa.

Indeed, France and Belgium have such agreements with the United States, and they have similar agreements with Russia, and it was through these means that the Supreme Court of New York was entitled to issue such a decision. Since the NRB/Credit Agricole Indosuez dispute, negotiations at the highest level of both the French and Russian governments have commenced regarding extending its Agreements to include transactions involving American businesses and citizens, whereby full faith and credit will be given to Russian-based writs of execution in the United States.

The courts of of the United States have historically reluctant to render full faith and credit to foreign writs that have been untested by the United States jurisprudence system. Different standards of evidence, burdens, proofs, and systems of justice have made it difficult to fully align our judicial systems with that of another country.

For that reason, the United States has resisted "rubber-stamping" a verdict or finding in a foreign land for recordation in the United States. However, there seems to be some movement afoot as it is our understanding that President Vladimir Putin contacted French President Jacques Chirac on this question in an effort to determine whether their governments can commence inter-governmental negotiations on this issue so that they can then go to the United States and speak with one voice.

Based upon the information gleaned from the three sources above, we were somewhat stunned that NRB could find itself in this position – all appartently the result of a clandestine plan by CAI to use one of its major customers (Chandlers and Sovereign Fourex) to effect this conspiracy. Consequently, we went to a fourth source -- again someone that has access to both investigative, legal, intelligence and open source information from within Russia, Switzerland, France, Monoco and Belgium -- in an effort to confirm the information obtain from sources one and two above.

The report that we received confirms the close relationship between the Chandler brothers and past and present GazProm officials; as well as high-level political figures within Russia.

The essence of this intelligence estimate is that Credit Agricole went to the Chandler's in an effort to resolve their litigation and business problems with NRB and requested that they use their influence at GazProm and at the ministerial level of Russia to run NRB out of business. In summary, this source reports information that is entirely consistent with the other three sources regarding the involvement of the Chandlers in the tortuously interference between NRB and GazProm.

### B) History of Relationship Between Richard and Christopher Chandler and Sovereign Group and Sovereign Forex, Ltd.

Richard and Christopher Chandler founded the Sovereign Group in 1992 and expanded its operations to include Sovereign (Forex) Ltd., Sovereign Capital Management AG, Sovereign Finance Group AG and the Zurich branch of Sovereign Bank Corporation.

The company once maintained its office at Seidengasse, 6, Zurich CH-8001 Switzerland. Its telephone number was listed as +411 - 213 1800 and its fax number is +411 - 222 1965. Its former web site located at http://www.sovereign.ch is now disconnected and is no longer accessible, another sign of the company being shut down. Likewise, its Russian web site, once located at http://www.sovereign.ru is no longer operational.

While the one source reported that Sovereign operated from the Radisson Slavyanskaya hotel, a search of other databases revealed that at least one of the Sovereign-related entities traced to Berezhkovskaya nab., 2, fl. 4, telephone number 941-86-47, with a fax number of 941-86-48.

It is believed that the company is now headquartered in Monaco, and consists of a family of speculative funds and financial companies operating primarily in the high-risk markets of Russia and other republics of the former Soviet Union. It is believed that the leading companies in the Group are Sovereign Forex and the United Financial Group.

The company's operations in Russia are very curious as not much is known about their actual operations, according to open source information. However, our sources report that the firm has been operating in Moscow since 1996 from within the Radisson Slavyanskaya hotel

### C) Relationship with Gazprom

From the very beginning, the Sovereign Group was closely tied to the giant Russian gas monopoly Gazprom, whose former chairman, Viktor Chernomyrdin, was for several years prime minister under President Yeltsin. In fact, some sources believe that the Chandlers created the Sovereign Group at the behest of Gazprom, and it is indisputably true that Sovereign Forex has for years acted as a front company for Gazprom senior executives.

Using a number of Russian companies, one of which is named "Beloye Ozero" (White Lake), Sovereign Forex and the United Financial Group have systematically bought Gazprom shares on behalf of Gazprom senior executives. It is estimated that Sovereign now controls approximately 1 billion shares, or 4% of Gazprom.

In addition to buying Gazprom shares, Sovereign Forex has set up personal, ciphered offshore accounts for Chernomyrdin, former Gazprom Chairman Rem Vyakhirev and other senior Gazprom managers in Gibraltar, the Channel Islands, the Seychelles and the Bahamas. In December 1999, the company assisted in establishing accounts in Monaco for former President Yeltsin and his family. It is believed that the Chandlers and their companies have similar relationships, although on a smaller scale, with the senior management of Lukoil and the electric power monopoly, UES.

### D) Non-Russian Clients

Through their various companies, the Chandlers also are able to launder funds and "hold" shares on behalf of non-Russian companies, which wish to remain anonymous. Sources report that among these companies are BP/Amoco, Total/Fina/Elf, and the Trump Group.

### E) Chandler's Links to Organized Crime

In the fall of 2002, Russian authorities learned that the Chandlers were involved in laundering money for two notorious Russian organized criminal groups, the Solnetsevo Group in Moscow and the Far Eastern Group centered in Vladivostok and Nakhodka. This news alarmed the high-level "protectors" of the Chandlers, and in September the brothers were told that if they wanted to continue their lucrative activities in Russia, they would have to sever their ties with the Russian underworld. The Chandlers agreed to do so, but there is some question if they actually fulfilled the agreement.

Indeed, authorities in Switzerland and elsewhere have suspected the Chandlers and CAI have been engaged in systematic money laundering on behalf of both organized crime members and others in Russia and elsewhere. On October 7th 2002, the Swiss investigation resulted in a number of legal actions against Sovereign Finance Group when a Swiss court ordered the company closed because of alleged money laundering activities in Russia and the Caribbean. It is our understanding from this source that the Swiss Federal Banking Commission ruled at the end of September that the group should be shut down.

Following their decision, police searches and other sweeps commenced at the Zurich offices of Sovereign (Forex) Ltd., Sovereign Capital Management AG, Sovereign Finance Group AG and the Zurich branch of Sovereign Bank Corp. Ltd. Following the initial police actions, a "closure order" was issued by the Swiss magistrate.

Following the police action and the judicial investigation, it was determined that separate from the alleged money laundering activities, it was revealed that Sovereign did not have a banking license. Our source reported that part of the evidence recovered during the raids in early October, was specific and credible evidence that Sovereign Forex had used Credit Agricole Indosuez's offices in Geneva as one of the main money laundering entry ports for Chechen organized crime elements, as well as for its clients who were former high-ranking officials in the Russian government.

When one compares the information available through open and public sources, against that which we obtained from closed and proprietary sources, we found that Sovereign Forex is considered a very discreet, quiet and illusive firm that has come to the attention of the Russian Federal Securities Commission because of claims that it has made on its Russian web site. While the Sovereign Forex has advertised widely in magazines such as Dengi or Money magazine, people in the Moscow brokerage industry know little about the firm.

One of the key words used throughout the Russian Web site of Sovereign Forex is "confidentiality" and repeated claims are made that "Sovereign Finance Group works with a broad range of customers, various financial institutions -- including central banks of several countries -- professional investing companies, asset management corporations, [and] exclusive private customers." The company also offered clients interbank services "under the same conditions as the largest banks, like Credit Suisse or Deutsche Bank." Needless to say, no mention is ever made about its relationship with CAI within open sources.

As to the ongoing Swiss investigation, it is our understanding that they have requested the assistance of authorities in St. Vincent & the Grenadines as it pertains to Sovereign Bank Corp. Ltd., which is an affiliated offshore bank of Sovereign Forex, Ltd., and is one of the facilities used by the Chandlers to wash money on behalf of its Russian clients, including organized crime members from that country.

Regulators St. Vincent & the Grenadines appointed a "controller" based upon the Swiss investigation into not only Sovereign Bank, but a facility identified as Eastern Caribbean Central Bank.

### F) Political Protection for the Chandlers

The Chandler brothers and their activities have the blessing and protection of the most influential political circles in Russia. They include former Gazprom officials such as Chenomyrdin and Vyakhirev; current Gazprom board member and former deputy prime minister and finance minister Boris Fyodorov; former President Yeltsin and members of his family; and, finally, President Putin and members of his inner circle. As a result of their relationships with these powerful individuals, the Chandlers are virtually "untouchable" by Russian police and regulatory bodies. In the period 2001-2002, Russian authorities tried three times to open criminal investigations into the Chandlers and their businesses in Russia. On all three occasions they were ordered not to proceed.

### G) Relationship with Credit Agricole

The relationship between the Chandler brothers and Credit Agricole began in 1996. In May of that year the older brother, Richard, entered into a "gentlemen's agreement" with an unidentified vice-president of Credit Agricole in Geneva. Under the terms of the agreement, the Sovereign Group would use the bank to channel money of its Russian clients through Switzerland to offshore accounts around the world. This arrangement has been very successful and is still in force today.

At the end of 1998 Credit Agricole asked the Chandlers for help in its dispute with the National Reserve Bank of Russia (NRB). Credit Agricole wanted to drive the NRB out of business. The Chandlers used their close ties with the then President of Gazprom Rem Vyakhirev to have Gazprom withdraw from an arrangement with NRB in which it guaranteed 30% of the bank's registered capital. This put tremendous pressure on the NRB. In September 2000, Credit Agricole paid the Chandlers $10 million for this assistance.

But this apparently was not enough. In early July 2002, Credit Agricole again asked to use their influence with Gazprom to exert further pressure on the NRB. This time the Chandlers asked for $20 million for their assistance. After some bitter bargaining, Credit Agricole finally agreed. As a result, the Chandlers are using their leverage with senior Gazprom management, including board member Fyodorov, to force Gazprom to withdraw all Gazprom funds on deposit with the NRB.

### H) Other Efforts To Tortuously Interfere In
### The Relationship Between NRB and GazProm

Apparently CAI was not satisfied with the November 1998 campaign on NRB which resulted in the above payment to the Chandlers in September 2000.

So, in early July 2002 they once again met in Geneva to discuss a second, more intensive campaign to harm NRB in its relationships with key customers. In that regard, the Chandlers agreed to participate in the plan, but the terms were drastically different than the first campaign, and the fees were double or $20 million to complete the task.

This result in what was characterized as "bitter negotiations" between the Chandlers and CAI. Apparently, the Chandlers would incur significant expenses and personal risk to carry out the plan of CAI, but after considerable discussion, it was agreed that should the Chandlers be successful in their efforts in harming NRB by causing a run on the bank by its key depositors that it controlled, they would be paid the $20 million fee.

Here again, one of the keys to this plot was to have GazProm as well as a number of its former high-level executives (who at the same time were customers of the Chandlers and their many companies) commence moving their relationships to other banks.

In the July 2002 plan, the Chandlers agreed to work directly with a GazProm board member who apparently agreed to participate in exchange for a fee. The Board Member, identified as Boris Federov is believed to be either a customer of the Chandlers or someone that they believe can be influenced.

To date, the Chandlers have not successfully completed the July 2002 action plan, but their efforts are ongoing and it is our information that Mr. Federov continues to work at causing harm to NRB on behalf of Chandler and CAI.

### I) Personal and Business Background of
### Richard and Christopher Chandler

The Chandlers originally hail from Hamilton, New Zealand, and came from a family of retailers. Their father was a wealthy person who owned significant assets in New Zealand and Australia. The sons took the money, estimated to be about $50 million and invested most of it in emerging markets in South America and in Southeast Asia.

The Chandlers were deeply involved in real estate in Hong King and Macao and had long relationships with the Bank of China and the Hong Kong Shanghai Banking Corporation, as well as other institutions in Hong Kong and Macao. Fortunately for them, they made most of their money before the great real estate blow out in the 1990s.

Starting in 1992, they began to shift their assets to Brazil, Argentina and other parts of South America. One of their first investments was with Telebras, the largest telephone company in Brazil. Here again, they were in and out of Brazil before its near-collapse in the late 1990s.

In around 1994 and 1995, they began investing in the Czech Republic, most principally with a company known as Technistone, AS. While we have not confirmed this claim, it is believed that the Chandlers also began to set up a series of off shore facilities to hide their own money and to assist other Russian-based elements in the secretion of their funds too.

This was started when they began investing in Sun Brewing, now known as Sun Interbrew. We also confirmed that they were deeply involved in a number of steel, aluminum, and mineral corporations in Russia that included Novolipetsk.

The Chandlers are no strangers to long, difficult and complex fights for control of companies in Russia. One of their targets was the Novolipetsk steel plant, which is part of Novolipetsk Metallurgical Group Joint Stock Co., located at Pl. Metallurgov 2 Lipetsk, 398040 Russia. We believe that this company later became part of the Interros Holding Company, 129090 Moscow, Ul. Shchepkina 32, Russia, telephone +7 (95) 726 57 54.

The president of Interros Holding is listed as Vladimir Olegovich Potanin and the general director is Dmitriy Lvovich Ushakov.

Since the Chandlers involvement in Novolipetsk, they also became enmeshed in a much more controversial and violent struggle that involved GazProm.

These same sources report that both gentlemen, but particularly Richard, are believed to be front men for former high level officials of GazProm who were ousted as a result of the on going blood feud that has beset the company. The ousted officials are directly connected to Russian organized crime persons. One source believes that these men pose significant problems because their intention is to act as front men financiers, using off shore corporations to wash money and real estate trusts.

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Scan Investigation
February 24, 2003
Page 17 of 134

We are told that they have a number of corporate affiliations, executive associations, etc., with several off shore companies in France, Switzerland, Jersey, Isle of Man, Channel Islands, UK, Bermuda and the Cayman Islands. These are facilities that they or persons on their behalf of created for the benefit of Russian businesspersons and former Russian ministry members.

### J) Executive Affiliations and Corporate Associations

We checked a number of sources outside of the United States and found that the Chandler brothers directly or indirectly control a number of companies that are related to Sovereign Fourex. These companies include:

1. Sovereign Securities, Ltd.
2. Parnell Enterprises, Ltd.
3. Chandler Investment Inc. Ltd.
4. Admiral Investments, Ltd.
5. Reldan Investments, Ltd.
6. Sovereign Finance, Ltd.
7. Chandler Apparel Corp. Ltd.
8. Standard Securities Ltd.
9. Zorin Investments Ltd
10. Geneva Investments Ltd
11. Pelican Ltd.
12. Patenoster Triustees Ltd
13. Paternoster Nominees Ltd
14. Eurocapital Finance Ltd
15. Sovereign Plaza Ltd
16. Societe du Corniche

At present, we have not traced all of these companies or determined if any have links to Credit Agricole Indosuez, but will complete this task in due course.

It is our understanding that these companies are all created in Switzerland, BVI, Bermuda, and other cash haven countries and represent the interests of Russian organized crime members, as well as high-level former GazProm executives who looted the company of its assets.

We are seeking to determine the identities of these executives and will report our findings under separate cover.

There are four categories of data that are available on both men.

17

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Scan Investigation
February 24, 2003
Page 18 of 134

A.    **Homeland Human Intelligence Asset Scan** - (Russia and Monaco) This will detail derogatory, negative or negative-inference data on both men and two of their companies. All of the data is in Russian and must be translated. In some cases, original class documents can be obtained to support the profile. The cost is estimated to be around $29,000, but the quality of the product is deemed to be extremely high, according to one Russian expert with whom we have consulted and is familiar with the ultimate source and that person's access.

It is believed that the turnaround time for production of the files and translate the reports is about 27 days. Because the sources are outside of the United States, they must be prepaid in full before the engagement is accepted.

B.    **Homeland Human Intelligence Asset Scan** - (New Zealand, Australia, Nauru, and Hong Kong) Another source reported that significant information about the men exists in these countries and none of it is available through online public database systems. The source indicated that a brief perusal of the data revealed that while it is considered "dated," it has significant implications on the history of the gentlemen and their plans and intentions. The cost to obtain the 7 files that have been thus far identified and located is about $19,300. The turnaround time is about 19 days.

C.    **Global Scans Richard Chandler, Christopher Chandler and one company** -- The names of both men are very common and have flooded the database systems. For example, in just one region, we found over 200 leads for R and 288 for C that pertain to corporate affiliations, banking, financial and credit relationships. A worldwide Scan, with special emphasis on the countries listed in A and B above would be about $12,800 per person. We also recommend that a full Global Scan be done on the Chandler-controlled company. The cost for this scan is $19,200 for a search in the 9 countries to which this company has links.

D.    **Archive Data** - We have done studies on three of the companies cited in the article that you forwarded to us. In one cases, we found 92 hits for C and 33 for R. Thus, a significant amount of data exists that can be reformatted from the old tapes and used in the report. The problem is that in each of those cases, we did hundreds of searches and therefore, it will take some time to go through all of the data files in order to make certain that we have obtained all of the leads.

In some cases, the downloads are non-text searchable and therefore, must be hand read, a real pain. In other cases, the downloads are in Russian or Czech. Cost is estimated at about $4,590.

With regard to the above proposals, we must estimate the unforeseeable costs and disbursements, which are rather difficult to forecast. Our experience is that the total expenses should never exceed 12% of the total amount of the fees.

18

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 19 of 134**

### *1) Sovereign Fourex*

Sovereign Fourex is another company that is owned by the Chandlers and is believed to be a key link to Credit Agricole on behalf of various elements in Russia and elsewhere. The company is very complex, and is basically a front for Russians who secretly control GazProm. Much detail is available on this firm and its links to Credit Agricole. Our sources indicate that Sovereign Fourex is a major money-laundering source for the Chandlers and others and is used as their conduit to Credit Agricole.

Seven abstracts for Sovereign Fourex in Switzerland and Bristol, most of which are in German and can be interpreted at the next level of searching, appear below:

```
                               SOVEREIGN (FOREX) LTD
                               REGISTRATION NO.: 02823960

OPERATING-STATUS: DISSOLVED

EXECUTIVE LIST:
 JEFFREY REVELL-READE
 BABURAI TARACHAND SHAH
 STEPHEN BERNARD WHEATLEY

* * * * * * * * * * * * * * * * EXECUTIVE * * * * * * * * * * * * * * * *

JEFFREY REVELL-READE
ADDRESS: FLAT 16 RICHMOND BRIDGE MANSIONS, WILLOUGHBY ROAD, RICHMOND.
NATIONALITY: AUSTRALIAN
OCCUPATION: CONSULTANT
POSITION:
APPOINTMENT          APPOINTMENT    APPOINTMENT     COMPANIES HOUSE   CURRENT
TYPE                 DATE           DOCUMENT        UPDATE DATE       POSITION

 APPOINTED AS DIRECTOR  4/25/1995    G288            4/1/1996          YES

BIRTH-DATE: OCTOBER 13, 1964
```

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 20 of 134**

---

[DOCUMENT CONTINUED]

BABURAI TARACHAND SEAH
ADDRESS: 73 ADDISON AVENUE, SOUTHGATE, LONDON. N14 4AJ
NATIONALITY: BRITISH
FUNCTION CODE: COMPANY SECRETARY
POSITION:

| APPOINTMENT TYPE | APPOINTMENT DATE | APPOINTMENT DOCUMENT | COMPANIES HOUSE UPDATE DATE | CURRENT POSITION |
|---|---|---|---|---|
| APPOINTED AS SECRETARY | 4/8/1994 | G288 | 4/1/1996 | YES |

BIRTH-DATE: SEPTEMBER 21, 1939


STEPHEN BERNARD WHEATLEY
ADDRESS: 21 ORLANDO COURT, ORLANDO ROAD, LONDON. SW4 0LD
NATIONALITY: BRITISH
OCCUPATION: FOREIGN EXCHANGE DEALER
FUNCTION CODE: COMPANY SECRETARY
POSITION:

| APPOINTMENT TYPE | APPOINTMENT DATE | APPOINTMENT DOCUMENT | COMPANIES HOUSE UPDATE DATE | CURRENT POSITION |
|---|---|---|---|---|
| APPOINTED AS DIRECTOR | 6/3/1993 | INCORPORATION | 4/1/1996 | YES |

BIRTH-DATE: JUNE 27, 1963

---

SOVEREIGN (FOREX) LTD, SUCCURSALE DE GENEVE
RUE DU RHONE 118
1204 GENEVE
SCHWEIZ / SWITZERLAND

CREFO-NR: 80080987
TELEPHONE: 022/ FAX: 022/
LEGAL-STATUS: ZWEIGNIEDERL. AUSLAEND.GESELLSCH. / HANDELSREGISTEREINTRAG: 30.09.1996
HR-TEXT: ACTIVITE DE SOCIETE FINANCIERE A L'ETRANGER; PLACEMENT, ACHAT, VENTE ET ADMINISTRATION DE
BIENS; CONSEILS DANS LES DOMAINES DES PAPIERS-VALEURS ET DE LA BOURSE

  EINTRAG IN HANDELSREGISTER / TRADE REGISTER: 30.09.1996

DESCRIPTION:    MAISON-MERE: ZUERICH

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 21 of 134**

---

SOVEREIGN (FOREX) LTD
SEIDENGASSE 6
8001 ZUERICH
SCHWEIZ / SWITZERLAND

CREFO-NR: 220295301
TELEPHONE: 0 1/213.18.00 FAX: 0 1/222.08.30
EMPLOYEES: 24
LEGAL-STATUS: AKTIENGESELLSCHAFT / HANDELSREGISTEREINTRAG: 28.10.1977
CAPITAL: 1000000000
INDUSTRY-CODE: 7549
INDUSTRY-TYPE: 7549 SONSTIGE KOMMERZIELLE DIENSTE

HR-TEXT: HAUPTSAECHLICH HANDEL MIT DEVISEN IM IN- UND AUSLAND SOWIE VERMITTLUNG, ERWERB, VERWALTUNG UND VERAEUSSERUNG VON VERMOEGENSWERTEN JEGLICHER ART AUF EIGENE ODER FREMDE RECHNUNG; BERATUNG AUF DEM GEBIET DER WERTPAPIER- UND WARENBOERSEN; BETEILIGUNG AN UND FINANZIERUNG VON UNTERNEHMEN UND DURCHFUEHRUNG VON HANDELSGESCHAEFTEN ALLER ART SOWIE AUSUEBUNG VON TREUHANDFUNKTIONEN UND SONSTIGEN DIENSLEISTUNGEN SOWIE ALLE RECHTSGESCHAEFTE, DIE DEM ZWECK DER UNTERNEHMUNG FOERDERLICH SIND.

   EINTRAG IN HANDELSREGISTER / TRADE REGISTER: 12.04.2002

DESCRIPTION: DAS UNTERNEHMEN BEFASST SICH MIT DER FUEHRUNG EINES BRANCHENBEZOGENEN BETRIEBES.

   MAN IST IN FOLGENDEM BEREICH TAETIG:

   - INTERNATIONALER DEVISENHANDEL

   DIE FIRMA HAT INTERNATIONALE KUNDEN; DIE AKTIVITAET WICKELT SICH JEDOCH AUSSCHLIESSLICH IN DER SCHWEIZ AB.

   PERSONALBESTAND:

   1998: 24

   1999: 24

   2000: 24

  GESCHAEFTSGANG: KEIN NAEHERER EINBLICK MOEGLICH

  FILIALE(N):   -
  EX-ZWEIGNIEDERLAS. RUE DU RHONE 118

CAPITAL-INFO:

  KAPITALART: AKTIENKAPITAL

  KAPITAL: SFR. 10'000'000.00

  LIBIERUNG: 100% LIBERIERT

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Scan Investigation
February 24, 2003
Page 22 of 134

[DOCUMENT CONTINUED]

KAPITALGLIEDERUNG:

GLIEDERUNGSART: INHABERAKTIEN

ANZAHL: 10'000

STUECKELUNGSBETRAG: SFR. 1'000.00

BEWERTUNGSART: ; ;

KAPITALBEMERKUNG: IM LAUFE DES JAHRES 1999 IST EINE AKTIENKAPITALERHOEHUNG AUF SFR. 15.00 MIO.
VORGESESEN.

CAP-CHANGES:

KAPITALAENDERUNG:
KAPITALART: AKTIENKAPITAL
GV DATUM: 21.07.1998
AENDERUNGSART: NACHLIB.
BETRAG ALTES KAPITAL: SFR. 5'000'000.00
BETRAG NEUES KAPITAL: SFR. 10'000'000.00

EXECUTIVES:

BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
GREMIUM: VERWALTUNGSRAT
STELLUNG: PRAESIDENT
NAME: WERNER ANGELO FURRER
ORT: ZUERICH
LAND: SCHWEIZ / SWITZERLAND
ZEICHNUNGSBERECHTIGUNG: KOLLEKTIVUNTERSCHRIFT ZU ZWEIEN
NATIONALITAET: SCHWEIZ
BUERGERORT: ZUERICH ZH, GOSSAU ZH

BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
GREMIUM: VERWALTUNGSRAT
STELLUNG: MITGLIED
NAME: DR.IUR. MARTIN GROSSMANN
ORT: DUEBENDORF
LAND: SCHWEIZ / SWITZERLAND
ZEICHNUNGSBERECHTIGUNG: KOLLEKTIVUNTERSCHRIFT ZU ZWEIEN
NATIONALITAET: SCHWEIZ
BUERGERORT: HOELSTEIN, ZUERICH

BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
GREMIUM: VERWALTUNGSRAT
STELLUNG: MITGLIED
NAME: RUDOLF MAAG
ORT: NIEDERWIL AG
LAND: SCHWEIZ / SWITZERLAND
ZEICHNUNGSBERECHTIGUNG: KOLLEKTIVUNTERSCHRIFT ZU ZWEIEN
NATIONALITAET: SCHWEIZ
BUERGERORT: HUETTWILEN

22

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Sean Investigation
February 24, 2003
Page 23 of 134

```
                          [DOCUMENT CONTINUED]

BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
GREMIUM: REVISIONSSTELLE
NAME: TREUHANDBUERO ROLF SCHWEIZER
ORT: USTER
LAND: SCHWEIZ / SWITZERLAND
RECHTSFORM: EINZELFIRMA
HANDELSREGISTEREINTRAG: 18.11.1998


BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
GREMIUM: AKTIONAER
STELLUNG: ALLEINAKTIONAER
NAME: SOVEREIGN FINANCE GROUP LTD
ORT: ZUERICH
LAND: SCHWEIZ / SWITZERLAND
RECHTSFORM: AKTIENGESELLSCHAFT
HANDELSREGISTEREINTRAG: 22.12.1998
KAPITALART: AKTIENKAPITAL
KAPITAL: SFR. 1'000'000.00
KAPITALBETEILIGUNG:
BETEILUNGSART: KAPITALANTEIL
ANTEIL IN PROZENT: 100
ANTEIL ABSOLUTE: SFR.0.00


BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
GREMIUM: GESCHAEFTSLEITUNG
STELLUNG: GESCHAEFTSLEITER
NAME: RUDOLF MAAG
ORT: NIEDERWIL AG
LAND: SCHWEIZ / SWITZERLAND
ZEICHNUNGSBERECHTIGUNG: KOLLEKTIVUNTERSCHRIFT ZU ZWEIEN
NATIONALITAET: SCHWEIZ
BUERGERORT: HUETTWILEN


BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
GREMIUM: GESCHAEFTSLEITUNG
STELLUNG: GESCHAEFTSLEITER
NAME: SUSANNE WITZIG
ORT: MAENNEDORF
LAND: SCHWEIZ / SWITZERLAND
ZEICHNUNGSBERECHTIGUNG: KOLLEKTIVUNTERSCHRIFT ZU ZWEIEN
NATIONALITAET: SCHWEIZ
BUERGERORT: LAUFEN-UHWIESEN
```

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 24 of 134**

[DOCUMENT CONTINUED]

BALANCE:
BILANZ:

| JAHR: | | 1997 | 1998 |
|---|---|---|---|
| FLUESSIGE MITTEL | SFR. | 954'933.00 | 6'127'118.00 |
| KUNDENGUTHABEN | SFR. | 6'271'091.00 | 6'102'856.00 |
| AKTIV-DARLEHEN | SFR. | 239'131.00 | 7'051'321.00 |
| UEBRIGE AKTIVEN | SFR. | 40'987.00 | 335'396.00 |
| EINRICHTUNGEN/ANLAGEN/FAHRZEUGE | SFR. | 174'576.00 | 540'862.00 |
| BILANZSUMME | SFR. | 7'680'718.00 | 20'157'553.00 |
| BANKSCHULDEN | SFR. | 382'829.00 | 2'718.00 |
| KUNDENGELDER | SFR. | 5'019'761.00 | 9'394'522.00 |
| TRANSITORISCHE PASSIVEN | SFR. | 41'059.00 | 188'000.00 |
| DARLEHENSSCHULDEN | SFR. | 422'695.00 | 65'142.00 |
| RUECKSTELLUNGEN | SFR. | 56'800.00 | 20'960.00 |
| AKTIENKAPITAL | SFR. | 1'500'000.00 | 10'000'000.00 |
| GESETZLICHE RESERVEN | SFR. | 0.00 | 13'000.00 |
| GEWINNVORTRAG | SFR. | 96'613.00 | 244'574.00 |
| GEWINN | SFR. | 160'961.00 | 227'637.00 |

PER 31.12. AKTIV-DARLEHEN = GUTHABEN NAHESTEHENDE GESELLSCHAFTEN (NEURE ZAHLEN SIND NICHT
ERHAELTLICH: 19.07.2001)

RFOLGSZAHLEN:

| JAHR: | | 1997 | 1998 |
|---|---|---|---|
| ERTRAG | SFR. | 5'259'518.00 | 7'461'268.00 |
| VERWALTUNGSAUFWAND | SFR. | 4'273'791.00 | 7'233'662.00 |
| NEUTRALAUFWAND | SFR. | 765'800.00 | 0.00 |
| STEUERN | SFR. | 57'967.00 | 31.00 |
| REINGEWINN | SFR. | 160'961.00 | 227'637.00 |

ERTRAG = OPERATIVES ERGEBNIS NEUTRALAUFWAND + AUSSERORDENTLICHER AUFWAND (NEUERE ZAHLEN SIND NICHT
ERHAELTLICH: 19.07.2001)

PROPERTY:
  IMMOBILIENART: KEIN GRUNDEIGENTUM
  BEWERTUNG: SFR. 0.00
  HYPOTHEK: SFR. 0.00

BANK: ZUERCHER KANTONALBANK; ZUERICH-HOENGG

ADDRESS-CHANGE:
  DATUM: 01.07.1998
  LETZTES DOMIZIL: ZUERICH, BAHNHOFSTR. 71
  NEUES DOMIZIL: ZUERICH, SEIDENGASSE 6

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 25 of 134**

```
                            SOVEREIGN FINANCE GROUP LTD
                                BAHNHOFSTRASSE 71
                                  8001 ZUERICH
                               SCHWEIZ / SWITZERLAND

CREFO-NR: 250198879
LEGAL-STATUS: AKTIENGESELLSCHAFT / HANDELSREGISTEREINTRAG: 22.12.1998
CAPITAL: 100000000
HR-TEXT: ERWRB UND HALTEN VON BETEILIGUNGEN UND FINANZIERUNGEN IM IN- UND AUSLAND; KANN GRUNDSTUECKE
ERWERBEN, HALTEN UND VERAEUSSERN.

    EINTRAG IN HANDELSREGISTER / TRADE REGISTER: 22.12.1998

CAPITAL-INFO:

  KAPITALART: AKTIENKAPITAL

  KAPITAL: SFR. 1'000'000.00

  LIBIERUNG: 100% LIBERIERT

  KAPITALGLIEDERUNG:

  GLIEDERUNGSART: INHABERAKTIEN

  ANZAHL: 1'000

  STUECKELUNGSBETRAG: SFR.  1'000.00

  BEWERTUNGSART: ; ;

EXECUTIVES:

  BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
  GREMIUM: VERWALTUNGSRAT
  STELLUNG: PRAESIDENT
  NAME: WERNER ANGELO FURRER
  ORT: ZUERICH
  LAND: SCHWEIZ / SWITZERLAND
  ZEICHNUNGSBERECHTIGUNG: KOLLEKTIVUNTERSCHRIFT ZU ZWEIEN
  NATIONALITAET: SCHWEIZ
  BUERGERORT: ZUERICH ZH, GOSSAU ZH

  BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
  GREMIUM: VERWALTUNGSRAT
  STELLUNG: MITGLIED
  NAME: MARKUS ODERMATT
  ORT: ZUERICH
  LAND: SCHWEIZ / SWITZERLAND
  ZEICHNUNGSBERECHTIGUNG: KOLLEKTIVUNTERSCHRIFT ZU ZWEIEN
  NATIONALITAET: SCHWEIZ
  BUERGERORT: DALLENWIL, ZUERICH
```

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 26 of 134**

---

[DOCUMENT CONTINUED]

AMTLICHE NEGATIVMITTELUNG:
SPERRBEZEICHNUNG: KONKURSEROEFFNUNG
DATUM DER VERUEGUNGSMITTELUNG: 08.08.2001
DATUM DER VERFUEGUNGSSTANDES: 27.09.2001; EINSTELLUNG MA. AKTIVEN

BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
GREMIUM: REVISIONSSTELLE
NAME: *ALCAZAR REVISIONS- & BERATUNGS AG IN LIQUIDATION
ORT: ZUERICH
LAND: SCHWEIZ / SWITZERLAND
RECHTSFORM: AKTIENGESELLSCHAFT
HANDELSREGISTEREINTRAG: 12.12.1990
KAPITALART: AKTIENKAPITAL
KAPITAL: SFR. 100'000.00

AMTLICHE NEGATIVMITTELUNG:
SPERRBEZEICHNUNG: AUFLOESUNG VON AMTES WEGEN

BEZUGSART: 02 BETEILIGUNG / SHAREHOLDER
GREMIUM: AKTIONAER
STELLUNG: ALLEINAKTIONAER
NAME: SOVEREIGN (FOREX) LTD
ORT: ZUERICH
LAND: SCHWEIZ / SWITZERLAND
RECHTSFORM: AKTIENGESELLSCHAFT
HANDELSREGISTEREINTRAG: 28.10.1977
KAPITALART: AKTIENKAPITAL
KAPITAL: SFR. 10'000'000.00
KAPITALBETEILIGUNG:
BETEILUNGSART: KAPITALANTEIL
ANTEIL IN PROZENT: 100
ANTEIL ABSOLUTE: SFR.0.00

---

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Scan Investigation
February 24, 2003
Page 27 of 134

```
                        TREUHANDBUERO ROLF SCHWEIZER
                           SONNENBERGSTRASSE 11
                               8610 USTER
                          SCHWEIZ / SWITZERLAND

CREFO-NR: 250185167
LEGAL-STATUS: EINZELFIRMA / HANDELSREGISTEREINTRAG: 18.11.1998

HR-TEXT: FUEHREN EINES TREUHANDBUEROS; ANBIETEN SAEMTLICHER DIENSTLEISTUNGEN IM BEREICH DES
WIRTSCHAFTSPRUEFERS, INSBESONDERE BUCHPRUEFUNGEN, STEUER- UND UNTERNEHMUNGSBERATUNGEN.

   EINTRAG IN HANDELSREGISTER / TRADE REGISTER: 10.12.1999

DESCRIPTION: ZEITUNGSMELDUNG 26.11.99: TRS TREUHANDBUERO ROLF SCHWEIZER, UMZUG, NEU AB 1.12.1999:
SONNENBERGSTR. 11 (MUEHLE NIEDERUSTER), 8610 USTER, TEL. 01/940.74.85 UND FAX 01/994.54.88, E-MAI:
ROLLOSWISS@BLUEWIN.CH

   EXECUTIVES:

  BEZUGSART: 01 GREMIUM/ORGAN / COMMITTEE
  GREMIUM: INHABER
  NAME: ROLF SCHWEIZER
  ORT: GREIFENSEE
  LAND: SCHWEIZ / SWITZERLAND
  ZEICHNUNGSBERECHTIGUNG: EINZELUNTERSCHRIFT
  NATIONALITAET: SCHWEIZ
  BUERGERORT: MOGELSBERG

  BEZUGSART: 02 BETEILIGUNG / SHAREHOLDER
  GREMIUM: REVISIONSSTELLE
  NAME: SOVEREIGN (FOREX) LTD
  ORT: ZUERICH
  LAND: SCHWEIZ / SWITZERLAND
  RECHTSFORM: AKTIENGESELLSCHAFT
  HANDELSREGISTEREINTRAG: 28.10.1977
  KAPITALART: AKTIENKAPITAL
  KAPITAL: SFR. 10'000'000.00

ADDRESS-CHANGE:
  DATUM: 10.12.1999
  LETZTES DOMIZIL: GREIFENSEE, BURSTWIESENSTR.59
  NEUES DOMIZIL: USTER, SONNENBERGSTR. 11

PUB-TYPE: COMPANY PROFILE

LANGUAGE: GERMAN; DEUTSCH

NAME-CHANGE:
  DATUM: 10.12.1999
  ALTES DOMIZIL: SCHWEIZER ROLF,DIPL.WIRTSCH.PR
  NEUES DOMIZIL: TREUHANDBUERO ROLF SCHWEIZER
  BEMERKUNG ZU NAMENS/DOMIZILWECHSEL: ALTER FIRMANAMEN: SCHWEIZER ROLF, DIPL. WIRTSCHAFTSPRUEFER
```

```
                                SOVEREIGN (FOREX) LTD
                            REGISTRATION NO.: 02823960
                    ST KILIAN HOUSE, 38 WHITELADIES ROAD, CLIFTON BRISTOL.
                                        BS8 2LG

* * * * * * * * * * * * *    COMPANY DETAILS    * * * * * * * * * * * * *

COMPANY TYPE: PRIVATE LIMITED WITH SHARE CAPITAL; DISSOLVED ON AUGUST 24, 1999; DISSOLVED COMPANY.

INCORPORATION: JUNE 3, 1993

DATE OF LAST ANNUAL RETURN: JUNE 3, 1996

EMPLOYEES: N/A

SIC-CODE: 65230 OTHER FINANCIAL INTERMEDIATION NOT ELSEWHERE CLASSIFIED

* * * * * * * * * * * * *    ACCOUNTS DETAILS    * * * * * * * * * * * * *

LAST FILED ACCOUNTS: MARCH 31, 1995

ACCOUNTS TYPE: SMALL COMPANY

ACCOUNTING REFERENCE DATE: MARCH 31

ISSUED CAPITAL (GBP): 100

* * * * * * * * * * * *    BALANCE SHEET (SUMMARY)    * * * * * * * * * * *

DATE OF ACCOUNTS      31/03/1994
```

| TURNOVER (GBP) | N/A | N/A | N/A |
|---|---|---|---|
| NET ASSETS (GBP) | 187,000 | N/A | N/A |

```
* * * * * * * * *    ANALYSED DATA FOR MARCH 31, 1994    * * * * * * * * *

ICC DIRECTORS
ICC SHAREHOLDERS REPORTS
ICC FINANCIAL ANALYSIS REPORTS

* * * * * * * * * * * * * * * *    HISTORY    * * * * * * * * * * * * * * * *

PREVIOUS NAME: IRON HORSE LIMITED

DATE OF NAME CHANGE: OCTOBER 25, 1993

PREVIOUS ADDRESS: 42A BUCKINGHAM PALACE ROAD, LONDON SW1N 0RE.

DATE OF ADDRESS CHANGE: MAY 14, 1997
```

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Scan Investigation
February 24, 2003
Page 29 of 134

```
                         [DOCUMENT CONTINUED]

* * * * * * * * * * * * FILING HISTORY * * * * * * * * * * * * * *

DATE RECEIVED      DOCUMENT TYPE
```

| DATE RECEIVED | DOCUMENT TYPE |
|---|---|
| 17/08/1999 | FINAL DISSOLUTION |
| 12/05/1999 | COMPANY IN LIQUIDATION ACCORDING TO COMPANIES HOUSE. |
| 12/05/1999 | RETURNS BY LIQUIDATORS OF THE FINAL MEETING ON WINDING UP |
| 02/06/1997 | COMPANY IN LIQUIDATION ACCORDING TO COMPANIES HOUSE. |
| 02/06/1997 | APPOINTMENT OF LIQUIDATOR FOR VOLUNTARY WINDING-UP |
| 28/05/1997 | RESOLUTION FOR VOLUNTARY WINDING-UP - INSOLVENT |
| 28/05/1997 | APPOINTMENT OF LIQUIDATOR - BY MEMBERS & CREDITORS |
| 28/05/1997 | NOTICE TO CREDITORS REQUESTING CREDITORS' DETAILS |
| 09/05/1997 | MEETING OF CREDITORS UNDER SEC 98 INSOLVENCY ACT 1986 |
| 05/07/1995 | CHANGE AMONG THE DIRECTORS OF A COMPANY |
| 08/06/1995 | PARTICULARS OF A MORTGAGE OR CHARGE |
| 11/01/1995 | ALTERATION IN MEMORANDUM OR ARTICLES OF ASSOCIATION |
| 24/02/1994 | CHANGE AMONG THE DIRECTORS OF A COMPANY |
| 29/09/1993 | MORTGAGE DOCUMENT |

```
                         SOVEREIGN (FOREX) LTD
                         REGISTRATION NO.: 02823960
            ST KILIAN HOUSE, 38 WHITELADIES ROAD, CLIFTON BRISTOL
                              BS8 2LG


COMPANY-TYPE: PRIVATE LIMITED WITH SHARE CAPITAL; DISSOLVED COMPANY.
  DISSOLVED ON :AUGUST 24, 1999

INCORPORATION: JUNE 3, 1993
ISSUED-CAPITAL: (GBP) 100
TOTAL-ASSETS: (GBP) 1,974,000
SHAREHOLDERS FUNDS: (GBP) 70,000
SIC-CODE: 65230 OTHER FINANCIAL INTERMEDIATION NOT ELSEWHERE CLASSIFIED


TABLE OF CONTENTS: ACCOUNTS DESCRIPTION
ACCOUNT DETAILS
INDUSTRY AVERAGE
SECRETARY, DIRECTORS AND ADVISORS
AUDITOR AND BANKER


LAST FILED ACCOUNTS: MARCH 31, 1995

ACCOUNTS TYPE: SMALL COMPANY

ACCOUNTS LODGED DATE: APRIL 25, 1997

FYE: MARCH 31

ANNUAL-RETURN: JUNE 3, 1996
```

29

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 30 of 134**

```
[DOCUMENT CONTINUED]
```

INDUSTRY AVERAGES:
COMPARED TO 7997 COMPANIES IN THE SAME INDUSTRY SECTOR
(YEAR ENDING 1994)
SIC CODE:
65230 OTHER FINANCIAL INTERMEDIATION NOT ELSEWHERE CLASSIFIED

| | * * * INDUSTRY QUARTILES * * * | | |
|---|---|---|---|
| | LOWER | MEDIAN | UPPER |
| PRETAX PROFIT / CAPITAL EMPLOYED (%) | 0.00 | 5.67 | 27.29 |
| PRETAX PROFIT / TOTAL ASSETS (%) | 0.00 | 2.56 | 11.69 |
| PRETAX PROFIT / SALES (%) | 0.00 | 15.46 | 65.04 |
| SALES / TOTAL ASSETS (%) | 2.17 | 11.25 | 92.29 |
| CREDIT PERIOD IN DAYS | | | |
| ((TRADE DEBTORS/SALES) X 365) | 78.80 | 0.00 | 0.00 |
| CURRENT ASSETS / CURRENT LIABILITIES | 0.63 | 1.21 | 3.09 |
| EMPLOYEE REMUNERATION / | | | |
| NO. OF EMPLOYEES (GBP) | * 4339.28 | 13943.18 | 30783.34 |
| SALES / NO. OF EMPLOYEES (GBP) | 5437.50 | 29500.00 | 82125.00 |
| WAGES / TURNOVER (%) | 47.69 | 27.92 | 11.39 |

CREDIT-RATING: YEAR 0 = DISSOLVED

CREDIT-LIMIT: NO LIMIT ASSIGNED OR LIMIT SUSPENDED - FOR REASON SEE CREDIT SCORE

COMPANY SECRETARY: BABURAI TARACHAND SHAH

DIRECTOR(S):
JEFFREY REVELL-READE; CONSULTANT
STEPHEN BERNARD WHEATLEY; FOREIGN EXCHANGE DEALER

AUDITOR: DODSON LIFFORD HALL

BANKER: BARCLAYS BANK

Whether this preliminary information is correct or not is unknown, as it has not been verified. A Global Scan on this firm would cost $23,200.

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Scan Investigation
February 24, 2003
Page 31 of 134

A search for news articles pertaining to *Sovereign (Forex)*, not all of which pertain to this company, returned the following results:

| | |
|---|---|
| 1. | 10/18/02 Russian Bus. Monitor (Pg. Unavail. Online), 2002 WL 8712965   WPS: The Russian Business Monitor   SWISS "SOVEREIGN GROUP" LEFT RUSSIAN CLIENTS WITHOUT MONEY.   TEXT: The prosecutor's office of Zurich launched investigation into operations of   the Swiss company Sovereign Group, a representative office of which ...   Word Count: 229 |
| 2. | 10/9/02 WMRC Daily Analysis (Pg. Unavail. Online), 2002 WL 104042145   WMRC Daily Analysis   Russian Money-Laundering Firm Closed   TEXT:   A Swiss court yesterday ordered the closure of Sovereign Finance   Group – a Zurich-based company active in Moscow (Russia), which has   allegedly ...   Word Count: 162 |
| 3. | 10/8/02 Dow Jones Int'l News 07:35:00   Dow Jones International News   Sovereign Finance Closes On Suspicion Of Money-Laundering   TEXT:   ZURICH –(Dow Jones)– Swiss police and the country's banking watchdog have closed down Zurich-based financial company Sovereign Finance Group on ...   Word Count: 117 |
| 4. | 7/24/02 Emerging Mkt. Daily News (Pg. Unavail. Online), 2002 WL 100416489   Emerging Markets Daily News   Sell Into Any Bond Rally   TEXT:   The bearish view that we adopted towards Nigerian fixed income assets   after the country's withdrawal from the IMF stand-by programme in March   ...   Word Count: 752 |
| 5. | 10/16/01 World News Connection (Pg. Unavail. Online), 2001 WL 29288368   World News Connection   Interfax Daily Business Report for 16 Oct 01   TEXT:   CHIEF RUSSIAN FINANCIAL AND MACROECONOMIC INDICATORS BOT 10.16.2001   10.13.2001 1. Official Exchange 29.510 29.500 Rate of Ruble to Dollar   ...   Word Count: 6628 |
| 6. | 10/15/01 Interfax (Moscow) (Pg. Unavail. Online), 2001 WL 29361249   Interfax (Moscow) NEWS   TEXT:   *** Russian industrial production grew 5.2% year-on-year in the first nine months of this year, the State Statistics Committee reported on   ...   Word Count: 1053 |
| 7. | 10/8/01 Interfax (Moscow) (Pg. Unavail. Online), 2001 WL 29362237   Interfax (Moscow) MINFIN BONDS AND EUROBONDS   TEXT:   There were no clear trends in another week of uncertainty during which   the United States at least acted to bolster its own economy and by so   ...   Word Count: 802 |
| 8. | 11/22/00 AFX (AP) (Pg. Unavail. Online), 2000 WL 29911611   AFX (AP)   Asia economic and corporate news summary   TEXT:   A summary of Asian economic and corporate news at 1000 GMT:   – SKorea Q3 GDP stronger than expected; too dependent on IT exports: Hyundai   Word Count: 1442 |
| 9. | 11/22/00 AFX (AP) (Pg. Unavail. Online), 2000 WL 29911962   AFX (AP)   Thai economic and corporate news summary   TEXT:   A summary of Thai economic and corporate news at 1000 GMT:   – Thai long term BBB– sovereign forex rating affirmed: Fitch IBCA   Word Count: 122 |
| 10. | 11/22/00 AFX (AP) (Pg. Unavail. Online), 2000 WL 29911963   AFX (AP)   Thai long term BBB– sovereign forex rating affirmed/outlook stable   TEXT:   Fitch IBCA has affirmed the country's long-term foreign currency   sovereign rating at BBB–.   In a statement received here, the agency said the ...   Word Count: 107 |
| 11. | 6/1/00 S. China Morning Post 1, 2000 WL 21993060   South China Morning Post   Moody's ready to give an upgrade   TEXT:   An expected credit upgrade for the Government, leading Hong Kong   banks and the transport sector could bolster the economy as a result of   lower ...   Word Count: 457 |
| 12. | 9/23/99 Asia Pulse (Pg. Unavail. Online), 1999 WL 27960001   Asia Pulse   STANDARD & POOR'S LOWERS SOVEREIGN FOREX RATINGS FOR CHINA   TEXT:   HONG KONG, Sept 23 Asia Pulse – International ratings agency Standard   & Poor's has lowered the long-term foreign currency sovereign and senior   ...   Word Count: 237 |

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 32 of 134**

---

13. 9/23/99 Asia Pulse (Pg. Unavail. Online), 1999 WL 27960170   **Asia Pulse   BRIEFING –**
ASIA ECONOMIC NEWS – SEPT 23, 1999   **TEXT:**   An executive briefing on the economies of
Asia for Sept 23, 1999,   prepared by Asia Pulse (http://www.asiapulse.com), the real-
time,   Asia-based ...   Word Count: 969

14. 1/25/99 AFX News 13:03:00   **AFX News**   SKorea sovereign, forex long-term rating raised
to BBB– from BB+ by S&P   **TEXT:**   NEW YORK (AFX) – Standard & Poor's Corp said it raised
the sovereign   credit rating and foreign currency long-term senior unsecured rating of
...   Word Count: 84

15. 1/25/99 AFX (AP) (Pg. Unavail. Online), 1999 WL 10492164   **AFX (AP)**   SKorea sovereign,
forex long-term rating raised to BBB– from BB+ by SP   **TEXT:**   Standard Poor's Corp said
it raised the sovereign credit rating and   foreign currency long-term senior unsecured
rating of the Republic of   ...   Word Count: 75

16. 10/4/97 Fin. Times-Abstracts 04, 1997 WL 22997522   **Financial Times   Swiss companies
raided in currency investigation**   **TEXT:**   Swiss companies associated with a British
foreign exchange dealer   have been raided as part of a three-nation investigation into
high-   risk ...   Word Count: 98

17. 10/4/97 Fin. Times-Abstracts 05, 1997 WL 22997621   **Financial Times   Offices raided in
forex probe**   **TEXT:**   Swiss companies associated with a UK foreign exchange dealer have
been raided as part of a three-country investigation into high-risk   currency ...
Word Count: 97

18. 9/14/97 Cap. Mkt. Rep. 21:50:00   **Capital Markets Report   =Headlines:Moody's:China
Sovereign Forex Rtg Well Positioned**   **TEXT:**   (END) DOW JONES NEWS  09-14-97   Word
Count: 489

19. 9/14/97 Cap. Mkt. Rep. 21:48:00   **Capital Markets Report   REPEAT:China Sovereign Forex
Rtg "Well Positioned":Moody's**   **TEXT:**   (END) DOW JONES NEWS  09-14-97   Word Count: 344

20. 11/7/96 Cap.Mkt. Rep. 02:11:00   **Capital Markets Report   Pakistan Sovereign Forex
Ceiling Lowered To B2 By Moody's**   **TEXT:**   NEW YORK (Dow Jones)--Moody's Investors
Service said it lowered Pakistan's sovereign ceiling for foreign-currency debt to B2
from B1. As a ...   Word Count: 287

21. 1/18/96 Cap. Mkt. Rep. 02:39:00   **Capital Markets Report   =Headlines: Bundesbank Sees
Deutsche Mark Still Overvalued, But More Price Stability; Dole:Budget Talks Possible;
Dlr Dn   TEXT:**   -- Despite a partial correction that began in the second quarter of
1995, the Deutsche mark remains overvalued, the Bundesbank says in its   ...   Word
Count: 564

We unlocked the above news articles and abstracted them in the following pages:

---

WPS: **The Russian Business Monitor**
WPS Russian Media Monitoring Agency
Friday, October 18, 2002

SWISS "SOVEREIGN GROUP" LEFT RUSSIAN CLIENTS WITHOUT MONEY.

The prosecutor's office of Zurich launched investigation into operations of
the Swiss company SOVEREIGN Group, a representative office of which had
actively worked in Russia. The procedure of the company's liquidation also
began. Russian clients have several tens of millions of dollars in SOVEREIGN
Group, further fate of which is unknown.

---

**CONFIDENTIAL MEMORANDUM TO FILE**
**Richard Chandler Limited Global Scan Investigation**
**February 24, 2003**
**Page 33 of 134**

The companies belonging to SOVEREIGN Group (SOVEREIGN (FOREX) Ltd., SOVEREIGN Capital management and SOVEREIGN bank Corporation) have been working on the Russian market since 1996. During this time the Moscow office of the group regularly published commercials in the leading business editions. SOVEREIGN offered its services for trade on the FOREX market, management and placing of capital on international markets and in the first-class banks guaranteeing complete confidentiality required by the Swiss law. The minimum sum that SOVEREIGN accepted for work on the FOREX amounted to $200,000. Contracts were signed directly in Switzerland.

Ivo Hopper, prosecutor of Zurich canton, said that two investigations were started against SOVEREIGN Group on October 7, 2002: the administrative (for operations without license) and the criminal (for money laundering). So far the prosecutor's office found one foreign branch of the company in St. Vincent. The prosecutor reports that if the money laundering if confirmed the management of the company may be imprisoned for three to five years.

Reference: Kommersant, October 16, 2002.

WMRC Daily Analysis
World Markets Research Centre Limited. All Rights Reserved
Wednesday, October 9, 2002

**Russian Money-Laundering Firm Closed**
**Dario Thuburn**

A Swiss court yesterday ordered the closure of SOVEREIGN Finance Group - a Zurich-based company active in Moscow (Russia), which has allegedly been involved in money-laundering. The company, a frequent advertiser intop Russian business publications, had no Swiss banking licence, but did have both a shady history and murky dealings with clients from several former Soviet states. The group, which consists of SOVEREIGN (FOREX) Ltd and SOVEREIGN Capital Management, has operated in Moscow since 1996 from the luxurious Raidsson Slavyanskaya hotel. According to its website, the group's turnover is estimated to have exceeded 200bn Swiss francs (US$120bn) in 2001. The news will do little to aid the Russian government's bid to remove the country from the Financial Action Task Force's (FATF) blacklist of countries not doing enough to combat money laundering (see Russia: 27 September 2002: Financial Watchdog Upbeat on Money-Laundering Probe). The government is hoping Russia's case will be reviewed at an FATF meeting in Paris (France) this week.

CONFIDENTIAL MEMORANDUM TO FILE
Richard Chandler Limited Global Scan Investigation
February 24, 2003
Page 34 of 134

Dow Jones International News
Dow Jones & Company, Inc.
Tuesday, October 8, 2002

SOVEREIGN Finance Closes On Suspicion Of Money-Laundering

ZURICH -(Dow Jones)- Swiss police and the country's banking watchdog have
closed down Zurich-based financial company SOVEREIGN Finance Group on suspicion
of money-laundering and the lack of a banking license, a Zurich district
prosecutor's office said Tuesday.

The Swiss Federal Banking Commission ruled Sept. 26 that SOVEREIGN Finance be
closed.

Monday, the police searched the Zurich offices of SOVEREIGN (FOREX) Ltd.,
SOVEREIGN Capital Management AG, SOVEREIGN Finance Group AG and the Zurich
branch of SOVEREIGN Bank Corp. Ltd.

The company had business ties to Russia and the Caribbean.

SOVEREIGN Finance Group Chairman Werner Furrer, a local politician, said he
isn't involved in the company's day-to-day business.

-By Martin Gelnar, Dow Jones Newswires

Emerging Markets Daily News
Business Monitor International.
Wednesday, July 24, 2002

Sell Into Any Bond Rally
Middle East & Africa Financial Alert

The bearish view that we adopted towards Nigerian fixed income assets
after the country's withdrawal from the IMF stand-by programme in March
2002 has, to date, been fully justified, with spreads on the US$ '20 Par
bond rising by over 1000bps since that time, to around 2,132bps+UST on
Thursday (see Market Strategy, 14/03/02, 'The Risks Of Going It Alone').
The main source of downside pressure is essentially the same reason why
the authorities chose to slam the door on their multilateral agreement,
namely the rise in political noise and fiscal laxity ahead of
presidential and legislative elections next year. There are few signs
that this situation is likely to improve in the near-term, with workers
in many sectors threatening strike action in order to win pay increases
of up to 25%, and a dispute between federal and state governments over
the distribution of dollar-denominated revenues from oil exports still
rumbling on.

# Exhibit 2



Menu

Search by Keyword, Topic, or Citation

# Swiss Court Closes Firm In Money Laundering Probe

**by Ulrika Lomas, Tax-News.com, Brussels**
10 October 2002

Dow Jones Newswires reported on Tuesday that a Swiss court has ordered the Zurich-based Sovereign Finance Group to close following alleged money laundering activities in Russia and the Caribbean.

The news agency revealed that the Swiss Federal Banking Commission ruled at the end of September that the group should be shut down. However, it was a police search of the the Zurich offices of Sovereign (Forex) Ltd., Sovereign Capital Management AG, Sovereign Finance Group AG and the Zurich branch of Sovereign Bank Corp. Ltd on Monday which finally prompted the court's closure order.

In addition to the money laundering allegations, the company was ordered to close as it does not have a banking license, according to Dow Jones.

Also reporting on the closure, the Moscow Times revealed that although the Sovereign Finance Group was a frequent advertiser in some of the country's top business publications, little was known in the Russian business community of its actual activities, although an unnamed bank executive told the newspaper that the group had been 'quite active' in moving Russian money out of the country of recent years.

The Moscow Times also refuted the Sovereign Finance Group's claim to be the only foreign brokerage company officially registered in Russia.

**To see today's news, click here.**

 

UK's market leading company formations provider   JORDANS

# Exhibit 3



**Портал Орловской области —**
публичный информационный центр



31 августа 2018, 17:09 MSK

- ВЕРСИЯ ДЛЯ СЛАБОВИДЯЩИХ
- ГЛАВНАЯ
- ОРЛОВСКАЯ ОБЛАСТЬ
- ОРГАНЫ ВЛАСТИ
- МЕСТНОЕ САМОУПРАВЛЕНИЕ
- ПРИЁМНАЯ ПРЕЗИДЕНТА РОССИЙСКОЙ ФЕДЕРАЦИИ В ОРЛОВСКОЙ ОБЛАСТИ
- РЕАЛИЗАЦИЯ СТРАТЕГИЧЕСКИХ ИНИЦИАТИВ ПРЕЗИДЕНТА РОССИЙСКОЙ ФЕДЕРАЦИИ В ОРЛОВСКОЙ ОБЛАСТИ
- ГУБЕРНАТОРСКИЕ ПРОГРАММЫ
- МОЛОДЁЖНОЕ ПРАВИТЕЛЬСТВО ОРЛОВСКОЙ ОБЛАСТИ
- НЕКОММЕРЧЕСКИЕ ОРГАНИЗАЦИИ
- ЗАКОНОДАТЕЛЬСТВО
- НЕЗАВИСИМАЯ АНТИКОРРУПЦИОННАЯ ЭКСПЕРТИЗА
- ОБЩЕСТВЕННОЕ ОБСУЖДЕНИЕ НОРМАТИВНЫХ ПРАВОВЫХ АКТОВ ОРГАНОВ ГОСУДАРСТВЕННОЙ ВЛАСТИ ОРЛОВСКОЙ ОБЛАСТИ
- ПУБЛИЧНЫЕ ОБСУЖДЕНИЯ ПРАВОПРИМЕНИТЕЛЬНОЙ ПРАКТИКИ
- ЭКОНОМИКА И СОЦИАЛЬНАЯ СФЕРА
- ПРЕСС-ЦЕНТР
- ОБРАЩЕНИЯ ГРАЖДАН
- АНТИКОРРУПЦИОННАЯ ГОРЯЧАЯ ЛИНИЯ
- ПРОТИВОДЕЙСТВИЕ КОРРУПЦИИ
- ГОСУДАРСТВЕННЫЕ УСЛУГИ И ФУНКЦИИ
- ГОСУДАРСТВЕННАЯ СЛУЖБА
- РЕЗЕРВ УПРАВЛЕНЧЕСКИХ КАДРОВ
- БЮДЖЕТ ДЛЯ ГРАЖДАН
- ПОРТАЛ «ОТКРЫТЫЙ БЮДЖЕТ ОРЛОВСКОЙ ОБЛАСТИ»
- АИС «ГОСЗАКАЗ ОРЛОВСКОЙ ОБЛАСТИ»
- КОНКУРСЫ, АУКЦИОНЫ
- УСЛУГИ В ЭЛЕКТРОННОМ ВИДЕ И МЕЖВЕДОМСТВЕННОЕ ЭЛЕКТРОННОЕ ВЗАИМОДЕЙСТВИЕ
- МНОГОФУНКЦИОНАЛЬНЫЕ ЦЕНТРЫ ПРЕДОСТАВЛЕНИЯ ГОСУДАРСТВЕННЫХ И МУНИЦИПАЛЬНЫХ УСЛУГ ОРЛОВСКОЙ ОБЛАСТИ
- ИНФОРМАЦИЯ ДЛЯ ЗАСТРОЙЩИКА
- ОЦЕНКА РЕГУЛИРУЮЩЕГО ВОЗДЕЙСТВИЯ
- МОНИТОРИНГ ПРАВОПРИМЕНЕНИЯ
- ССЫЛКИ
- **НАГРАДЫ И НАГРАЖДЁННЫЕ**
  › Награждённые

**НАГРАДЫ И НАГРАЖДЕННЫЕ**

**Государственные награды Российской Федерации**

назад

**медаль ордена "За заслуги перед Отечеством"**

УЧРЕЖДЕНА
Указом Президента Российской Федерации
от 2 марта 1994 года N0 442

Медаль ордена
"За заслуги перед Отечеством"
I степени

Медаль ордена
"За заслуги перед Отечеством"
I степени с мечами





Медаль ордена
"За заслуги перед Отечеством"
II степени

Медаль ордена
"За заслуги перед Отечеством"
II степени с мечами





УТВЕРЖДЕНО
Указом Президента Российской Федерации
от 2 марта 1994 года N0 442
(в редакции Указа Президента Российской Федерации
от 6 января 1999 года N0 19)

**ПОЛОЖЕНИЕ**
о медали ордена "За заслуги перед Отечеством"

1. Медалью ордена "За заслуги перед Отечеством" награждаются граждане за заслуги в области промышленности и сельского хозяйства, строительства и транспорта, науки и образования, здравоохранения и культуры, а также в других областях трудовой деятельности; за большой вклад в дело защиты Отечества, успехи в поддержании высокой боевой готовности подразделений, частей и соединений, за отличные показатели в боевой подготовке и иные заслуги во время прохождения военной службы; за укрепление законности и правопорядка, обеспечение государственной безопасности.

2. Медаль ордена "За заслуги перед Отечеством" имеет две степени:
- медаль ордена "За заслуги перед Отечеством" I степени;
- медаль ордена "За заслуги перед Отечеством" II степени.

Высшей степенью медали является I степень, дающая право при новых заслугах на награждение орденом "За заслуги перед Отечеством" IV степени. Награждение производится последовательно: медалью II степени, потом медалью I степени.

**НАГРАДЫ И НАГРАЖДЕННЫЕ**

Награжденные
Государственные награды РФ
- Указ Президента Российской Федерации от 7 сентября 2010 года № 1099 «О мерах по совершенствованию государственной наградной системы Российской Федерации»
- Положение о государственных наградах Российской Федерации
- Выдержка из раздела IV Положения о государственных наградах Российской Федерации, утвержденного Указом Президента Российской Федерации от 7 сентября 2010 года № 1099 «О мерах по совершенствованию государственной наградной системы Российской Федерации», о выдаче дубликатов (муляжей) награждённым государственными наградами Российской Федерации взамен утраченных
- Инструкция о порядке выдачи орденов, медалей, знаков отличия, нагрудных знаков к почетным званиям Российской Федерации и документов к государственным наградам Российской Федерации взамен утраченных
- звание Героя
- ордена
- медали
- знаки отличия
- почетные звания
- Методические рекомендации о порядке оформления наградных документов для представления к награждению государственными наградами Российской Федерации
- Формы наградного листа представления к награждению государственными наградами

Награды Орловской области
Награды Губернатора Орловской области
Награды Правительства Орловской области
Почетные граждане Орловской области

- Государственные награды Российской Федерации
- Награды Орловской области
- Награды Губернатора Орловской области
- Награды Правительства Орловской области
- Почётные граждане Орловской области

СПЕЦПРОЕКТЫ
ОТКРЫТЫЕ ДАННЫЕ
ПЕРЕЧЕНЬ СВЕДЕНИЙ, ПРЕДОСТАВЛЯЕМЫХ С ИСПОЛЬЗОВАНИЕМ КООРДИНАТ
БЕЗОПАСНОСТЬ ДОРОЖНОГО ДВИЖЕНИЯ
КАРТА САЙТА
АНТИТЕРРОР
НЕТ НАРКОТИКАМ

Найти:



Экстренные телефоны:

С городского/сотового телефона

| Единый телефон пожарных и спасателей | 01/101 |
| Полиция | 02/102 |
| Скорая помощь | 03/103 |
| Аварийная газовая служба | 04/104 |



НАШИ ПАРТНЕРЫ







3.Военнослужащим за отличия в боевых действиях вручается медаль ордена "За заслуги перед Отечеством" с изображением мечей.

4.Медаль ордена "За заслуги перед Отечеством" носится на левой стороне груди и располагается после орденов. При наличии у награжденного медали I степени медаль II степени не носится, за исключением медали с изображением мечей.

5.При ношении ленты медали на планке она располагается после орденских лент. Если награжденный имеет медали I и II степени, то носится только лента медали I степени.

УТВЕРЖДЕНО
Указом Президента Российской Федерации
от 2 марта 1994 года N0 442
(в редакции Указа Президента Российской Федерации
от 6 января 1999 года N0 19)

## ОПИСАНИЕ
### медали ордена "За заслуги перед Отечеством"

Медаль ордена "За заслуги перед Отечеством" из серебра. Она имеет форму круга диаметром 32 мм с выпуклым бортиком с обеих сторон. На лицевой стороне - изображение знака ордена "За заслуги перед Отечеством". На оборотной стороне, по окружности, - девиз: "Польза, честь и слава". В центре - год учреждения медали - 1994.

В нижней части - рельефное изображение лавровых ветвей и номер медали.

Медаль I степени позолоченная.

Медаль при помощи ушка и кольца соединяется с пятиугольной колодкой, обтянутой шелковой муаровой лентой красного цвета. Ширина ленты - 24 мм.

К медали ордена "За заслуги перед Отечеством", вручаемой военнослужащему за отличия в боевых действиях, к кольцу между колодкой и медалью, присоединяются два перекрещивающихся меча. Длина каждого меча - 28 мм, ширина - 3 мм.

При ношении ленты медали на планке лента медали I степени имеет в центре желтую полоску шириной 1 мм, лента медали II степени - серую полоску шириной 1 мм.

назад

Главная – Награды и награжденные – Государственные награды Российской Федерации – медали

© 1998-2018 Администрация Губернатора и Правительства Орловской области

О портале
Обратная связь
Написать вебмастеру



## Портал Орловской области —
публичный информационный центр



September 10, 2018, 17:57 MSK

**VERSION FOR THE VISUALLY IMPA RED**

HOME

ORYOL REGION

AUTHORIT ES

LOCAL GOVERNMENT

RECEPTION OF THE PRESIDENT OF THE RUSSIAN FEDERATION  N THE OREL REGION

REALIZATION OF STRATEGIC INITIATIVES OF THE PRES DENT OF THE RUSSIAN FEDERATION  N THE OREL REGION

GOVERNOR'S PROGRAMS

YOUTH GOVERNMENT OF OREL REGION

NON-PROFIT ORGANIZATIONS

LEGISLATION

INDEPENDENT ANTI-CORRUPTION EXPERTISE

PUBLIC DISCUSSION OF NORMATIVE LEGAL ACTS OF PUBLIC AUTHORIT ES OF THE ORYOL REGION

PUBLIC DISCUSSIONS OF LAW ENFORCEMENT PRACTICE

ECONOMICS AND SOCIAL SPHERE

PRESS-CENTER

APPEALS FROM CITIZENS

ANTI-CORRUPTION HOTLINE

ANTI-CORRUPTION

STATE SERVICES AND FUNCTIONS

PUBLIC SERVICE

MANAGEMENT RESERVE

BUDGET FOR CITIZENS

PORTAL "OPEN BUDGET OF THE OREL REGION"

AIS "STATE ORDER OF OREL REGION"

COMPETITIONS, AUCTIONS

SERVICES IN ELECTRONIC FORM AND  NTERDEPARTMENTAL ELECTRONIC  NTERACTION

MULTIFUNCTIONAL CENTERS FOR THE PROVISION OF PUBLIC AND MUNICIPAL SERVICES OREL

INFORMATION FOR THE DEVELOPER

REGULATORY  MPACT ASSESSMENT

MONITORING OF LAW ENFORCEMENT

LINKS

AWARDS AND AWARDS

› Awarded

**State awards of the Russian Federation**

› Awards Orel region

› Awards of the Governor of Orel Region

### AWARDS AND AWARDEES

State awards of the Russian Federation

*backward*

## Medal of the Order "For Services to the Fatherland"

ESTABLISHED
By the Decree of the President of the Russian Federation
of March 2, 1994 N0 442

Medal of the Order
of Merit for the Fa herland,
I degree

Medal of the Order
of Merit for the Fatherland,
1st class with swords





Medal of the Order
of Merit for the Fa herland
II degree

Medal of the Order
of Merit for the Fatherland
II class with swords





APPROVED by the
Decree of the President of the Russian Federation
No. 442 of March 2, 1994
(as amended by Presidential Decree
No. 19 of January 6, 1999)

## STATEMENT
### of the medal of the Order "For Services to the Fatherland"

1. The Medal of the Order "For Services to the Fatherland" is awarded to citizens for merits in the fields of industry and agriculture, construction and transport, science and education, health and culture, as well as in other areas of work; for the great contribution to the defense of the Fatherland, success in maintaining high combat readiness of units, units and formations, for excellent performance in combat training and other merits during military service; for strengthening the rule of law and order, ensuring state security.

2. The medal of the Order "For Services to the Fatherland" has two degrees:

- Medal of the Order "For Services to the Fatherland", I degree;

- Medal of the Order of Merit for the Fatherland II degree.

The highest degree of a medal is the I degree granting the right with new merits to reward the Order of Merit for the Fatherland of the IV degree. Rewarding is performed consistently: a medal of the II degree, then a medal of the I degree.

### AWARDS AND AWARDEES

**Awarded**

**State awards of the Russian Federation**

- Decree of the President of the Russian Federation of September 7, 2010 No. 1099 "On measures to improve the state award system of the Russian Federation"
- Regulations on state awards of the Russian Federation
- Extract from Section IV of the Provisions on State Awards of the Russian Federation approved by the Decree of the President of the Russian Federation of September 7, 2010 No. 1099 "On Measures to Improve the State Award System of the Russian Federation"  on the issue of duplicates (models) awarded by the state awards of the Russian Federation in exchange for the lost
- Instruction on the procedure for issuing rewarded duplicates of medals  medals  decorations  badges to honorary titles of the Russian Federation and documents to state awards of the Russian Federation in exchange for the lost
- Hero Rank
- of the Order
- medals
- marks of Excellence
- honorary titles
- Methodical recommendations on the procedure for issuing award documents for submission to the state awards of the Russian Federation
- Forms of the premium presentation sheet for the awarding of state awards

**Awards Orel region**

**Awards of the Governor of Orel Region**

**Awards of the Government of the Orel Region**

**Honorary citizens of the Orel region**

> Awards of the Government of the Orel Region

> Honorary citizens of the Orel region

SPECIAL PROJECTS

OPEN DATA

LIST OF INFORMATION PROVIDED US NG COORDINATES

ROAD SAFETY

SITE MAP

**ANTITERROR**

**NO DRUGS**

To find:



**Экстренные телефоны:**

С городского/сотового телефона

| | |
|---|---|
| Единый телефон пожарных и спасателей | 01/101 |
| Полиция | 02/102 |
| Скорая помощь | 03/103 |
| Аварийная газовая служба | 04/104 |



OUR PARTNERS







3. Servicemen for differences in combat are awarded a medal of the Order "For Services to the Fatherland" with a picture of swords.

4. The medal of the Order "For Merits before the Fatherland" is worn on the left side of the chest and is located after the orders. If a medal of the 1st degree is awarded, a medal of the second degree is not worn, except for medals with the image of swords.

5. When wearing a ribbon of a medal on the bar, it is placed after the medal ribbons. If the awardee has medals I and II degrees, then only the ribbon of the 1st degree medal is worn.

<div align="center">

УТВЕРЖДЕНО
Указом Президента Российской Федерации
от 2 марта 1994 года N0 442
(в редакции Указа Президента Российской Федерации
от 6 января 1999 года N0 19)

**ОПИСАНИЕ**
**медали ордена "За заслуги перед Отечеством"**

</div>

Медаль ордена "За заслуги перед Отечеством" из серебра. Она имеет форму круга диаметром 32 мм с выпуклым бортиком с обеих сторон. На лицевой стороне - изображение знака ордена "За заслуги перед Отечеством". На оборотной стороне, по окружности, - девиз: "Польза, честь и слава". В центре - год учреждения медали - 1994.

В нижней части - рельефное изображение лавровых ветвей и номер медали.

Медали I степени позолоченная.

The medal with the ear and ring is connected to a pentagonal shoe, covered with a silk moire ribbon of red color. The width of the tape is 24 mm.

To the medal of the Order "For Merits before the Fatherland", handed to the serviceman for differences in combat operations, to the ring between the shoe and the medal, two crossed swords join. The length of each sword is 28 mm, width - 3 mm.

When wearing a band of medals on the bar, the band of the 1st degree medal has in the center a yellow strip 1 mm wide, a band of the 2nd degree medal - a gray strip 1 mm wide.

backward

---

Home - Awards and awarded - State awards of the Russian Federation - medals

© 1998-2018 Administration of the Governor and the Government of the Orel Region

> About us
> Feedback
> Write to webmaster

# Exhibit 4





**Crypto Museum**
cryptomuseum.com



← R-394K    USSR    Cold War    R-394KM →

## Strizh  Стриж
USSR digital spy radio set – Swift Mark IV

**Homepage**
**Crypto**
**Spy radio**
Index
Glossary

World War II
Cold War
Special forces
Stay-Behind
OWVL
Receivers
Other

▼ Countries

Burst encoders
Intercept
Covert
Radio
PC
Telex
Telephones
People
Agencies
Manufacturers

DONATE

Kits
Shop
News
Events
Wanted
Contact
About
Links

Strizh (Russian: Стриж) is a digital HF **spy radio station**, developed in the early 1980s in the **Soviet Union (USSR)**. It was used by the countries of the **Warsaw Pact** until the fall of the **Iron Curtain** in 1989. Strizh replaced earlier radio sets like the **R-353** and the **R-394K**. It was used by the **KGB** and the **GRU** for espionage and clandestine activities, and is very similar to the **military R-394KM**.

Strizh covers 1.5 to 13.5 MHz and consists of **three modules**: a **receiver** (left), a **transmitter** (right) and a **digital storage unit (DSU)** at the centre. Each module is housed in a grey metal enclosure and is connected to its neighbour by means of a large connector towards the front.



The DSU has a built-in **burst encoder**, which allows numerical (pre-coded) messages to be stored in its internal memory and to play them back at **very high speed** as soon as a link with the spy centre is established. This minimises the risk of **interception and detection** by the enemy.

Spy radio stations of this kind generally have no model or serial number plate. Instead they are given code names. In this case, the radio is called Strizh (English: Swift) and the serial number is written on a label inside the DSU: 600402. Strizh was typically used by the secret services of the former Warsaw Pact, such as the **KGB** (Russia) and the **Stasi** (DDR), whereas the **R-394KM** was used by military special forces, reconnaissance units, behind-enemy-lines organisations, etc.

Both versions of the radio set were developed in the early 1980s and remained in production until at least 1989. The radio shown here was probably manufactured in 1986 and was discovered in an underground cache in (West) Germany in 2004, complete with fully operational batteries[1].

       

## Controls
The controls of the Strizh radio station are nearly identical to those of the R-394KM with some small **differences**. The set can only be used if all **three units** are mounted together and a 12V DC source is connected to the power socket at the top of the DSU. Turn the unit on with the toggle switch at the top centre of the DSU. Set the MODE switch at the bottom right to REC (Receive).



Operation of the set is identical to the R–394KM, but the connections are somewhat different. Rather than the typical Russian military connectors, this version has commercial sockets, similar to the ones found on western domestic equipment. Furthermore the set has English text on the front panel, whereas the military version was in Russian  All differences with the R–394KM are discussed below. For a description of the operation, please refer to the operating instructions.

## Modular design

Like many other true spy radio sets, Strizh has a modular construction. This allows the individual modules to be hidden separately. It also allows simple replacement of a module in case of a failure. Like its brother, the R–394KM, Strizh consists of three functional modules: a receiver (RX) on the left, a transmitter (TX) on the right and a control unit at the centre. The Control Unit, or Digital Storage Unit (DSU), contains the burst transmitter and the burst receiver, but also the individual RX and TX synthesizers. Without the DSU, the other two modules can not be used.



The three modules are connected via the large connectors towards the front of each unit. An ingenious spring-loaded clamp mechanism holds the units together. Each module has two such clamps just below the control panel: one towards the front and one towards the rear. The units can be separated again by pushing the spring-loaded clamps inwards with a screwdriver.



## Digital Storage Unit  DSU

The Digital Storage Unit (DSU) is at the heart of the Strizh radio station. It contains individial digital synthesizers for the transmitter and the receiver, allowing split-frequency operation between 1.5 and 13.5 MHz. The DSU also contains an automatic digital message centre. Each feature has its own 5-digit red display, but the black numerical keypad is used for for all three.



The DSU allows 203 groups of five numbers each (typically called *datagrams*) to be stored in its internal memory. Once the connection with the spy centre has been established, the datagrams are sent at very high speed (burst) in order to reduce the time on the air and hence minimize the risk of interception and detection.

The DSU is also capable of receiving burst transmissions, typically from the spy centre, fully automatically, and can store messages in its internal message, so that they can be read later through the leftmost 5-digit red display.

In order to retain the data in the DSU's memory, a 9V backup battery has to be installed through a rectangular hole at the front of the DSU. Please note that the position of the battery is different from the R-394KM (see below). The DSU clearly shows the current state of technology in the USSR in the early 1980s. It shows that the Russians had abandonned valve-based technology in favour of transistors and integrated circuits (ICs) and that they had embraced digital solutions. Despite its compact dimensions, the DSU contains no less than 120 ICs! More about messages below.

## Receiver  RX

The leftmost module is the receiver. It is connected to the left of the DSU and is a double-super-heterodyne receiver with the same frequency range as the transmitter (2–15 MHz). The frequency is adjustable in steps of 1 kHz and the intermediate frequencies are at 140.5 MHz and 500 kHz.

The type of modulation is set with a 3-position

selector at the top. The receiver is suitable for AM (A3), CW (A1) and A2. The latter (A2) is for the reception of digital (telegraphy) signals that are modulated onto a sub-carrier. For the reception of normal morse code signals, the middle setting (CW or A1) should be used [2].



Below the modulation selector is the adjustment for the Beat Frequency Ocillator (BFO) that is used for making CW signals audible. Below the BFO are the LF audio adjustment (volume), the antenna adjustment and the HF band selector.

The middle display at the centre of the DSU is used for the receiving frequency in kHz. This display is marked 'REC'. After switching on the radio, with the power switch at the top center of the DSU, set the MODE selector (bottom right of DSU) to REC. Next set the band selector to the desired frequency range. The following ranges are available:

2 → 3 MHz, 3 → 5 MHz, 5 → 8 MHz, 8 → 13 MHz

The RX frequency can be set by holding down the K–button below the display briefly, pressing the red C–button to clear the synthesizer and then (whilst holding down the K–button), typing 5 digits on the key pad. When finished, release the K–button. The display will now be blanked again. Please note that 4–digit frequencies, e.g. 7035 kHz need a leading '0' as shown here:

<p style="text-align:center; color:red">07035<br>10150<br>12887</p>

Now press and hold the unmarked TUNE button (just above the earphone socket) and tune the antenna adjustment of the receiver (ADJ ANT) for a maximum reading on the meter. And finally the volume knob should be used to ajust the audio level of the earphone to an appropriate level.

## Transmitter TX

The rightmost module is the transmitter. It is connected to the right of the DSU and delivers approx. 15W PEP. Manual telegraphy, using the built–in key or the numbers 0–9 on the key pad is possible in A1A modulation, (CW) but for a burst transmission Phase Modulation (PM) is used. This allows a transmission speed of 835 numbers per minute (equivalent to 167 datagrams).

Before using the transmitter, a suitable antenna wire length should be selected from the table on the DSU. For example: when transmitting on a frequency of 5125 kHz, the antenna wire (ANT) has to be 8 metres long, whilst the matching counterpoise (GND) should be 12 metres long.



Next, clear the existing transmission frequency by pressing the C–button under the rightmost display and enter the required frequency on the key pad, e.g. 05125. Use the K–button to check the frequency on the display. You may also hold down the K–button while entering the frequency.

Set the Antenna Matcher to the required position as indicated in the table on the DSU. For example: for a frequency of 5125 kHz, the Antenna Matcher (STEP) should be set to '8'. Now select the required modulation type with the MODE selector at the bottom right of the DSU. For burst transmissions, it should be set to FM, which is actually Phase Modulation (PM). Press and hold down the morse key and adjust the FINE knob for a maximum reading on the meter. Then release the morse key. → On this version of the radio, an external morse key should be used.

When using Strizh for manual telegraphy (morse code), connect an external key to the CINCH socket on the transmitter (KEY) or the EXT socket on the DSU, and set the MODE selector on the DSU to CW (A1). On the military version of the radio, the R–394KM, the internal morse key on the transmitter can be used for this. Mode A2 is used for high–security burst transmissions, in which the signal is modulated onto a sub–carrier. The push button (CONTROL POWER) can be pressed to check the battery voltage. It should put the needle of the meter somewhere in the green area.

## Burst speed

The speed at which a message is sent, depends on the selected transmission mode:

- **CW – 10 GPM**
  This is the so-called *morse* mode (CW). It is used for normal speed automatic and manual morse code and allows **10 groups** (of 5 numbers each) to be transmitted per minute.

- **A2 – 167 GPM**
  This is the so-called *tone telegraphy* mode (TT) which allows **167 groups** per minute to be sent. This means that the longest possible message of 203 groups is sent in approx. 1.2 min.

- **FM – 415 GPM**
  This is so-called *phase telegraphy* mode (FT) which offers the highest security by sending the data at a speed of **415 groups** per minute. In this mode, the longest possible message of 203 groups is sent in less than 0.5 min.



## Preparing a burst transmission

The leftmost display (DATA) on the DSU is used for the burst encoder, together with the leftmost column of keys (C, П, ПУСК, P) and the black numerical key pad. After switching on the radio station, check the battery voltage (CONTROL POWER) and set the MODE selector to Receive (REC). A message consists of a 5-digit header followed by a series of 5-digit groups (datagrams) that are each separated by pressing ENTER (P). The DSU can hold 203 of such 5-digit datagrams.

Next, set the Memory Control selector, at the bottom left of the DSU, to Program (PRGM) and enter the 5-digit header of the message using the numerical keys. The numbers should be visible in the display immediately. Terminate the header by pressing the ENTER–button (P).



Now enter the message as a series of 5-digit groups and terminate each group by pressing the P-button. If you made a mistake, the current group can be cleared by pressing the C-button. Multiple messages can be entered by pressing the P-key twice at the end of a message.

When finished, set Memory Control to STORE. A message can be checked by setting the Memory selector to PRGM again, after which the first radiogram (i.e. the header) should be visible. Now use the P-button to step through the groups. Errors can be corrected by pressing C, entering a new 5-number group and pressing P. When finished, set the Memory selector to STORE again.

The message is now ready for transmission. Prepare the transmitter as <span style="color:blue">described above</span> and select the required transmission mode (FM or A2). Set the Memory Control selector to PRGM and keep the START–button (ПУСК) depressed until the DATA display lights up and the antenna current light starts flashing. Then release the ПУСК–button. The message will now be sent.

During the transmission, the display will show the datagrams and the morse signals can be heard through the earphone. When the message is completed, the display and the Antenna Current Indicator will go off. If you have another message ready to go, press the P-key until the message header shows on the DATA display and press ПУСК to start. When finished set the Memory

selector to STORE again. The message stays in the memory of the DSU as long as the main power switch is ON, or the Memory selector is set to STORE. In order to clear the message, turn the radio set off and set the Memory selector to 'OFF'. Wait a few seconds before switching on again.



## Accessories



Antenna    Earphone    Power

## Antenna

Like most HF radio sets, Strizh is best used with a wire antenna. Depending on the selected operating frequency, a wirelength of 6 or 8 metres was used and a counterpoise of 4, 6, 8 or 12 metres. A table, printed on the control panel of the DSU, shows which wire lengths to use.

The two wires were connected to the two screw–terminals at the top right of the transmitter, to the right of the meter. The upper connector is for the counterpoise wire (GND) whilst the lower one is for the antenna (ANT). When transmitting, a small red light, just below the meter, gives an indication of the antenna current.



The length of the wires has been choosen carefully, so that the standing wave ratio of the transmitter can be matched easily by the built–in antenna tuner. Again, the table on the DSU is used to select the correct tuner preset.

The table dictates the setting of the STEP selector on the transmitter, for any given frequency. For example: when transmitting on a frequency of 7035 kHz, the STEP selector should be set to 9. The FINE knob is then used to adjust the transmitter for maximum power output. Select the desired transmission mode (e.g. CW), activate the transmitter by holding down the external morse key and ajust the FINE knob for a maximum reading on the meter. Then release the key.

## Earphone

Unlike the military R–394KM, which uses a Russian military pair of headphones, Strizh has been converted for use with standard domestic earphones with a 3 mm jack at the end. The one shown here was made in Russia in the 1980s and came with a standard Western 3 mm jack.



When the operator lost his earphone or when it got broken, he would be able to buy a standard earphone from a local store whithout attracting any attention. The earphone is suitable for both the left and the right ear, as the plastic clip can be reversed.

## Power source

Strizh should be powered by a 12V DC source that can deliver 5A. Although it is possible to use an external power supply unit, the radio was commonly driven from the battery of a car. When the spy had to send a message to the spy centre in the homeland, he would drive to a quiet spot, e.g. in a forest, put up the antenna, connect the radio to the car battery and deliver the message.

In order to save time, he might have entered the

(pre)coded message in the memory of the DSU at
home. This is why the DSU has a backup battery.



As the battery cable might break or get lost,
Strizh was equipped with an 8–pin DIN power
socket, rather than a Russian military one. It
allowed the spy to buy a new connector from a
local electronics store. The cable shown here
was probably made at a later date. As the former
owner probably couldn't find a suitable 8–pin
DIN connector, he used a 5–pin one and broke
away the remaining three pins from the socket.

The original cable would probably have had a cigarette–lighter plug in place of the two banana–
type plugs shown above, or ultimately two battery clamps, allowing it to be connected directly to
the car battery. As 12V is the most common voltage in domestic cars world–wide, Strizh can be
used directly. For the same reason, older spy radio sets, such as the R–350 and the R–354, were
powered by 6V DC, which was a common voltage in the cars of the 1950s and 60s.

➤ Pinout of the DIN socket



# Differences with R–394KM

Strizh is fully based on the design of the (military) R–394KM. In fact, the radio station has been
designed in such a way that it could be made suitable for a variety of purposes, including Special
Forces, reconnaissance, Stay–Behind, underground caches and clandestine activities (espionage).
Depending on the application, the radio station was adapted to the specific user requirements.

For espionage, the set was not housed in the typical military case of the R–394KM, but came as
three separate units that could be adapted for any type of concealment (e.g. inside a common
briefcase). Furthermore, the units had english lettering on their control panels. This was done for
two reasons: It would not immediately expose the set as being Russian when it was accidently
discovered by, say, the police. The most important reason however, was the fact that many spies
and agents working abroad did not speak Russian and were not able to read Russian instructions.



Depending on the area in which the radio was to
be used (i.e. the target country), the radio was
adapted to the local availability of spare parts.

On this example, the typical Russian fuse holder
has been replaced by a western alternative. In
case the fuse was blown, the agent could obtain
a new commonly available fuse from any local
store, rather than ask for an original (smaller)
Russian one, which was not available in the west
and would certainly have raised eyebrows. In the
same vein, the military 4–pin power socket was
replaced by a more common 8–pin DIN socket.

On a standard R–394KM, a built–in morse key is present towards the front of the transmitter. It
allows messages to be sent directly in morse code in case of an emergency. As this was not very
convenient – most operators were not capable of giving morse code and if they were, they would
like to use an external key – the internal key was replaced by a CINCH (RCA) socket.

The following differences with the R–394KM have been found:

- No storage compartment at the left
- No military storage case
- Three modules separately cased
- 9V battery compartment at the front of the DSU
- DIN power socket
- Western–style fuse holder (for 20 mm fuses)

- 3 mm jack socket for headphones
- English text on control panels
- Grey control panels (rather than hammerite)
- Morse key replaced by CINCH socket (RCA)

Although Strizh was built on the chassis of the R-394KM, the holes in the grey front panels are positioned in such a way that they accomodate standard civil connectors rather than the usual military ones. It is entirely possible that some of the modifications mentioned above were carried out after the Cold War (i.e. by a former owner), but this seems unlikely. They are carried out in a professional manner and fit in with the idea of being able to source spare parts locally.

The position of the 9V backup battery needs some clarification. On the military version of the R-394KM, the backup battery is located under a removable oval lid on the control panel of the transmitter. Below this panel is space for a cylindrical Acacia battery (Russian: Акация), which is actually a stack of 6 circular 1.5V cells.



Although the holder for the Acacia battery is still present inside the transmitter, there is no lid in the control panel. As this type of battery was not available in the west, a western-style 9V battery holder was added to the front of the DSU.

This allowed the agent to obtain a replacement battery from a local store and install it through a rectanglular hole in the front of the DSU. Another modification to this effect was the replacement of the 2-pin Russian headpones socket by a standard 3 mm jack socket, allowing any ordinary earphone to be used, such as the ones that were commonly supplied with portable radios.



# Coding and decoding messages

It is often claimed that digital spy radio station, such as Strizh, have a built-in encryption system for the protection of the messages. This is not true however. Strizh can only send and receive pre-coded numerical messages at very high speed  Encryption should be done externally.

The spy radio set (i.e. Strizh) was generally **no**  used for receiving messages as it was considered too risky. In most cases, a spy would use a domestic short-wave receiver (e.g. a Sony ICF-2000ID) and tune in to the broadcast of one of the so-called number stations. Short-Wave listeners will certainly remember the endless ranges of numbers read in German or English by a female voice.

### EINS ZWO SIEBEN DREI ACHT TRENNUNG...

These numerical messages contained instructions for spies and agents world wide and were generally encrypted with the unbreakable One-Time Pad (OTP). Occasionally, the lines of a poem or the pages from a popular book were used as the encryption key, but that was less secure.

In most cases, the spy radio station was only used for transmitting messages. The text-based messages were first converted to numbers using some kind of encoding scheme. The result was then encrypted by means of a One-Time Pad (OTP) and stored in the memory of the DSU.



The image on the right shows an original One-Time Pad as it was used by Eastern Block spies from the 1960s onwards. It is a small booklet that contains very thin pages, each with a series of random numbers in groups of 5 digits. These numbers were added to the numerical message.

Only two copies of the number ranges existed: one with the spy and one at the spy centre in the

homeland. Each 5-digit group was added to a 5-digit group of the message. A page from this booklet was only used once (hence the name <u>one-time</u> pad), and was destroyed immediately after use. When a one-time pad consists of truely random numbers, this code remains unbreakable.

➤ More about one-time pads
➤ More about number stations

## Storage case

Unlike the military variant, the R-394KM, Strizh is not housed in a transit case. Instead, its casing is constructed in such a way that it could be built inside virtually any type of concealment, for example a common briefcase that would not attract unnecessary attention when carried around.

When *this* unit was (re)discovered in 2014, it was stored inside a green aluminium transport case that was originally used for a military 9S13 (Russian: 9C13) homing device. The radio set fits tightly inside this case, but the lid has been bulged somewhat in order to accomodate the knobs. The top lid of the case is rubber-sealed.



It is unlikely that Strizh was originally stored inside this case. Carefully hiding the fact that it is a Russian device (by putting English text on the front panel) and then storing it inside a case with Russian markings, doesn't make any sense.

Furthermore, the case has no space for the accessories, such as the headphones, the power cable and the antenna wires. On the other hand, the case might have been used to protect the radio when it was stored for longer periods of time, e.g. as part of a cache. In that case, the accessories might have been stored in a separate container. If you know more about this, please let us know.

## Circuit description

The transceiver consists of the following building blocks:

1. Transmitter
2. Synthesizer
3. Receiver

## Block 2 – Synthesizer

This is the largest of the three units that is physically placed between the transmitter (block 1) and the receiver (block 2). Although it is called the synthesizer, it is much more than that. It contains the internal power supply unit (PSU), a keypad and three displays, and provides the tuning signals for the receiver and the transmitter. Furthermore it contains the Storage-Keying Device (NMU) that allows messages to be stored in its internal RAM and sent at very high speed.

- 2-01 – Reference oscillator (10 MHz)
- 2-02 – Analogue board (synthesizer)
- 2-03 – Display and keypad board
- 2-04 – Logic board
- 2-05 – PSU
- 2-06 – PLL (phase detector)
- 2-07 – NMU (see below)

## Block NMU   block 2-07

Inside the synthesizer section (block 2) is a digital circuit that is provided as a closed metal block with a large connector at one end. This block is marked SECRET and is known as NMU (Russian: HMY), which stands for: Накопительно-манипулирующего устройства (Storage-keying device). Inside the NMU are five circuit boards, marked A1 thru A5, which contain the following circuits:

- A1 – Tone Telegraphy keyer (TT)
- A2 – Morse keyer (CW)
- A3 – Address decoder and RAM
- A4 – Pulse distributor

- A5 – Phase Telegraphy keyer (FT)

## Serial numbers

It is currently unknown how many R–394KM and Strizh transceivers were built. Judging from the serial numbers on recovered radio sets, it seems likely that two batches of the R–394KM were built and one batch of Strizh. So far, we've seen the following serial numbers:

- 360133, 380995, 380996    ← R–394KM
- 547659, 547992    ← R–394KM
- 600402    ← Strizh

There seem to be three number ranges: starting with '3' and '5' for the military R–394KM variant and '6' for the agent/spy radio sets. If we assume that the '6' series was indeed the spy variant, and that they were numbered from 1 onwards, it seems safe to estimate that several hundred units of this type were built. Serveral thousands of the military variant will have been built.

## Connections

### Power supply

The Strizh spy radio set featured on *this* page features an 8–pin male DIN socket for connection of the external 12V DC power source. This was a replacement of the original Russian 4-pin male socket that is found on the military R–394KM. The diagram below shows the pinout of the DIN power socket when looking into the socket. Note that a 5-pin socket would have been suitable. Pins 6, 7 and 8 are removed from the socket, so that a common 5-pin female plug can be fitted.

1. 0V
2. *n.c.*
3. 12V
4. 0V
5. 12V
6. *n.c.*
7. *n.c.*
8. *n.c.*

### External connector

A 10–pin expansion connector is present at the center of the DSU, between the MEMORY and MODE selectors. This socket is sometimes protected by a black plastic cap and is intended for the connection of additional equipment such as an external morse keyer. It allows the transceiver to be partly remote-controlled by the external device. The connector has the following pin-out:



An external key can be connected between KEY and GND. Please note that the radio has two KEY inputs: one used for AM (amplitude modulation) and one for PM (phase modulation, here called 'FM'). Also note that the pin-out of this socket is different from the same socket on the earlier R–394K radio. Connectors for this socket are difficult to obtain.

> WARNING — connecting the wrong type of accessory may cause permanent damage. On the version of Strizh featured on this page, this socket was probably unused as a separate key input is available on the transmitter.

---

1. This contact is NOT wired on most Strizh/R–394KM units. When wired, it provides a clock signal for an external keyer. In A2 mode, the clock signal is 100 Hz. In FM mode it is 250 Hz.

## Technical specifications

- Power          12 – 13.8 V DC
- Current        0.7 A (RX) or 4.5 A (TX)
- Output power   15 Watt
- Frequency      2 – 15 MHz (or actually 1.5 – 14.999 MHz)
- Weight         8 KG

## Documentation

A. Radio Station R–394KM Technical Description and Operating Instructions
   Full circuit description, block diagrams and wiring diagram (Russian).
   IV1.106 007 TO. 1988. SECRET. Serial number 10.

   ➤ Drawings and diagrams for this manual

B. Radio Station R–394KM Technical Description and Operating Instructions. Appendix.
   Components list and circuit diagrams (Russian).
   IV1.106 007 TO1. 1988.

C. Block NMU (Russian: Блок НМУ) Technical Description
   Circuit description and diagrams of the burst encoder (Russian).
   2.082.046 TO. 1988. SECRET. Serial number: 31.

## References

1. Gunter Fietsch, *Nachrichtentechnik der Nationalen Volksarmee*
   Part 2, 1996, p. 303. ISBN 3–88180–340–8.

2. Wikipedia, *Types of radio emissions*
   Overview of modulation types. Retrieved September 2014.

3. Anonymous source, *Eye witness account of R–394KM found in Germany*
   Interview with Crypto Museum, 2009.

## Further information

- R–394KM (military version of the Strizh)
- Other USSR spy radio sets
- Other spy radio sets

---

Any links shown in red are currently unavailable. If you like the information on this website, why not make a donation?
© Crypto Museum. Created: Sunday 27 September 2015. Last changed: Thursday, 01 March 2018 – 07:52 CET.



# Exhibit 5

# REPORT:  THE CHANDLER BROTHERS



DATE:    November 2004

My investigation into money-laundering in Monaco quickly led to the SOVEREIGN GROUP (including Sovereign Asset Management and Sovereign Forex), and SOVEREIGN GROUP's mysterious principals, the CHANDLER brothers -- Richard and Christopher -- whom we now suspect of espionage in addition to money laundering.

| | |
|---|---|
| Subject: | Richard Fred CHANDLER |
| DOB: | 9 November 1958, Hamilton, New Zealand |
| | |
| Subject: | Christopher Lincoln CHANDLER |
| DOB: | 17 January 1960, Hamilton, New Zealand |
| | |
| Father: | Robert Richardson CHANDLER |
| DOB: | 10 March 1924, Auckland, New Zealand |
| Mother: | Marija CHANDLER |
| DOB: | 18 February 1937, Trogir, Dalmatia, Yugoslavia |

Date of Marriage:    18 August 1956
Place of Marriage:    Trogir, Dolmatia, Yugoslavia

' Robert & Marija have a criminal conviction in New Zealand dated February 1979 for a breach of the Customs Act.

All members of the CHANDLER family at one time held New Zealand driving licenses, linked to post office box addresses. All such licenses have long since expired without renewal. None of the four family members currently own property nor reside in New Zealand; the family departed NZ in the late 1980s and cut all ties with their native country. It is unknown whether any of the CHANDLERS have taken citizenship in another country, although they have become resident in Monaco. People familiar with the CHANDLERS believe they are UK nationals.

The first piece of data linking the CHANDLERS to the Principality of Monaco deals with the dissolution of Chandler House Limited, a New Zealand property company struck off the registry on 30 January 1991. As they were then residing outside of New Zealand, the CHANDLERS were obliged to provide their address, and on 5 April 1988, both brothers provided this address: Le Soleil D'Or 20, 14th floor, CD Rainier III, MC 98000 Monaco.

The first known press article on the CHANDLERS was published in the *Financial Times* (6 July 2002), bylined Andrew JACK (Moscow correspondent), who wrote that the brothers are "intensely private" and "extremely low-profile." If anything, this description is an under-statement. Press reports since that time, in conjunction with SOVEREIGN's investment in South Korea's SK Corp, have labeled the brother "mysterious."

The CHANDLERS run numerous off-shore companies, most of which operate beneath their SOVEREIGN FOREX & SOVEREIGN ASSET MANAGEMENT umbrella. On 26 January 1998, Sovereign Plaza Limited (registered in the British Virgin Islands), purchased a fourteen-story building of thirty apartments at 10 av. des Ligures in Fontvieille for 423,000,000 French francs (approximately $65 million), cash, utilizing an Austrian bank, Credit Anstalt. They re-named this building Sovereign Plaza. The CHANDLERS are reputed to use the top two floors of Sovereign Plaza as 1) a local Monaco residence for themselves and 2) business offices.

Sovereign Plaza's apartments are mostly empty. Enquiries from local real estate agents are routinely rebuffed. The owners have no interest leasing.

The building has its own underground car park, with direct elevator access to the internal building. Security in the car park is said to be "extreme," with both human security and numerous CCTV cameras. Furthermore, the CHANDLERS appear to have constructed a skirting around the roof of their penthouse garden, presumably to shield it from view. With its easy access to both Monaco's heliport and sea ports of Cap d'Ail and Fontvielle, Sovereign Plaza offers excellent security to covert operators who visit the principality.

The CHANDLER brothers' main residences are not in Monaco, but in nearby St-Jean-Cap-Ferrat, on two estates, Le Rocher and Petite le Rocher. The brothers have disguised their presence in these villas by displaying bogus names on their mail boxes. Not without a sense of humor, they have chosen *M. Dilettante* (Relax) and *Mde. Boissin* (Drink) as their address aliases.

Additionally, the old David Niven estate in Cap Ferrat has become home to Robert and Marija CHANDLER. As is the custom with the CHANDLERS, true identities are disguised. All building and utility bills relating to this landmark house are sent to an entity called SOCIETE DU CORNICHE.

On 15 January 2003 we conducted discreet on-site surveillance outside Sovereign Plaza. Despite the fact that all apartments are empty

(except those used by the CHANDLERS), and the CHANDLERS do not possess a license to transact business in Monaco, eighteen motor vehicles entered the underground car park between nine and ten-thirty a.m. (These included a Mercedes 500 sports car, Monaco licence tag C969, which traces to Christopher CHANDLER.)

At this point we were willing, at considerable expense, to commission a report from special sources with a proven ability to access the Russian SVR's registry. Here follows the substance of that report:

In the early 1990s, following the collapse of the Soviet Union, the Russian Foreign Intelligence Service (SVR) faced severe budget restrictions. In order to maintain its operational capabilities, then SVR director Yevgeny PRIMAKOV ordered an aggressive worldwide search for business entities that the SVR could use a) to generate income for the service and b) provide support to secret operations. This search led the SVR London rezidentura (station chief) to the CHANDLER brothers. Richard and Christopher were born in New Zealand where they had managed the family real estate interests before venturing into significant business in the Far East and Latin America.

The SVR recruited the brothers in 1992 and moved them to Zurich, Switzerland, where they formed the SOVEREIGN GROUP, a family of speculative funds and financial companies operating primarily in the high-

risk markets of Russia and other republics of the former Soviet Union. The CHANDLERS picked a handful of influential Swiss politicians, lawyers, and accountants as nominees to front this operation.

At the same time, the CHANDLERS opened a branch of SOVEREIGN FOREX in Bristol, England, which acted exclusively as a branch of Gazprom and whose main function was to launder illicit profits for Gazprom's senior executives.

SOVEREIGN (FOREX) Ltd, Registration No. 02823960, had three nominee executives:    Jeffrey REVELL-READE (Australian), Stephen Bernard WHEATLEY (British), and Baburai Tarachand SHAH.

For the past decade, the CHANDLERS and their companies have worked on behalf of the SVR both in support of its intelligence operations and as a front for a number of Russian companies and senior members of the Russian government and business community.  Both sides appear satisfied with the relationship.  Both the SVR and the CHANDLERS have made a great deal of money, and the CHANDLERS have proven to be quite adept at discharging their intelligence responsibilities.  In addition, the SVR's reputation at home has been enhanced by the tasks the CHANDLERS have performed on behalf of Presidents YELTSIN and PUTIN and members of their families and governments.

The CHANDLERS and the SOVEREIGN GROUP, especially SOVEREIGN FOREX, play an important role in support of SVR operations worldwide by providing the following services:

* Cover positions in the company for Russian Intelligence officers destined to become *illegals* (non-official, deep-cover agents). The officers gain experience in Western business practices and in life in the West. They also develop a "legal" job history.

* Transfer SVR operational funds into banks and offshore accounts all over the world. These funds are used to finance sensitive illegal and paramilitary operations as well as normal operations of SVR stations.

* The CHANDLERS identify persons among their business and governmental contacts of potential operational interest to the SVR. They also identify Western firms engaged in developing new technologies and alert the SVR to individuals of interest with those firms.

* Rather surprising (says our special source), given the risks involved, the CHANDLERS also perform specific operational tasks such as loading and unloading dead-drops and meeting SVR "illegals" in Switzerland and France. They seem to do these jobs well. In Moscow on 20 December 1999 (Chekhist Day), Richard was awarded the Russian

order "For Service to the Fatherland" third class.

\* SOVEREIGN's Relationship with Gazprom and other Russian companies:  From the very beginning, the SOVEREIGN GROUP has been closely tied to the giant Russian natural gas monopoly, Gazprom, whose former chairman, Viktor CHERNOMYRDIN, was for several years prime minister under President YELTSIN.  In fact, SOVEREIGN FOREX has for years acted as a front company for Gazprom senior executives.

The CHANDLERS have used SOVEREIGN FOREX, the UNITED FINANCIAL GROUP, and a number of Russian companies such as *Beloye Ozero* (White Lake) to purchase Gazprom shares on behalf of senior Gazprom executives and the political elite of Russia.  Altogether, the SOVEREIGN GROUP has bought about one billion shares -- four percent -- of Gazprom.  As a result, the CHANDLERS have become highly influential in behind-the-scenes power struggles in Gazprom.  They were instrumental in placing former deputy prime minister and finance minister Boris FYODOROV on the company's board in the summer of 2002.

In addition to buying Gazprom shares, SOVEREIGN FOREX has set up personal, ciphered offshore accounts for CHERNOMYRDIN, former Gazprom chairman Rem VYAKHIREV, and other senior Gazprom

managers, in Gibraltar, the Channel Islands, and the Seychelles. In December 1999 the company assisted in establishing accounts in Monaco for former President YELTSIN and his family.

It is believed that the CHANDLERS have similar relationships, albeit on a smaller scale, with the senior management of Lukoil and the electric power company, UES.

\* Non-Russian clients: Through their various companies, the CHANDLERS are able to launder funds and "hold" shares (as nominess) on behalf of non-Russian companies who desire that their financial transactions remain anonymous. Among these companies are BP/Amoco, Total/Fina/Elf, and the Trump Group.

\* A Special Relationship with Credit Agricole Swiss: The CHANDLERS appear to have a special relationship with Credit Agricole Swiss, which dates to 1996. In May of that year, Richard entered into a "gentlemen's agreement" with the Geneva branch of Credit Agricole. Under the terms of the agreement, the SOVEREIGN GROUP would use Credit Agricole to channel money from its Russian clients through Switzerland to offshore accounts around the world. This arrangement has been very successful and remains in force today.

\* Involvement with Organized Crime:  In the autumn of 2002, the SVR learned that the CHANDLERS were laundering money and share-buying for two notorious Russian organized criminal groups, the SOLNTSEVO GROUP of Moscow and the FAR EASTERN GROUP, centered in Vladivostock and Nakhodka.  These unauthorized (by SVR) relationships greatly alarmed and angered the SVR leadership, who called Richard to a meeting in Vienna in November 2002.  A senior SVR deputy director ordered Richard to cease all contacts with the Russian criminal underworld.  Richard agreed, but some in the SVR doubt that the CHANDLERS have done so.

\* Political Protection for the CHANDLERS:  For the most part, the CHANDLERS and their activities have the blessing and protection of the most influential circles in Russia.  Their backers:  the SVR, former Gazprom officials including CHERNOMYRDIN and VYAKHIREV, Gazprom board member Boris FYDOROV, former President YELTSIN and his family, and President PUTIN and members of his inner circle.  As a result of their relationships with this powerful elite, the CHANDLERS are virtually untouchable by Russian police and regulatory bodies.  In the period 2001-02, Russian prosecutors tried three times to open criminal investigations into the CHANDLERS and their activities in Russia.  On all three occasions, the prosectors were ordered not to proceed.

\* Sovereign Plaza is the de facto SVR station in Monaco.

\* Activities of the CHANDLER Brothers in 2001/2:

--   In February 2001 the CHANDLERS funneled $650,000 belonging to Directorate S (Illegals) of the SVR through UNITED FINANCIAL GROUP to offshore accounts in the Bahamas and Cyprus. In April 2001 these funds were transferred to accounts in the United States to finance Directorate S operations in the USA.

-- In April 2001 the CHANDLERS discreetly acquired $45.5 million worth of Gazprom shares for Total/Fina/Elf.  The brothers received $1.2 million for arranging this transaction.

-- In May 2001 Christopher CHANDLER picked up a dead drop in Nice, which contained personal documents, a large amount of money, and communication equipment for a Russian illegal officer.  Later the same month he picked up the officer, who had arrived in Marseilles on a cruise ship, passed him the contents of the dead drop, and put him on a plane. The officer's assignment was to establish a "legal" business in the UK.

-- In August 2001, the CHANDLERS acquired $25 million worth of Gazprom shares for Credit Agricole Swiss.   The brothers' fee was $750,000.

--     Between August and October 2001 the CHANDLERS dispatched four operational reports to SVR Headquarters describing the personalities of several prominent British and French businessmen and politicians with whom they were in contact. They also sent a report outlining the likely situation in Monaco post-Prince Rainier.

-- In September 2001 the CHANDLERS used UNITED FINANCIAL GROUP to transfer $500,000 belonging to Directorate S into accounts in the Channel Islands. These funds were to be used to finance the operations of SVR Illegals in Western Europe.

-- In December 2001 Richard CHANDLER met with a high-ranking SVR officer, probably a deputy director of the service, on the French Riviera. This official asked the CHANDLERS to facilitate the transfer of funds from Libya to Russia, payment for special operational equipment sold to the Libyan Intelligence service by the Russians.     The CHANDLERS subsequently arranged transfer of $18 million from Libya to accounts in Cyprus and then,via Credit Agricole, into accounts in Sberbank in Russia.

-- In January 2002 the CHANDLERS brokered an introduction of Credit Agricole to senior Libyan officials on whose behalf Credit Agricole is now conducting discreet financial operations. Credit Agricole paid the CHANDLERS one million dollars for this introduction.

-- In March 2002, acting on the direct orders of the Director of the SVR, the CHANDLERS used SOVEREIGN FOREX to acquire $10 million worth of Gazprom and Yukos shares for President PUTIN. These shares were deposited in the Bern branch of Credit Agricole.

-- In May 2002 Christopher CHANDLER organized a long-term dead drop in the suburbs of Avignon. The dead drop contains two short wave radios and a set of codes.

-- In June 2002, the CHANDLERS used UNITED FINANCIAL GROUP to transfer $500,000 in special operational funds into accounts in Gibraltar and the Channel Islands. These funds are to be used for SVR operations in France and Spain.

-- In September 2002 the CHANDLERS acquired $4 million worth of Gazprom shares for Russian Prime Minister Mikhail KASYANOV, which were deposited in the Bank of Bahamas.

-- In September 2002 the CHANDLERS acquired one million dollars worth of Lukoil shares for Russian Foreign Minister Igor IVANOV and deposited them in the Bank of Zurich.

-- In November 2002 the CHANDLERS used UNITED FINANCIAL GROUP to transfer special operational funds in the amount of $875,000 into accounts in the Bahamas and Panama. These funds were to be sent to the United States to finance SVR operations in the USA.

## SWISS INVESTIGATION

In the midst of our investigation, we discovered that the Swiss government is conducting its own on-going investigation into the activities of the SOVEREIGN GROUP. The investigating magistrate, Ivo HOPPLER, believes that SOVEREIGN has engaged in money-laundering for Russian clients. Moreover, HOPPLER believes that SOVEREIGN has de-frauded a number of small-time Russian investors.

Here is the genesis of that investigation:

At the end of September 2002, the Swiss Federal Banking Commission ruled that SOVEREIGN GROUP (Zurich) be closed down. Following this decision, the police commenced sweeping searches at the Zurich offices of SOVEREIGN FOREX LTD, SOVEREIGN CAPITAL MANAGEMENT AG, SOVEREIGN FINANCE GROUP AG, and SOVEREIGN BANK CORP, LTD. The latter was discovered to be operating as a bank without a license. (SOVEREIGN BANK is based in St. Vincent, which remains on a blacklist of countries who fail to combat

money-laundering.)   Soon after, on 7 October 2002, a Swiss court ordered SOVEREIGN GROUP (Zurich) to cease its various operations due to alleged money-laundering activities in Russia and the Caribbean. Part of the evidence removed by police were documents linking SOVEREIGN FOREX to Credit Agricole as on of the main money-laundering entry ports for elements of Chechen organized crime, as well as for clients who were former high-ranking officials in the Russian government (a corroboration of our special source findings).

Our dataveillant determined that the SOVEREIGN GROUP's entities at Seidengasse 6, Zurich CH-8001 traced to two operational bases in Moscow:  1)  The Radisson-Slavyanska Hotel (owned jointly by Chechen mobster Umar JABRAILOV) and 2) an office at Berezhkovskaya nab 2, floor 4, telephone number 941-86-47, fax number 941-86-48.

In the wake of a Swiss investigation, the SOVEREIGN GROUP's websites in Switzerland (www.sovereign.ch) and Russia (www.sovereign.ru) are no longer operational.

A member of my team met with Ivo HOPPLER, the Swiss investigating magistrate, in Zurich on 18 February 2003.   HOPPLER stated his belief that Richard and Christopher CHANDLER are the principals behind all of the various SOVEREIGN entities in Switzerland, but that he could not (at that time) prove this with hard evidence.

HOPPLER indicated an interest in linking the CHANDLER BROTHERS to SOVEREIGN, with the objective of issuing warrants for their arrest.

In mid-October 2003, HOPPLER's preliminary investigation turned into a full investigation and the magistrate has several full-time investigators at his disposal.

Earlier in 2003, SOVEREIGN/THE CHANDLERS came out of the closet when they became the largest shareholder in South Korea's SK Corporation.   In so doing, they identified themselves as a "Monaco headquartered" asset- management company.

Yet, after two thorough checks with Monaco's registry, we can find no evidence that the CHANDLER brothers, nor SOVEREIGN GROUP (nor any of its entities), have ever applied for permission, nor received the necessary authorization, to conduct business in the Principality of Monaco.

In June 2004 we cultivated a source -- a UK national -- who was recently employed by the CHANDLERS for six months.   This source confirmed that the CHANDLERS indeed operate a commodity-trading business on two floors atop Sovereign Plaza.

Our source provided us with a Sovereign Group internal telephone

directory, which demonstrated that, in addition to the CHANDLER brothers, no fewer than fourteen (14) individuals are employed by SOVEREIGN GROUP, whose main phone number is listed as (377) 97.98.66.00. The *Trader Desk* is listed as (377) 97.98.66.01.

These include:

* Philip FLYNN, CEO             97.98.66.33
* James FITTER, Chief Trader    97.98.66.50
* Terence CURRIER               97.98.66.01
* Ian GALVIN                    97.98.66.01
* Sam DOCHERTY                  97.98.66.01
* Nora Lynn DEMONGEOT           97.98.66.01
* Deborah MORRISON              97.98.66.01
* Esther KRUKOWSKI              97.98.66.45
* Heidi BOBACK                  97.98.66.45
* Lara CHANDLER                 97.98.66.03
   (Wife of Christopher)
* Elisabeth ROSATI              97.98.66.02
* Caroline ALLWOOD              97.98.66.02
* Sara PALMER-HUSSEY            97.98.66.02
* May TASHA                     97.98.67.39
* Emily MONKS                   97.98.66.03

In addition, there are telephone extensions for six boardrooms,

three conference rooms and one video-conference room.

# Exhibit 6

# Le règlement de la dette angolaise aurait donné lieu à des détournements de fonds

Une partie des sommes destinées à rembourser la Russie aurait notamment bénéficié à MM. Falcone et Gaydamak.

LE MONDE   02 04 2002 à 10h37

Les juges Courroye et Prévost-Desprez sont entrés dans un labyrinthe dont ils n'ont pas fini d'explorer les subtilités : celui des sociétés intervenues dans le règlement de la dette de l'Angola à la Russie, entre 1996 et 2000. Les magistrats enquêtent sur d'éventuels détournements de fonds – initialement destinés au ministère des finances russe. Ce dernier n'aurait touché, pendant cette période, que 161 millions de dollars sur les 773 millions payés à Abalone Investment Limited, la société agissant comme intermédiaire dans le recouvrement de la dette et dont les ayant droits sont Arcadi Gaydamak et Pierre-Joseph Falcone. S'élevant à l'origine à 5 milliards de dollars – héritage de l'époque soviétique –, cette dette avait été réduite de 70 % grâce à un accord conclu en novembre 1996, aux termes duquel l'Angola devait payer à la Russie 1,5 milliard de dollars, sous forme de billets à ordre, d'ici à 2016.

Selon les enquêteurs, MM. Falcone et Gaydamak auraient respectivement touché 60 et 130 millions de dollars, à titre personnel et également, dans le cas de M. Falcone, via la société Brenco. L'examen des mouvements de fonds intervenus entre 1997 et 2000 sur le compte CO-101436 détenu par Abalone à l'UBS de Genève laisse apparaître d'autres bénéficiaires. Ainsi, Elisio de Figueiredo, ambassadeur itinérant de l'Angola en France, a touché 18,8 millions de dollars sur un compte ouvert aux îles Caïmans. Le banquier russe Vitali Malkine a, lui, reçu 48,8 millions de dollars d'Abalone. Les magistrats ont par ailleurs été destinataires, en mars, de signalements Tracfin (service anti-blanchiment du ministère des finances français) ayant permis d'établir que M. Falcone avait ouvert en 1998 des comptes au nom de trois sociétés de droit panaméen (Dramal, Camparal et Tutoral), à la Banque internationale du Luxembourg (BIL). Selon Tracfin, les "bénéficiaires économiques" de ces comptes seraient M. Falcone lui-même, M. Figueiredo, et le président angolais, José Eduardo Dos Santos. En avril 2001, M. Dos Santos s'était plaint auprès de Jacques Chirac d'une enquête qui causait selon lui "de graves préjudices moraux" à son pays. Jusqu'alors, rien n'avait permis d'établir qu'il ait pu percevoir des fonds de M. Falcone.

Arcadi Gaydamak affirme pourtant que l'opération russo-angolaise "n'a pas donné lieu au moindre détournement". Il a déclaré au Monde que lui et ses deux partenaires dans Abalone, M. Falcone et M. Malkine, s'étaient partagé 50 millions de dollars en trois ans. "C'est une opération de trading classique, extrêmement favorable pour nous", explique-t-il. Le 14 mars 2001, M. Falcone avait expliqué aux juges que son intéressement personnel prévu dans l'affaire ne devait pas "pas être inférieur à 15 millions de dollars", mais qu'il avait "fait crédit à l'Etat angolais". De son côté, le juge de Genève Daniel Devaud, qui instruit le volet suisse de l'affaire, a adressé à M. Courroye une commission rogatoire afin d'interroger M. Falcone. Dans un courrier du 4 janvier, M. Devaud qualifie de "hautement probable" l'inculpation de M. Falcone pour "blanchiment".

Dans le cadre de cette procédure, le parquet de Genève a décidé le gel de 700 millions de dollars sous forme de billets à ordre qui se trouvaient sur un compte ouvert à la banque UBS. Fin 1996, la Russie et l'Angola avaient signé un accord de restructuration de la dette prévoyant que l'Angola rembourserait 1,5 milliard de dollars, au lieu des 5 milliards dus. A cette fin, la banque centrale angolaise avait émis à l'intention du ministère des finances russe 31 billets à ordre d'une valeur nominale de 48,362 millions de dollars chacun, dont l'encaissement est échelonné jusqu'en 2016.

Au printemps 1997, la Russie, désireuse de percevoir cet argent, fait appel à la société Abalone Investments Limited, dirigée par MM. Gaydamak et Falcone, rejoints ensuite par M. Malkine. Le premier entretient de solides contacts au sein du gouvernement de Viktor Tchernomyrdine ; le second est proche du président angolais ; le troisième préside la Rossiysky Credit Bank – avant d'être remplacé par M. Gaydamak en décembre 2000. Leur objectif est de récupérer les billets à ordre détenus par Moscou, qu'ils sont censés encaisser au bénéfice du ministère des finances, grâce au pétrole angolais : en effet, le 30 mai 1997, Abalone signe un accord de livraison de pétrole pour une valeur de 1,5 milliard de dollars avec la compagnie Sonangol, agissant au nom du gouvernement angolais. Parallèlement, Abalone se met d'accord avec un opérateur pétrolier,

Le règlement de la dette angolaise aurait donné lieu à des détournements de fonds

Glencore, seul en mesure d'avancer l'argent. Selon M. Gaydamak, les quelque 800 millions de dollars – moins la part de risque encourue par l'opérateur – sont déposés sur un compte UBS à Genève, la banque transférant ensuite cet argent au ministère des finances russe. Abalone aurait ainsi racheté 16 lettres de crédit sur 31, avant que la justice ne bloque la transaction en cours en gelant les comptes.

## CONTACTS AVEC LE KREMLIN

L'examen du compte Abalone à l'UBS entre le 16 juillet 1997 et le 17 juillet 2000 indique toutefois que seuls deux versements, de 145,1 et 16,7 millions de dollars, ont été effectués sur le compte du ministère des finances à Moscou, alors que près de 773 millions de dollars avaient été versés par la société pétrolière Sonangol. Selon M. Gaydamak, cette différence a une explication : après le paiement des premiers billets à ordre, la société Abalone et le gouvernement russe auraient signé un avenant au contrat qui les liait. Au lieu de percevoir des rentrées de fonds, la Russie aurait décidé de racheter ses propres obligations via Abalone. Le montage, tel qu'il est décrit par M. Gaydamak, serait le suivant : Abalone transfère l'argent reçu par Sonangol à cinq sociétés, basées en Israël, au Luxembourg et à Chypre, qui, ensuite, rachètent les obligations de l'Etat russe.

Bien qu'une très faible partie de la dette angolaise soit rentrée dans les caisses de l'Etat russe, M. Gaydamak semble avoir conservé d'excellentes relations au Kremlin. La brigade financière dispose d'un "mémo" de M. Falcone, sans doute rédigé en 1999, où il est écrit : "A. G. m'a dit avoir rencontré Poutine, qui lui a dit être prêt à envoyer au titre d'une coopération politique concrète jusqu'à 1 000 millions de dollars de matériel gratuitement". M. Gaydamak a assuré au Monde n'avoir "jamais rencontré Vladimir Poutine".

**Fabrice Lhomme et Piotr Smolar**

# Angolan debt settlement allegedly embezzled funds

Part of the money intended to repay Russia would have benefited MM. Falcone and Gaydamak.

THE WORLD   02 04 2002 at 10:37

Judges Courroye and Prévost-Desprez have entered a labyrinth they have not finished exploring the subtleties: the companies involved in the settlement of the debt of Angola to Russia, between 1996 and 2000. The magistrates are investigating possible embezzlement - initially intended for the Russian Ministry of Finance. During this period, it received only $ 161 million out of the 773 million paid to Abalone Investment Limited, the company acting as an intermediary in the recovery of the debt and whose rights holders are Arcadi Gaydamak and Pierre-Joseph Falcone. . Originally amounting to $ 5 billion - a legacy of the Soviet era - this debt had been reduced by 70%, thanks to an agreement concluded in November 1996, whereby Angola was to pay Russia 1 , $ 5 billion, in the form of promissory notes,

According to the investigators, MM. Falcone and Gaydamak have respectively reached 60 and 130 million dollars, as employees and also in the case of Mr. Falcone, via Brenco company. Examination of the movement of funds occurred between 1997 and 2000 CO-101436 Abalone account held by UBS in Geneva leaves appear other beneficiaries. For example, Elisio de Figueiredo, Angola's ambassador to France, received $ 18.8 million from an account opened in the Cayman Islands. The Russian banker Vitali Malkine has received $ 48.8 million from Abalone. The magistrates were also addressed, in March, reports Tracfin (anti-money laundering service of the French Ministry of Finance) which allowed to establish that Mr Falcone opened accounts in 1998 on behalf of three Panamanian companies (Dramal, Camparal and Tutoral) at the International Bank of Luxembourg (BIL). According to Tracfin, the "economic beneficiaries" of these accounts would be Mr. Falcone himself, Mr. Figueiredo, and the Angolan President, José Eduardo Dos Santos. In April 2001, Mr Dos Santos complained to Jacques Chirac of an investigation which he said caused "serious moral damage" to his country. Until then, nothing had established that he was able to collect funds from Mr. Falcone.

Arcadi Gaydamak asserts, however, that the Russian-Angolan operation "did not give rise to any hijacking" . He told Le Monde that he and his two partners in Abalone, Mr. Falcone and Mr. Malkine, had shared $ 50 million in three years. "This is a classic trading operation, extremely favorable for us," he explains. On March 14, 2001, Mr. Falcone had explained to the judges that his personal interest in the case should not "not be less than $ 15 million", but that he "gave credit to the Angolan State". For his part, the Geneva judge Daniel Devaud, who examines the Swiss part of the case, sent Courroye a letter rogatory to question Mr Falcone. In a letter dated 4 January, Mr Devaud described as "highly probable" Mr Falcone's indictment for "laundering" .

As part of this process, the Geneva Public Prosecutor's Office decided to freeze $ 700 million in promissory notes from an account opened at UBS Bank. By the end of 1996, Russia and Angola had signed a debt restructuring agreement that Angola would repay $ 1.5 billion instead of $ 5 billion. To this end, the Angolan central bank issued to the Russian Ministry of Finance 31 promissory notes with a nominal value of US $ 48.362 million, the receipt of which is staggered until 2016.

In the spring of 1997, Russia, wishing to collect this money, appealed to Abalone Investments Limited, headed by MM. Gaydamak and Falcone, then joined by Mr. Malkine. The former maintains strong contacts within the government of Viktor Chernomyrdin; the second is close to the Angolan president; the third presides the Rossiysky Credit Bank - before being replaced by Mr Gaydamak in December 2000. Their aim is to recover the promissory notes held by Moscow, which they are supposed to cash for the benefit of the Ministry of Finance, thanks to Angolan oil: on May 30, 1997, Abalone signed a $ 1.5 billion oil delivery agreement with Sonangol, acting on behalf of the Angolan government. At the same time, Abalone agrees with an oil operator, Glencore, the only one able to advance the money. According to Mr Gaydamak, the approximately $ 800 million - minus the risk incurred by the operator - is deposited in a UBS account in Geneva, the bank then transferring the money to the Russian Ministry of Finance. Abalone would have bought 16 letters of credit out of 31, before the justice blocking the current transaction by freezing the accounts.

Le règlement de la dette angolaise aurait donné lieu à des détournements de fonds

**CONTACTS WITH KREMLIN**

The examination of the Abalone Account at UBS between 16 July 1997 and 17 July 2000, however, indicates that only two payments of $ 145.1 and $ 16.7 million were made to the account of the Ministry of Finance at Moscow, while nearly 773 million dollars had been paid by the oil company Sonangol. According to Mr Gaydamak, this difference has an explanation: after the payment of the first promissory notes, Abalone and the Russian government signed an amendment to the contract binding them. Instead of collecting cash, Russia would have decided to buy back his own bonds via Abalone. The editing, as described by Mr. Gaydamak, would be as follows: Abalone transfers the money received by Sonangol to five companies, based in Israel, Luxembourg and Cyprus, which then buy back the obligations of the Russian state.

Although a very small part of Angolan debt has been returned to the coffers of the Russian state, Mr. Gaydamak seems to have maintained excellent relations in the Kremlin. The financial brigade has a " memo " from Mr. Falcone, probably written in 1999, where it says: "AG told me that he met Putin, who told him that he was ready to send for cooperation. concrete policy up to $ 1,000 million worth of material " . Mr Gaydamak has assured the world would have "never met Vladimir Putin" .

**Fabrice Lhomme and Piotr Smolar**