# Exhibit 6



# Transcript of **Robert Eringer**

Tuesday, February 22, 2022

*Christopher Chandler v. Donald Berlin, et al.*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 113428

```
 1                UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3

 4

 5   CHRISTOPHER CHANDLER,            )
                                      )
 6                  Plaintiff,        )
                                      )    No. 1:18-CV-02136-APM
 7     v.                             )
                                      )
 8   DONALD BERLIN, et al.,           )
                        Defendants.)
 9   _____)

10

11

12

13           THE DEPOSITION OF ROBERT ERINGER

14                    February 22, 2022

15                        8:28 A.M.

16

17

18

19

20

21   Job No.:113428

22   Reported by:   VIRGINIA M. PEREZ

23              CSR No. 11433

24

25
```

```
 1    A.    Yes.
 2    Q.    The second paragraph starts with "The client"?
 3    A.    Yes.
 4    Q.    Could you read the first clause into the record?
 5    A.    "The client has not disclosed the ultimate client
 6  in this matter, but we are assured that permissible purposes
 7  exists for conducting all appropriate banking, financial,
 8  credit and other database searches."
 9    Q.    Is it true that you did not disclose to Mr. Berlin
10  the ultimate client for which he is proposing to prepare a
11  report?
12    A.    I'm reasonably certain that is true.
13    Q.    And who was the ultimate client?
14    A.    Prince Albert of Monaco.
15    Q.    And prior to Mr. Berlin's preparation of the
16  limited report, did you disclose to Mr. Berlin that the
17  report was to be prepared for Prince Albert?
18    A.    No.
19    Q.    At that time were you employed by Prince Albert?
20    A.    Yes.
21    Q.    And what was the substance of your employment?
22    A.    He retained me to be his Intelligence Advisor.
23    Q.    And in February of 2000 -- excuse me -- in October
24  of 2002, were you working full time as Prince Albert's
25  intelligence advisor?
```

```
 1      A.   I did.
 2      Q.   And did you keep it confidential?
 3      A.   Well, it was for my client only, Prince Albert of
 4   Monaco.
 5      Q.   And the course of your work as intelligence advisor
 6   to Prince Albert, did you routinely prepare reports and
 7   other communications for his review?
 8      A.   Yes.
 9      Q.   And when you prepared those reports, did you have
10   personal knowledge of the contents that, of the contents?
11      A.   Always.
12      Q.   Did you prepare those reports either at or soon
13   after you acquired the information they contained?
14      A.   Depending on Prince Albert's schedule.  The sooner
15   we would get together periodically and he would hear about
16   whatever my latest findings on any subject.  Proviso, I
17   would like to quantify about three questions back, and you
18   asked if anybody was privy to such confidential information?
19   The answer to that is not only Prince Albert, but other
20   intelligence services with which I liaisoned, which I would
21   occasionally share with other intelligence agency also share
22   intelligence with me.
23      Q.   Did you ever tell Mr. Berlin that you were sharing
24   information with other intelligence services?
25      A.   No.
```

Trustpoint.One | Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1      Q.   This morning during your testimony you said that
2  you removed pages from certain exhibits that counsel for
3  defendants presented to you; is that right?
4      A.   I didn't say I removed.  I provided some documents
5  for this gentleman to look at.  And then he decided for
6  himself what he wanted to photograph and he did.
7      Q.   Do you remember the missing pages from several
8  exhibits that we talked about this morning?
9      A.   I do recall the fact, yes, that the reports were
10 not in sequence because there were pages apparently missing.
11     Q.   Do you know why they were pages missing?
12     A.   I suppose it is because they have nothing do with
13 this case.
14     Q.   Can you explain that?
15     A.   Well, as you saw in various briefing papers that I
16 had organized for Prince Albert, would cover a wide range of
17 topics and so I will speculate that the pages are not in
18 those reports, dealt with other matters.  Matters other than
19 the Chandler brothers.
20     Q.   You said speculate?
21     A.   I think that's the case.
22     Q.   Did the pages disappear?
23     A.   No, I still have them.
24     Q.   And you chose not to produce them because you
25 determined they were not relevant to this case?

```
 1      A.   I haven't had a subpoena to produce them.
 2           MR. OSTER:  Objection.  Misstates his testimony.
 3           THE WITNESS:  I haven't had a subpoena to produce
 4   these documents.
 5           MR. WATKINS:  Can you repeat my last question,
 6   please?
 7           (Record read.)
 8           THE WITNESS:  Wait, wait.  Once again, I will
 9   repeat the answer I gave before.  I produced some documents
10   voluntarily without a subpoena.  And the gentleman to my
11   left decided for himself what to photograph.
12   BY MR. WATKINS:
13      Q.   Are you saying -- you said photograph?
14      A.   Yes.
15      Q.   Were any of these documents that we reviewed this
16   morning, are those photographs that you're describing?  I'm
17   a little confused about the photograph piece?
18      A.   I believe so.  I'd have to defer.  I don't remember
19   making any photocopies.
20      Q.   Let's a take a step back.
21      A.   Sure.
22      Q.   You met with Mr. Oster before today?
23      A.   Yes.
24      Q.   Please tell me what you did to identify documents
25   that you shared with Mr. Oster and Mr. Dean?
```

1    A.    I guess I perused my files and put together a
2  number of documents that related directly to this case.
3    Q.    And to the extent that the documents included
4  pages that were not presented today?
5    A.    I didn't see them today.
6    Q.    Sorry.  You didn't see what today?
7    A.    I didn't see pages that were missing today.  But if
8  you're trying to suggest that I specifically removed them,
9  then that's not the case.
10   Q.    So this morning I thought you testified that to the
11  extent certain documents, and we'll go into detail later,
12  had missing pages your belief was that the reason that the
13  pages weren't present is because they are not relevant to
14  this case?
15   A.    I believe that's the case, yes.
16   Q.    So my only real question is, and I don't want to go
17  in circles is --
18   A.    Mm-hmm.
19   Q.    -- how were the pages removed from the documents?
20   A.    Well, we sat and I showed the gentlemen to my left
21  these documents and he with his phone took photographs of
22  the ones he felt were relevant.
23   Q.    Okay.  Did you hire Mr. Berlin to obtain derogatory
24  or negative information about Mr. Chandler?
25   A.    I hired Mr. Berlin to do a data globe scan a data

```
 1    interested in doing a globe scan, can you do that and what
 2    would the cost be?  I'm pretty simple with these things.
 3    Don Berlin plays back to me is a lot paper and a lot of
 4    verbiage which really means pretty much nothing.  He showed
 5    me an exhibit earlier which has a lot of terms and
 6    conditions and everything else.  I never signed an agreement
 7    with Donald Berlin agreeing to all of his conditions and so
 8    on.  But nonetheless, he does that for his own protection.
 9         Q.   Did Mr. Berlin think that the research was for you
10    to use for your own purposes?
11              MR. OSTER:  Objection.
12              THE WITNESS:  Clearly not because he refers to an
13    ultimate client.  On top of which, I would have no reason --
14    I mean, Donald Berlin had done some globe scans for me
15    before.  And I don't -- I don't personally initiate globe
16    scans on people because I want to find out more about them.
17    It's purely a business thing.
18    BY MR. WATKINS:
19         Q.   When you say "it's a business thing," and this is
20    to clarity of the record.  This deposition process a little
21    awkward because conversationally I understand what you're
22    saying.  But can you explain for the record what you mean by
23    "This is a business purposes"?
24         A.   Very simply.  I have no personal motive for trying
25    to get anything derogatory or negative about anybody.  I was
```

Trustpoint.One | Alderson  
www.trustpoint.one  
www.aldersonreporting.com  
800.FOR.DEPO  
(800.367.3376)

```
 1   fulfilling a function of trying to assemble information to
 2   the best of my understanding I could brief Prince Albert as
 3   I would any other client.  And my relationship with Don
 4   Berlin I would introduce him as a subcontractor where I am
 5   asking him for a service fee to provide information for me
 6   specifically for me without him ever knowing who the client,
 7   the ultimate client is.
 8        Q.   And we can agree that Mr. Berlin may not have known
 9   the identity of the ultimate client was, but ultimately he
10   understood that you were working for somebody else?
11        A.   We can agree on that.  I don't believe I ever told
12   him who the ultimate client was because that was not my
13   practice to do that.  Now whether he knew that for other
14   reasons because we associated in the same circles, I can't
15   discount that idea.  He didn't hear it from, I don't
16   believe.
17        Q.   Basically, what I'm trying to say is, Mr. Berlin
18   knew based on your past dealings that the purpose of the
19   engagement was based on the work that you were doing for the
20   ultimate client?
21        A.   Oh, yes.  Yes, he would know that it was not
22   something that is personal to me.  I wasn't the ultimate
23   client.
24        Q.   And you understand that his compensation, although
25   indirectly, came from the ultimate client?
```

Trustpoint.One | Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

 1     A.   Well, only insofar as what you showed me in this
 2  exhibit and I probably didn't read it at the time and I
 3  didn't think much of it now, because I never signed an
 4  agreement with Donald Berlin saying that agreeing to all of
 5  the conditions and things that he's put in here on website
 6  and so on.
 7     Q.   Agreed.  And we've gotten through we, but my
 8  question is --
 9     A.   Yeah.
10     Q.   I'm really trying to ask a simple question about
11  it.
12     A.   Yeah.
13     Q.   You never promised Mr. Berlin that you wouldn't
14  share information that he provided you with the ultimate
15  client?
16     A.   No, I never promised him that I would not share,
17  that is correct.
18     Q.   And why would you not have done that?
19     A.   Well, he never asked me whether I was going to
20  share it with an ultimate client or not.  I don't believe he
21  ever said, "Are you going to share this?"  He was just happy
22  for the work, I suppose.
23     Q.   In the previous talk, please talk to me a little
24  bit about a previous engagement that you've had with
25  Mr. Berlin?

Trustpoint.One | Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
 1      A.   Yeah, I was trying to recall that.  Because I
 2  thought it might come up at the deposition as to what else
 3  he had done.  As I mentioned, he was introduced to me by
 4  Clair George because I thought we had a need to find out
 5  something.  And it probably had to do with a client we had
 6  at the time in a private-sector client.
 7      Q.   So in your past dealings with Mr. Berlin, it's fair
 8  to say that you shared information that he gleaned with the
 9  ultimate client in those other matters?
10      A.   Yes.
11      Q.   And Mr. Berlin knew that?
12           MR. OSTER:  Objection.
13           THE WITNESS:  See, I don't know what Mr. Berlin
14  knew or didn't know.  But it didn't seem like a question
15  worth asking.  I assumed once I paid for an investigation
16  that he does for me, I consider myself proprietor of that.
17  I then own it from that point on.  Which is why I probably
18  never would have signed anything like you showed me earlier.
19  BY MR. WATKINS:
20      Q.   And the ultimate client paid for Mr. Berlin and
21  obviously the clients owns Mr. Berlin's information?
22           MR. OSTER:  Objection.
23           MR. WATKINS:  Based on your understanding?
24           MR. OSTER:  Objection.
25           THE WITNESS:  I never really thought about that
```

Trustpoint.One | Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
 1   It's your position to just answer the question.  It's not
 2   your job to figure out where we go.
 3        A.   Okay.
 4        Q.   Are you taking the position that Mr. Berlin's
 5   report about Mr. Chandler was verified and accurate?
 6        A.   The new information that Don Berlin provided in his
 7   report wasn't of sufficient interest to me to verify.  And I
 8   never bothered because as we've seen -- the only thing that
 9   mattered to me that was in his report was the fact that he
10   had somehow gotten access to information that I had already
11   had previously.
12        Q.   Do you remember what the question is before you?
13        A.   Maybe you can state it again?
14             (Record read.)
15   BY MR. WATKINS:
16        Q.   As you sit here today, do you take the position
17   that the information about the Chandlers brothers is
18   verified and correct?
19        A.   We did our best at the time to verify everything
20   that was in his report, even that, which he should not have
21   had in his report because it predated his involvement.  We
22   continually try to verify information.  In the course of
23   doing that, we kept our client Prince Albert apprised of
24   whatever new information that we had.
25        Q.   That's not the question.  The question is, as you
```

Trustpoint.One | Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
 1              MR. OSTER:  Then your question assumes facts not in
 2    evidence.
 3              MR. WATKINS:  See this is why it's important to
 4    limit the speaking objection.  Because --
 5              MR. OSTER:  You're the one asking him the question.
 6              MR. WATKINS:  Let me finish.  Let me finish.
 7    You're mischaracterizing my question.
 8    BY MR. WATKINS:
 9        Q.   What was Mr. Berlin's reaction when he learned
10    that you shared what's been marked as Exhibit 1 with Prince
11    Albert?
12              MR. OSTER:  Objection.
13              THE WITNESS:  I actually don't recall.  I didn't
14    have a conversation with him about it.  I don't know when he
15    learned that.  I assume at some point he learned that I was
16    working with Prince Albert whether I was working with Prince
17    up until 2007 or after I filed a lawsuit and then it was a
18    certain amount of publicity that was generated from that.  I
19    can't imagine that Don Berlin would not know that I've been
20    working for Prince Albert.  Did he harbor any thoughts about
21    whether or not that I had shared, I would have to assume
22    that what he was doing for me, since it involved Monaco, the
23    Chandler brothers, Monaco presence was that Albert have seen
24    the Chandlers.  But that would be his own assumption that
25    only he could answer to.  There was a period of time where
```

```
 1   subpoenaed him directly.  I gave his address last October or
 2   when I met with him.  You easily could have subpoenaed the
 3   documents from him, but you didn't do it.  Then I asked you
 4   to you setup a deposition in December, I never heard back
 5   until after the first of the year.  And then, you asked me
 6   could I setup a deposition with Mr. Eringer.  And as a
 7   courtesy, I did.  You then had some discussions between you
 8   and Mr. Eringer, to which, I was not privy.  But you then
 9   after we had subpoenaed him subject to the conditions that I
10   worked out with him for today you sent him a document
11   subpoena and a deposition subpoena for the same day and
12   didn't serve it on him.  You just emailed it do him.  So the
13   notion that he has withheld anything is false.  The notion
14   that I was involved with him withholding anything is utterly
15   false.  And had you wanted a complete set of documents
16   today, you easily could have gotten them, but you didn't and
17   that's the truth.
18           MR. DEAN:  And to add on the documents.  The
19   documents that we introduced into evidence today are
20   documents that were received from Mr. Eringer.  And like any
21   attorney does, we produced the copies the E.R. documents are
22   all the documents that Mr. Oster got from Mr. Eringer.  We
23   produced a complete set to you from that set of documents we
24   selected many and not all and we asked him questions about
25   the documents that we wanted to ask him about.  Which, you
```

```
 1   those to you.  And then we got another set of documents
 2   which were sent to us from Mr. Eringer and those were
 3   actually photographs.  And that brought the total to 91 or
 4   94, I believe.  And we immediately produced those to you.
 5           MR. DEAN:  Are you saying documents or pages?
 6           MR. OSTER:  Pages.  Pages, I'm sorry, yeah.  So
 7   when Mr. Eringer is saying that I photographed documents,
 8   he's -- I mean, he's right in a sense I was using my phone
 9   -- I was using something called Cam Scanner, which looks
10   like a scanned document.  And, if you look at the Bates
11   numbers after you get past 73 or so, those are the documents
12   that we later obtained from Mr. Eringer.  ==And those are==
13   ==actually photographs of documents.==  ==But from one to whatever==
14   ==that number is, our documents that I chose from among the==
15   ==ones that he showed me that dealt with Mr. Chandler, good or==
16   ==bad, and took a picture of, scanned using my phone.==
17           MR. WATKINS:  So since we're on the record, we've
18   all litigated long enough to know, that these documents have
19   authenticity issues.  They're apparent on the front of the
20   documents.  And I don't say that to accuse either of you
21   have of having been involved in falsifying anything like
22   that.
23           MR. OSTER:  No, I understand.
24           MR. WATKINS:  But documents without any indication
25   of the total number of pages, dates, et cetera that are 20
```

```
 1   Eringer.
 2           We're off the record at 4:53 p.m.
 3
 4           (The proceedings were concluded at 4:53 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2   STATE OF CALIFORNIA    )
                            )
 3   COUNTY OF SANTA BARBARA)
 4
 5                   C-E-R-T-I-F-I-C-A-T-E
 6
 7
 8        I, VIRGINIA PEREZ, CSR No. 11433, Court Reporter
 9   and in and for the County of Ventura, State of California,
10   do hereby certify that the foregoing and attached 254 pages,
11   is a true, correct, and complete transcript of my
12   stenographic notes, taken of the foregoing hearing, and
13   taken at the time and place hereinbefore stated, and was
14   transcribed under my direction and supervision, and
15   completed on the 22 day of February, 2022.
16
17
                         *Virginia Perez*
18                       _____
                         Certified Shorthand Reporter
19                       February 22, 2022
20
21
22
23
24
25
```