## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————

|  |  |  |
|---|---|---|
| **CHRISTOPHER CHANDLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 18-cv-02136 (APM)** |
| | ) | |
| **DONALD BERLIN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

—————————————————————

## <u>MEMORANDUM OPINION AND ORDER</u>

### I.

In February 2003, Robert Eringer, a self-described espionage operative, hired Defendant Donald Berlin, a private investigator, to prepare a background report about Plaintiff Christopher Chandler.  That report—which the parties call the "Pitch"—contained statements accusing Plaintiff, who is an international businessman, of money laundering, organized crime, and other misconduct tied to Russian interests.  Fast forward fourteen years.  In November 2017, the British media published stories about Plaintiff that mirrored the Pitch's contents.  As it turns out, Eringer had prepared a dossier based on information from the Pitch and given the dossier and the Pitch to the press.  Plaintiff learned of the Pitch for the first time in May of 2018, when a reporter shared the dossier and the Pitch with him.

Plaintiff then brought this action against Defendants—Berlin and his associated companies—asserting two counts of libel *per se* under District of Columbia law.  Count One was based on Defendants' initial publication of the Pitch to Eringer in 2003.  Count Two was based on the republication of the Pitch's false contents to British media in 2017.  This court held that both

counts were barred by the statute of limitations.  The D.C. Circuit, however, reversed as to Count One, but not Count Two.  *See Chandler v. Berlin*, 998 F.3d 965 (D.C. Cir. 2021).

Following remand, the parties engaged in an extended period of discovery, which culminated in the filing of cross-motions for summary judgment.  Those motions are now before the court.  For the reasons that follow, the court denies Defendants' motion in its entirety and grants Plaintiff's motion in part.  The court grants judgment in Plaintiff's favor as to (1) the falsity of the Pitch's allegations of criminal wrongdoing; (2) publication of those allegations by Defendants; and (3) the *per se* libelous nature of those statements.  The court reserves judgment as to whether Plaintiff is a private or limited-purpose public figure.

## II.

Defendant Berlin is the principal, owner, and registered agent of various corporate entities that have done business as Investigative Consultants, Inc. ("ICI") out of an office in Washington, D.C., since 1996.  Redacted Compl., ECF No. 20, ¶ 20 [hereinafter Compl.]; Defs.' Answer, ECF No. 26, ¶ 20.[1]  ICI's website claims that the company compiles reports using "proprietary artificial intelligence" and touts its "30 years [of] experience in data interpretations, criminal investigations, [and] psychology."  Compl. ¶ 30; Answer ¶ 30.

Berlin has known Robert Eringer, a writer of espionage-themed books and a self-styled espionage operative, since at least 2002.  Answer ¶ 37; *Chandler*, 998 F.3d at 968.  In that year, Eringer asked ICI to conduct a limited background investigation of Plaintiff and his brother, Richard Chandler, using open source information.  Compl. ¶ 38; Answer ¶ 38.  Eringer was, at the time, working for an "ultimate client," Albert II, Prince of Monaco, though Berlin did not know

---

[1] The associated companies that are named defendants are: (1) Investigative Consultants, Inc.; (2) Investigative Consultants, Inc. of Washington, D.C.; and (3) Investigative Consultants Incorporated.  The court refers to these companies collectively as "ICI."

the client's identity.  Defs.' Resp. to Pl.'s Stmt. of Material Facts Not in Dispute, ECF No. 94-1, at 4 [hereinafter Defs.' Resp. to Pl.'s SOMF].

In 2003, Berlin prepared a 134-page report for Eringer, which the parties call either the "Pitch" or the "Limited Report."  Compl., Ex. 1, ECF No. 20-1 [hereinafter Pitch].  The Pitch contains multiple statements associating Plaintiff with criminal acts and other wrongdoing.  Defs.' Resp. to Pl.'s SOMF at 1–2.  For instance, the Pitch states that Plaintiff is "suspected of a massive money-laundering scheme, principally for high-level political types in Russia, as well as organized crime groups in that country," through an entity known as Sovereign Forex Ltd.  Pitch at 1, 14.  The Pitch also describes a legal dispute between two financial institutions, Credit Agricole Indosuez ("CAI") and the National Reserve Bank of Russia ("NRB"), and claims that Plaintiff and his brother conspired with CAI to tortiously interfere with NRB.  *Id.* at 1–16; Answer ¶ 7.

Berlin admits that the information compiled in the Pitch was not based on human sources.  Defs.' Resp. to Pl.'s SOMF at 7.  Rather, the references to "sources" in the Pitch were to people with access to databases that Berlin could not access, not individuals with personal knowledge.  Defs.' Reply Mem. of P&A in Support of Defs.' Mot. and in Opp'n to Pl.'s Mot., ECF No. 93 [hereinafter Defs.' Reply], Ex. 1, Berlin Decl., ECF No. 93-2, ¶ 4.

Berlin delivered the Pitch to Eringer on or about February 24, 2003.  Answer ¶ 62.  After receiving the Pitch, Eringer used it to create his own write-up regarding the Chandlers, which Eringer in turn provided to Prince Albert the following year.  Pl.'s Mot. for Partial Summ. J., ECF No. 88 [hereinafter Pl.'s Mot.], Ex. 2, Eringer Dep., ECF No. 88-5, at 13:20–14:11.[2]

---

[2] Eringer also apparently used the Pitch to publish other statements about Plaintiff, including by (1) briefing British intelligence, Pl.'s Opp'n to Defs.' Mot., ECF No. 89, Ex. 6, Eringer Dep., ECF No. 89-9, at 179:15–23, 186:11–15; (2) filing a 2007 lawsuit in California whose complaint included allegations that Plaintiff engaged in criminal activity, Objections & Resps. to Defs.' Asserted Facts, ECF No. 22, ¶ 8; ECF No. 21-7, ¶ 13; (3) publishing a spy novel titled "The Spymaster of Monte Carlo," in which Eringer repeated many of the allegations contained in the Pitch, Defs.' Stmt. of Material Facts Not in Dispute, ECF No. 21-8, ¶¶ 9–10; Pl.'s Objections & Resps. to Defs.' Asserted Facts, ECF No. 22, ¶¶ 9–10; and (4) posting an online article entitled "The Art of the Ruse: Richard and Christopher

### III.

Before the court are the parties' cross-motions for summary judgment.  Defendants seek entry of judgment as to the sole remaining claim of libel *per se* (Count One).  Defs.' Mot. for Summ. J., ECF No. 86 [hereinafter Defs.' Mot.].  Plaintiff, on the other hand, asks for entry of partial judgment as to certain elements of that claim.  Pl.'s Mot.

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking or opposing summary judgment may do so by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A genuine dispute arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

When considering the parties' submissions, "the court views the evidence in the light most favorable to the nonmoving party . . . and draws all reasonable inferences in his favor." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).  "The burden is always on the movant to demonstrate why summary judgment is warranted. The nonmoving party's failure to oppose summary judgment does not shift that burden." *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016) (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J.,

---

Chandler," containing information from the spy novel, Pl.'s Resp. to Facts, ECF No. 22, ¶ 11; ECF No. 21-4.  It remains unclear to the court which, if any, of these publications Plaintiff seeks to connect to Defendants' original publication of the Pitch to Eringer.

concurring)).  But when faced with a "properly supported motion for summary judgment . . . the nonmovant must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Jeffries v. Barr*, 965 F.3d 843, 859 (D.C. Cir. 2020) (quoting *Anderson*, 477 U.S. at 256).  If the nonmovant fails to do so, summary judgment must be granted.

## IV.

### A.  Defendants' Motion for Summary Judgment

> 1.  *There Is a Genuine Dispute of Material Fact as to Whether Eringer Believed the Pitch to Be False.*

Defendants first move for summary judgment on the element of defamatory meaning. According to Defendants, because Eringer believed that the information contained in the Pitch was fabricated, and thus false, when he received it from Berlin, its statements were not capable of defaming Plaintiff.  Citing case law in the context of satirical statements, Defendants argue that because the Pitch could not have been interpreted by Eringer as stating "actual facts" regarding Plaintiff, the statements in the Pitch cannot create liability for defamation.  Defs.' Mem. of P&A in Support of Defs.' Mot., ECF No. 86-2, at 6–9 [hereinafter Defs.' Mem.]; *see Farrah v. Esquire Magazine*, 736 F.3d 528, 536 (D.C. Cir. 2013) (stating, in the context of satire, that a statement is "not actionable if it 'cannot reasonably be interpreted as stating actual facts about an individual'") (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 2 (1990)); *see also Close It! Title Servs. v. Nadel*, 248 A.3d 132, 139 n.16 (D.C. 2021) (explaining that the defamatory nature of the publication "must be considered as a whole, in the sense that it would be understood by the readers to whom it is addressed") (quoting *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)) (internal quotation marks omitted).

This argument rests on Plaintiff's discovery responses, as well as an "independent forensic investigation" commissioned by Plaintiff's company.  Specifically, Defendants point to Plaintiff's

counsel's own words in a discovery response letter, claiming that "Mr. Eringer not only paid Defendants to prepare the Limited Report and to manufacture false accusations against Mr. Chandler." Defs.' Mot., Ex. 1, ECF No. 86-3, at 2. They also cite two of Plaintiff's interrogatory responses, stating: (1) "I suspect that Messrs. Eringer and Berlin worked together to fabricate the false accusations against me that form the basis of this lawsuit, in part because the two men have a financial interest in the outcome of this case," Defs.' Mot., Ex. 2, ECF No. 86-4, at 2; and (2) "Mr. Berlin and Mr. Eringer defrauded Prince Albert II of Monaco into paying for fake background checks on a number of successful expats living in Monaco, including me and my brother," *id*. at 4. Finally, they identify an investigative report commissioned by Plaintiff's company, Legatum Limited, which concluded: "Eringer agreed to pay Berlin a substantial fee to produce a report implicating Mr[.] Chandler in the alleged wrongdoing of Swiss Sovereign. . . . Eringer included the false report he commissioned from Berlin as the cornerstone piece of 'evidence' in his dossier . . . ." Defs.' Mot., Ex. 3, ECF No. 86-5, at 21.

Notwithstanding these statements, there remains a genuine dispute of material fact as to whether Eringer understood that the Pitch's allegations of criminal wrongdoing were false. Eringer testified as follows at his deposition:

> In the realm of possibility now that somebody had it in for the Chandlers and provided false information through the Oracle system[3] from the get-go put on us the wrong track. But the interesting thing is, every step of the way, which ever direction we turn, there seems to be some confirmation whether it be police reports from Monaco that actually outright said "money laundering" on them. These kinds of things more and more made us believe *that Oracle's information was correct*.

---

[3] The "Oracle system" refers to the database that Berlin relied upon to create the Pitch. Defs.' Mot., Ex. 12, Eringer Dep., ECF No. 86-14, at 26:14–27-2.

Pl.'s Opp'n to Defs.' Mot., Ex. 6, Eringer Dep. at 186:21–187:4 (emphasis added).  He further testified:  "So we began to believe that this must be true based on non-duplicate sources telling us other things most especially the Monaco police reports that actually labels both brothers as being connected to the Russian Mafia and being engaged in money laundering. . . .  [T]he Oracle system was expensive and I bought into it."  *Id*. at 223:9–16.  Eringer's own words thus create a fact dispute as to whether he knew the Pitch's allegations were false.

The statements cited by Defendants do not compel a different result.  "[A]lthough answers to interrogatories may be considered so far as they are admissible under the rules of evidence, where such answers are not based upon personal knowledge, such answers have no probative force."  *Houston v. Sectek, Inc.*, Case No. 04-cv-2218 (RWR), 2008 WL 2599832, at *1 (D.D.C. June 30, 2008) (quoting *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 n.1 (2d Cir. 1968)).  Here, Plaintiff averred in his interrogatory responses that he "suspect[ed]" that "Eringer and Berlin worked together to fabricate the false accusations against me . . . ."  Defs.' Mot., Ex. 2, ECF No. 86-4, at 2.  That statement, made with a lack of personal knowledge, does not establish that the two men in fact worked together.  The same holds true for counsel's statement that "Eringer . . . paid Defendants to prepare the Limited Report and to manufacture the false accusations against Mr. Chandler."  Defs.' Mem., Ex. 1, ECF No. 86-3, at 2.  Counsel's averment, made without personal knowledge, is not a statement of fact.  As for the study commissioned by Plaintiff's company, which suggests that Eringer hired Berlin to prepare a false report, Defs.' Mot., Ex. 3, ECF No. 86-5, at 21, that study cannot establish an undisputed fact in the face of Eringer's deposition answers.  Accordingly, the court denies Defendants summary judgment on this ground.

>        2.      *Plaintiff Is Not Foreclosed from Proceeding Under a Negligence Theory of*
>                *Liability.*

Next, Defendants seek to preclude Plaintiff from proceeding on a negligence theory of liability.  Defs.' Mem. at 9–12.  Plaintiff's pleading, they say, compels this result.  *See id.* at 10–11 (identifying instances of "language of intentional misconduct"); Defs.' Reply at 7–8 (same). Plaintiff counters that a complaint need not assert legal theories, but rather must plead facts sufficient to support legal claims.  Pl.'s Mem. in Opp'n to Defs.' Mot., ECF No. 89-2, at 12–16 [hereinafter Pl.'s Opp'n].  The facts pleaded, Plaintiff asserts, support either a theory based on actual malice *or* negligence, even though the more favorable standard never appears in the complaint.

Plaintiff is correct.  A civil complaint is a notice pleading.  "[S]o long as the basis for a claim is clear, a complaint need not 'plead law' in specific detail."  *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 18 n.5 (D.C. Cir. 2008); *Cothran v. Dalton*, 83 F. Supp. 2d 58, 60 n.1 (D.D.C. 1999), *aff'd*, 6 F. App'x 9 (D.C. Cir. 2001) ("Fed. R. Civ. P. 8(a) does not require a claimant to plead the legal theories upon which he bases the claim.").  Here, because the pleaded facts support liability based on intentional misconduct, they also support liability based on negligence.

Defendants' cases are inapposite.  They rely on authorities holding that negligence is not a "lesser-included" offense to the intentional tort of assault.  *See, e.g.*, *Sabir v. District of Columbia*, 755 A.2d 449, 452 (D.C. 2000).  That comparison is not apt, because an assault, by definition, cannot be committed negligently; it is an intentional tort.  On the other hand, the tort of defamation can be committed either intentionally or negligently.  *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 n.33 (D.C. 2016) (characterizing the difference between negligence and actual

malice in a defamation action as "the level of fault"). Plaintiff therefore is not barred from pursuing a negligence theory of liability based merely on the Complaint's allegations of intentional conduct.

3. <em>Expert Testimony Is Not Required to Establish a Standard of Care.</em>

Even a claim premised on negligence, Defendants insist, still fails. They contend that Plaintiff has not established the applicable standard of care, because the only expert testimony they have offered pertains to "intelligence collection, analysis, and dissemination," and the Pitch is "not an intelligence report," but an investigative report. Defs.' Mem. at 13. Defendants thus maintain that Plaintiff has not established the standard of care applicable to their work. *Id*. at 13–15. The court is unpersuaded.

"Under District of Columbia law, a plaintiff seeking to prove her case through direct evidence of negligence has the burden of establishing three elements: (1) 'the applicable standard of care'; (2) 'a deviation from that standard by the defendant'; and (3) 'a causal relationship' between the deviation and the injury she suffered." *Robinson v. Washington Metro. Area Transit Auth.*, 774 F.3d 33, 38 (D.C. Cir. 2014) (quoting *Varner v. D.C.*, 891 A.2d 260, 265 (D.C. 2006)). Typically, the standard of care is that of a "reasonable man under like circumstances," which a jury can ascertain "without the aid of expert testimony." *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009) (quoting Restatement (Second) of Torts § 283 (1965)) (internal quotation marks omitted). But if the "subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson," expert testimony is required. *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000) (quoting *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995)) (internal quotation marks omitted).

Courts in this District have held that "[t]aking reasonable precautions to ensure the accuracy of an investigative report is simply not something beyond the comprehension of a

9

layman.  Expert testimony is not required . . . ."  *Pearce v. E.F. Hutton Grp., Inc.*, 664 F. Supp. 1490, 1510 (D.D.C. 1987); *see also Walker v. Dist. of Columbia*, Case No. 15-cv-55 (CKK), 2018 WL 11428661, at *3 (D.D.C. Oct. 25, 2018) (holding that the plaintiff could "question the investigator (a fact witness) regarding facts pertaining to the way in which the investigation was conducted," but could not "focus[] on any methodology he employed, as a focus on methodology begins to cross into an area where expert testimony would be needed to establish a standard"). *Cf. Wilson v. CARCO Grp., Inc.*, 518 F.3d 40, 42 (D.C. Cir. 2008) (holding in a Fair Credit Report Act case that the Act "does not always require a plaintiff . . . to present expert testimony on the issue of whether the defendant's procedures were reasonable").

Plaintiff asserts that his defamation claim rests in part on Berlin's failure to verify the information he gathered before publishing it to Eringer.  *See* Pl.'s Opp'n at 12.  Because ordinary care is the appropriate standard in this case, the court need not determine at this point whether or how Plaintiff's expert may be used at trial.  It is sufficient to say that Plaintiff's claim does not fail because his expert testimony does not establish a standard of care.

### 4.   *Plaintiff Does Not Need to Prove Actual Damages.*

Defendants' remaining arguments focus on Plaintiff's need and ability to prove damages resulting from the alleged libel.  First, because Plaintiff testified in his deposition that he was not "concerned about what Mr. Eringer thought of" him, Defendants assert that he was not harmed by Berlin's publication of the Pitch to Eringer and, as a result, Plaintiff lacks standing due to the absence of any injury.  Defs.' Mem. at 18–21, 25–31.  Second, Defendants assert that by arguing before the D.C. Circuit that Berlin's 2003 publication of the Pitch to Eringer was a distinct harm from Eringer's subsequent publications in 2017, and because the D.C. Circuit agreed with him, Plaintiff is estopped and foreclosed from claiming damages with respect to *any* subsequent publications.  *Id*. at 21–25.  Finally, Defendants say Plaintiff cannot recover punitive damages

because he has proven no underlying injury.  *Id.* at 31–33.[4]  The court does not agree with any of these contentions.

   *Proof of Actual Damages.*  An essential element of a defamation claim is "either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."  *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)).  "A statement is actionable as a matter of law when it 'tend[s] to injure a person's reputation,' such as when a speaker 'imput[es] to a person a criminal offense; a loathsome disease; matter affecting adversely a person's fitness for trade, business, or profession; or serious sexual misconduct.'"  *Smith v. Clinton*, 253 F. Supp. 3d 222, 242 (D.D.C. 2017), *aff'd*, 886 F.3d 122 (D.C. Cir. 2018) (quoting *Carey v. Piphus*, 435 U.S. 247, 262 n.18 (1978)).  Plaintiff argues that the Pitch falls into this category—it is libel *per se*—because it makes accusations that he was engaged in criminal wrongdoing and therefore damages are presumed.  Pl.'s Opp'n 23–25.

   Defendants respond that the presumption of damages in such cases can be overcome, and they have done so.  They contend that Plaintiff's testimony that he did not care what Eringer thought of him establishes the absence of any harm.  Defs.' Mem. at 25–31.

   But Defendants are wrong on the law.  "[T]he doctrine of presumed damages in the common law of defamation *per se* 'is an oddity of tort law, for it allows recovery of purportedly compensatory damages *without evidence of actual loss*.'"  *Carey v. Piphus*, 435 U.S. 247, 262 (1978) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974)) (emphasis added).  "The doctrine has been defended on the grounds that those forms of defamation that are actionable *per se*

---

[4] Defendants also argue that Plaintiff cannot prove any actual out-of-pocket damages arising from the investigation commissioned by Legatum because the company paid for it, not Plaintiff.  Defs.' Mem. at 15–18.  Plaintiff concedes that he no longer seeks out-of-pocket damages.  Pl's Opp'n at 15.

are virtually certain to cause serious injury to reputation, and that this kind of injury is extremely difficult to prove." *Id*. "Moreover, statements that are defamatory *per se* by their very nature are likely to cause mental and emotional distress, as well as injury to reputation, so there arguably is little reason to require proof of this kind of injury either." *Id*. Defendants do not contest the law of defamation *per se* applies here, so Plaintiff is not required to establish proof of actual damages to survive summary judgment. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 734 (7th Cir. 2004) ("[U]nder the doctrine of presumed damages a party is not required to show specific loss . . . .").[5]

The Supreme Court's decision in *TransUnion LLC v. Ramirez* does not compel a contrary conclusion. *See* Defs.' Mem. at 30–31. There, the court found that a class of plaintiffs whose inaccurate credit reports were never disclosed lacked standing even though the Fair Credit Reporting Act afforded them a right of action. 141 S. Ct. 2190, 2208–09 (2021). *Ramirez* is easily distinguishable. That case involved no "publication" of the inaccurate information, and therefore no plaintiff suffered any harm. Here, on the other hand, there was a publication of false information that was *per se* defamatory. Defendants have cited no case holding that presumed damages in a libel *per se* case are insufficient to satisfy the Article III injury requirement.

*Damages for Republication*. The court also cannot agree with Defendants that Plaintiff is foreclosed—through judicial estoppel or the law-of-the-case doctrine—from seeking damages for Eringer's republication of the Pitch to his "ultimate client," Prince Albert. Plaintiff argued, and the D.C. Circuit agreed, that Berlin's 2003 publication of the Pitch to Eringer was a distinct harm

---

[5] The doctrine of presumed damages would appear not to apply under District of Columbia law where the plaintiff is a public figure, or the speech involves a matter of public concern. *See Moss v. Stockard*, 580 A.2d 1011, 1033 n.40 (D.C. 1990) (stating that "a private plaintiff may recover presumed damages without a showing of actual malice when the defamatory statement relates to a 'matter of purely private concern'") (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985)). In their moving papers, Defendants have not argued either that Plaintiff is public figure or limited-public figure or that the Pitch's contents were speech on a matter of public concern.

from Eringer's subsequent publications.  In holding that "Chandler cannot recover for any harm he may have suffered from the 2017 republication in the event Berlin is ultimately liable for the 2003 publication," the Circuit reasoned that the 2017 "republication in this case was not reasonably foreseeable" in 2003.  998 F.3d at 976.  But the Circuit did not consider whether any *other* republication might qualify as a distinct harm and therefore give rise to additional damages. Notably, Plaintiff's Complaint includes allegations regarding a 2004 republication of information in the Pitch by Eringer to Prince Albert.  Compl. ¶¶ 54–56.  Discovery has borne out that such a republication occurred.  *E.g.*, Pl.'s Mot., Ex. 2, Dep. of Robert Eringer, ECF No. 88-5, at 13:20– 14:11.

*Punitive Damages*.  Defendants' argument concerning punitive damages rests on a line of reasoning that the court already has rejected, namely, that Plaintiff was required to produce evidence of actual harm.  Punitive damages therefore potentially remain available.

For the foregoing reasons, the court denies Defendants' Motion for Summary Judgment.

**B.    Plaintiff's Motion for Partial Summary Judgment**

Plaintiff moves for partial summary judgment, seeking to resolve four issues in his favor: (1) the allegedly defamatory statements are false; (2) Berlin published the Pitch to Eringer; (3) Plaintiff is a private person, warranting a negligence standard; and (4) the alleged defamatory statements are libelous *per se*.  Pl.'s Mem. in Support of His Mot. for Partial Summ. J., ECF No. 88-2 [hereinafter Pl.'s Mem.].  Plaintiff prevails on some but not all of these issues.

*1.    Plaintiff Has Proven the Falsity of the Pitch's Statements*

"A statement is actionable in defamation under District of Columbia law if it is both false and defamatory."  *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001).  To prove falsity, Plaintiff submits his own deposition testimony denying the Pitch's assertions of criminal

13

conduct.  Pl.'s Mot., Ex. 9, Dep. of Christopher Chandler, ECF No. 88-12, at 234:7–9 ("Well, from my perspective, the report is patently false, so you have a very lengthy detailed report that's a fiction."); *id*. at 241:1–7 (agreeing that "[g]iven that the entire story was untrue, Berlin simply drafted a report that was a wholesale fabrication"); *id*. at 273:4–8 ("I knew that the allegations were false . . . when reading it, it was like this isn't possible because it's just not true.").  He also submits a letter from the Chief Public Prosecutor of the Canton of Zurich, which in effect confirms that his office was unable to make any connection between Plaintiff and Sovereign Forex Ltd., the company through which the Pitch claimed Plaintiff had laundered money for Russian interests.  Pl.'s Mot., Ex. 14, ECF No. 88-17.  In addition, Plaintiff submits his own declaration to rebut the Pitch's claim that he was present for a meeting in Geneva, Switzerland, in early July 2002 to further a conspiracy to interfere with the NRB, i.e., the National Reserve Bank of Russia.  Pl.'s Mot., Ex. 15, Chandler Decl., ECF No. 88-18, ¶ 11.  Plaintiff says that, based on a review of his passport, he was not in Switzerland during that time.  *Id*.

Defendants contend, as an initial matter, that Plaintiff's "conclusory statements that the Limited Report is false . . . are insufficient to support his motion."  Defs.' Mem. of P&A in Opp'n to Pl.'s Mot., ECF No. 94, at 30 [hereinafter Defs.' Opp'n].  It is true that "[a] non-movant's own assertions about facts within her or his personal knowledge can be competent evidence to create a material factual dispute, but party assertions 'so conclusory' as to put a jury in 'no position to assess' whether they are based in fact will not suffice."  *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) (quoting *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)) (citations omitted).  But here Plaintiff has offered more than his "own assertions about facts."  On the Sovereign Forex allegation, for example, he has supplied not only his own statements but the statement of a Swiss law enforcement official, confirming that their investigation established no

connection between Plaintiff and that company.[6]  As to the statement concerning Plaintiff's alleged interference with NRB, Plaintiff points to his passport, which does not place him in Switzerland at the time of a key meeting described in the Pitch.  Although Defendants dismiss the weight of this evidence, Defs.' Opp'n at 31–32, it is of the kind that a jury could assess to determine the credibility of Plaintiff's denials.

Defendants marshal three additional responses.  First, they contend that the statements must be read in the context, and because Eringer believed the Pitch was false, there is a dispute of fact as to their falsity.  That argument, however, conflates falsity with defamatory meaning.  *See Rosen v. Am. Israel Public Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012) (stating that an actionable statement must be both "false and defamatory").  Those are two separate inquiries, and context is relevant only to the latter.  *See, e.g.*, *Klayman v. Segal*, 783 A.2d 607, 613–14 (D.C. 2001) (assuming falsity, but engaging in a separate inquiry "to determine whether the challenged article . . . is capable of defamatory meaning," which requires the court to consider the publication "in the sense it would be understood by the readers to whom it was addressed," because "'[c]ontext' is a critical legal concept for determining whether, as a matter of law, a statement is reasonably capable or susceptible of a defamatory meaning").  Accordingly, the fact that Eringer might have understood the statements to be untrue does not foreclose a finding with respect to falsity.

Second, Defendants contend that the Pitch's statements are not legally false because Berlin was merely reporting information that he obtained from unverified sources.  Defs.' Opp'n at 26–29.  They argue that when, as here, a speaker publishes what another has said, such retelling "does not necessarily result in liability for the person who made that report."  *Id*. at 26.

---

[6] Defendants have not objected to the admissibility of this exhibit, only the weight the court should give to it.  Defs.' Opp'n at 31.

But that is not the law.  Long ago in *Olinger v. American Savings and Loan Association*, the D.C. Circuit said, "[t]he law affords no protection to those who couch their libel in the form of reports or repetition. . . .  [T]he repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement."  409 F.2d 142, 144 (D.C. Cir. 1969).  And, quoting from the Restatement, the court continued: "When one person repeats a defamatory statement which he attributes to some other person, it is not enough for the person who repeats it to prove that the statement was made by the other person.  He must prove the truth of the defamatory charges which he has thus repeated."  *Id*. (quoting Restatement (First) of Torts § 582 cmt. d (1938));  *see also Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60–61 (2d Cir. 1980) (affirming as a "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement") (quoting *Hoover v. Peerless Publications, Inc*., 461 F. Supp. 1206, 1209 (E.D. Pa. 1978)).  Defendant thus cannot avoid summary judgment on falsity because he merely repeated allegations first made by someone else.

Third, Defendants attempt to create a dispute of material fact on falsity by pointing to two records: (1) a memorandum prepared by one of Eringer's associates, Piers Erskine, summarizing a conversation with Ivo Hoppler, a prosecutor for the Canton of Zurich, in February 2003, Defs.' Opp'n, Ex. 4, ECF No. 94-6, at 2; and (2) Monaco police files that reference a suspicion of money laundering by Plaintiff, Defs.' Opp'n, Ex. 6, ECF No. 94-8, at 4 (ECF pagination) ("SUSPICION OF MONEY LAUNDERING AND WORKING FOR RUSSIAN INFORMATION SERVICES"). But neither of these records is sufficient to create a genuine dispute of material fact as to the falsity of the Pitch.  The summary of the conversation with Hoppler is not admissible, as it is plainly

hearsay.[7]  And even if the memorandum's contents were admissible (for example, by Hoppler's testimony), at most, Hoppler "appeared" to know that "the Chandler brothers were behind the Sovereign operations *but he cannot prove it.*"  Defs.' Opp'n, Ex. 4, ECF No. 94-6, at 2.

The Monaco police report is equally flawed.  It, too, is inadmissible hearsay.[8]  But even if somehow admissible, all the report says is that Plaintiff was "Subject of an ALERT FROM THE D.S.T. since 03/01/02: SUSPICION OF MONEYLAUNDERING AND WORKING FOR RUSSIAN INFORMATION SERVICES."  Defs.' Opp'n, Ex. 6, ECF No. 94-8, at 4 (ECF pagination).  Another entry similarly states, "Richard CHANDLER and his brother Christopher HELD A LARGE PART of the capital of the 'LUKOIL' AND 'GASPROM' Companies (linked to former RUSSIAN senior officials who may have TIES TO ORGANIZED CRIME."  *Id.* at 7 (ECF pagination).  Both entries convey no more than bare suspicion, and neither establish any actual fact that creates a genuine dispute about falsity.

Because Plaintiff has met his burden, and Defendants have failed to raise a genuine dispute of material fact, the court grants Plaintiff summary judgment as to the element of falsity.[9]

## 2. Publication

The parties agree that the allegedly defamatory statements were published by Defendants to Eringer on February 24, 2003.  Pl.'s Mem. at 8–9; Defs.' Reply at 24 n.15.  Thus, summary judgment on the element of publication is granted to Plaintiff.

---

[7] Defendants suggest the memorandum is a business record, *see* Defs.' Opp'n at 31 n.17, but it bears none of the hallmarks of such records.  In any event, Hoppler's purported statements within the record, if submitted for their truth, are plainly hearsay.

[8] Defendants have made no effort to establish the foundational predicate to qualify the Monaco police record as a business or public record.  *See* Fed. R. Evid. 803(6), 803(8).  Even if they had, as discussed, the record's contents do not raise a genuine dispute of material fact.

[9] The court does not hold that those statements were capable of defamatory meaning when the Pitch was published to Eringer, because there is a dispute of material fact as to Eringer's state of mind when he received the Pitch.  *Supra* Section IV.A.1.

3.     *Plaintiff as a Private or Limited-Purpose Public Figure*

The parties dispute whether Plaintiff should be treated as a private or limited-purpose public figure for purposes of his defamation claim.  Pl.'s Mem. at 9–13; Defs.' Reply at 32–38. The parties agree that the appropriate standard for this inquiry is set forth by the D.C. Circuit in *Waldbaum v. Fairchild*, 627 F.2d 1287 (D.C. Cir. 1980).  The court must (1) decide whether there is a public controversy and determine its scope (prior to the alleged defamation); (2) ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impacts of its resolution; and (3) look at the plaintiff's role in the controversy.  *Fridman v. Orbis Bus. Intel. Ltd*., 229 A.3d 494, 505 (D.C. 2020) (applying *Waldbaum*).

With respect to the first prong, courts "must examine whether persons actually were discussing some specific question, looking to see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment."  *Jankovic v. Int'l Crisis Grp*., 822 F.3d 576, 585 (D.C. Cir. 2016) (quoting *Waldbaum*, 627 F.2d at 1297) (internal quotation marks omitted).  With respect to the third, the Circuit has cautioned that "[b]eing an executive within a prominent and influential company does not by itself make one a public figure.  In many cases, a corporate official is simply a conduit for announcing and administering company policies made by others.  Similarly, many executives who do make corporate policy do not thereby take stands in public controversies."  *Waldbaum*, 627 F.2d at 1299.

A public-figure plaintiff "must have achieved a special prominence in the debate, and either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution."  *Fridman*, 229 A.3d at 505 (quoting *Waldbaum*, 627 F.2d at 1297) (internal quotation marks omitted).  "In undertaking this analysis, a court can look to the plaintiff's past conduct, the extent of press

coverage, and the public reaction to his conduct and statements." *Waldbaum*, 627 F.2d at 1297. Plaintiff claims that Defendants have offered no evidence that he was involved in any public controversy, and that his organization's dealings cannot suffice to make him a public figure under *Waldbaum*.  Pl.'s Mem. at 9–13.

Defendants, however, have suggested an existing public controversy regarding the governance of Gazprom, Russia's largest natural gas company.  *See* Defs.' Opp'n, Ex. 7, ECF No. 94-9, at 49 ("Gazprom's management, which was composed mainly of holdovers from the Soviet-era gas ministry, had a reputation for being incompetent and even corrupt," Gazprom was audited "by the Russian parliament," and "[t]he Russian press reported that overpriced pipeline construction projects were being awarded to friends and relatives of company insiders"). Defendants maintain that, through their company, the Chandler brothers exercised influence over the leadership and activities of Gazprom, including by lobbying Vladimir Putin to appoint Gazprom's president, "wrench[ing] control of Gazprom from its Soviet-era managers."  Defs.' Opp'n at 35.  *Cf. Jankovic*, 822 F.3d at 587 (rejecting plaintiff's argument "that the breadth of the controversy ensures that someone such as himself—a mere businessman interested in civic affairs—could not have been expected to have the requisite impact" to be a limited-purpose public figure, because "evidence shows that [the plaintiff] had voluntarily thrust himself into ensuring that Serbia underwent reforms in the post-Milosevic era").  The allegedly defamatory statements in the Pitch assert that Plaintiff used his connection to Gazprom to engage in financial crimes, both by manipulating other financial entities through Gazprom and by receiving protection from "high-level political types," including Gazprom officials and Vladimir Putin.  Pitch at 1–2, 3–4, 6; *see also id*. at 7 (alleging that "GazProm has a notorious background that includes allegations of corruption, organized crime infestation, and other claims").

Given the importance of this issue, the court defers its ruling.  Both parties have made compelling arguments, and the court would benefit from an oral hearing on the matter.

        *4.*      *The Pitch's Accusations as Libelous* Per Se

As discussed already, the court agrees that the Pitch's allegations of criminal misconduct are libel *per se.  See supra* Section IV.A.4.  The court therefore grants Plaintiff summary judgment on this issue, as well.

## V.

The court hereby denies Defendants' Motion for Summary Judgment, ECF No. 86, and grants in part the Plaintiff's Cross-Motion for Partial Summary Judgment, ECF No. 88.  The parties shall appear for a remote status conference on September 20, 2023, at 9:00 a.m.

Dated: September 5, 2023

                             Amit P. Mehta
                     United States District Court Judge