UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTOPHER CHANDLER, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No. 1:18-cv-02136-APM |
| | ) |
| DONALD BERLIN, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**DEFENDANTS' BRIEF IN SUPPORT OF CHRISTOPHER CHANDLER'S
STATUS AS A LIMITED PUBLIC FIGURE FOR PURPOSES OF HIS CLAIMS**

**INTRODUCTION**

Defendants Donald Berlin, Investigative Consultants, Inc., and Investigative Consultants of Washington, D.C., Inc., (collectively, "Defendants" or "Mr. Berlin") respectfully submit this Supplemental Memorandum on the question whether Plaintiff Christopher Chandler is a public figure for a limited purpose. The evidence that Defendants have already submitted, along with the additional evidence discussed below, conclusively shows that Mr. Chandler satisfies the relevant legal standards and that his arguments to the contrary are meritless.

The parties agree on the three-part test for determining whether a defamation plaintiff is a limited purpose public figure. (Dkt. 94 at 43; Dkt. 88-2 at 15-16.) *See, e.g., Jankovic v. International Crisis Group,* 822 F.3d 576, 585 (D.C. Cir. 2016), citing. *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296-98 (D.C. Cir. 1980) and *Tavoulareas v. Piro,* 817 F.2d 762, 772-73 (D.C. Cir. 1987). The inquiry is "highly fact intensive." *Fridman v. Orbis Business Intelligence, Ltd.,* 229 A.3d 494 (D.C. 2020), quoting *Doe No.1 v. Burke,* 91 A.3d 1081, 1091-92 (D.C. 2014). First, there must be a public controversy predating the alleged defamation and its

resolution must reasonably be expected to affect "persons beyond the immediate participants in the dispute." *Jankovic,* 822 F.3d at 585. (Citation omitted.) Second, the plaintiff must have "played a significant role in the controversy" *Jankovic,* 822 F.3d at 585, by "purposely trying to influence the outcome" or "realistically [being] expected, because of his position in the controversy, to have an impact on its resolution." *Id.,* at 587, quoting *Waldbaum,* 627 F.2d at 1297. Finally, the alleged defamation must be germane to the plaintiff's participation in the controversy. *Jankovic,* 822 F.3d at 585. Defendants have shown that Mr. Chandler meets each of these criteria.

I. **A Public Controversy Existed.**

As to the first requirement, Mr. Chandler does not dispute the existence of several related public controversies during the period before Mr. Berlin's 2003 report. Defendants showed that there were major disputes in Russia about corrupt corporate management and shareholders' rights, reform of the Russian economy after the 1998 default on its debt, and struggles to control both Gazprom and Novolipetsk Steel. (Dkt. 94 at 40-44.) *See also, OAO Alfa Bank v. Center for Public Integrity,* 387 F. Supp. 2d 20, 43 (D.D.C. 2005) (characterizing "[t]he rise of the oligarchs and the decline of the Russian economy" as "one of the defining foreign policy controversies of the 1990s," with choices made at that time "still being debated today.") Mr. Chandler has offered no rebuttal.

II. **Mr. Chandler Made Substantial Efforts to Resolve the Controversy.**

Defendants already have shown that, through Sovereign, Mr. Chandler undertook sustained public efforts to fight corporate corruption, safeguard shareholders' rights and promote economic reform in Russia during the late 1990s and early 2000s. Those efforts included a reform campaign at Novolipetsk Steel (also known as NLMK) that "drew international attention," "made legal history," and "demonstrated that corporate governance standards could be upheld in Russia." (Dkt. 94 at 41.) "Sovereign's activism" resulted in the disappearance of corrupt "tolling agreements," a

method of enriching corporate managers at the expense of shareholders. (*Id.*) Sovereign also "hosted a landmark conference" on rebuilding the Russian economy and organized shareholder coalitions at major Russian companies. (*Id.*) In 2000, Sovereign began its active efforts to eliminate corruption and modernize management at Gazprom. (*Id.*, at 42.) Sovereign appointed Boris Fyodorov to the board of directors and later persuaded Vladimir Putin to replace Gazprom's corrupt president with Putin's handpicked candidate. (*Id.*) Sovereign continued its public efforts in 2001-2003 by publishing papers and issuing a press release promoting improved governance standards at Gazprom. (*Id.*)

### A. Additional Evidence Shows Sovereign's and Mr. Chandler's Influence.

There is further evidence confirming Sovereign's significant role in influencing resolution of the controversies prior to Mr. Berlin's 2003 report. Sovereign's audited 2000 financial statement says it "spent most of 2000 executing a focused advocacy program to improve corporate governance at Russia's largest companies, namely Gazprom and Lukoil." (Ex. 1 at 2, bolding deleted.) According to Sovereign, that program involved several public endeavors:

> We have:
> - Co-ordinated the appointment of an independent director to the board of Gazprom.
> - Written numerous papers which have increased the international awareness of Gazprom's mismanagement and corruption.
> - Consulted with major international banks and international financial institutions on their Russia policy and strategy.

(*Id.*, bolding deleted.)

Sovereign's 2001 financial statement extolled the results of its efforts. "Sovereign's long fought battle for corporate governance reform in Russia came to a climax this year. The change of management at Gazprom was akin to the breaking of a dam which released a torrent of change at Russia's largest company." (Ex. 2 at 3.) Sovereign described itself as "winning the ideological war in Russia with a tactical series of corporate governance policy papers and focused lobbying." (*Id.*) The 2003 report noted that Sovereign expected publicity about its reform efforts. "Gazprom reaffirmed its commitment to reform in a joint press release with Sovereign." Ex. 3 at 2. Indeed, the statement from Boris Fyodorov quoted at Dkt. 94 at 43 is from a 2003 Sovereign press release. (*See* Dkt. 94-9 at 55 (Fyodorov statement ;) *id.,* at 87 (endnote citing the Sovereign press release as the source of the quote).) Alexei Miller's quote at Dkt. 94-9 at 56 is from a Gazprom press release, demonstrating Gazprom also regarded Sovereign's actions at Gazprom to be newsworthy. (*See* Dkt.94-9 at 87 (endnote citing Gazprom press release as the source of Miller's quote).)

Mr. Chandler's public efforts to influence corporate reform in Russia did not escape the notice of the press. On July 6, 2001, the *Financial Times* reported Mr. Chandler and his brother "exert an extraordinary influence over the development of Moscow's equity markets." (Ex. 4.) They had "taken significant stakes in some of Russia's most high-profile companies and used their influence to fight for improved corporate governance in order to raise the share price." (*Id.*) They were "well-known in Monaco," and "Moscow insiders identif[ied] the Chandlers' fingerprints on the recent bitter fight over Gazprom." (*Id.*) After Boris Fyodorov joined the Gazprom board, "[o]bservers say the Chandlers have strongly influenced Mr. Fyodorov's agenda to push for management change and an end to alleged asset-stripping." (*Id.*) The article also described their battle with Novolipetsk Steel as "[t]heir longest and highest-profile fight." (*Id.*)

The *Wall Street Journal* also reported on Mr. Chandler's public reputation for corporate reform in Russia. In an article describing the Chandlers' investment in a South Korean oil refiner, the *Journal* noted that the Chandlers "have a decade of experience on capitalism's wild Russian frontier, where other investors say they have pushed for greater transparency and better management at a series of big companies, including the world's largest producer of natural gas, OAO Gazprom." (Ex. 5 at 1.) It noted that in Russia in the 1990s, "the brothers became known for taking minority positions in undervalued and badly managed energy and metals companies and pressing management to improve performance or resign." (*Id.* at 2.) It also described the views of "Moscow bankers" about the Chandlers, who said that "the brothers pushed for the 2001 ouster of Rem Vyakhirev, the former chief executive of Gazprom, who was accused of corruption and nepotism by shareholders." (*Id.*) Although the article was published on June 4, 2003, shortly after Mr. Berlin's report, it reports on the public reputation of the Chandlers at an earlier time – during their "decade of experience" in Russia. It is therefore competent evidence of their public reputation in the late 1990s and early 2000s.

### B. Mr. Chandler Has Admitted That Sovereign's Efforts Were His Own Efforts.

Mr. Chandler does not dispute that Sovereign had a long track record of efforts to influence the resolution of public controversies over corruption and shareholders' rights in Russia and reform of the Russian economy. In fact, he forthrightly admits that Sovereign "spent years fighting to root out corruption in Russia," and "played a notable role fighting Russian corruption." (Dkt. 96 at 29.) He argues, however, that those "notable" efforts are attributable to his company, Sovereign, and not to him personally. (Dkt. 96 at 28-29.) As noted above, both the *Financial Times* and the *Wall Street Journal* identified Mr. Chandler and his brother as the ones who exerted Sovereign's

influence in Russia. More important, both Mr. Chandler and his authorized representatives regard Sovereign's corporate activism as his own deeds.

On May 7, 2018, Mr. Chandler wrote to Bob Seely, MP, who had accused him of being a Russian spy in a speech in the British Parliament. That letter (Ex. 6) documented Mr. Chandler's personal history of public activism during the 1990s and early 2000s in support of shareholders' rights and against corrupt corporate dealings in newly privatized Russian corporations. Mr. Chandler described his "career to date" as "characterised by holding those in power to account, and specifically those in Russia." (*Id.* at 1.) Although Sovereign was the vehicle through which he invested in Russian companies, his letter is replete with statements claiming personal credit for Sovereign's actions. For example:

- "Beginning in 1993, . . . I started investing in Russia." (Ex. 6 at 2, ¶ 5.)

- "By the time I invested in Russia . . . ." (*Id.*)

- "I could take a stand against vested interests and corrupt corporate parties where necessary – which is something the record clearly shows I did repeatedly." (*Id.*)

- "In Russia I first invested in 1993 in Sun Brewing . . . . I invested while it was still private . . . ." (*Id.*, ¶ 8.)

- "I invested in many companies in Russia . . . for about a decade." (*Id.,* ¶ 9.)

- "In Russia, I stood up for ethical business leadership and good corporate governance." (*Id.* at 3, ¶ 10.)

- "I joined other minority shareholders in a call for the removal of Rem Vyakerev, the 'Red Director' of Gazprom . . . ." (*Id.*)

- "I also confronted NLMK's management . . . ." (*Id.*)

- "In taking these actions, I made enemies amongst very powerful and politically connected persons." (*Id.,* ¶ 12.)

- "I believe that the dossier was part of an effort by powerful and politically connected persons in Russia to discredit and threaten me at that time, when I was standing up against oligarchs and kleptocrats in calling for ethics and good governance in businesses that were being actively plundered." (*Id.*)

- "I also drafted policy papers, calling on the Russian government to take steps that would increase trust in society and thereby promote a more prosperous future for the country." (*Id.,* ¶ 13.)

- "Beyond my history of fighting for better corporate behavior in Russia, . . . ." (*Id.,* at 4, ¶ 17.)

The letter also included attachments, two of which already are part of the record in this case. (Dkt. 94-10 (Ex. A to the letter) and Dkt. 94-12 (Ex. C to the letter.)).[1] Mr. Chandler

---

[1] By attaching the newspaper articles to his letter to Mr. Seely, Mr. Chandler showed his belief in their accuracy.

described Ex. C as a "history of that time . . . which we prepared years ago, prior to all of the recent media attention," Ex. ___ at 3, ¶ 11.

By including Ex. C with the letter, Mr. Chandler confirmed his unqualified belief that Legatum's history of that period was accurate and reliable. That history begins with a discussion of one of the influential "policy papers," that Mr. Chandler mentioned in his letter, an essay entitled *Seven Steps to Prosperity in Russia.* (Ex.7.) Originally published in Russia in 1999, the essay was reprinted in *The Future of Freedom in Russia,* a collection of essays edited by Ambassador William vanden Heuvel, after a conference at the Library of Congress at which many of the essays' authors, although not Mr. Chandler, appeared.[2] The essay was widely circulated among members of the Federal Duma, one of the houses of the Russian Parliament, as well as the "international investment community." (Dkt. 94-12 at 2; Ex. 7 at 225.) Mr. Chandler's "history" describes his essay as "the most talked about paper of the year," (Dkt. 94-12 at 2.) He generated support for its ideas from both the World Bank and other foreign investors in Russia. (Ex. 7 at 227.) Although the essay is unsigned, Mr. Chandler's authorship was "an open secret in some quarters." (Dkt. 94-12 at 2.)

A separate letter (Ex. 8) from Mark Stoleson, Chief Executive Officer and Partner of the Legatum Group, Mr. Chandler's current investment company, to a different Member of Parliament, dated May 5, 2018, also conflates Sovereign's actions in Russia with Mr. Chandler's. Mr. Stoleson was "duly authorised" to send that letter on Mr. Chandler's behalf. (*Id.,* at 1.) In addition to two separate

---

[2] Mr. vanden Heuvel's preface describes the conference in greater detail. (Ex. 7 at viii-x.)

references to "Christopher Chandler's investments in Russia," (*id.,* at 6, 7,) the letter makes no effort to distinguish between Sovereign's actions and those of Mr. Chandler.

> [T]he truth is that Christopher Chandler **and** his Sovereign investment organization were very active in calling for better corporate governance in Russia during the 1990's and 2000s. This meant **they** had to stand up against entrenched interests, so-called "Red directors," oligarchs and kleptocrats. **They** called out the practice used by Russian mangers called "tolling" which diverted cash flows of companies into their own pockets. And by doing this **they** made enemies amongst very powerful and well-connected Russians. We suspect that Eringer may have stumbled across elements of a disinformation campaign by Russian elements to discredit and harass Christopher Chandler 20 years ago **when he was active in challenging governance standards in Russia.**

(*Id,* at 6, emphasis added.)

Mr. Chandler's statements to this Court also show that Sovereign's actions in Russia should be attributed to him. His summary judgment motion argued that Mr. Berlin's statements about the Swiss company known as Sovereign Forex were actually statements about Mr. Chandler himself, solely because Mr. Berlin alleged that Mr. Chandler and his brother controlled Sovereign Forex. Indeed, even Mr. Berlin's statement that Mr. Chandler merely was "closely connected" to Credit Agricole, a French bank, was sufficient, according to Mr. Chandler, to demonstrate that statements about Credit Agricole actually were accusations against Mr. Chandler:

> [I]t does not matter . . . that some of the Pitch's sentences name Sovereign Forex or Credit Agricole instead of Chandler, because the Pitch unambiguously states that

>Chandler and his brother control Sovereign Forex . . . and are closely connected with Credit Agricole . . . . **These statements, in context, establish that the Pitch's accusations are about Chandler and his brother**.

(Dkt. 88-2 at 10, emphasis added.)

Mr. Chandler's argument was successful, as the Court granted summary judgment on his claim that Mr. Berlin's report contains false statements about him, without distinguishing statements about Mr. Chandler from statements about Sovereign Forex. (Dkt. 102 at 13-17.) It is disingenuous for him now to argue that "[f]or purposes of the law, Chandler is not his companies." (Dkt. 96 at 29.)

A company can act only through individuals, whether they are owners, officers, directors, or employees. Both Mr. Chandler and his representatives consistently have admitted that it was Mr. Chandler who acted on Sovereign's behalf by investing in Russia, prominently challenging entrenched corrupt management in the companies whose shares he held, and aggressively promoting both fair corporate governance and economic reform throughout Russia.

Citing *Waldbaum v. Fairchild Publications,* 627 F.2d 1287, 1299 (D.C. Cir. 1980) and *Tavoulareas v. Piro,* 817 F.2d 762 (D.C. Cir. 1987), Mr. Chandler observes that a person's status as a company executive "does not by itself make the person a public figure." (Dkt. 96 at 29.) But he neglects to point out that the executives in both cases were found to be limited purpose public figures based on their own actions and that their status as executives, while not dispositive, was relevant to the public figure issue. *Waldbaum,* 627 F.2d at 1299-1300; *Tavoulareas,* 817 F.2d at 773. Like the plaintiffs in those cases, Mr. Chandler repeatedly injected himself into public controversies over a period of several years. Those actions qualify him as a public figure.

**C. Defendants Have Produced Competent Evidence of Mr. Chandler's Activities Prior to the 2003 Publication of Mr. Berlin's Report.**

Mr. Chandler criticizes Defendants' public figure evidence as relying "almost exclusively on publications that post-date the Limited Report." (Dkt. 96 at 30.) With this memorandum, Defendants have supplied significant evidence from 2003 and earlier to support their contentions, including Sovereign's financial statements from 2000, 2001, and 2003, Mr. Chandler's 1999 essay *Seven Steps to Prosperity in Russia*, and newspaper articles from the *Financial Times* and *Wall Street Journal*.[3]

In any event, the premise of Mr. Chandler's argument is incorrect. Although a plaintiff must be a public figure as of the time he was defamed, Mr. Chandler has cited no rule of law requiring all **evidence** of public figure status to have been created before the alleged defamation. The participants in an event or series of events surely are competent witnesses to recount what happened at an earlier time. In particular, there is no basis for discounting Mr. Chandler's own recollections of what he did to combat corruption in Russia. His entire career has been "characterised by holding those in power to account, and specifically those in Russia." (Ex. 6 at 1.) Although his attorneys disparage the "pamphlet published by Legatum more than a decade after the Limited Report," (Dkt. 96 at 34,) Mr. Chandler enthusiastically endorsed that document (Ex. C to his May 7, 2018, letter) as an accurate discussion of the history of his anti-corruption efforts in Russia. (Ex. 6 at 3, ¶11.) Indeed, it was a major feature of his defense against the allegations in Parliament.

---

[3] Mr. Chandler criticizes the newspaper articles filed at Dkt. 94-8 because they "do not mention Sovereign or Chandler." Dkt. 96 at 30. But those articles are relevant to demonstrate the pre-existing public controversy over reform of corporate corruption in Russia, even if they do not discuss Mr. Chandler's role in that controversy.

**D. Mr. Chandler Did Not "Actively Reject the Spotlight" in Russia in the 1990s and Early 2000s.**

Mr. Chandler says he "spent most of his life actively rejecting the spotlight," chiefly by not giving interviews. Dkt. 96 at 31. Perhaps this is true of his life after he sold his investments in Russia. But during the corporate reform controversies in Russia before Mr. Berlin published his report, Mr. Chandler published numerous papers, which gained international attention, (Ex. 6 at 3, ¶ 13,) including "the most talked about paper of the year," (Dkt. 94-12 at 2,) engaged in litigation that "made legal history, (*id.,* at 3,) repeatedly took stands against corporate corruption, (Ex.6 at 2, ¶ 5,; *id.,* at 3, ¶12, and made enemies because of his public efforts. (Ex. 6 at 3, ¶ 12; Ex. 8 at 6). He was an active participant in public controversies affecting the Russian economy and its major corporations and used his influence to seek resolution of the controversies. (Ex. 4.) None of those actions is consistent with rejecting the spotlight.

**III.   Mr. Berlin's Report Is Germane to Mr. Chandler's Participation in the Public Controversy.**

Defendants have shown that Mr. Berlin's report is germane to Mr. Chandler's participation in the public controversy. (Dkt. 94 at 44.) Information about the alleged corruption of a perceived public fighter against corruption is obviously relevant to the credibility of that person. Mr. Chandler's calls for moral reform and an end to corrupt business dealings would be considered in an entirely different light if he himself were engaging in underhanded transactions. Mr. Chandler has not disputed this point.

It is important to note that the truth or falsity of Mr. Berlin's report plays no role in deciding the germaneness issue:

[T]he germaneness part of the *Waldbaum* inquiry is not the place to debate whether the statement is true or even well-supported. Those questions are relevant to the actual malice inquiry. The purpose of the germaneness inquiry is to ensure that the allegedly defamatory statement – whether true or not – is related to the plaintiff's role in the relevant public controversy.

*Jankovic,* 822 F.3d at 589.

## **CONCLUSION**

Because Mr. Chandler meets the three-part test of *Waldbaum, Tavoulareas, Jankovic,* and other cases, this Court should deny his motion for summary judgment on this issue and should rule that Mr. Chandler is a limited public figure for purposes of this case.

December 8, 2023                                              Respectfully submitted,


*/s/ Steven M. Oster*
John P. Dean
D.C. Bar No.   362904
Steven M. Oster
D.C. Bar No. 376030

**OSTER McBRIDE PLLC**
1320 19th Street, N.W., Suite 601
Washington, D.C. 20036
(202) 596-5291 (p)
(202) 747-5862 (f)
soster@ostermcbride.com
johndean8@aol.com

*Counsel to Defendants*

-14-

## CERTIFICATE OF SERVICE

I certify I caused a true and correct copy of the attached BRIEF IN SUPPORT OF CHRISTOPHER CHANDLER'S STATUS AS A LIMITED PUBLIC FIGURE to be filed using the Court's CM/ECF system, thereby serving counsel of record.

December 8, 2023 /s/ **_Steven M. Oster_**
Steven M. Oster