**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHRISTOPHER CHANDLER,** | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )   **Case No. 1:18-cv-02136-APM** |
| | ) |
| **DONALD BERLIN,** *et al.*, | ) |
| | ) |
| *Defendants*. | ) |
| _____ | ) |

**DEFENDANTS' BRIEF IN SUPPORT OF CHRISTOPHER CHANDLER'S**
**STATUS AS A LIMITED PUBLIC FIGURE FOR PURPOSES OF HIS CLAIMS**

# EXHIBIT ONE



**SOVEREIGN FINANCE LIMITED
AND SUBSIDIARIES**

**ACCOUNTS**

**31ST DECEMBER 2000**

CONFIDENTIAL

# SOVEREIGN FINANCE LIMITED AND SUBSIDIARIES

## REPORT OF THE DIRECTORS
### YEAR ENDED 31ST DECEMBER 2000

The Directors present their report on the affairs of the Group together with the audited accounts for the year ended 31st December 2000.

**ACTIVITIES**

The principal activity of the Group is investment.

**DIRECTORS**

The Directors who held office during the year were:

C L Chandler
R F Chandler

**SECRETARY**

P S Flynn acted as Company Secretary throughout the year.

**AUDITORS**

The auditors Ernst & Young are willing to continue in office.

By order of the Board

Secretary
23rd February 2001

Registered Office:

P O Box 438
Road Town
Tortola
British Virgin Islands

1

CHANDLER005_00035858

# SOVEREIGN FINANCE LIMITED AND SUBSIDIARIES

## CHAIRMAN'S REPORT
### YEAR ENDED 31ST DECEMBER 2000

The year 2000 was a period of active development. Good progress was made setting the stage for improved performance going forward.

**Investment Management**

With a concentrated and long-term investment strategy, the Group's performance is naturally dependent upon the share price appreciation of a small number of investments. This year's performance was below our average long term performance levels. Emerging markets remained out of favour and Russian corporate governance risks continued to impede share price appreciation despite a very strong debt market. With no debt, improved liquidity and an increasingly diversified portfolio, the Group has the luxury of time, allowing its investments to mature.

For the past several years, the portfolio has been heavily weighted in oil and gas companies, especially in **Gazprom**, the world's largest gas company with 25% of world gas reserves. While 2000 was an excellent year for oil and gas prices, which nearly tripled, oil and gas companies' share prices rose only 5% on average. The stock market currently does not believe in the long-term sustainability of energy prices above $18 per barrel. The Group has positioned the major part of its investment portfolio based upon 3 fundamental beliefs:

I  Long-term energy prices are heading higher as the world discovers less energy and consumes more. Gas will outperform oil due to environmental concerns.

II  Russia will increase its investment rating as political risk decreases while economic development continues. Russian Eurobonds doubled in 2000, already reflecting the dramatic improvement in Russian risk due to higher government revenues received from higher international energy prices.

III  Corporate governance will improve as Russian managements embrace "the competitive advantage of virtue" and realize they have more to gain from transparency and increased market capitalization. The oil company **Yukos** is the leader in this trend. Russian companies will eventually move from "getting on" to "getting honest". The global financial community will no longer allow Russia to "promise now and default later".

The Group spent most of 2000 executing a focused advocacy program to improve corporate governance at Russia's largest companies, namely **Gazprom** and **Lukoil**. We have:

♦  Co-ordinated the appointment of an independent director to the board of **Gazprom**

♦  Written numerous papers which have increased the international awareness of **Gazprom**'s mismanagement and corruption.

♦  Consulted with major international banks and international financial institutions on their Russia policy and strategy.

It remains to be seen if and how the Russian government will respond to the corporate governance abuses and international media attention surrounding **Gazprom**, which remains the test case for corporate governance reform in Russia. The failure by the Russian government to introduce management reforms at **Gazprom** since acquiring board control in June 2000 has been particularly disappointing, although not totally unexpected.

**Looking Ahead**

Over the past year the Group has taken the following forward looking steps:

♦  Increased its portfolio diversification with new investments in Asia.

♦  Developed a more active portfolio trading strategy.

♦  Allocated capital to independent fund managers to improve the flow of investment ideas and market knowledge.

The Group continues to improve investment administration through greater excellence, elegance and efficiency in trading execution and custody.  Effort will continue to be invested in 2001 in the promotion of corporate governance reform in Russia, in order to continue to unlock the exceptional value of companies with world-class potential that are being held hostage to old ways of corrupt thinking and action.

We are extremely positive that 2001 will finally see share price appreciation in the group's key investments as well as the continued development of an organisation committed to "excellence in global investment management".

Richard F. Chandler
Chairman

23rd February 2001

2

CHANDLER005_00035859

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHRISTOPHER CHANDLER,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **Case No. 1:18-cv-02136-APM** |
| | ) | |
| **DONALD BERLIN,** *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF CHRISTOPHER CHANDLER'S**
<u>**STATUS AS A LIMITED PUBLIC FIGURE FOR PURPOSES OF HIS CLAIMS**</u>

# <u>EXHIBIT TWO</u>



S O V E R E I G N

SOVEREIGN FINANCE LIMITED AND SUBSIDIARIES

ACCOUNTS

31ST DECEMBER 2001

CONFIDENTIAL

CHANDLER005_00035872

# SOVEREIGN FINANCE LIMITED AND SUBSIDIARIES

## REPORT OF THE DIRECTORS
## YEAR ENDED 31ST DECEMBER 2001



The Directors present their report on the affairs of the Group together with the audited accounts for the year ended 31st December 2001.

**ACTIVITIES**

The principal activity of the Group is investment.

**DIRECTORS**

The Directors who held office during the year were:

C L Chandler
R F Chandler

**SECRETARY**

P S Flynn acted as Company Secretary throughout the year.

**AUDITORS**

On 28th June 2001, Ernst & Young, the Group's auditor, transferred its entire business to Ernst & Young LLP, a limited liability partnership incorporated under the Limited Liability Partnerships Act 2000 of England. Ernst & Young resigned as the Groups's auditor with effect from 28th June 2001 and the Directors appointed Ernst & Young LLP to fill the vacancy in the office of auditor.

By Order of the Board

Secretary
22nd February 2002

Registered Office:

P O Box 438
Road Town
Tortola
British Virgin Islands

2

CHANDLER005_00035873

# SOVEREIGN FINANCE LIMITED AND SUBSIDIARIES

## CHAIRMAN'S REPORT
## YEAR ENDED 31ST DECEMBER 2001



Sovereign made excellent progress in 2001 both in terms of investment performance and in re-positioning its portfolio. The Group returned to strong growth with a 23% increase in net asset value during the year while most of the major benchmark indices showed substantial losses.

**Investment Performance in 2001**

♦ The portfolio was heavily weighted in favour of Russia and South Korea which were the best performing global equity markets in 2001. Two elements are common to the success of these countries: the embracing of structural reforms and economic growth. South Korea continued to restructure its corporate sector, with a focus on reducing Chaebol debt and bank sector reform. Meanwhile, Russia reformed its tax system and land code. Russia also benefited from high oil prices for most of the year and a reduction in country risk following President Putin's diplomatic efforts.

♦ Sovereign's long fought battle for corporate governance reform in Russia came to a climax during the year. The change of management at Gazprom was akin to the breaking of a dam which released a torrent of change at Russia's largest company. The company's stock achieved a listing on the Russian Trading System (RTS), the major recognised Russian stock exchange. Progress was also made in the areas of tariff reform and share market liberalisation, although much remains to be done. While Gazprom's share price increased significantly during the year, the company still trades at a fraction of its true value. The company must now make swift progress on several fronts if its potential is to be realised.

♦ While Sovereign was winning the ideological war in Russia with a tactical series of corporate governance policy papers and focused lobbying, it also established a second key position, in South Korea. This country is an anomaly in the Global Emerging Markets ("GEMS") universe with an investment grade bond rating but with a very cheap equity market. This mis-correlation was also evident in Russia last year when bonds dramatically outperformed equities. The reason appears to be corporate governance issues once again, but here we believe South Korea has made good progress. There is significant domestic liquidity which has the potential to drive a sustained stock market rally in 2002.

**Future Outlook**

♦ GEMS have polarised and ceased to be a liquid and homogeneous asset class. Sovereign's focus will broaden to global markets from GEMS in 2002. Global markets have become more volatile providing better quality opportunities. The investment focus in 2002 will be on North Asia, especially South Korea, Japan & Hong Kong.

♦ Russia will remain a major constituent of Sovereign's investment portfolio and the Group will continue its campaign for corporate governance and other market reforms.

Sovereign continues to develop both its people and its methodology to achieve "Excellence in Global Investment". Sovereign's out-performance during 2001 has served to reconfirm its core philosophies, strategies and values.

Richard F. Chandler
Chairman

22nd February 2002

3

CHANDLER005_00035874

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHRISTOPHER CHANDLER,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **Case No. 1:18-cv-02136-APM** |
| | ) | |
| **DONALD BERLIN,** *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF CHRISTOPHER CHANDLER'S**
**STATUS AS A LIMITED PUBLIC FIGURE FOR PURPOSES OF HIS CLAIMS**

# EXHIBIT THREE



**S O V E R E I G N**

# SOVEREIGN GROUP HOLDINGS LIMITED AND SUBSIDIARIES

## Financial Statements

31ST DECEMBER 2003

1

CONFIDENTIAL

# SOVEREIGN GROUP HOLDINGS LIMITED AND SUBSIDIARIES

## Report of the Directors
## Year Ended 31st December 2003



The Directors present their report and the audited financial statements of the Group for the year ended 31st December 2003.

**CHANGE OF NAME**

The Company changed it's name from Sovereign Finance Limited to Sovereign Group Holdings Limited on 9th July 2003.

**INCORPORATION**

The Company is incorporated in the British Virgin Islands.

**ACTIVITIES**

The principal activity of the Group is investment.

**DIRECTORS**

The Directors who held office during the year were:

C L Chandler
R F Chandler

**SECRETARY**

P S Flynn acted as Company Secretary throughout the year.

**AUDITORS**

The auditors Ernst & Young LLP are willing to continue in office.

By Order of the Board

Secretary

Date: 12th February 2004

Registered Office:

PO Box 438
Road Town
Tortola
British Virgin Islands

1

# SOVEREIGN GROUP HOLDINGS LIMITED AND SUBSIDIARIES

## Chairman's report
## Year Ended 31ST December 2003



The year has been one of exceptional growth as Sovereign has capitalised on it's core strengths of identifying significant trend changes (Japanese banks) and taking advantage of crisis opportunities (SK Corporation).  The net asset value of the portfolio increased by 150%.

Key drivers of this growth have been:

◆   The explosive share price rises in UFJ Holdings Inc. ("UFJ") and Japanese banking stocks in general.  UFJ was the best performing FTSE 500 stock of 2003 with a yearly return of 354%.  Sovereign was attracted by UFJ's management team and restructuring plans, which did not involve diluting existing shareholders.  Sovereign built up a stake in UFJ throughout the early part of the year as the market continued to fret over the possible nationalisation of the bankrupt Japanese banks.  Following the government bail out of Resona Holdings Inc in May, the fifth largest Japanese bank by assets, without impacting existing shareholders, sentiment towards Japanese banks underwent a sea change as the mantra for the Mega-Banks became "too big to fail".   In July 2003 Sovereign became the largest shareholder in UFJ Holdings Inc and was required under the Japanese Securities and Exchange Act to publicly disclose its 5.11% holding.

◆   SK Corporation ("SK") is an oil refining company which owns the largest single site refinery in the world supplying approximately 35% of the Korean petroleum market.  The share price reached an 18 year low in mid-March following the disclosure of a massive fraud at SK Global (a trading company which was 38% owned by SK) and the subsequent arrest of a number of executives including three board members of SK.  Sovereign was of the view that the fraud did not significantly impair either the short term viability or the long-term value of the company and that the market reaction was excessive.  Furthermore by introducing international standards of corporate governance and a new vision based upon a strong ethical foundation, Sovereign believed that SK could emerge as world class company.  In the space of only 16 days Sovereign rapidly acquired a 14.99% stake in SK.  The share price returned 201% from acquisition of the shares in March to the year end.

Other key developments during the year have been:

◆   The decision to exit Gazprom which was almost complete by the year end.  Although Gazprom's share price returned 58% for the year it has been a relative under-performer in the Russian market with the RTS index reaching new all time highs and returning 72% for the year.  Key reforms such as the removal of the ring fence and the listing on MICEX failed to occur and although Gazprom reaffirmed its commitment to reform in a joint press release with Sovereign, tangible results of this commitment failed to appear.  Sovereign decided to redeploy its capital in the recovering and more liquid Japanese market.

◆   Early in the year Sovereign began to appreciate the full scale of the consumer credit problems in Korea and the negative impact they would have on both the general Korean market and the financial sector in particular.  Sovereign disposed of its positions in Korean credit card companies, including LG card which subsequently required bailing out by a consortium of Banks towards the end of 2003.  In addition, the Kookmin Bank position which had been built up over a period of two and a half years, was liquidated.

◆   Sovereign became the leading member of a group of dissenting bondholders who fought to overturn the initial liquidation restructuring plan of Worldcom Inc. which would have disenfranchised holders of MCI Communications Inc ("MCI") preference shares (a solvent subsidiary of Worldcom Inc.) and provided them with no compensation.  Following litigation and protracted negotiations the dissenting bondholders were able to obtain a minimum settlement of 42 cents on the dollar and Sovereign was able to exit the MCI position for a 101% return.

Future Outlook

◆   Sovereign will continue its focus on Asia, specifically Northern Asia and the banking and energy sectors based upon the belief that these areas will be prime drivers of global growth over the coming decade.

Richard F Chandler
Chairman

12th February 2004

2

CHANDLER005_00035903

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHRISTOPHER CHANDLER,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **Case No. 1:18-cv-02136-APM** |
| | ) | |
| **DONALD BERLIN,** *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF CHRISTOPHER CHANDLER'S**
**STATUS AS A LIMITED PUBLIC FIGURE FOR PURPOSES OF HIS CLAIMS**

# EXHIBIT FOUR

## COMPANIES & FINANCE EUROPE

**STEEL** GERMAN GROUP'S LONG-AWAITED MOVE WILL END UNPOPULAR DUAL CHAIRMANSHIP SYSTEM BUT MANY ANALYSTS SAY MORE NEEDS TO BE DONE

# ThyssenKrupp prepares for board shake-up

**By Tobias Buck in Frankfurt**

ThyssenKrupp, the German steel and engineering group, yesterday announced a long-awaited shake-up of its executive board, ending the heavily criticised dual chairmanship model put in place when the former rivals merged two years ago.

The move will leave Ekkehard Schulz as sole chairman from October 1, when his co-chairman Gerhard Cromme will move to head ThyssenKrupp's supervisory board. Succeeding him as head of the group's automotive division will be his deputy, Jürgen Harnisch, while Ulrich Middelmann will take over responsibility from Mr Schulz at ThyssenKrupp's steel operations.

The number of board members will be reduced from nine to eight.

While analysts welcomed the move as a step towards streamlining the group's often opaque and slow decision making procedures, many complained the boardroom was in need of an even wider-reaching overhaul. One company's shares were 3.32 per cent higher at €14.14 in late trading.

The new board will have to tackle problems created by last year's cancellation of the planned float of its steel division. The spin-off would have allowed ThyssenKrupp to focus on its automotive components and elevator divisions, and would have gone a long way towards reducing its debt of more than €7bn. The group has been criticised for its slow-ness in divesting non-core activities such as shipbuilding and industrial plant construction.

However, analysts hoped that the new management structures would speed up an overhaul of Thyssen-Krupp's operations.

"It [the board shake-up] certainly clears the way for more efficient management and increases the probability that the urgently needed divestments of non-core operations will actually take place," said Klaus Soer, a steel analyst at Deutsche Bank in Frankfurt.

"One CEO leading the conglomerate instead of two who currently run the business is a clear sign in the market that the company aims to set up a more focused management structure. In the past, many decisions were simply not taken fast enough," he said.

Jörg-Andre Finke, steel analyst at the Frankfurt-based bank Helaba, said: "Markets felt the two chairmen were constantly getting in each other's way."

However, Mr Finke insisted the changes were not enough. "The executive board is still too large and too old. Everyone would benefit if the board was slightly smaller. The structures and decision making of the group would really benefit from a clearer cut," he said.

**By James Harding, Media Editor**

## Italian pay-TV groups to be merged

Media magnates Rupert Murdoch and Jean-Marie Messier have agreed to merge their Italian pay-TV businesses in an attempt to staunch losses, cut costs and accelerate the journey to profitability.

The merger of Stream, which is the Italian pay-TV platform belonging to Mr Murdoch's News Corp, and Telepiù, the rival service owned by Mr Messier's Vivendi Universal, requires Italian regulatory approval.

But if the two media moguls can secure the approval of the competition authorities, the combination will have approximately 3m to 3m subscribers in Italy and nearly €1bn in projected revenues.

Under the terms of the complex deal, the merger will proceed in several stages.

News Corp has agreed to buy the 50 per cent stake in Stream now owned by Telecom Italia, the Italian telecommunications group. Mr Murdoch's News Corp then plans to sell on a 25 per cent shareholding to Vivendi Universal, the French company which in the world's second largest media and communications group.

News Corp will then merge its 75 per cent shareholding in Stream with Telepiù and Vivendi's Stream platform.

The combined company will be 75 per cent owned by Vivendi and 25 per cent owned by News Corp, which has an option to increase its shareholding to 50 per cent over the next three years.

People involved in the deal were aiming to finalise documents last night. One adviser warned, however, that the transaction could still be delayed.

Stream and Telepiù have each been losing hundreds of millions of dollars as the two fledgling pay-TV groups competed to buy content to win subscribers.

Both investors hope that by combining the two services they will be able to lower the programme acquisition costs and pass on lower prices to consumers.

But there have been concerns in Italy that some businesses, notably football, would suffer with reduced competition in pay-TV.

Lehman Brothers, which advised Vivendi, estimates the value of the combined group at €5bn ($4.5bn).

---

# Auditors find no evidence of deals that aided Itera

**By Andrew Jack in Moscow**

Auditors scrutinising the links between Gazprom, the Russian gas group, and the Florida-based producer Itera have been unable to verify dividends and other payments made by Itera, according to a draft report.

Gazprom's board commissioned PwC to conduct the inquiry this year following growing criticism of alleged commercial transactions the Russian company is said to have conducted with Itera on favourable terms.

The absence of written documentation or of any financial accounts produced by Itera, and the lack of response to some queries from both it and Gazprom, have restricted analysis of the connections between the two companies.

A 47-page draft report prepared by PwC, Gazprom's auditor, is unable to identify any definite evidence of deals in which Itera benefited at the expense of Gazprom, while implicitly criticising some transactions.

The report has been obtained by the Financial Times, and extracts were published in Vedomosti, a joint venture newspaper between the FT, Dow Jones and Independent Media of the Netherlands.

It says it has so far identified no Gazprom employees holding shares in Itera, with the possible exception of V.E. Bryanskikh, a Gazprom employee who "may" hold shares in Lanko Prokomplekt, a company which had been partly owned by Itera and which in turn owns stakes in two other gas companies.

However, the document highlights extensive commercial links between Gazprom and Itera, including up

## The discreet power behind Russia's private sector

*The Chandler brothers exert an extraordinary influence over Moscow's equity markets, writes Andrew Jack*



*Boris Fyodorov: the Chandlers amassed enough support to install him at Gazprom*

From an apartment overlooking the tax haven of Monaco, where successive waves of old White Russian emigrés and New Russian "oligarchs" have made their fortunes, two brothers from New Zealand exert an extraordinary influence over the development of Moscow's equity markets.

Richard and Christopher Chandler are among a handful of intensely private but powerful individual investors who have taken significant stakes in some of Russia's most high-profile companies and used their financial muscle to fight for improved corporate governance in order to raise the share price.

Yet they have managed to keep the fact of their own involvement extremely low-profile. "They prefer to talk about trends or golf than their business," says one friend. "They are well-known in Monaco. Sociable – and very discreet."

Moscow insiders identify the Chandlers' fingerprints on some of the most bitter shareholder struggles over Gazprom. They estimate that the brothers own up to 4 per cent of the company, making them probably the third largest shareholder of the group after the state and the management and Ruhrgas of Germany.

"They are sharp, smart, and work very hard as advocates of their cause," says one individual who has dealt with them. Along with his colleagues, he prefers to remain anonymous, given both the Chandlers' tough approach to business and the largesse they show to the financial intermediaries they use.

Brought up in Hamilton, a town in the north of New Zealand, and in their 40s, the Chandlers inherited a retailing chain from their father, and by the 1980s were investing in emerging markets.

Their first fortune was made in the Hong Kong property market. Then they

shifted to Latin America, speculating on debt and buying into the Brazilian company Telebrás.

By the early 1990s, with the former Communist regimes crumbling, they started investing in the Czech Republic before moving further east. "Russia has probably taken much wealth from $800m to over $3bn," says one person who knows them well.

Their first investment in Russia was a private equity stake of several million dollars in Sun Brewing, now part of Sun Interbrew. The pushed hard to seek a swift return on their money, demanding a listing via what became the company's first Global Depositary Share in 1996.

"In hindsight, we wait public too early, when the market was not ready," says Chris Bryanskikh, then executive director of Sun. "But the Chandlers were honourable and very professional."

Their longest and highest-profile fight began with the 1994 privatisation of the Novolipetsk steel plant, in which they acquired a block-ing minority stake of 25 per

cent plus one share via the offshore vehicle Cambridge Capital Management.

Boris Jordan, who had launched the investment bank Renaissance and acquired a stake in the company, worked with them. "They were mandate and made their name," says one Moscow associate.

The attempt by Vladimir Potanin's Interros group, which controlled Novolipetsk, to buy up the shares without paying a high premium led to a "ring-fence" which would allow them to convert their domestic shares in ADSs, they could make much more.

So could UFG, with exit fees on their "grey schemes" of up to 4 per cent. But, as another broker warns: "One day the Chandlers will leave Russia, and never invest in another cent."

letter or co-ordinating a group of investors in your own name," says one acquaintance.

The brothers bought as much as 4 per cent in UES, the electricity utility, partly purchasing security held by Deutsche Bank. They also held a significant share in Lukoil, the oil group.

But perhaps their biggest gamble was Gazprom. They have built a holding since 1997, using "grey schemes" which respect the letter, if not the spirit, of legislation theoretically limiting foreigners to owning American Depositary Shares rather than domestic shares.

Renaissance was one of the largest brokers of domestic shares, but having fought Gazprom's management, it decided to wind down its positions. Rival UFG took up the slack. Today it manages an estimated 6 per cent of Gazprom's shares, of which the Chandlers represent at least half. UFG and the Chandlers refused to comment.

Coupled with other friendly investors, UFG managed to amass 6 per cent of the votes cast at this year's annual general meeting and a similar number last year to put Boris Fyodorov, its chairman, on the board.

Observers say the Chandlers have strongly influenced Mr Fyodorov's agenda, to push for management change and an end to alleged asset-stripping. With the higher Gazprom share price, they are likely to have already made a profit. With the continuing campaign to bring down the "ring-fence" which would allow them to convert their domestic shares in ADSs, they could make much more.

---

# Downturn may force drastic action at Océ

**By Ian Bickerton in Amsterdam**

Océ, the Dutch photocopiers and printers group, said yesterday it might be forced to take drastic action to reduce costs as weakening world economies bite into revenue growth and undermine profits.

The company posted a 37 per cent drop in second-quarter net income – a marked acceleration in the rate of decline from the previous three months.

Robust van Iperen, chairman, said: "If things do not improve in three to six months we will have to be more drastic."

He would not divulge what measures were under consideration but indicated they would come on top of a reduction in headcount that has already resulted in 270 forced redundancies worldwide in the first six months, a process that he said would continue in the second half.

Last year, Océ slashed 1,000 posts as part of a wide-ranging restructuring,

reflecting the move from analogue to digital formats. It employs about 20,000 people worldwide. Its main focus is the US and Europe.

Mr van Iperen said the current climate was hitting the company harder than at any time in the past five or six years. It has issued two profit warnings this year. "People are really worried about the economic downturn," he said, referring to the postponement by customers of machine orders in all business segments.

While he said Océ had not lost market share, and that some improvement was expected in the second half with new product launches, he repeated previous statements that the opening would not offset the first-half downturn.

"We have already been forced to change our statements twice, so it would not be wise to put another forecast on the table," he said. He said 2,000 jobs were lost across the company and uncertainty.

Shares opened hardly

changed at €12.16, reflecting the fact that investors had been primed for the figures. Last month, the company warned that second-quarter sales would be flat and full-year earnings would not match the €162m ($137m) of 2000.

While second-quarter revenues rose 1 per cent overall, to €868.6m, a static US and European market share, which generates nearly half group turnover, resulted in an autonomous 3 per cent fall and negative currency effects. Net income fell to €25.1m from €40.1m in the quarter of 2000 and of €56.8m in the second half of last year, reflecting problems in its sector, notably the €300m acquisition last year of the US commercial printing systems.

Net income fell to €25.1m from €40.1m in the quarter of 2000 and of €56.8m in the second half of last year, reflecting problems in its sector, notably the €300m acquisition last year of the US business through acquisition and Reijling per share fell to 20 cents from 47 cents in the second half of 2000.

The company's problems were exacerbated by higher charges, due to the US dollar and related derivatives contracts, and the growing proportion of income from countries with relatively high tax rates.

---

# Bayer is the most likely buyer of Aventis arm

**By David Firn**

Bayer, the German chemicals and pharmaceuticals hybrid, has emerged as the most likely candidate to buy Aventis Crop Science from Aventis, the Franco-German life sciences group, if analysts and other companies could emerge with higher bids.

Groups thought to be interested include BASF, Bayer's German rival, and Dow Chemical of the US.

The acquisition of Aventis Crop Science, the number three in the $28bn agro-chemicals sector, would be a key step in Bayer's ambitions plans to expand its agrochemical activities.

The move would catapult it from number six to the top of the agro-chemical league tables and

with Syngenta, the leader.

The acquisition would significantly strengthen Bayer's position in herbicides and plant biotechnology, where it lags behind its competitors.

Regulators are expected to look closely at the implications of Bayer's dominant positions in insecticides and sugar beet herbicides, leading to speculation that it might sell those to BASF.

Bayer, which is resisting shareholder pressure to break up its conglomerate structure, has been thwarted several times in its attempts to build up its life science business through acquisitions.

It was outbid for DuPont Pharma, which was sold to Bristol-Myers Squibb for $7.8bn in June, and Cyanamid, the agro-chemical unit of American Home Products that was bought by BASF for $3.8bn last year.

told the board that they would abstain from voting. Mr Colannino and Mr Gnutti had not wanted the board's two meetings about what they later said were only a "theoretical" conflict of interest regarding Tin.it's €1.8bn ($1.6bn) purchase last year of Seat.

They revealed the conflict at a third meeting called to give final approval of the purchase. Only then did they say that they were investors in a company that bought the new owned a stake in Seat, one

# Brussels seeks small print from Montedison bidders

**By Deborah Hargreaves in Brussels**

The European Commission has asked Fiat, the Italian manufacturing group, to reveal the terms of its agreement with Electricité de France and other investors to bid for Montedison, the Italian conglomerate, to see if the deal raises under European Union merger rules.

Romano Prodi, the Commission's president, said the same day that the takeover would have to be reviewed under EU merger rules.

The Commission has taken a tough line on deals involving EdF, using its ambitions to expand in the EU energy market as a way of forcing concessions to open up the French electricity market, where the company has a monopoly.

However, the way the takeover is structured, it is unlikely to fall under EU review. This is because Italenergia, strictly speaking, has no turnover, and two-thirds of Montedison's revenues come from the Italian market.

For a deal to be reviewed by Brussels, both merger partners need to have revenues of at least €250m in more than one EU country.

The way the deal is structured, it looks as if it would need to be examined by the Italian competition regulator. Fiat said last night that it would refer the deal to the Italian competition authorities.

But the Commission is keen to read the small print it would need to judge the Italian competition authorities.

Under the EU's merger rules, companies have seven days after the announcement of a bid to notify the European Commission. Italenergia has three weeks before it needs to notify the Commission that it is trying to take into account the revenues of all partners in Italenergia – especially EdF.

---

## Banks mull alliance

Commerzbank's chief executive yesterday toned down speculation that he was in full merger talks with Deutsche Bank, Germany's largest bank, and the two banks were looking at ways to cut costs through an alliance.

Commerzbank has been conducting an "exchange of views" regarding a mortgage banking tie-up with its two larger rivals but talks were at an early stage.

Dresdner Bank, Germany's third largest bank, was unavailable for comment. *Reuters, Munich*

## Sabena set to sue Swissair

Sabena, the troubled Belgian airline, confirmed it was following the lead of the Belgian government and suing its part-owner, Swissair. A Sabena spokesman said the company had instructed its lawyers to begin action against Swissair in a Brussels commercial court to claim €200m ($425m) to make Swissair meet what he said were commitments to pay for a 1997 expansion of Sabena's fleet and the delivery of four Airbus aircraft. The Belgian state is seeking €200m from Swissair, which claims reneged on a promise to raise its 49.5 per cent stake in Sabena to 85 per cent. *Reuters, Brussels*

---

# Telecom Italia chief under investigation

**By Fred Kapner in Rome**

Roberto Colannino, chairman and chief executive of Telecom Italia, yesterday received formal notification from a Turin prosecuting magistrate that he was under investigation for a possible conflict of interest when his company acquired Seat Pagine Gialle, a directory company, according to news agencies citing judicial sources.

Mr Colannino is among 10 executives with ties to Telecom Italia and Seat who received notifications, the news agencies reported. Ugo Colannino, the chairman and chief executive and others received notice of the investigations, which would be handed out to broaden an investigation that began three weeks ago, and which would implicate Marco Tronchetti Provera and others, the new owners of Telecom Italia, according to reports.

Telecom Italia yesterday said Mr Colannino and Mr Colannino and others had not received the notifications.

Telecom Italia shares fell sharply in May when the investigation was first made public, but they were little changed yesterday. One analyst said the notifications were expected but were nonetheless troubling for the management of Telecom Italia. "I don't think there is any effect on the company, but it is certainly another negative for a management," he said. Turin investigators opened the probe after a board member complained that Mr Colannino and Emilio Gnutti, another director, had failed to properly notify and explain to the board a potential conflict of interest when they bought Seat Pagine Gialle, the internet service provider, and Telecom Italia into the same board.

Mr Colannino and Mr Gnutti had not wanted the board to hold two meetings about what they later said were only a "theoretical" conflict of interest regarding Tin.it's €1.8bn acquisition of Seat.

---

## NEWS DIGEST

confirmed he was holding talks with Dresdner over a possible mortgage banking alliance as part of a wider cost-cutting strategy.

# The discreet power behind Russia's private sector

The Chandler brothers exert an extraordinary influence over Moscow's equity markets, writes **Andrew Jack**

From an apartment overlooking the tax haven of Monaco, where successive waves of old White Russian emigres and New Russian "oligarchs" have made their homes, two brothers from New Zealand exert an extraordinary influence over the development of Moscow's equity markets.

Richard and Christopher Chandler are among a handful of intensely private but powerful individual investors who have taken significant stakes in some of Russia's most high-profile companies and used their influence to fight for improved corporate governance in order to raise the share price.

Yet they have managed to keep the fact of their own involvement extremely low-profile. "They prefer to talk about tennis or golf than their business," says one friend. "They are well-known in Monaco, likeable – and very discreet."

Moscow insiders identify the Chandlers' fingerprints on the recent bitter fight over Gazprom. They estimate that the brothers own up to 4 per cent of the company, making them probably the third largest shareholder after the Russian government and Ruhrgas of Germany.

"They are sharp, smart, and work very hard as advocates of their cause," says one individual who has dealt with them. Along with his colleagues, he prefers to remain anonymous, given both the Chandlers' tough approach to business and the largesse they show to the financial intermediaries they use.

Brought up in Hamilton, a town in the north of New Zealand, and in their 40s, the Chandlers inherited a retailing chain from their father, and by the 1980s were investing in emerging markets.

Their first fortune was made in the Hong Kong property market. Then they

shifted to Latin America, speculating on debt and buying into the Brazilian company Telebras.

By the early 1990s, with the former Communist regimes crumbling, they started investing in the Czech Republic, before moving further east. "Russia has probably taken their wealth from $600m to over $1bn," estimates one acquaintance. "They tried to find mispriced assets, and leverage up very aggressively," says another.

Their first investment in Russia was a private equity stake of several million dollars in Sun Brewing, now

part of Sun Interbrew. They pushed hard to seek a swift return on their money, demanding a listing via what became the country's first Global Depositary Share in 1994.

"In hindsight, we went public too early, when the market was not ready," says Shiv Khemka, then executive director of Sun. "But the Chandlers were honourable and very professional."

Their longest and highest-profile fight began with the 1994 privatisation of the Novolipetsk steel plant, in which they acquired a blocking minority stake of 25 per

cent plus one share via the offshore vehicle Cambridge Capital Management.

Boris Jordan, who had launched the investment bank Renaissance and acquired a stake in the company, worked with them before the two sides fell out.

"They were moralistic and quite stubborn," says a financier. "If something could be done legally, they would do it, but they would not take part in offshore profit-taking schemes. Their game was improving market capitalisation."

"They sometimes ask you to do things like writing a

letter or co-ordinating a group of investors in your own name," says one acquaintance.

The brothers bought as much as 8 per cent in UES, the electricity utility, partly purchasing security held by Deutsche Bank. They also held a significant share in Lukoil, the oil group.

But perhaps their biggest gamble was Gazprom. They have built a holding since 1997, using "grey schemes" which respect the letter, if not the spirit, of legislation theoretically limiting foreigners to owning American Depositary Shares rather than domestic shares.

Renaissance was one of the largest brokers of domestic shares, but having fought Gazprom's management, it decided to wind down its positions. Rival UFG took up the slack. Today it manages an estimated 6 per cent of Gazprom's shares, of which the Chandlers represent at least half. UFG and the Chandlers refused to comment.

Coupled with other friendly investors, UFG managed to amass 10 per cent of the votes cast at this year's annual general meeting and a similar number last year to put Boris Fyodorov, its chairman, on the board.

Observers say the Chandlers have strongly influenced Mr Fyodorov's agenda, to push for management change and an end to alleged asset-stripping. With the recent sharp rise in the share price, they are likely to have already made a profit. With the continuing campaign to bring down the "ring-fence" which would allow them to convert their domestic shares in ADSs, they could make much more.

So could UFG, with exit fees on their "grey schemes" of up to 4 per cent. But, as another broker warns: "One day the Chandlers will leave Russia, and never invest another cent."



Boris Fyodorov: the Chandlers amassed enough support to install him at Gazprom                    Kommersant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHRISTOPHER CHANDLER,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **Case No. 1:18-cv-02136-APM** |
| | ) | |
| **DONALD BERLIN,** *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF CHRISTOPHER CHANDLER'S**
**STATUS AS A LIMITED PUBLIC FIGURE FOR PURPOSES OF HIS CLAIMS**

# **EXHIBIT FIVE**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/SB105466373485841200

# Pushing Corporate Reform Causes Friction in Korea

Sovereign Asset Management

*By Hae Won ChoiStaff Reporter of The Wall Street Journal*
*June 4, 2003 4:21 am ET*

SEOUL, South Korea -- In March, the stock of South Korea's largest oil refiner, SK Corp., plummeted after news broke of a multibillion-dollar accounting scandal at an affiliated company. A small, Monaco-based investment fund, Sovereign Asset Management Ltd., took advantage of the price drop to snap up a stake of nearly 15% in SK Corp.

The men behind Sovereign, two highly secretive brothers, Richard and Christopher Chandler, have a decade of experience on capitalism's wild Russian frontier, where other investors say they have pushed for greater transparency and better management at a series of big companies, including the world's largest producer of natural gas, OAO Gazprom.

But the brothers have their work cut out for them as they fight to transform SK Group, one of South Korea's massive, family-controlled businesses known as chaebol. Sovereign Asset Management wants SK Corp. to stop supporting its ailing affiliate and is pushing for what would amount to a breakup of the group -- which also includes the country's largest mobile-phone service company and a handful of other firms.

SK Group's management and the powerful clan that has dominated the sprawling conglomerate since the 1950s, however, have other plans. They want to divert money from healthy, publicly traded companies in the group to bail out the unit gutted by the accounting fraud.

Government auditors discovered earlier this year that SK Global, a trading company that once exported cabbage to Korean emigres in Los Angeles in the 1970s, had systematically inflated profits and understated debts for years.

The dust up between Sovereign Asset Management and SK Group is a sign of the times. Foreigners now own more than 34% of South Korean shares by value, up from just 13% at the end of 1996, the year before the start of the Asian financial crisis. This is leading to friction between investors looking for Western-style corporate governance and Korean managers unaccustomed to being questioned by shareholders. "As foreign investors own a greater piece of the Korean corporate pie, they are going to gain a bigger say in what happens to corporate Korea," says Yi Seung Gook, head of research at BNP Paribas Securities in Seoul.

But that may not come without a fight. The Chandlers' experience is a cautionary tale and a barometer of the extent of reform in the world's 10th largest economy. Korea's conglomerates have a long history of using healthy companies to prop up weaker affiliates at the expense of shareholders. In the wake of the financial crisis, the South Korean government moved to strengthen the hand of minority shareholders by pressing the chaebol to remove cross shareholdings, mutual debt guarantees and other financial ties among units.

Much progress has been made. But as Sovereign can attest, there is still sometimes little shareholders can do, especially foreign shareholders, to influence management of Korean conglomerates, which tends to answer not to them but to controlling family members and to government bureaucrats.

Sovereign, the Chandlers' main investment vehicle, bought into Hong Kong real estate in the mid 1980s before investing in Russia in the 1990s. There, the brothers became known for taking minority positions in undervalued and badly managed energy and metals companies and pressing management to improve performance or resign. Moscow bankers say the brothers pushed for the 2001 ouster of Rem Vyakhirev, the former chief executive of Gazprom, who was accused of corruption and nepotism by shareholders. The gas giant's market value has since doubled to $20 billion, helping enrich Sovereign, which is believed to hold about 2% of the company. Sovereign declined to comment on its stake in Gazprom or its dealings with the company's management.

## Impressed by Reform Pledge

The brothers became seriously interested in increasing their exposure in Korea in February. James Fitter, Sovereign's chief operating officer, says the firm was impressed when President Roh Moo Hyun, in his inauguration speech, pledged to

continue corporate reform efforts started by the previous administration. Two weeks later, Mr. Fitter got on a plane and flew to Seoul for a look around, before taking a handful of investment ideas back to present to the Chandlers and the firm's investment committee.

"South Korea has a great future but was confronted by the unusual convergence of the threat from North Korea, uncertainty over the war in Iraq, fallout from the SK Global scandal ... all at the same time," says Mr. Fitter. "Recognizing Korea's ability to overcome these obstacles and wanting to increase our exposure ... we thought it was a good time to invest in SK Corp., which we believed was significantly undervalued."

In late March, Sovereign hired the local office of Deutsche Securities and two other local brokerage firms to start buying shares of SK Corp. on the open market. And, over the next two weeks, the firm amassed a 14.99% stake for about $140 million. The acquisition sparked speculation that Sovereign was mounting an unsolicited takeover bid. Sovereign denies this, saying it has no plans to run SK, but intends to be a long term investor.

Sovereign has called on executives and board members of SK Corp. to refuse to participate in any bailout of SK Global.

SK Group, meanwhile, has been cobbling together a bailout package with contributions from SK Corp. and other units and has been scrambling to sell the plan to SK Global's creditors, which include nearly every major bank in South Korea. The banks, not surprisingly, want to get back the money they lent SK Global, and they don't care where it comes from, potentially putting them at odds with Sovereign and other shareholders in SK Group companies. In a last ditch effort to appease irate creditors, SK Global said Tuesday it plans to raise 959.5 billion won ($797.6 million) through the sales of its stakes in SK Group units, including SK Telecom Co. and SK Securities Co.

On May 7, ratings agency Standard & Poor's cut SK Corp.'s debt rating to double B plus from triple B minus, and warned that a further downgrade was possible. S&P cited increasing pressure on the firm to provide support to SK Global. Frustrated at the lack of progress in advancing its agenda, the next week, Sovereign threatened to sell its shares. If SK Corp. "chooses to continue with its past practices, despite its promise to break with the past and adopt greater

transparency," Sovereign said in a statement issued May 12, the firm "may be obliged to divest all or part of its shareholding."

## Holding On

So far, however, Sovereign is holding on. In late May, it hired the local office of Lazard Asia Ltd. as an adviser. The head of Lazard's Korean operations, Hogen Oh, has a reputation as a tough negotiator. He was chairman of an organization overseeing Korean corporate restructuring at the height of the financial crisis.

Sovereign's dealings in Korea have recently gotten it into trouble with regulators. On May 19, the South Korean government filed a complaint with the state prosecutor's office against Sovereign's Crest Securities unit. The complaint alleges that Crest broke a law that requires foreign companies to notify the Commerce Ministry before taking more than a 10% stake in a South Korean company. The ministry says that Crest had acquired a 10% stake in SK Corp. by April 4, but didn't report its action until April 9.

Sovereign's Mr. Fitter said that his firm was "disappointed," adding the complaint brought against Crest was "arbitrary" and that Crest had fulfilled "all of its regulatory obligations under the Korean securities and exchange laws."

Sovereign's critics in Korea say the firm is an odd champion for corporate transparency, given the extreme secrecy with which it works. The Chandler brothers declined to be interviewed for this article and Mr. Fitter declined to answer personal questions about the Chandlers. "We believe that organizations, like people, have a *prima facie* right to privacy," says Sovereign's Web site.

*—Jeanne Whalen in Moscow contributed to this article.*

**Write to** Hae Won Choi at haewon.choi@wsj.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHRISTOPHER CHANDLER,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **Case No. 1:18-cv-02136-APM** |
| | ) | |
| **DONALD BERLIN,** *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF CHRISTOPHER CHANDLER'S
STATUS AS A LIMITED PUBLIC FIGURE FOR PURPOSES OF HIS CLAIMS**

# <u>EXHIBIT SIX</u>



**LEGATUM**™

Monday, 7th May 2018

The Rt. Hon. Bob Seely MP
House of Commons
London
SW1A 0AA
United Kingdom

**BY HAND & BY EMAIL** (bob.seely.mp@parliament.uk)

Dear Mr. Seely,

I wanted to reach out to you directly as you seem to have led the effort to attack my character and accuse me of being a Russian spy. It is surreal to even have to type those words as there is absolutely no shred of truth to such accusations. You are accusing an innocent person and must understand that you are causing very significant damage to my reputation, as well as my business and global charitable activities.

I sincerely hope, and choose to believe, that you are convinced your actions are justified because you are attempting to hold Russia accountable for its actions. If that is the case, and you had taken time to study my history or had the courtesy to reach out to me, you would have found that my career to date has been characterised by holding those in power to account, and specifically those in Russia.

In other words, you might have found an ally. Given your expertise in Russia I am hoping that you are well placed to understand my story.

**The truth**

I can happily walk you through my entire business history, but here are some key facts for you to consider:

1. I was admitted to the as a barrister and solicitor to the High Court of New Zealand in March 1983.

2. Since commencing work in my family's retail business, my life's work to date has been dedicated to investing my personal assets, building a world-class investment firm and to philanthropic endeavours that have measurably improved the lives of millions of people. I have only invested my own, personal capital, and have never worked or invested for or on behalf of anyone else. I have never managed or invested anyone else's money or acted on anyone's behalf in business affairs.

---

**Legatum Limited**

Level 3 · Legatum Plaza
Dubai International Financial Centre
PO Box 506625 · Dubai · UAE

Telephone +971 4 317 5800
Facsimile +971 4 317 5811
Website   www.legatum.com

Chandler00001927

3.  Starting in 1982 I invested primarily in New Zealand and then Hong Kong real estate and stocks. I then branched out into private equity and public equities, focusing on companies in China, Brazil and then a limited amount in the Czech Republic.

4.  In 1986 my portfolio was primarily Asian-focused but with some success and a growing global focus, I moved to Monaco.

5.  Beginning in 1993, following *perestroika*, I started investing in Russia. I had already successfully compounded my investments for years and had very significant capital before investing in Russia. This is critical to understand as part of the allegations against me are that I worked on behalf of others illegally for personal gain. The truth is that I never had a need to derive personal gain from illegal or underhand activities. My view has always been that wealth illicitly gained is no true profit. Despite having invested successfully in markets as diverse as China, Brazil, Russia, India, Turkey, Nigeria, Pakistan, the US and elsewhere, I have never paid a bribe or otherwise compromised my principles.

    By the time I invested in Russia I had already accumulated significant wealth legally and ethically by investing in real estate and publicly listed companies across a range of industries and countries. Moreover, my independence as an investor was key to my success in two ways: (1) I could maintain a patient, long-term view in my investments, especially during periods of market volatility and (2) I could take a stand against vested interests and corrupt corporate parties when necessary – which is something the record clearly shows I did repeatedly.

6.  Like other western investors in Russia at the time, I operated through western investment banks and brokers such as Credit Suisse First Boston, Salomon Brothers, Morgan Grenfell (later acquired by Deutsche Bank) and United Financial Group (owned by an American and also later acquired by Deutsche Bank) and others to assist with research and facilitate sales and purchases. All of my investments were run through these types of regulated, western financial institutions. I can provide you with a list of a number of our core contacts at that time who can attest to my character and unwavering commitment to the highest standards of ethics.

7.  Although my business is privately owned and has never managed other people's money, I have insisted that it be audited from inception. Therefore, I and my businesses have been audited by the same Big-4 firm, Ernst & Young (now EY) for over 30 years. My accounts show that I invested my own capital and had both positive and negative returns. In the Asian financial crisis of 1998, my fund, by that time largely invested in Russia, went down 90% before recovering over the subsequent years. Not having outside investors allowed me to weather that storm without the redemptions that challenged fund managers at that time.

8.  In Russia I first invested in 1993 in Sun Brewing, a brewing company owned not by a Russian, but by an Indian family. I invested while it was still private and supported the company as it became the first Russian company to have GDRs listed on the London Stock Exchange.

9.  Like other major investors at the time, including George Soros and the Harvard University endowment, I invested in many companies in Russia including Gazprom, Lukoil, Vimplecom, Sberbank, Mosenergo, Irkutskenergo, NLMK and others for about a decade.

Chandler00001928

10. In Russia, I stood up for ethical business leadership and good corporate governance in an endeavour to place the country on the right path toward a truly free market economy. I joined other minority shareholders in a call for the removal of Rem Vyakerev, the "Red Director" of Gazprom as it became clear offshore tolling vehicles were being used to siphon billions of dollars out of the company and into the pockets of management. Similarly, I also confronted NLMK's management who were engaged in large-scale tolling (theft) and their efforts to wrest ownership of the Steel mill from shareholders through illegal share dilutions. To be clear, there were billions of dollars at stake in these disputes and they were highly contested. Although we operated through western institutions and played by "Queensberry Rules", it goes without saying that the Russians did not act in kind.

11. In Exhibit A I have attached articles from that time relating to NLMK and also Gazprom. I invested in Russia through "Cambridge Capital Management", which was represented by the London office of the American investment bank, Salomon Brothers.

    In Exhibit B I have attached an Institutional Investor article from 2006 which sets out this story in narrative form and also demonstrates that I went on to stand for ethics and good governance in Asia.

    Exhibit C is an internal history of that time entitled "Toward an Ethical Corporate Governance in Russia and South Korea – Who if not you?" which we prepared years ago, prior to all of the recent media attention.

12. In taking these actions, I made enemies amongst very powerful and politically connected persons. Untrue things were written about me in Russia at that time, by those who sought to discredit us and derail our efforts. I believe that the "dossier" you have seen was likely created at that time as a direct result of our engagement to bring positive change in corporate Russia, by those who stood to lose from our proposed changes to the status quo. *I believe that the dossier was part of an effort by powerful and politically connected persons in Russia to discredit and threaten me as at that time, when I was standing up against oligarchs and kleptocrats in calling for ethics and good governance in businesses that were being actively plundered.*

13. That said, I was only a minority investor and had no real power other than voting shares, writing letters and encouraging others. Therefore, in an attempt to change Russian corporate behaviour, I also drafted policy papers, calling on the Russian government to take steps that would increase trust in society and thereby promote a more prosperous future for the country.

    I attach as Exhibit D an example of such papers, called "Seven Steps to Prosperity" published under a pen name "Prosperity International".

14. As you know Russia has a long history of disinformation and attacking its enemies at home and abroad. It would be highly plausible that people in power sought to plant stories and complete fabrications about me where I lived at the time – in Monaco. That is the best theory I can come up with at this time without having had a chance to review the "dossier" and dig deeply into the source. Indeed, I would expect that any dossier with allegations, claims or a catalogue of "facts" will lack any real evidence supporting those assertions (unless they have been forged). All of our activities were undertaken publicly, always in partnership with international financial institutions, and with integrity.

Chandler00001929

15. Moreover, it is critical for you to acknowledge that at no time did the French, Monaco or any other authority pursue any matter outlined in the "dossier." As security services they would have assessed the source and concluded – rightly – that there was nothing to pursue as I had committed no wrongdoing. Rather, I lived in the open, completely transparently as a resident of Monaco, interacting with my western advisers and audited completely.

16. The rest of the story is well documented. It appears that Robert Eringer, while working for Prince Albert, made a case of mistaken identity between my firm – "Sovereign Asset Management Limited" of Monaco and "Sovereign Asset Management AG" part of a completely unrelated group of Swiss companies.  The Swiss Sovereign, unrelated to me, was indeed sanctioned for misdeeds, including money laundering for Russians. Eringer must have been emboldened by the dossier, but never thought to question its veracity.  He certainly never contacted me, and we were unaware of the existence of the Swiss Sovereign group until Eringer's dossier surfaced some years later.  It is well known that his competence and credibility has been widely discredited.

17. Beyond my history of fighting for better corporate behaviour in Russia, I have also been a major supporter of efforts to call out Russia for disinformation and propaganda. I estimate that I have spent $10 million on backing some of the leading academic voices in this space and in the governance and transparency fields over the last 10 years.

    The links in Exhibit E include a sample of this body of work, which provides a damning indictment of Russian state media abuse. If you are concerned with Russian propaganda, meddling and disinformation, then we actually should be working together to address the issues – as I have a long and proven history of doing just that.

18. The evidence that the work of the Legatum Institute to call out Russia has had an impact can be seen by the reaction it triggered. The Legatum Institute has been harassed by people posing as members of the Russian media and at the peak of our anti-propaganda campaign had our phone lines hacked and data network blocked with DDoS attacks.

19. Finally, it may be of interest to you to learn that I have been a champion for the poor and marginalised in society for nearly 30 years. In 1999 I started my philanthropic journey and since then have supported over 1,600 humanitarian projects in over 100 countries around the world. Some of these have grown into some of the world's most innovative and largest humanitarian initiatives in their space, like the END Fund (de-worming), Freedom Fund (combatting modern day slavery and human trafficking) and the Luminos Fund (getting refugee and other out of school kids back into the classroom).

    We did not just support these initiatives, but founded them, funded them, incubated them and work together with a global network of other philanthropists and front-line organisations to scale them in to major initiatives. If you really want to know a person, look at what they do, not what they say. So, I invite you to look at what I have actually done, where there is real evidence and impact and many, many credible people to verify the truth.

In summary, in what I choose to believe was an earnest attempt to raise concerns about Russia, you have unfortunately publicly accused me of things that are wholly-false, and thereby impugned the character of an innocent person. From the floor of the Commons your colleagues called on me to "prove" my innocence which should make anyone who respects English jurisprudence deeply concerned. The principle of "innocent until proven guilty" is still a pillar of English justice.

Chandler00001930

Not only have I never been convicted of anything, I have never once been approached or questioned by the French, Monaco, Swiss or any other authority about any impropriety. The authorities who apparently received the "dossier" took absolutely no action and clearly concluded that no wrongdoing had occurred. And just to be clear, I have similarly never had any questions about my business affairs from any other authority. Rather, I have run an ethical and purpose-driven investment business for decades.

I would also state for the record that I have never been contacted by any secret service from any nation, ever, nor have I worked with them.

So why are you putting me on trial and convicting me in the court of public opinion without a fair right to defend myself? I can only imagine, but some are speculating that it is a purely political hatchet job relating to Brexit. That too would be a monumental irony as I am not a British citizen and took no position on Brexit. Even the work of the Legatum Institute was neither for or against Brexit itself; but sought to make a success of the people's decision to leave the EU. Had the referendum gone the other way, the Institute would have worked just as hard for Britain's success within the EU. That would not have made us anti-Brexit, any more than today's work is pro-Brexit.

Regardless of the motives, the actions being taken are profoundly unjust, and I believe amount to an abuse of Parliamentary privilege. Other, less public, options were open to you – like simply speaking to me. More than that, this abuse of state power against a private individual has clearly violated my basic human right to a fair hearing and defence. This is something I am taking legal counsel on presently and intend to continue pursuing until I have explored every legal avenue to clear my name.

As I have said in public statements, I would have preferred for you to meet with me before you took action, but remain willing to meet with you now. That would seem to be the honourable thing to do now that you have been appraised of the facts, and indeed the truth.

I am actually in London this week and could make myself available should your schedule allow.

Regardless of whether you meet with me, given the truth set out above, I request that you retract your statements and issue an apology from the floor of the Commons. This is the only way to undo the needless damage done and restore justice to a situation gone badly awry.

Yours sincerely,
**LEGATUM LIMITED**

Christopher Chandler
**Founder and Partner of Legatum Group**

Cc:   The Rt. Hon. Liam Byrne MP (Birmingham, Hodge Hill)
       The Rt. Hon. Ben Bradshaw MP (Exeter)
       Mr. Chris Bryant MP (Rhondda)
       Mr. Adam Holloway MP (Gravesham)

Chandler00001931

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHRISTOPHER CHANDLER,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 1:18-cv-02136-APM** |
| | ) | |
| **DONALD BERLIN,** *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF CHRISTOPHER CHANDLER'S**
**<u>STATUS AS A LIMITED PUBLIC FIGURE FOR PURPOSES OF HIS CLAIMS</u>**

# <u>EXHIBIT SEVEN</u>

# THE FUTURE OF FREEDOM IN

# RUSSIA

EDITED BY

*William J. vanden Heuvel*

TEMPLETON FOUNDATION PRESS

PHILADELPHIA & LONDON

Templeton Foundation Press
Five Radnor Corporate Center, Suite 120
100 Matsonford Road
Radnor, Pennsylvania 19087

© 2000 by Templeton Foundation Press

All rights reserved. No part of this book may be used or reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the written permission of Templeton Foundation Press.

The opinions expressed in these documents do not necessarily reflect the views of the John Templeton Foundation.

Special thanks to Declan Murphy and Karen Dinsdale of Impresarios, Ltd., Washington, D.C. for their help in making this book possible.


Designed by Richard Eckersley
Typeset by G&S Typesetters
Printed by Data Reproductions, Auburn Hills, MI

Library of Congress Cataloging-in-Publication Data

The future of freedom in Russia / edited by William J. vanden Heuvel.
      p.   cm.
     Includes bibliographical references and index.
     ISBN 1-890151-43-2 (cloth : alk. paper) — ISBN 1-890151-44-0 (pbk. : alk. paper)
      1.  Civil society—Russia (Federation)    2.  Rule of law—Russia (Federation)   3.  Civil rights—Russia (Federation)    4.  Capitalism—Moral and ethical aspects—Russia (Federation)   5.  Russia (Federation)—Social policy.
     I. Vanden Heuvel, William J. (William Jacobus), 1930–

     JN6699.A15 F88 2000                                      00-031547
     323'.0947—dc21


Printed in the United States of America
00  01  02  03  04  05  06     10  9  8  7  6  5  4  3  2  1

# CONTENTS

vii    Preface: The Future of Freedom in Russia
*William J. vanden Heuvel*

PART I
**Establishing Freedom Under the Rule of Law**

3    Bring out Your Dead!
*Boris Pustintsev*

17    Russia's Transition to Democracy: Constitutional
Justice and the Protection of Civil Liberties
*Marat Salikov*

48    Some Historical and Political Aspects of Building
a Civil Society in Russia
*Sergei Komaritsyn*

59    Russia's Legal Revolution
*Sarah Carey*

PART II
**Developing the Ethical Underpinnings of
a Free-Market Economy**

71    Adventures of a Restaurateur
*Arkadii Novikov*

79    An Exploration of Optimism and Hope:
Junior Achievement in Russia
*Nina Kuznetsova*

91    Small Business in Russia: A View from Under
the Table
*Leonid V. Ivanov*

CONTENTS

PART III
**Building a Civil Society**

107    Nurturing a Cherished Garden: The Growth of a
Youth Community
*Sister Maria Borisova*

130    Building an Ethical Civil Society through Justice
*Irina V. Reshetnikova*

142    The Building of a Civil Society and the Media
*Larisa Malinova*

154    Foreign Funders and Russian Recipients: Areas
of Misunderstanding
*Mikhail Kaluzhskii*

PART IV
**Advancing Freedom of Inquiry and Belief**

165    Advancing Freedom of Belief in Russia
*Lawrence A. Uzzell*

176    The Orthodox Russian Church: Issues of
Our Times
*Father Georgii Edel'shtein*

192    The Advantages of Educational Freedom:
New Wine in Old Skins
*Andrei Mal'tsev and Kirill Novosel'skii*

211    Conclusion: Freedom, Responsibility, and
the Future of Russia
*James H. Billington*

225    APPENDIX
Seven Steps to Prosperity in Russia

235    Glossary

237    Index

# PREFACE

## THE FUTURE OF FREEDOM IN RUSSIA

### WILLIAM J. VANDEN HEUVEL

*Mr. vanden Heuvel has served as deputy U.S. permanent representative to the United Nations and as U.N. representative to the European Office of the U.N. Now of counsel to the law firm of Stroock & Stroock & Lavan, he is also Senior Advisor to Allen and Company, a New York investment banking firm. Ambassador vanden Heuvel has served as president of the International Rescue Committee, as chairman of the Board of Governors of the United Nations Association of the United States of America, and as chairman of the New York City Board of Corrections. A graduate of the Cornell University Law School, he was editor-in-chief of the Cornell Law Review and later served as executive assistant to General William J. "Wild Bill" Donovan, special counsel to Governor Averell Harriman, and assistant to Attorney General Robert F. Kennedy. Ambassador vanden Heuvel is a member of the Council on Foreign Relations, chairman of the Franklin and Eleanor Roosevelt Institute, and chairman of the Council of American Ambassadors.*

TO UNDERSTAND Russia is not only a compelling intellectual experience, it is a necessary commitment if the twenty-first century is to fulfill the possibilities of "a well-ordered society." Attitudes toward Russia define optimists and pessimists, those who see the glass half full or half empty. It is a country whose culture and brilliant achievements in literature, music, and science tell us that given a democratic framework and an assurance of freedom for its people it can certainly emerge as a powerful, constructive, contributing leader in a world where its geography has such a commanding place.

In February 1999, the John Templeton Foundation convened an unusual conference at the Library of Congress. James Billington, the brilliant Librarian of Congress and a major force in the area of Russian studies, gave the keynote speech with an eloquent, poetic invitation to consider the future of freedom in Russia. The invitation itself told us that something very different was at hand – that the pessimistic view of Russia, now the reigning orthodoxy of the American foreign policy establishment, was about to be challenged. Instead of asking "who lost Russia" – the very question bespeaks the arrogance of those who believe that great nations are available for purchase and sale – a roster of participants spoke from the heart and the heartland of Russia, reporting the human dimensions of current problems but also describing the inspiring energy, commitment, courage, and genius of countless men and women who will be the unsung founders of the "new Russia."

What they have to say is worth hearing. Their credibility is contained in their biographical descriptions – imprisoned dissidents under the old regime, men and women of religious faith who survived the brutality of Communist repression and who now illuminate the search for new directions, entrepreneurs whose imagination and pragmatism reflect the tenacious creativity needed to build a prosperous economy, citizens committed to the fundamental freedom of speech and expression knowing it to be the true guarantor of democratic government. They do not deny the profound corruption, the political skullduggery, and the financial mismanagement in contemporary Russia. They know those problems as well as anyone, and their statements graphically describe them. But they report the good news of decency, honesty, and determination that has brought enormous progress, often invisible to those who travel only to Moscow and St. Petersburg, progress often achieved despite of, not because of the national government, progress that is the seed corn for the years to come.

The Templeton Foundation has done something extraordinary in assembling such a group, so very different than the usual array of experts who never tire in telling us everything that has gone wrong. The Foundation recruited presenters largely from the dis-

tant regions of the Russian Federation where many of the most interesting political and social developments are taking place. Scholars and grass roots organizers were brought together to give their insight and experience into planning the years ahead. One has the feeling that we have come upon the soldiers in the trenches who, despite remote and listless commanders in the capital headquarters, understand what has to be conquered and have the strength of passionate determination to win the struggle.

Washington policy makers, listen to Boris Pustintsev, the president of Citizens' Watch, a nongovernment organization that works for effective civilian and parliamentary control over Russia's security agencies. His credentials were established when he led demonstrations *inside* Russia in 1956, protesting its invasion of Hungary. He spent years in Soviet prisons and labor camps. Even in democratic Russia he has been a target of the KGB. He talks of history and the process of reconciliation, of a Russia bound to Europe and striving together to overcome racism and bigotry, of Aleksandr Nikitin, whose report on the threat of the radioactive waste engendered by Russia's Northern Fleet caused his arrest and trial for espionage. Mr. Pustintsev's commitment to truth and the rule of law makes his a voice that must be heard if freedom is to have a future in Russia.

With wit and courage, Arkadii Novikov, a creative, very successful entrepreneur, discusses how he conceived and built his chain of thirteen restaurants and the ethical dilemmas he confronted in a Russia "where no businessman can operate honestly." He looks to the new government to establish a legal framework that will both encourage enterprise and integrity. One has the feeling that Mr. Novikov and those like him will do more for the economy of Russia than the planners in the Kremlin.

Father Georgii Edel'shtein, a parish priest in the Orthodox Russian Church, describes the Moscow Patriarchate as "the most reactionary institution in Russia." For twenty years he has ministered to the needs of the poor and oppressed in the remote village of Karabanovo. His words are the essence of the freedom to worship. His faith will move mountains, and maybe even the hierarchy of his church.

PREFACE

In enunciating the Four Freedoms as the basis of the democratic world to which he committed America's strength, Franklin Delano Roosevelt understood that freedom of speech and expression was fundamental to his hopes. Both the government and the oligarchs are a threat to this freedom in contemporary Russia, but when you read the words of Larisa Malinova you understand that a new army is being organized, an army of trained, independent managers and journalists who are prepared to work and fight for media access so that uncensored, accurate, unselfish information can be brought to the people of Russia.

Each writer, each article has a message that is relevant and powerful. The traumatic history of the twentieth century has left Russia gravely wounded. In the transition from Communism, its resources have been plundered and greed has replaced creed. From the miasma, voices emerge that echo the best of democratic values. These men and women deserve first our audience and then our support – the support of our government and each of us individually – support that will give substance to their commitment to a free society based on values of social justice that we share, sustained by allegiance to the rule of law that ultimately defines a civilized community.

Whether encouraging free enterprise, an independent judiciary, the rule of law, a commitment to freedom of speech and expression, or the right to worship as each individual chooses, our government would be well advised to emulate successful venture capitalists: bypass the corruption of the Moscow "apparat," find good people and projects on the local level, carry out proper due diligence, and then monitor progress and provide support to help reach the goal they, the people of Russia, have set for themselves.

Sir John Templeton is a famous optimist whose spiritual faith has been the bedrock of his success. The Foundation that bears his name, in sponsoring this conference and publishing this book, reaffirms his understanding of the complexity of freedom's cause and the moral strength required to achieve it.

x

# APPENDIX

## SEVEN STEPS TO PROSPERITY
## IN RUSSIA

*The manifesto below was circulated in Russia among members of the Federal Duma and the international investment community in 1999; it was placed in the public domain without copyright or attribution. This document, which offers a number of very practical and insightful perspectives of relevance to the future of freedom in Russia, is presented here as an important and succinct summary of the core issues of reform facing Russians today. Preceding "Seven Steps" itself is the cover letter used when it was distributed in Russia.*

Respected Duma Member:

*Russia needs moral reform, not only economic reform.*

Today the Russian people are at a crossroads in the development of this great nation. There is no way back, yet the way forward seems uncertain.

Courageously, the nation embraced many difficult reforms, and thus the seeds of a prosperous tomorrow were sown — so why has the crop of our prosperity failed? It is said that the economic reforms failed. But let us be honest: Weren't the young shoots of economic growth choked by the weeds of short-term self-interest as people at all levels seized what they could, regardless of the interests of others?

Even the best economic plan is doomed to failure if everyone, low and high alike, is committed to abusing the system to achieve self-enrichment. Whether this be accomplished by stealing assets, offering or accepting bribes, or evading taxes makes little difference. Let us be honest enough to admit that our dysfunctional eco-

nomic system is not a viable economy at all. This system cannot take our country to the levels of wealth and prosperity enjoyed by other leading economic powers. It is based upon uncontrolled cronyism and corruption; its citizens tear from each others' hands the shattered fragments of the Soviet state.

Russia needs a program of moral reform, not only economic reform. To harvest a great crop, the soil must first be prepared: let us plow up the old thinking of each person, group, and faction seeking its own interest before that of its neighbor. Let us create an effective mechanism of distributing wealth and find the discipline to employ it with respect for our nation and its laws. If the nation now fails to build a civil society that respects the rights of each person, then the harvest of the future will be such wrenching strife that the remaining fabric of our society will surely be torn apart. Certainly, let the wisdom distilled from the experience of other nations guide us in building the new system, but let us also have the discipline to plow a straight course and refrain from indulging in today's temptations at the expense of tomorrow's growth.

The ideas expressed above are obvious and familiar, but how difficult it is for each of us to follow simple moral principles when everyone around us apparently has abandoned them. Which of you does not remember those moments of despair when your personal attempts to make a difference in your own sphere collided with the outrageous inefficiency of the current system, when you needed to scale the walls of bureaucracy, indifference, incompetence, and self-interest in order to accomplish any task? But who, if not you, has the power to start acting in accordance with your true principles, here and now? Leadership offers a unique opportunity to make a difference in the moral foundations of society. Remember the sense of appreciation you had whenever you encountered examples of integrity among civil servants and businessmen. Imagine what a difference you could make to people if they saw your behavior as another such example.

In the wake of the current crises, a group of concerned individuals have taken the time to produce "Seven Steps to Prosperity," a manifesto for these challenging times written by ordinary people.

*Seven Steps to Prosperity in Russia*

please take some of your valuable time to read through this document. Its ideas are not new, and they belong to all of us. We urge you to consider the "Seven Steps," to add to their number, to make them your own, and to seek ways of encouraging their implementation.

We cannot afford to fight amongst ourselves any longer. Fixing the roof does not help when the weak foundation can no longer stop the house from collapsing. When the collapse comes, it is a tragedy for all, landlords and tenants alike, regardless of their principles and ambitions. It is time to gather the wonderful resources of Mother Russia and work together to build a common future, based on an integrity that will bring prosperity to all Russians. Prosperity is built on the cornerstones of honesty, fair dealing, and societal morality; without them, the commonwealth is doomed to destruction. Each of us has an opportunity to contribute to the solution. It is time for a prosperous Russia to take its rightful place in the world. If we persist in doing what is right, we will surely reap our harvest in due season. But are we willing to make sacrifices and work together now?

I am the chairman of a Western company that has invested in Russia since 1994. These issues have been discussed with other foreign investors, as well as with representatives of the World Bank and the EBRD. Though they agree with these views, they clearly are not in a position to make the changes that are necessary. That is why I am writing this letter to you.

Yours truly,

# RUSSIA: SEVEN STEPS TO PROSPERITY

## 1. Tax Code

Make the code simpler, fairer, and more efficient. Reduce tax rates across the board to encourage payment. Improve the tax collection infrastructure through use of up-to-date computers to track taxpay-

APPENDIX

ers and payments. Shift the tax base to a focus on consumers and profits, rather than turnover and payroll taxes on industry. The tax system should encourage investment and efficiency. Barter must be eliminated.

Russian citizens need to believe that they are being taxed fairly and that the money collected will be spent wisely. A simplified tax system must demonstrate that everyone, including the privileged, is paying tax and that the tax burden is being fairly shared by each according to his ability to pay, without abusing the productive members of society through excessive or "progressive" taxation.

Simplest of all may be to adopt a consumption tax at a low, flat rate such as 15 percent. Such a tax would have the dual advantages of being easy to administer and encouraging saving and investment, since it would tax consumption rather than income. Because three quarters of Russia's citizens pay no tax, this would gently accustom the population to paying a small tax. Rates could be raised to European levels of 18 to 20 percent at a later date, as needed.

To encourage the payment of such a tax, Italy, which also has had problems with a large "parallel economy," developed a simple system whereby every transaction requires the issuing of a receipt *(ricevuta fiscale)*. The tax police perform spot checks of customers leaving shops to ensure that the receipt has been issued. Failure to produce the tax receipt makes both the purchaser and the shop liable to fines based upon a percentage of the transaction value.

## 2. Bankruptcy Law

There needs to be an effective bankruptcy law to establish the basis of a free market and to incline investment and human capital to produce goods and services for which a need exists. Further, an effective bankruptcy law is a prerequisite for sound and efficient banks and lending institutions.

Bankruptcy provides the ultimate form of accountability. It is axiomatic that actions have consequences, and in everyday life, consequences are the "feedback mechanism" that stimulates learning, correction, and progress. In the West, bankruptcy is always a last re-

sort, and companies are encouraged to "work out" their difficulties if they can provide a plan demonstrating how they intend to meet their commitments. Given the massive dislocation that the Russian economic transition has engendered, there is a natural and magnanimous tendency toward forbearance where bankrupt organizations are concerned. Unfortunately, indiscriminate tolerance leads to a lack of accountability and demonstrates that no consequences ensue from inadequate performance or behavior. Russians must start to see that redundant and mismanaged organizations will not be permitted to consume society's scarce resources without having at least a reasonable prospect of generating a profit – that is, generating more than they consume. Unless bankruptcy provides a credible threat of accountability, demonstrated through initiation of bankruptcy proceedings, economic abuses will continue.

### 3. Investor Protection

Laws, regulation, and enforcement need to be reviewed.

(i) The regulation of protections for investors needs to be overhauled to achieve conformity with international standards and eliminate the abuses of shareholders' rights, which have discredited the market.

(ii) Grant the Russian SEC real enforcement powers, and make penalties severe enough to be a deterrent to abuse. Enact laws that guarantee investors transparency through good corporate governance.

(iii) The Russian stock market must be shown to be a regulated, transparent market where companies can come to raise capital and investors can be sure that their interests as minority shareholders are protected. Parastatal companies such as Gazprom and UES should be shown to be managed for all shareholders. Gazprom's two-tier share structure should be eliminated, as it allows corruption, creates confusion, and is inconsistent with free, open, and transparent markets.

(iv) Russian flight capital and private foreign capital will not return without new regulation to protect investors. If these funds re-

turn, they could be more important than IMF assistance and could dramatically reduce dependence on funding by external agencies such as the IMF, the World Bank, and the EBRD.

Many of Russia's major industrial and natural-resource companies are being plundered through the use of satellite businesses, owned by the companies' managers, which provide raw materials at inflated prices and purchase the finished goods at below-market prices. Such transfer pricing moves the profit from the core industrial business into the pockets of the managers. Consequently, no taxes are paid, there is no growth in employee wages, and, importantly, there is no return on the investment capital employed.

This "hollowing out" of Russian industry from the inside is further compounded where export businesses are concerned, as the operating profits of Russia's major exporters are easily transferred offshore through these management-owned companies. They accumulate in the managers' foreign bank accounts and deprive the Russian economy of much-needed capital and hard currency. This practice is employed by many of the exporters of oil, metals, and other natural resources. The enrichment of the few at the expense of the workers, taxpayers, and shareholders is criminal – it constitutes theft, tax evasion, and oppression of minorities – and ought to be treated as such.

The capitalist system cannot function without a return on the capital employed. The result of this widespread abuse is evident in the low rates of tax collection and in the faltering performance of whole industries, as managers hijack the businesses entrusted to them with impunity.

## 4. Banking System and Pension Plans

In order for confidence to return to the banking system, Russia must revise its banking regulation and institute professional oversight. Because of the lack of Russian expertise in banking, the market should be opened to foreign banks or joint ventures (with majority foreign ownership) to allow transfer of know-how, technology, and best practices. The population has lost faith in domestic banks.

A good comparison is Brazil, where over 80 percent of the banking system is foreign-owned. A sound banking system is a precondition, if Russians are to take the estimated $40 billion they hide at home and put it into banks where it can be used for investment and lending to industry. The development of private pension plans, as in Chile, would also provide capital to industry.

Russia lacks a basic banking industry. The term "banks," when applied to the investment banks/hedge funds of Russia, is misleading and a misnomer. The "Main Street" banks of the West are primarily deposit-taking, loan-making institutions. The Russian banks essentially have borrowed large sums to play the financial markets.

The skills and experience required for sound evaluation of loan applications are absent in Russia, and if Russian main-street banks were operating as lending institutions today, they would suffer significant, crisis-inducing losses through poor lending controls while they learned the business. The costliness of this learning curve has been demonstrated amply in other developing capital markets, in Asia and Latin America. There is a clear need for foreign retail banks to be given access to the Russian market. Institutions such as Hongkong Bank, Citibank, Barclays, and others would bring a skill-set of immense value and restore public confidence in this tarnished Russian industry. This could be seen as a beneficial form of "technology transfer."

## 5. Land Reform

Private ownership of land is the foundation of entrepreneurial and middle-class wealth in democratic countries. It gives people an incentive to work and build capital and encourages the efficient use of land. Residential mortgages are usually one of the foundations of the banking system, and the banking system in turn is a foundation of the services economy. People who own homes also invest in improvements, and such investment is also a major driver of economic activity in most developed countries.

Stable countries and economies need a significant middle class that will seek to protect the country's economic well-being and po-

litical stability. The right to purchase, develop, borrow against, and resell real estate is vital to the process of developing a strong middle class. In the West, the owners of many small businesses develop their seed capital through ownership and development of their own homes, shops, or farms.

It is difficult to see a surge in the number of small businesses, yielding a stable middle class, unless land reform enables Russian citizens to own their own homes, shops, and farms. A major secondary result clearly will be the more efficient use of all types of land, both agricultural and urban, as each landowner seeks to maximize the return from his "patrimony." The efficient use of farmland would reduce Russian dependence on food imports and create a dynamic farming industry. This could also significantly reduce "urban drift" from the farms – consider Chinese land reforms – and, in due course, become a revenue source for the state through the collection of land-transfer taxes. The benefit to the Russian economy would be real and demonstrable.

The challenge is to undertake land reform in such a way that the small landowner is not duped out of his holding by aggressive attempts to plunder the country, just as share privatization led to many Russian managers' "harvesting" the stock of Russian companies from unknowing workers. One way might be to privatize land and forbid the transfer of the title for three years thereafter. Inevitably, people would enter into "forward sale contracts," but the law could deter this by declaring all contracts having the effect of a forward sale to be unenforceable. Though somewhat draconian, this approach would be no worse than the existing situation, and it would allow landowners time to consider investing in their real-estate asset and enhancing its value.

## 6. Social Responsibility and the Development of Morality

(i) Develop a balance between social responsibility and economic development. Only a strong, vibrant economy will give the country the financial resources to build a fair and just social system.

(ii) Make corruption unacceptable. Promote ethics and values in government administration. This step is especially important in a country where religion has been banned for most of this century and where the moral foundation of the culture is weak. Many people have survived by circumventing rules under Communist governments. Many of today's problems can be traced back to this central issue: No value has been placed on morality in society. Russian culture must now evolve by incorporating a moral dimension if it is to justify foreign investment and support.

(iii) The rule of law needs to be established. The civil and criminal codes and the functioning of the legal system, the police, and the judiciary system should be reviewed. Often, laws exist but are not enforced. How many officials have been imprisoned for corruption?

(iv) Greater transparency is needed for people in fiduciary roles, such as public officials and corporate managers.

(v) Eliminate barter. Barter is the doorway to corruption; it puts temptation in people's way.

The fundamental problem is a moral one. Too many individuals abuse the system with impunity. Uninhibited self-enrichment is the name of the game, and too few people are willing to voluntarily respect the rules of the capitalist game: the rules of ownership, requiring proper corporate governance and transparency and entailing respect for minority rights; the rules of accountability, including observing the law, paying taxes, and telling the truth. Many Russians seem to see capitalism as an amoral system of "every man for himself." Perhaps this should not surprise us, given the Russians' experience under the Soviet system, where the top dog frequently used his position to garner the spoils. Under the Communist system, however, there were at least some checks and balances – albeit inefficient by Western standards – that ensured a basic degree of accountability to the community for the resources being consumed.

In the liberalized Russian system, a veneer of capitalism covers a rotten core of unchecked cronyism. It is a pity that too few influential individuals have sufficient economic incentive or moral

fortitude to change the situation. As Steve Hanke writes, "Russia has entered a pre-Revolutionary political phase. The economy is neither a communist system nor a capitalist one, but that doesn't mean that it's in a period of transition: Russia has not been moving toward a market economy. Today, the Russian economy is a mutation of the old communist system and is totally dysfunctional."

The cronyism and uninhibited misappropriation of Soviet assets under the pretense of reform has given real capitalism a bad name. There may be a need to teach the Russian people that democratic capitalism is not "communism without accountability."

If citizens desire a free society, then they must be willing to support that society with integrity. That means choosing to obey laws, seeking the betterment of their fellow citizens, and creating an environment where business and productivity can flourish. Further, it means paying taxes to support law and order and fund public services. Such efforts must start at the top. Russia's leaders must look to themselves if they wish to improve the current situation. They must lead by example, pay their taxes, and eschew cronyism, graft, and corruption. The long-term solution might include a public awareness/media campaign explaining that capitalism must be built on pillars of integrity, accountability, transparency, and truth.

## 7. Restructuring the Domestic Debt

This debt must be restructured in a manner consistent with international standards of fair dealing, based on examples such as Latin America. Appoint a respected international investment bank or respected institution to broker a "Brady-type" deal acceptable to all parties that restores Russia's credibility. Russia must demonstrate the principles of fairness and equality of treatment if it is to recover some of its reputation as a sovereign borrower.

If Russia wants to access the international capital markets and attract investment, it must demonstrate that it plays by the rules of the international financial community. If Russia wants to be part of the global financial community, it must show that it can exercise the moral responsibility that accompanies this privilege.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **CHRISTOPHER CHANDLER,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 1:18-cv-02136-APM** |
| | ) | |
| **DONALD BERLIN,** *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF CHRISTOPHER CHANDLER'S**
<u>**STATUS AS A LIMITED PUBLIC FIGURE FOR PURPOSES OF HIS CLAIMS**</u>

# <u>EXHIBIT EIGHT</u>



LEGATUM™

Saturday, 5th May 2018

Tom Tugendhat MP
Chairman of the Foreign Affairs Committee
House of Commons
London
SW1V 4EQ

**BY HAND & BY EMAIL**

Dear Mr. Tugendhat,

**Re:  The "Robert Eringer dossier"**

I am writing on behalf of myself, and am also duly authorized by Christopher Chandler, Philip
Vassiliou and Alan McCormick to write on their respective behalves in our personal capacities, as
the partners of Legatum Partnership LLP.  The partners of Legatum Partnership LLP founded The
Legatum Institute Foundation ("**LIF**" or, "**the Legatum Institute**") over ten years ago to focus
on how best to increase prosperity on a national and global level. We have provided funding to
LIF, and its predecessor entity, since inception and although today it has over 40 donors in total
and a board of trustees the majority of whom are independent, we remain its largest donor.  As
you know, LIF is an educational U.K. charity that is dedicated to creating the pathways from
poverty to prosperity, led by Baroness Philippa Stroud as its Chief Executive Officer.

I understand from Philippa that you have agreed to look into the issues that I now set out in this
letter. Your agreement to do so is as appreciated as much as it is fundamentally important to the
public interest, as will become apparent to you once you have digested the contents of this letter.

**The debate of Tuesday 1st May 2018**

I am deeply concerned about the recent debate that took place on the floor of the Commons on
Tuesday 2nd May, during which four members, with the protection of Parliamentary privilege, made
a number of ill-founded allegations about the Legatum Institute and Christopher Chandler, founder
of the Legatum Group. Not only do these irresponsible allegations derive from a thoroughly
discredited source, but the Legatum Institute's valuable and impactful philanthropic work is now
being unjustly put at risk by them, to the effect that they are being accused of being a "*covert and
malign influence*".

---

**Legatum Limited**

Level 3 · Legatum Plaza
Dubai International Financial Centre
PO Box 506625 · Dubai · UAE

Telephone  +971  4  317  5800
Facsimile  +971  4  317  5811
Website    www.legatum.com

Document ref. 200 018 624 / 1.0

Chandler00001916

I attach at **Appendix 1** a marked-up copy of **_Hansard_** for that day, which illustrates just how errant the members were in the claims that they made during the course of the debate.

No notice was given to any of Christopher Chandler, the Legatum Institute or the Legatum Group that these allegations were to be made. None of us were given the opportunity to rebut or respond to them, nor were we even provided with the evidence by which we were in effect "convicted" by these members of the Lower House. That alleged evidence is still being denied to us.

In the case of one of the four MPs who led the debate, The Rt. Hon. Liam Byrne MP, Mr. Byrne had already received a detailed rebuttal letter from me on 19th December 2017 (**Appendix 3**), on behalf of the partners of Legatum Partnership LLP, concerning a number of the allegations at issue (and the thoroughly discredited nature their source), after he had raised concerns in an article in The New European on 25th November last year, "_Who is hacking Brexit? And why we need our own Robert Mueller inquiry_".

Mr. Byrne not only elected to ignore my letter at the time, he went on to participate in Tuesday's debate making no mention of the fact that I had already written to him in December, nor that the allegations at issue had not only been vigorously denied but that he had been made privy to material which seriously undermined their credibility. This appears to have been an abuse of the privilege which MPs have in the two Houses to speak freely, and not be held responsible for any damage that is caused to others by what is said.

I am therefore setting out the key elements of Legatum's rebuttals to the implausible allegations which were made during the debate, which we firmly believe derive from the already discredited "Robert Eringer dossier" – Mr. Eringer himself being equally unworthy of belief.

**The "dodgy" dossier**

Having been repeatedly denied access to a copy of this dossier, you will appreciate that we do not know the full detail of what it contains. Given that this is the case, you will also appreciate that we are only able to rebut (i) the material that those who have apparently seen the dossier tell us it contains, and (ii) the Eringer allegations that are already in the public domain.

However, the evidential basis on which, during Tuesday's debate, the dossier was claimed to be authentic, in fact, strongly suggests the opposite. Mr. Bob Seely MP says this:

> "_According to the French security services, <u>as recorded by their colleagues in Monaco</u> – and clearly, I am confident that these documents are genuine – Mr. Chandler is described as having been "an object of interest to the DST since 2002 on suspicion of…working for the Russian intelligence services_." (**emphasis added**).

In fact, as our enquiries have informed us, there was only <u>one</u> security/intelligence official in Monaco – Robert Eringer. I deal with Mr. Eringer in detail later in this letter. But it appears then, that the wholly discredited Mr. Eringer is responsible not only for the highly implausible content of the dossier; but its perceived authenticity also relies on his own dubious account of events.

Chandler00001917

As you will also see later in this letter, the alleged basis of the DST interest in Mr. Chandler appears to be based on Mr. Eringer's errant report that he had been "*talent spotted*" and subsequently recruited by the SVR.  This absurd allegation was put to Mr. Chandler only on Friday, by a Sunday paper, and has been comprehensively rebutted by his lawyer.

**The supporting documents**

There is a substantial array of supporting documents and/or links to material which can be accessed via the Internet for the rebuttals contained both in this letter and the annotated extract from **Hansard**, despite the inherent difficulty of proving a negative. Philippa will have those documents with her when you meet, should you wish to view any of them. I have, however, attached three important documents to this letter, which seem to me that it is essential that you see in order fully to appreciate the gravity of the situation that I set out in my letter.

**Our declined requests for sight of the dossier**

Both the Legatum Institute and the Legatum Group have made repeated requests to see this "dossier", in order that it may be responded to, where necessary, in an informed and comprehensive manner.

To date, our appeals have fallen on deaf ears.  In light of the events that took place on the floor of the House of Commons on Tuesday, it appears to us that at least five MPs may have seen Mr. Eringer's "dossier", because the allegations that they made mirrored those made the media relying on the same source.

**The allegations made against Christopher Chandler and Legatum**

On 30th November last year, we received an email from a journalist at one leading Sunday publication making a series of allegations against Christopher Chandler.  I will now set out those allegations and very briefly why they are completely unfounded:

**Allegation 1**:   Richard and Christopher Chandler operated a commodity trading company headquartered in Monaco that operated without business registration.

**Truth**:   With respect to the Chandler brothers' operations, this is completely unfounded and false, and demonstrates a failure of Mr. Eringer to understand the nature of the Chandlers' business operations. First, the Chandler brothers never operated a commodity trading company headquartered in Monaco – or anywhere else for that matter, past or present. Second, the brothers did not operate any commercial trading entities in Monaco either – the Sovereign Group managed their private family assets and, as such, their operations were not required to be  regulated by the financial regulator in Monaco.  Please find at **Appendix 4** a letter from the Department for Finance and Economy within the Monaco Government, which

Chandler00001918

confirms this. This is an embarrassingly fundamental error for the supposed intelligence expert, Mr. Eringer (about more later).

**Allegation 2**:   Richard and Christopher Chandler were suspected of money laundering for Russian interests, and during Eringer's inquiries, he discovered a group of companies – called Sovereign with significant interests in Russia – was under investigation in Switzerland for suspected money laundering.

**Truth**:   Mr. Eringer's "suspicions" are based on a monumental case of mistaken identity, which borders on farce. Eringer mixed up Mr. Chandler's "Sovereign" group of companies with an unrelated Zurich-based group of companies which also bore the word "Sovereign" in their corporate/trading names.  How the blundering Mr. Eringer made his error is plain to see, when you consider that one of Mr. Chandler's companies at the time was called Sovereign Asset Management Limited and one of the wholly unrelated Zurich-based entities was called Sovereign Asset Management AG (Swiss incorporated).  However, the cataclysmic product of Eringer's error of mistaken identity only comes into sharp focus when you consider that certain of these wholly-unrelated Zurich-based "Sovereign" group of companies, including Sovereign Finance Group, *were* closed down by the Swiss authorities on account of allegations of working with Russians suspected of money laundering and other criminal activities.

To be clear, no connection whatsoever exists or existed between Mr. Chandler and these Swiss-based companies – or between Mr. Chandler and Switzerland generally, – other than bearing part of the same name.  As you will note, Mr. Byrne was put on full notice of the facts and this case of mistaken identity on 19th December last year (**Appendix 3**) – yet, he still acted as he did on the floor of the Lower House on Tuesday.

**Allegation 3**:   Richard and Christopher Chandler have an association with various Russian and Chechen individuals, including Umar Djabrailov (exiled and barred from entering Monaco)

**Truth**:   False, unfounded, defamatory and untrue.  Of all the named individuals presented to us by the media last year, what we can categorically state is that Mr. Chandler never knew or met any of the named individuals, let alone had any relations with any of them.  When the names of these individuals were first presented to us in December, this was literally the very first time any of us had ever heard the names of the individuals referenced.

**The wholly discredited Mr. Eringer**

The source of this information is an individual called Robert Eringer. Some of the allegations were

Document ref. 200 018 624 / 1.0

Chandler00001919

drawn from that individual's "complaint'" in an action which he brought against Prince Albert II of Monaco – an action in which he was comprehensively defeated, as he was in a similar second action.

As you will see from the enclosed letter that I sent to Mr. Byrne in December, Mr. Eringer has been convicted of criminal defamation, five times. It appears that as well as being the sole individual in Monaco in intelligence gathering, he has a colourful past, including having been both a tabloid journalist and a fiction writer of spy novels.

According to the account given in his own self-published book, "*The Spymaster of Monte Carlo*", Mr. Eringer had a highly suspect record while working for the Principality of Monaco in the 2000's. According to Court documents, his lucrative relationship with Prince Albert II and Monaco terminated in 2008, after which he made two attempts to sue Prince Albert and, separately, the Principality of Monaco, claiming that he was owed money. According to the public record, he lost both cases.

You will also find on Mr. Eringer's **Wikipedia** page the plethora of false allegations that he has made against high profile individuals, which have subsequently been overturned in the Courts.

In 2011, Mr. Eringer was quoted by Mark Hollingsworth in the **ES Magazine** as follows; "*Eringer investigated* [the Chandler brothers'] *Sovereign Group, a trading commodity based in Monaco, but found no evidence of wrongdoing.*"; an account which has recently been corroborated by Mr. Byrne himself, in his own article published in the New European last November (see below).

Mr. Eringer has since, apparently, performed a complete volte face from that position by (as we presume) distributing elements of his dossier which apparently assert precisely the reverse, further undermining his credibility. Unfortunately, as I set out below, it appears that Liam Byrne has done likewise.

Mr. Eringer is both the author and the compiler of the dossier, which he now appears to be peddling to anyone who will pay him for sight of it. The newspaper in question did no more than send us the very briefest extracts of it in November and December last year. Clearly, they lacked sufficient confidence in the dossier to provide a copy to Christopher Chandler or Legatum, once we had provided them with the facts. One can only assume it is because on careful analysis, its contents would be found to be comprehensively fictional.

**Media inquiries**

As part of the media's inquiries in November and December, one publication claimed that it "….*has seen Monaco police files which identify the Chandler brother as persons of interest* [to the authorities]". This same publication initially offered to provide Legatum with "…*full details of the information in the Monaco police files*". When this was requested, Legatum was eventually sent the email which purported to provide "…*some of the key details in the Monaco police files seen by* [name of major Sunday publication]".

Document ref. 200 018 624 / 1.0

Chandler00001920

It is striking that the offer to set out "*full details*" of the alleged Monaco Police files was never honoured; presumably because they did not bear scrutiny. However, certain of these dubious allegations were raised on the floor of the Commons on Tuesday, under the protection of Parliamentary privilege.

It is noteworthy that once the publication in question was provided with the facts in response to the Eringer allegations set out the paper on 30 November 2017 it appears to have concluded that it was unable to run the original story they envisaged. We assume that they made this decision after having considered the source, the highly defamatory and indefensible allegations made and hopefully an assessment of the true history of Christopher Chandler, which is one of an unblemished dedication to ethical business leadership and standing up for what is right both in the corporate and policy spheres.

The lawyers acting for Christopher Chandler and Legatum have engaged with this publication over these allegations and every effort has been made to secure a copy of the dossier. It is important to appreciate that there is no credible evidence whatsoever that either Christopher Chandler or any incarnation of Legatum has acted in any way improperly. There is no credible evidence that they have been the subject of any serious enquiry by any policing or regulatory authority. Every business and philanthropic enterprise undertaken by Christopher Chandler / Legatum has repeatedly been the subject of rigorous independent audit and scrutiny. Nothing untoward has ever been uncovered.

### Our theory

Although we do not have a copy of the alleged dossier, we have recently heard whispers of some of its alleged contents, which include detailed, but fantastical and wholly-fabricated claims linking Christopher Chandler to Russia. While it will be almost impossible to prove a negative, the truth is that Christopher Chandler and his Sovereign investment organisation were very active in calling for better corporate governance in Russia during the 1990's and 2000's. This meant they had to stand up against entrenched interests, so-called "Red-directors", oligarchs and kleptocrats. They called out the practice used by Russian managers called "tolling" which diverted cash flows of companies into their own pockets. And by doing this they made enemies amongst very powerful and well-connected Russians. We suspect that Eringer may have stumbled across elements of a disinformation campaign by Russian elements to discredit and harass Christopher Chandler 20 years ago when he was active in challenging governance standards in Russia. Someone may have concocted a false counter-narrative and planted it with intelligence services in France and Monaco, where Mr. Chandler lived at the time. Whether or not our theory is correct, the facts are (1) none of the allegations are true, **none** and (2) none of the authorities pursued the matter. Mr. Chandler has never been approached or questioned by any authority anywhere about his business affairs. Finally, it is important to note that Christopher Chandler's investments in Russia were all done with the assistance and through large, western investment banks and brokers, mostly London

Document ref. 200 018 624 / 1.0

Chandler00001921

based.  And his business has been audited from inception by a western, "Big-4" accounting firm. The point is that Christopher Chandler's investments in Russia were transparent and ethical, but did challenge entrenched and powerful interests which may have tried to strike back with less than ethical methods.

**The three purposes of this letter**

The first purpose is to ask you to do everything in your power to assist me in securing a copy of the dossier.

It is completely unjust that Christopher Chandler and Legatum have had to endure baseless assaults on their reputation and activities from the floor of the Commons.  That injustice is compounded by the fact that these four MPS have demanded that the allegations be refuted while refusing to supply a copy of the alleged dossier to those they have maligned, leaving them without any ability to defend themselves.  That is bullying and a breath-taking abuse of power that undercuts their basic human right to make a fair defence.

You will note that during one of his contributions to the debate Mr Seely said, "*It might be that Committees will wish to have access to this information, and I suspect that those who have it will provide it to any of the six Committees investigating Russia, if they wish to do so.*"

Mr Seely went on to say this: "*It might be that Mr Chandler can provide a satisfactory explanation or argue that these relationships, if they existed, are now historical or have been misrepresented in the documents. I do not use privilege lightly, Mr Speaker. He might wish to offer evidence, written or oral, to any of those six Committees, whose work I am supporting, in a modest way, as secretary to the Russia steering group. I look forward to his response—I am quite sure there will be one*".

At the risk of stating the obvious, neither Mr. Chandler, the Legatum Institute nor the Legatum Group should be asked to rebut allegations which derive from evidence that they have not been permitted to see – an exercise which would only be required in a state which had abandoned all pretence of upholding justice or democratic values. I would therefore urge you to do all in your power to secure a copy of the papers on which the allegations were based, so that they can be addressed – there also being the most obvious public interests in that being done – and done soon.

As an illustration of the urgency around these issues, Mr Chandler's lawyer was obliged to write a letter to a Sunday newspaper yesterday evening (**Appendix 2**) to deal with yet another groundless allegation which appears to be derived from a campaign to progressively leak the dodgy dossier through the media.  I believe we may anticipate that being necessary on numerous other occasions while these false allegations pollute the ether.

The second purpose is to draw your attention to the fact that one of those MPs, Liam Byrne, made a series of allegations during the debate despite firstly having stated quite the opposite in a recent article – and, having not only made no effort to verify them or consult Christopher

Document ref. 200 018 624 / 1.0

Chandler00001922

Chandler/Legatum, he had already set out a number of those allegations or similar in a newspaper article and received a comprehensive rebuttal.

Mr. Byrne wrote an article which was published on 25 November last year in an anti-Brexit newspaper called **The New European**. In that article he said this: "*Chandler subsequently appeared in an intelligence review in Monaco aimed at clearing out the Russian Mafia from the state, but thankfully this found 'no evidence of wrongdoing'.*" It is impossible to reconcile that statement with the stance taken by Mr. Byrne during the course of the debate.

My letter of 19th December 2017 to Mr. Byrne is enclosed at **Appendix 3**. That letter deals directly with some and bears closely on a number of the issues raised in the debate. As I set out above, Mr. Byrne was present in the House when Mr. Seely observed that Mr. Chandler may be able to "*provide a satisfactory explanation…*". As Mr. Byrne well knows, this had had already been provided by means of my December letter to him.

Mr. Byrne also knew that the author of the dossier, Robert Eringer, had as a matter of public record been comprehensively discredited – as, in particular, the appendix to that letter makes abundantly clear. Yet despite this, he did not demur from claims made by Mr. Seely that the dossier should be treated as credible by the House, and that the allegations made in it against Mr. Chandler/Legatum should be taken seriously.

Worse still, Mr. Byrne himself quotes from the dossier, the veracity of which he has been given ample reason to question, in his own statements from the floor, claiming that the Chandler brothers are "*connected to money laundering*" – directly contradicting what he said in his **New European** article.

Mr. Byrne goes on to make this damning statement concerning the Legatum Institute and Christopher Chandler, for which he had not a shred of evidence; "*What we cannot have is agents of influence peddling policies and proposals backed by dirty money from one of our country's enemies*".

The final purpose of this letter is to request that any translated dossier that is handed to the committees, in the light of this information, would also be deemed inadmissible

## Conclusion

The debate that is being played out in both Houses – and the U.K. as a whole – concerns issues of such great importance that it should not be polluted by false claims made by one side against the other.

Parliament is charged with setting an example. As I set out above, I believe that MPs would be failing in their duties to the U.K.'s democratic institutions and the public as a whole, were they to be passive in the face of what appears to be the most obvious abuse of members' privileges.

Document ref. 200 018 624 / 1.0

Chandler00001923

I therefore very much hope that when you meet with Philippa, you can find some way to undo the damage which Mr. Seely, Mr. Byrne and their colleagues have done – both to the individuals and institutions that have been wrongly maligned, and the precious privilege of Parliamentary debate.

Finally, I should note that I will be in London from Monday, 7th May to the end of the week, and am available to meet with you / be at your disposal to answer any further questions in addition to your meeting with Philippa, should that be helpful.

Yours sincerely,

**LEGATUM LIMITED**

Mark Stoleson
**Chief Executive Officer and Partner of Legatum Group**

*Encl.*

Document ref. 200 018 624 / 1.0

Chandler00001924