## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CHRISTOPHER CHANDLER,** | ) | |
| | ) | |
| *PLAINTIFF*, | ) | |
| | ) | |
| v. | ) | **CASE NO. 1:18-CV-02136-APM** |
| | ) | |
| **DONALD BERLIN,** *ET AL.*, | ) | |
| | ) | |
| *DEFENDANTS.* | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM IN
## SUPPORT OF THEIR MOTION FOR A NEW TRIAL

Defendants Donald Berlin and Investigative Consultants, Inc., respectfully submit this memorandum of points and authorities in support of their motion for a new trial pursuant to Fed. R. Civ. P. ("Rules") 59(a)(1)(A) and 60(b)(3). There are four reasons the Court should order a new trial. **First**, based on newly discovered evidence concealed from the Court and the Parties, the jury was permitted to believe Mr. Chandler could not sue Mr. Eringer and, therefore, was unable to use such a lawsuit to discover Mr. Berlin's report years before he filed this case. But at the very moment Mr. Chandler was swearing that he could not sue Mr. Eringer, he and his counsel sued Mr. Eringer for defamation in Superior Court. Because he misrepresented his knowledge of highly material legal advice, the judgement in Mr. Chandler's favor should be vacated and a new trial ordered pursuant to Rules 59(a)(1)(A) and 60(b)(3). **Second**, Mr. Chandler's jury instruction on the statute of limitations, adopted by the Court, was inconsistent with the law in the District of Columbia, the inconsistency was far from harmless, and raised a substantial possibility that the jury's verdict was based on an improper legal theory, requiring reversal and a new trial. **Third**, because there is insufficient evidence

that Mr. Berlin could reasonably have foreseen publication of any part of the Limited Report

to the CIA, there is no way of determining if the jury assigned any liability to Defendants for

that publication, rendering the basis of the verdict unknowable and requiring a new trial.

**Fourth**, the jury's extraordinary verdict totaling over $8 million for a single publication of the

Limited Report to Mr. Eringer is far beyond the bounds of reasonable compensation for Mr.

Chandler for any harm caused by Defendants, warranting a new trial on presumed and punitive

damages unless Plaintiff agrees to an appropriate remittitur.

## I.    NEWLY DISCOVERED EVIDENCE DEMONSTRATES THAT CHANDLER'S MAIN REASON FOR NOT SUING ERINGER IS FALSE.

### A.    Chandler's Supposed Legal Advice That He Could Not Sue Eringer

Defendants argued that the one-year statute of limitations, D.C. Code sect. 12-

301(a)(4), barred Plaintiff's claims. They contended that the discovery rule adopted in *Diamond*

*v. Davis,* 680 A.2d 364 (D.C. 1996), did not save his case because Chandler had notice of Robert

Eringer's allegations about him, including Eringer's assertion that he had documents about

those charges. Accordingly, a lawsuit against Eringer was an available reasonable method of

investigating those claims and it would have revealed the existence of Mr. Berlin's report years

before the filing of this case.

Chandler did not dispute the factual premises of Defendants' statute of limitations

arguments. He admitted that: (1) Eringer's statement that he had documents about his

allegations against him was true and Mr. Berlin's report was one of those documents (Ex. A

at 469:13-470:20); (2) a lawsuit against Eringer would have been a reasonable means to force

Eringer either to prove his allegations or retract them (*id.*, at 472:24-473:2); and (3) if he filed

suit, Eringer would have been forced to produce the documents in his possession. (*Id.*, at 474:7-12.)

Chandler insisted, however, that it was impossible for him to have sued Eringer, based upon legal advice he supposedly received. (Ex. A at 321:17-322:2) He claimed a lawyer, (whose name he did not remember and whose advice he never mentioned in his deposition) told him he "did not have standing, being based in Monaco, not being American, and with [Eringer] in California. Standing meaning we had no legal grounds with which to bring a case against him." (*Id.*, at 321:20-22.) According to Chandler, that the advice applied not only to the statements about him in Eringer's California complaint against Prince Albert (DX 156 (Ex. 1.)) but also to Eringer's statements published on the internet. (Ex. A at 484:20-485:8.) Chandler also testified that the other reasons he had expressed for not suing Eringer made no difference in light of the legal advice he received. (*Id.* at 478:13-16) (weighing of other factors "is completely irrelevant or secondary" because he could not sue Eringer.)

Time and again, Chandler repeated that he did not sue Eringer because he could not, based upon legal advice he supposedly received. *E.g.*, Ex. A. at 472:24-473:2 (suing Eringer was a reasonable means of forcing him to prove his allegations "if we were able to;") *id.*, at 473:24-474:5 ("did not have standing or the legal foundation on which to sue him";) *id.*, at 478:25 (lawsuit against Eringer would require him to prove his charges or retract them "[i]f we were able to bring one;") *id.*, at 480:2-3 (any discussion of suing Eringer is "hypothetical because it wasn't an option";) *id.*, at 481:11-20 ("advice from my legal counsel" is why he didn't sue Eringer even though he sued Mr. Berlin;); *id.*, at 485:1- 8 (based on advice of counsel, he "didn't believe it was an option" to sue Eringer for statements in his blog;) *id.*, at 486:6-15 (he

decided to "leave the curiosity to others" (PX 70 (Ex. 2,)) because there was nothing he could do about Eringer's accusations, based on advice from his lawyer.)

According to Chandler, he **never** received any advice that he could sue Eringer.

Q. [D]id you ever receive advice, "yes" or "no," that it would be — a lawsuit against Mr. Eringer would be available to you in the United States?

A. Not that I recall, no.

(Ex. A at 482:4-7).

### B. Chandler Sued Eringer During The Trial And Concealed The Filing Of That Suit.

Actions speak louder than words. On October 16, 2024, the very day that Chandler swore on direct examination that it was not possible for him to sue Eringer, he did just that. Represented by the same lawyers who represent him in this case, Chandler filed a complaint against Eringer in District of Columbia Superior Court. (Oster Decl. at ¶¶ 1-8.**)** The complaint alleged that Eringer libeled him in an email sent to Mr. Berlin in 2018, a copy of which had recently been produced in this case. (Oster Decl., Ex. C, at ¶¶ 7-11.) According to the complaint, the six-year old email accused Chandler of "laundering money for the Russian mafia." (*Id.*, at ¶. 9.)

The Superior Court complaint demonstrates that Chandler' testimony was false. He obviously **did** receive advice that it was possible to sue Eringer in the United States and obviously believed it **was** possible to sue Eringer for accusing him of money laundering. That complaint is more than mere impeachment evidence; it is substantive evidence that: (1) Chandler could pursue Eringer in the United States; and (2) he had received legal advice that

such an action was possible. That evidence destroys Chandler's attempt to avoid the statute of limitations defense.

Chandler and his attorneys took several steps to prevent discovery of their action against Eringer during the trial. Chandler did not serve the complaint immediately. It remained unserved at least as late as November 16, 2024, almost a month after it was filed. (Oster Declaration at ¶ 4.)[1] Furthermore, the complaint alleged there was diversity of citizenship between Chandler and Eringer (Oster Decl., Ex. C, at ¶¶ 3-4,) but Chandler didn't file in this Court. Doing so would have triggered his attorneys' obligations imposed by Local Civil Rule 40.5(b)(3). That rule requires an attorney who is aware of a related case filed in this Court to "immediately notify, in writing," the judge to whom any related case is assigned and to serve that notice on all counsel of record in each related case. By filing in Superior Court, Chandler avoided the requirement to inform the Court and defense counsel that he sued Eringer.

On the day after they filed suit, Chandler's attorneys undertook additional efforts to conceal their action. On redirect, they made no effort to correct Chandler's testimony that he never received advice that an action against Eringer was available to him. Moreover, they failed to disclose the new lawsuit during the argument over the admission of DX 165, which is Exhibit 3 to this motion. That exhibit is an October 12 letter that counsel sent to Eringer three days before the start of the trial, demanding that he retract the statements in the 2018 email and requiring him to preserve all related documents. Defendants argued that the letter was an obvious attempt to intimidate Eringer before he testified by threatening him with a lawsuit.

---

[1] Eringer did not learn about the complaint because he received service; a scheduling notice sent by the Superior Court was the first notice to him that Chandler sued him. (Oster Decl., Ex. A.)

The Superior Court complaint refers to that letter and alleges that Eringer did not retract his statements. (*Id.* at ¶¶15-16.)  Despite that express reference, Plaintiff's counsel insisted to this Court that the letter never threatened a suit, even though they already had made good on their threat. ("The letter is not threatening." Ex. A at 619:23.) ("[T]here are no threats in it at all." *Id.*, at 620:7-8.) ("I don't see any threats or any kind of improper conduct here." *Id.*, at 622:11-12.)

### C.  The Newly Discovered Evidence Warrants a New Trial.

Rule 59(a)(1)(A) permits this Court to order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Newly discovered evidence is grounds for a new trial pursuant to Rule 59(a)(1)(A) or for relief from judgment pursuant to Rule 60(b)(2). The applicable standard is the same for both rules. *Silver v. IRS,* 569 F.Supp.3d 5, 10 (D.D.C. 2021) (" 'same standard' applies for granting a new trial on newly discovered evidence, 'whether the motion is under Rule 59 or 60(b)(2).' ") (quoting C. Wright and A. Miller, *Federal Practice and Procedure,* sect. 2808 (3d. Ed. 1980).) [2]

A court may grant a new trial based on newly discovered evidence if four conditions exist:

> (1) the newly discovered evidence is of facts that existed at the time of trial or other dispositive proceeding; (2) the party seeking relief was justifiably

---

[2] The only difference between the rules is the time when a motion based on newly discovered evidence can be filed. Rule 59(b) requires a Rule 59(a) motion to be filed within 28 days of entry of the judgment. Pursuant to Rule 60(c)(1), a Rule 60(b)(2) motion can be filed up to one year from entry of judgment, if based on evidence that could not reasonably have been discovered in time to file a Rule 59(a) motion.

ignorant of the evidence despite due diligence; (3) the evidence is
admissible and is of such importance that it probably would have
changed the outcome; and (4) the evidence is not merely cumulative or
impeaching.

*James Madison Project v. Department of Justice*, 320 F. Supp.3d 143, 148 (D.D.C. 2018), quoting
*West v. Holder*, 309 F.R.D. 54, 57 (D.D.C. 2015).

The evidence of Chandler's filing and concealment of his suit against Eringer satisfies
these requirements. First, because he filed on October 16, while he was testifying, the evidence
was in existence during the trial. Second, Defendants were "justifiably ignorant" of the
evidence. They had no notice of the filing as they would have if the complaint were filed in
this Court. Chandler's testimony and counsel's arguments did not disclose any reason to
believe that Chandler had filed suit. Unless Defendants monitored filings in several courts on
a daily basis, they had no way to learn about the initiation of the suit.[3] Requiring them to do
so in the midst of trial goes far beyond any reasonable meaning of "due diligence," especially
in light of Chandler's denial that he ever received advice that he could sue Eringer in the
United States.

Third, the evidence is admissible and is likely to have changed the outcome. The
question whether Chandler had the right to sue Eringer for defamation was central to his
refutation of the statute of limitations defense. Because he raised that issue, Defendants surely

---

[3] Defendants would have had to make daily checks of filings in the District of Columbia, as
well as federal and state courts in California (where Mr. Eringer lives) and Virginia (where Mr.
Berlin received the email.)

had the right to refute it. Chandler's own testimony demonstrates that proof of his ability to sue Eringer likely would have persuaded the jury to accept the statute of limitations defense. Chandler admitted that all of his other excuses for not suing Eringer were "completely irrelevant" because of his supposed inability to sue. (Ex .A at 478:13-16.) In light of the collapse of his pivotal argument, it is likely that the jury would have agreed with Defendants' position on the statute of limitations.

Finally, the evidence is neither cumulative nor impeaching. Given Chandler's inability to recall anything specific about the advice he supposedly received**,** as well as his failure even to mention it during his deposition or at any time before trial, it was difficult for Defendants to introduce contrary evidence. Therefore, the newly discovered evidence is not cumulative of other evidence on this point. The Superior Court complaint also is not merely impeaching. It does not show only that Chandler's testimony was false; it also affirmatively demonstrates that that he could, and did, sue Eringer for defamation, thereby providing strong support for the statute of limitations defense.

Because evidence of Chandler's suit against Eringer satisfies every condition for granting a new trial on the basis of newly discovered evidence under Rule 59(a)(1)(A), Defendants respectfully request the Court to grant a new trial on this ground.

### D. In The Alternative, Rule 60(b)(3) Authorizes Relief From The Judgment.

Rule 60(b)(3) permits this Court to relieve Defendants from the judgment for "fraud (whether previously called intrinsic or extrinsic), misrepresentation or misconduct by an opposing party." Chandler's filing of the Superior Court complaint and his efforts to conceal that filing are sufficient grounds for relief under that rule.

Rule 60(b)(3) establishes a demanding standard:

A litigant seeking relief under Rule 60(b)(3) must prove the fraud, misrepresentation, or misconduct by clear and convincing evidence. *See Shepard v. Am. Broad. Cos.,* 67 F.3d 1469, 1477 (D.C. Cir. 1995). In addition to demonstrating misconduct, the movant must show the misconduct was prejudicial, foreclosing the "full and fair preparation or presentation of its case." *Summers v. Howard Univ.,* 374 F.3d 1188, 1193 (D.C. Cir. 2004); *see also Stridiron v. Stridiron,* 698 F. 2d 204, 207 (3d Cir. 1983) ("To prevail, the moving must establish that the adverse party engaged in fraud or other misconduct, and that this conduct prevented the moving party from fully and fairly presenting his case.")

*In re Hope 7 Monroe St. Limited Partnership, v. Riaso, LLC,* 743 F.3d 867, 875 (D.C. Cir. 2014).

Defendants' motion satisfies these requirements. The evidence, consisting of the Superior Court complaint, Chandler's testimony denying that he never was advised that he could sue Eringer in the United States, his insistence that he could not do so, and his attorneys' efforts to conceal the complaint, can not reasonably be disputed. That evidence clearly and convincingly establishes at least misrepresentation. Chandler's deception prevented a full and fair presentation of Defendants' statute of limitations defense because Defendants did not, and reasonably could not, know about the Superior Court complaint, an obviously material piece of evidence. The jury would have viewed Chandler's testimony in a different light if they knew that his actions ***during the trial*** were contrary to the position he was advocating. While there are several reasons to doubt Chandler's testimony about the advice he received (including his failure even to mention that advice at his deposition) those doubts pale in comparison to the undisputed material fact that Chandler ***did*** sue Eringer, thereby establishing, by clear and

convincing evidence, that his most significant argument in opposition to the statute of limitations defense was wrong.

The Federal Circuit faced a similar situation in *Cap Export, LLC v. Zinus, Inc.,* 996 F.3d 1332 (Fed. Cir. 2021), a patent case. The patent holder's president testified in his deposition that he was unaware of any prior art. After entry of judgment in the patent holder's favor, evidence became available showing that, before applying for the patent, he purchased on behalf of his company more than 400 beds incorporating the elements of the patent. Confronted with that evidence, he admitted his deposition testimony was " 'literally incorrect.' " *Id.,* at 1338. The Federal Circuit affirmed the District Court's grant of Rule 60(b)(3) relief from a judgment in the patent holder's favor. Because the company's president "misrepresented his knowledge of highly material prior art," *id.,* at 1342, the judgment was properly vacated under Rule 60(b)(3).

As in *Cap Export,* Chandler's testimony that he never was advised that a suit against Eringer was available to him was "literally incorrect." He "misrepresented his knowledge of highly material" legal advice. We respectfully submit that this Court should reach the same result as the Federal Circuit and should vacate the final judgment pursuant to Rule 60(b)(3).

## II.    THE STATUTE OF LIMITATIONS INSTRUCTION WAS ERRONEOUS

The Court largely adopted the material elements of Chandler's proposed instruction on the statute of limitations and the discovery rule. Chandler, however, proposed an instruction that departed from the authoritative statement of the discovery rule in *Diamond v. Davis*, 680 A.2d 364, 372-81 (D.C. 1996) ("*Diamond*"). As a result, the jury was left with insufficient guidance as to the difference between a legally valid reason for Chandler not to

pursue Eringer and several patently insufficient reasons. So, for instance, the jury was free to consider, *inter alia*, Mr. Chandler's purported desire not to upset his mother or his belief Eringer's documents must have been false or non-existent as a sufficient reason to deprive Mr. Berlin of the rights granted by the statute of limitations. The jury was free to excuse Chandler from not bothering to read a book by Eringer that he was told contained false and defamatory statements about him. Absent the Court of Appeals' legal guardrails in *Diamond* and other authority the jury was free to treat Chandler's conduct and the statute of limitations as little more than a technicality rather than a substantive rule of law.

The parties agree that the discovery rule applies to this case and, further, that the Mr. Berlin needed to show by a preponderance of the evidence that a lawsuit against Mr. Eringer was likely to reveal the Limited Report. As discussed above, Chandler conceded the factual premises of Defendants' statute of limitations argument. The evidence, including Eringer's claims to have documents backing up his claim that Mr. Chandler laundered money, made it more likely than not that if Mr. Chandler had exercised reasonable diligence by suing Eringer, he would have discovered the Limited Report years before he brought this case.

### A. The Instructions Deviated From The Law In the District of Columbia.

The Court's statute of limitation instruction deviated from *Diamond* in several material respects, as Mr. Berlin raised at the charging conference and in his objections to the final instruction given to the jury. (Ex. A at 424-25; 433-39; 704-08; 741-42.) The instruction omits any mention of Chandler's duty to investigate, a duty that is central to *Diamond's* articulation of the discovery rule:

…we take this opportunity to state that the standard is in fact the same in all cases to which the discovery rule applies…. *In every case, the plaintiff has a duty to investigate matters affecting her affairs with reasonable diligence under all of the circumstances.* Once the plaintiff actually knows, or with the exercise of reasonable diligence would have known, of some injury, its cause-in-fact, and some evidence of wrongdoing, then she is bound to file her cause of action within the applicable limitations period, measured from the date of her acquisition of the actual or imputed knowledge.

680 A.2d at 381 (emphasis added.)

Although the instruction states Mr. Chandler is on inquiry notice of all facts he would have discovered "if he had conducted a due investigation" and requires he "exercise reasonable diligence under the circumstances," the Court never states that those circumstances include a legal duty to investigate or suffer the consequences. The instruction gave the jury no guidance as to when an investigation is necessary, leaving the jury to consider Mr. Chandler's *choices* as the equivalent of, or a sufficient basis to eschew, a reasonable investigation. Moreover, although *Diamond* concedes that sometimes no investigation is necessary, the Court did not elaborate or exemplify what those circumstances might be. Absent these guardrails, there can be no confidence the jury applied the law to the facts before it.

Chandler's instruction is lacking in each of these critical respects and fails to provide the jury with sufficient guidance on the two critical questions it must answer in order to render a proper verdict on statute of limitations: the threshold requirement imposed on a plaintiff

aware of injury, cause, and evidence of wrongdoing, and the conflates reasonable diligence with inquiry notice:

The defendants in this case have asserted as an affirmative defense that Mr. Chandler's defamation claim is barred by the statute of limitations, which is a time limit for bringing a claim. The statute of limitations for a defamation claim under District of Columbia law is one year. Defendants bear the burden of proving their statute-of-limitations defense.

To establish that a statute of limitations bars Mr. Chandler's defamation claim, defendants must prove by a preponderance of the evidence that Mr. Chandler failed to file his lawsuit within one year after he was on what is called "inquiry notice of defendants' false statements."

"Inquiry notice" is the notice a plaintiff would have possessed of a defendant's actions if he had conducted due investigation.

Mr. Chandler filed this lawsuit on September 14th of 2018; therefore, you must decide whether Mr. Chandler was on inquiry notice before September 14th of 2017 that defendants were the authors of the report.

Now, whether Mr. Chandler was on inquiry notice before September 14th, 2017, is a highly fact-bound question. It requires that you decide whether Mr. Chandler exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him.

Reasonable diligence means the level of inquiry that reasonably may be expected in a given set of circumstances. It does not require super-human effort

or the exercise of perfect judgment. A person exercising reasonable diligence may make mistakes that delay the search.

The circumstances also may be such that a person is not required to conduct any investigation at all. The fact that Mr. Chandler had knowledge of Mr. Eringer's false statements more than one year before he filed suit does not necessarily mean that he was on inquiry notice before September 14th of 2017 about defendants' roles as publishers of the report. You must consider all relevant facts and circumstances when deciding whether Mr. Chandler was required to investigate, and that, if he had investigated, whether he would have learned of defendants' false statements.

If you determine that the defendants have proven by a preponderance of the evidence that Mr. Chandler was on inquiry notice of defendants' identities as publishers of the report before September 14th, 2017, you must find in favor of defendants. On the other hand, if defendants have not shown by a preponderance of the evidence that Mr. Chandler was on inquiry notice before September 14th of 2017, then Mr. Chandler's lawsuit was timely and you must find the defendants have not proven that Mr. Chandler's lawsuit is barred by the statute of limitations.

(Ex. A at 735:17-737:17.)

Chandler's instruction omits the three foundations of the discovery rule under District of Columbia law. It does not mention (1) knowledge of injury, (2) cause, and (3) some evidence

-14-

of wrongdoing, and the consequent requirement to perform a reasonable investigation that may include filing a lawsuit.

### B. Defendants' Proposed Instruction Follows the Law in this Circuit

Defendants' proposed instruction met all of the requirements set forth by the Court of Appeals in *Diamond* and *Estate of Chappelle v. Sanders*, 442 A.2d 157, 159 (D.C 1982). In particular, it incorporates both the discovery rule and the burden on a plaintiff to undertake a reasonable investigation where, as here, discharge of his duty upon inquiry notice would have revealed Mr. Eringer's repeated publications of defamatory statements about Mr. Chandler, but also the Defendants' single publication to Eringer:

> The statute of limitations for Plaintiff's claim is one year from publication of the defamatory statement. Mr. Berlin "published" his Report to Mr. Eringer in February 2003 and Plaintiff filed this case on September 14, 2018, more than a year after that publication. Ordinarily, that would mean his suit is barred by the one-year statute of limitations.
>
> Plaintiff, however, relies on an exception to the statute of limitations known as the discovery rule. The discovery rule allows a plaintiff to avoid the expiration of the statute of limitations in certain circumstances. Those circumstances are:
>
> 1. The plaintiff has a duty to investigate matters affecting his affairs with reasonable diligence under all the circumstances.
>
> 2. As soon as the Plaintiff learns of some injury, its cause, and some evidence of wrongdoing, the discovery rule requires him to file suit within the

applicable limitations period, in this case, one year. If you find by a preponderance of the evidence that Plaintiff learned of the injury he has complained of in this case, its cause, and some evidence of wrongdoing before September 14, 2017, you must find that Plaintiff filed suit after expiration of the statute of limitations and your verdict must be for the defendants.

3. If a plaintiff fails in his duty to investigate matters affecting his affairs with reasonable diligence, the law regards him as having what's called "inquiry notice." "Inquiry notice" is the knowledge that the Plaintiff would have possessed if he conducted an investigation with reasonable diligence. If you find by a preponderance of the evidence that Plaintiff did not undertake a reasonable investigation of the allegations made by Mr. Eringer in 2010, 2012, 2014, and 2015, and if you find that a reasonable investigation of those allegations by Plaintiff likely would have resulted in his discovery of Mr. Berlin's report before September 14, 2017, then you must find that Plaintiff filed suit after the statute of limitations expired and your verdict must be for the defendants.

4. In some circumstances, the filing of a lawsuit can be part of the reasonably diligent investigation required by the law. For example, if a plaintiff believes that more than one person wrongfully caused him injury, but plaintiff only knows the identity of one potential defendant, filing a lawsuit against the known defendant can be part of a reasonably diligent investigation. The

Plaintiff can use the court's available discovery procedures to learn the
identity of the unknown defendant.

(Dkt. 179-1; Defendants' Proposed Statute of Limitations Instruction, citing *Diamond* and
*Chappelle*.)

The instruction encompasses both the three threshold requirements to trigger a statute
of limitations (knowledge of injury, cause, and some evidence of wrongdoing) and the
requirement of a reasonable investigation that may include filing a lawsuit. If a lawsuit is part
of a reasonable investigation, and a lawsuit would have revealed the Limited Report, the jury
should have returned a verdict for Defendants.

### C. The Court's Instruction Did Not Provide Sufficient Guidance for the Jury.

By contrast, Chandler's Instruction fails to provide the jury with sufficient guidance on
the two critical questions it must answer in order to render a proper verdict on statute of
limitations: the threshold requirement imposed on a plaintiff aware of injury, cause, and
evidence of wrongdoing, and the conflates reasonable diligence with inquiry notice.

Chandler's instruction fails to even mention the threshold elements in *Diamond* that
begin the running of the statute of limitations, all of which were known to Mr. Chandler in
2009, 2010, and certainly no later than 2015: 680 A.2d at 371 ("when the plaintiff has
knowledge of (or by the exercise of reasonable diligence should have knowledge of (1) the
existence of injury, (2) its cause in fact, and (3) some evidence of wrongdoing" Nor does the
Court's instruction clarify that whether a plaintiff is on actual or inquiry notice is sufficient to
commence the running of the statute of limitations in a particular case. *Id.* at 372 (citing *Clay
Properties v. Washington Post*, 604 A.2d 890, 895). Finally, the instruction fails to describe the

quantum of knowledge required to trigger the duty to investigate (there can be no dispute Mr. Chandler was in possession of such knowledge) and the amount of diligence that most be exercised once an investigation is triggered.

The instruction's focus on excusing Mr. Chandler from "mistakes," "superhuman efforts," and "perfect judgement," without discussing the burden he did bear is likely to have confused the jury and is contrary to *Diamond*'s emphasis on the importance of a diligent investigation: "if a plaintiff has not acquired actual knowledge of a cause of action only because of his failure to meet that duty to investigate, the plaintiff is nevertheless charged with that knowledge." *Id.* at 372. It defined "inquiry notice" as "that notice which a plaintiff would have possessed after due investigation," and held that "[o]nce either actual or inquiry notice is present, . . . the statute of limitations begins to run as a matter of law." *Id.* Mr. Chandler's willful blindness in not even bothering to read the book that accused him of spying for the Russians and laundering money, as well as his metaphysical assertion that false documents cannot exist, are the antithesis of a *Diamond's* duty to investigate.

It is also the antitheses of the Court of Appeals decision in *Chappelle v. Sanders*, 442 A.2d 157 (D.C. 1982). Plaintiff's decedent in that case was a passenger involved in an auto accident. The driver of the other car gave the decedent's driver a false name and fled the scene. The plaintiff sued the driver and the owner after the statute of limitations had run, but argued that the driver's concealment of his identity and the owner's false denial tolled the statute. The Court disagreed:

> We hold that appellees' concealment of their identities did not toll the running
> of [the] limitations periods. In the circumstances here we are inclined to follow

> the rationale of those jurisdictions which have held generally that concealment
> of the identity of liable parties, unlike concealment of the existence of a claim,
> is insufficient to toll the statute of limitations.

*Id.* at 159 (citing 51 Am. Jur. 2d, *Limitation of Actions,* §148 (1970)).

Because the estate knew the identity of the car's owner, it "could have filed a timely claim against [her] and amended it as pretrial discovery revealed the identity of any other liable parties." 442 A.2d at 159. Thus, even though the plaintiff did not know the driver's name, the plaintiff's knowledge of an injury, its cause in fact, and some evidence of wrongdoing by the driver was sufficient to impose a duty to investigate the identity of the driver and to commence the running of the limitations period. In this case, Eringer's sworn statements that he had documents, later discovered to include the Limited Report, required no superhuman, mistake-free effort on Mr. Chandler's part to (as he suggested to his brother) sue Eringer and make him "put up or shut up." (PX-68 (Ex. 7.))

All of this information, guidance, and law is missing from the statute of limitations instruction which left the jury to speculate as to what triggers a statute of limitations, the difference between actual knowledge and inquiry notice, when the statute accrues, and what actions are required of a plaintiff upon accrual.

### D. ACCORDINGLY, THE ERRONEOUS INSTRUCTION WAS NOT HARMLESS, BUT INSTEAD RAISED A "SUBSTANTIAL POSSIBILITY" THAT THE VERDICT WAS BASED ON AN IMPROPER LEGAL THEORY, REQUIRING REVERSAL

It is well-settled that an erroneous jury instruction is grounds for a new trial unless the error was harmless. That is, whether the erroneous instruction raises "a substantial possibility that the jury's verdict was based on an improper legal theory, and thus require[s] reversal." *In*

*re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 89 (D.D.C. 2006) (citing *United States v. Lemire,* 720 F.2d 1327, 1343 (D.C.Cir.1983)). Given Chandler's instruction's failure to advise the jury of the threshold requirements for reliance on the discovery rule in the District of Columbia, and its invitation for the jury to consider improper grounds for relieving Chandler of his duties under the rule, that standard is easily met in this case.

Furthermore, the statute of limitations confers on Defendants substantial rights that the instruction failed to express. Statutes of limitation play a critical role in an orderly system of justice and promote fairness:

> Statutes of limitations "have long been respected as fundamental to a well-ordered judicial system." *Bd. of Regents v. Tomanio,* 446 U.S. 478, 487, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). The time limits they impose "are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." …They also promote fairness both by allowing parties "to plan for litigation and allocate resources based on realistic predictions," *Bond v. Serano*, 566 A.2d 47, 56 (D.C. 1989) (Farrell, J., concurring), and by granting "repose to defendants when plaintiffs have tarried for an unreasonable amount of time," *Brin v. S.E.W. Inv'rs*, 902 A.2d 784, 799 n.20 (D.C. 2006).

*Brookens v. United States*, 182 A.3d 123, 129–30 (D.C. 2018). Chandler's instruction failed to take these well-known rights into account; instead leaving the jury with the impression that Mr. Chandler was under no duty to act promptly upon repeated notices of his claims against

Eringer, and left to speculate whether prompt action would have revealed the Limited Report among Eringer's documents.

### III.    THE EVIDENCE DOES NOT SHOW THAT ANY REPUBLICATION TO THE CIA WAS REASONABLY FORESEEABLE.

In *Lynch v. Wal-Mart Assoc., Inc.,* 2024 WL 491230, (D.D.C. 2/8/24), the court discussed the available grounds for a Rule 59(a)(1)(A) new trial motion. Among those grounds are "when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence [or] (2) the damages being excessive." Id., at *2 (citations and internal quotation marks omitted. The standard is demanding. A "jury verdict stands unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict." *Youseff v. FBI,* 687 F.3d 397, 403 (D.C. Cir. 2012).

In the remainder of this memorandum, we demonstrate that Defendants have met this challenge. This section shows that the there is no evidence that Mr. Berlin reasonably foresaw any republication of his report to the CIA, and the following section shows that the jury's damage award is excessive because it is not supported by the evidence introduced at trial.

Mr. Chandler asserted that Defendants were liable for republication of the limited report to Prince Albert and the CIA. Mr. Berlin can be liable for a republication only if it was reasonably foreseeable to him. *Chandler v. Berlin,* 998 F.3d 965, 976 (D.C. Cir. 2021). Thus, Chandler had to prove that "republication under circumstances at least roughly similar to what in fact occurred must have been foreseeable" to Mr. Berlin in 2003. *Id.*

But there was a complete failure of evidence as to whether Mr. Berlin foresaw republication of his report, or any of the information in the report, to the CIA. Mr. Berlin's

unwavering testimony was that he prepared the Limited Report for one person: Mr. Eringer, and that he did not expect or intend that it be republished. (Ex. A. at 289:4-25; 290:13.) Furthermore, there is no evidence that Mr. Eringer ever told Mr. Berlin that he expected to say anything to the CIA about the Chandlers or any of the information in the report. The evidence, therefore, shows that republication to the CIA was not foreseeable.

Due to the absence of any evidence of a *foreseeable* republication to the CIA, the jury's damages award cannot stand. Even if republication to Prince Albert was reasonably foreseeable, (a point that Defendants do not concede) the jury's lump sum award of $4,000,000 makes it impossible to determine how much of that award they allocated to the alleged CIA republication.

The Supreme Court's decision in *Greenbelt Co-op Pub. Assn v. Bresler*, 398 U.S. 6 (1970), is on point. The Court reversed a verdict in a defamation case because it was impossible to tell whether the verdict was based on a proper ground. "For when 'it is impossible to know, in view of the general verdict returned' whether the jury imposed liability on a permissible or an impermissible ground 'the judgment must be reversed and the case remanded." 398 U.S. at 11, 90 S.Ct. (*citing, inter alia, Times v. Sullivan*, 376 U.S. 254 (1964)

The same problem obtains here: it is impossible to know how much of the jury' award is based on Chandler's evidence-free claim involving the alleged republication to the CIA. Consequently, a new trial is necessary.

## IV. THE DAMAGE VERDICTS ARE GROSSLY EXCESSIVE AND WARRANT A NEW TRIAL OR AN APPROPRIATE REMITTITUR.

As noted above, this Court has the discretion to order a new trial when a verdict is contrary to the weight of the evidence and where a damage award is excessive. *Lynch, supra,* at

*2. The weak evidentiary support for the jury's extraordinary award of $8,000,001in compensatory and punitive damages demonstrates the need for such relief in this case.

"A successful libel plaintiff can recover three types of damages — nominal, compensatory, or punitive." *Robertson v. McCloskey,* 680 F. Supp. 414, 415 (D.D.C. 1988). As discussed below, the jury's compensatory award of $4,000,000 and its punitive award of $4,000,001 are far beyond any amounts that reasonably compensate Chandler for any harm he suffered or that reasonably punish Defendants. The evidence supports an award of only nominal damages, with a correspondingly small amount of punitive damages, if any.

**A.** **There Is No Evidence of Acutal Harm.**

In *Ingber v. Ross,* 479 A.2d 1256, 1265, (D.C. 1984), the District of Columbia Court of Appeals established the factors to consider in determining damages for defamation. They are: " 'the seriousness of the defamatory charge, the extent of the distribution of the defamation, the extent to which the communication was actually believed, and the plaintiff's prominence and professional standing in the community.' " (Quoting R. Sack, *Libel, Slander, and Related Problems,* 354-55 (1980)). In applying those standards, it is critical to recognize that Chandler sought damages only for alleged republications of Mr. Berlin's report to Prince Albert and the CIA. Consequently, the jury should have limited its consideration to compensating Mr. Berlin only for those republications. The trial evidence, however, does not show that those isolated republications caused any harm. There was no evidence of any economic damage, such loss of customers or other business losses. Chandler's only evidence of supposedly harmful actions that third parties took against him was his vague testimony about one encounter with the Monaco police and a few interactions with customs authorities at an airport in France during

2004. The evidence is wholly insufficient to support a claim that any republication of Mr. Berlin's report had any influence on those events.

Although he first received Mr. Berlin's report in 2018, it took Chandler six years to connect those incidents with Mr. Berlin's report. (Ex. A at 564:16-565:19.)  He admitted that he does not remember any significant details about them. He does not know why the police pulled him over. (Ex. A at 338 6-8; 22-24.) He does not remember anything they asked him and characterized the episode as "one of those strange encounters that seemed to have no rationale to it." (Ex. A at 337:13-16.) His testimony about the events at the airport was similar. The customs authorities asked how much money he was carrying, "which isn't an uncommon question." (Ex. A at 332:20.) They did not tell him the basis for their further interrogations or searches. (Ex. A at 334:19-21.) In particular, they never asked whether he was acting on behalf of any Russians. (Ex. A at 335:10-12.) Chandler admitted that he does not know why any of these incidents occurred and conceded that neither the police nor the customs authorities ever said anything that made him believe Mr. Berlin's report had anything to do with them. (Ex. A at 565:2-9.) Those incidents, therefore, can not be the basis of any damages award.

### B. There Is No Evidence That Republication To Prince Albert and The CIA Caused Any Emtional Distress.

Chandler also testified about his emotional distress and sleepless nights caused by the allegations against him, but his testimony did not connect any of those harms with republications to either Prince Albert or the CIA. On the contrary, he expressly said that the widespread publication of Eringer's charges caused his distress. Asked to explain "the personal impact" of Mr. Berlin's report on him "in terms of any kind of embarrassment or mental anguish [he] may have experienced," (Ex. A at  342:11-13,) Chandler testified:

I think if I had thought the report had never seen the light of day, you might look at it and think that's just ridiculous. But because I was seeing it for the first time after numerous — I don't want to go there — **after it had been circulated publicly for some time,** then it was gutting.

(Ex. A at 342:14-18.) (Emphasis added.)

Thus, the public circulation of Mr. Berlin's report caused Chandler's emotional distress. There is no evidence that either Prince Albert or the CIA had anything to do with the public circulation of the report years after those republications allegedly occurred.[4] In any event, Mr. Berlin, bears no responsibility for that public circulation in 2017 and 2018. *Chandler v. Berlin,* 998 F.3d 965, 975-78 (D.C. Cir. 2021).

## C. There Is No Evidence That Republication To Prince Albert And The CIA Damaged Chandler's Reputation.

Chandler also repeatedly testified that Mr. Berlin's report damaged his reputation. But Chandler is only suing for damages caused by the specific republications to Prince Albert and the CIA. His testimony did not explain why those particular republications had any effect on his overall reputation. Instead, he spoke about damage to his overall reputation but never tied any of that damage either to Prince Albert or the CIA. *See, e.g.,* Ex. A at 330:3-4 ("when somebody destroys your reputation, you're not always aware of the consequences of that:") *id.,* at 11-12 ("when people start to see you differently, whether you're aware of it or not, it comes at a cost.") The closing argument of Chandler's counsel was similar in its lack of focus

---

[4] Mr. Berlin's report itself never was given to either Prince Albert or the CIA. Eringer sent a separate report to the CIA in 2003, (DX-99 (Ex. 4.)) He sent a report on the Chandlers to the Prince in 2004 (DX-13 (Ex. 5,)), and had sent identical information to the Prince *two years* before he received Mr. Berlin's report. (DX-5 (Ex. 6.))

on the two republications at issue. *See, e.g.,* Ex. A at 758:7-8 (asking the jury "to hold the defendants responsible for publishing this report and ruining Mr. Chandler's reputation;") *id.,* at 804:9 claiming the accusations will be "echoing for eternity.") There is no evidence that any republication to either the Prince or the CIA had affected Chandler's reputation in any way. Prince Albert never told Chandler that he held him in lower esteem or had diminished regard for him. (Ex. A at 581:19-22.) Indeed, Chandler has never met Prince Albert. (*Id.* at 580:25-581:3.) And he presented no evidence at all about his reputation with the CIA or how any republication affected his reputation with that agency.

*Ingber* requires a jury to consider, among other things, the extent of distribution of the defamatory statement and whether the statement was believed. 470 A.2d at 1265. In this case, the jury awarded millions of dollars in damages without any evidence that the audience for the only republications at issue , *i.e.,* Prince Albert and the CIA, believed anything in Mr. Berlin's report, distributed its allegations further, or harmed Chandler in any way as the result of that report.

### D. On This Record, Chandler Can Recover Only Nominal Presumed Damages.

With no evidence of actual harm caused by the asserted republications, Chandler is limited to recovering presumed damages to vindicate his reputation. Decisions awarding presumed damages in circumstances similar to this case show that nothing more than nominal damages are appropriate.

For example, in Grossman *v. Goemans,* 631 F. Supp. 972 (D.C. 1986), the defendant wrote a letter to the SEC accusing the plaintiffs, an attorney and his law firm, of aiding and abetting fraud by issuing an opinion letter to a corporation. The defendant also sent a copy of

that letter to 170 investors in the corporation. The SEC took no action against the plaintiffs, and plaintiffs produced no evidence that the defendant caused them actual harm. *Id.,* at 972-74. In awarding presumed damages, the court noted: "Damages for loss of reputation without proof of actual damages 'are extremely difficult to quantify' and in such cases 'a nominal recovery may be sufficient to vindicate the injury to reputation.' " *Id.,* at 974, quoting *Airlie Foundation, Inc. v. Evening Star Newspaper Co.,* 337 F. Supp. 421, 431 (D.D.C. 1972). The Court applied the *Ingber* standards, concluding that the charges were serious and published to at least 170 persons. It noted that the plaintiffs had an interest in maintaining their reputations, but there was "little to suggest" that the recipients of the letter believed the accusations. In those circumstances, a compensatory award of $2,500 was sufficient to vindicate the plaintiffs' reputations. 631 F. Supp. at 974.

*Lothschuetz v. Carpenter,* 898 F.2d 1200 (6th Cir. 1990), is similar. The defendants filed allegations with the FCC that the plaintiffs, two former FCC attorneys and their current employer, had engaged in unethical conduct. The defendants also wrote to President Carter and "several agencies and politicians" accusing one of the attorneys and the employer of violating conflict of interest laws. *Id.,* at 1202. The District Court awarded nominal damages of $1.00 to each plaintiff. District of Columbia law governed the case. *Id.* The plaintiffs conceded that "they offered no significant evidence of harm to their reputations," but contended they were entitled to presumed damages. *Id.,* at 1204-05. The court agreed that presumed damages were appropriate, but held "the presumption entitles them to nothing more than what the district court ordered — nominal damages." *Id.,* at 1205.

*Ayala v. Washington,* 679 A.2d 1057 (D.C. 1996), is another comparable case. Plaintiff was an airline pilot. The defendant sent letters to the FAA and the plaintiff's employer accusing him of "drug use and other violations of FAA regulations." *Id.,* at 1060. Neither the FAA nor the employer took action against the plaintiff, as they determined the allegations were not true. *Id.* The jury awarded compensatory damages of $1.00.

*Grossman, Lothschuetz,* and *Ayala* share common elements with this case. Each of them involves defamatory statements communicated to a government agency and, in *Lothschuetz,* to a head of state. In each case, there was no evidence that the recipients took any adverse action against the plaintiff and no evidence that the the recipients believed the statements. Although the statements charged plaintiffs with serious misconduct, the totality of the circumstances supported nothing more than an award of nominal damages. Measured against those awards, the jury's $4,000,000 verdict in this case cannot stand. Like the plaintiffs in each of those cases, Chandler did not prove that the recipients of the republications took any adverse action against him, nor did he show that they believed the allegations. The alleged republications of Mr. Berlin's report were no more widely distributed than the allegations in any of those cases. Indeed, the *Grossman* allegations were sent to at least 170 people. The *Ingber* factors resulted in nominal damage awards in each case. They should dictate the same result here.

Two decisions awarding presumed damages for reputational harm in more than nominal amounts are also instructive. In *LaRue v. Johnson,* 2018 WL 1967128 (D.D.C. 2/22/18), *report and recommendation adopted* 2018 WL 2561036 (D.D.C. 4/4/18), the court awarded presumed general damages of $40,000 because the defendant's widely disseminated

accusations caused Plaintiff to be isolated from family, friends and business contacts and lowered her personal and professional standing in the community. 2018 WL 1967128 at *9.

In *United States ex rel. Guo v. National Endowment for Democracy,* 2022 WL 503765 (D.D.C. 2/18/22), plaintiff was a prominent Chinese dissident living in the United States. The defendant accused him of illegal conduct and "worse for him" acting for the Chinese government. *Id.*, at *14. The defendant widely disseminated the statements resulting in plaintiff's isolation "from the professional community to which he has devoted himself 'for approximately 40 years.' " *Id.* In light of that explicit proof of concrete harm, the court determined that nominal damages were insufficient and awarded $40,000 in general damages. *Id.*

Two features of *LaRue* and *Guo* stand out. First, courts award more than nominal damages when presented with specific proof of widespread dissemination of defamatory statements that were believed by the recipients, thereby lowering the esteem in which the plaintiffs were held within their personal and professional communities. ***There is no such proof in this case with respect to the republications to Prince Albert and the CIA.*** There is no evidence that either the Prince or the CIA disseminated the allegations further, no evidence that either of them believed the allegations or took any harmful actions against Chandler, and no evidence that those republications (as opposed to the 2017 and 2018 republications that Mr. Berlin is not responsible for) caused Chandler to experience lowered esteem or isolation in any relevant community. Second, even when there is such proof, courts award damages in amounts that are orders of magnitude lower than the jury's award in this

case. In light of the $40,000 awards in *LaRue* and *Guo,* there is no rational basis for a judgment 100 times greater.

*Szymkowicz v. Frisch,* 2020 WL 4432240 (D.D.C. 7/3/20) establishes a further guidepost for evaluating the verdict in this case. The issue in that defamation case was whether the plaintiff's complaint satisfied the $75,000 jurisdictional amount for diversity jurisdiction. The court rejected plaintiff's reliance on presumed damages to meet the threshold because he, like Chandler in this case, "failed to explain in any concrete terms how defendant's statements harmed him." *Id.,* at *8. Thus, a "mere invocation of presumed damages, " *id.,* at *7, is insufficient to support an award that would even approach $75,000, let alone $4,000,000. As Judge Howell stated in *Szymkowicz,* " '[i]n a case involving defamation *per se*, damages are presumed and no proof of actual harm to reputation is required for recovery of damages,' " but " '[a] court, nevertheless, retains discretion to grant a new trial for excessive damages where the amount of presumed damages is wholly unsupported by the evidence.' " *Id.,* at *7, quoting *Prendeville v. Singer,* 155 Fed. Sox. 303, 305 (9ᵗʰ Cir, 2005). This is such a case.

Nominal damages were sufficient to vindicate the reputations of the plaintiffs in *Grossman, Lothschuetz,* and *Ayala.* Chandler's reputation is no more valuable than the reputations of the plaintiffs in those cases, and the damage award should be similar. We therefore respectfully request the Court to grant a new trial on damages unless Chandler accepts a remittitur of no more than nominal damages.

Remitting the compensatory damage award necessarily requires remitting the award for punitive damages. "[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages , to a significant degree, will satisfy due process . . . . [A]n award of

more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425 (2003).[5]

Apart from the constitutionally required evaluation of the ratio between punitive and compensatory damages, Chandler's evidence does not support a multi-million-dollar punitive damages verdict. The jury undoubtedly was influenced by Chandler's claimed attorney's fees of $5,000,000. But the evidence establishes that Chandler's method of litigating the case was the major factor driving those fees. The case began when his attorney sent a letter to Mr. Berlin giving him "one opportunity" to avoid "spending the next several in litigation." (DX 101 (Ex. 8) at 2.) According to the letter, Mr. Berlin had 48 hours (later extended by an additional 24 hours) to sign a statement containing several inaccuracies.

Mr. Berlin's counsel responded, not by "doubling down" but providing an accurate statement that Mr. Berlin had no personal knowledge about any misconduct by Chandler. (DX 150, (Ex. 9), Proposed Berlin Declaration, ¶ 7.)  Counsel suggested a meeting of the parties to discuss Chandler's concerns (Ex. 9 at 3,) but Chandler and his attorneys would have none of it. Chandler's attorneys showed they meant it when they said "one opportunity" to avoid lengthy and expensive litigation by filing this case the same day they received the response on behalf of Mr. Berlin. Plaintiff's litigation decisions, not any obstinacy on the part of Mr. Berlin, lead to litigation instead of efforts to come to agreement.

---

[5] The Court has suggested that a higher ratio could be appropriate if a "particularly egregious act has resulted in only a small amount of economic damage," or if the value of non-economic harm is difficult to detect. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 582 (1996). Any evaluation of such a ratio must await the determination of compensatory damages, but it is unlikely that a ratio that would lead to a $4,000,001 award of punitive damages could be sustained.

The punitive damages award in this case also was likely to have been influenced by Chandler's counsel's improper closing argument, which urged the jury to consider "thousands of reports for an unknown number of targets and ICI and Berlin lining their pockets with the proceeds for the misinformation they're selling." (Ex. A  at 751:17-19,) and his improper request for thirty million dollars. There never was any evidence that Mr. Berlin published any other defamatory report at any time, and the Court in *State Farm* expressly held that the jury may not consider "conduct that bore no relation to [the plaintiff's] harm." 538 U.S. at 422. "A defendant should be punished for conduct that harmed the plaintiff, not for being an unsavory individual or business." *Id.,* at 423.

For all these reasons, a new trial should also be granted on punitive damages, unless plaintiff agrees to an appropriate remittitur.

## **CONCLUSION**

Wherefore, Defendants respectfully request a new trial or remittitur.

November 27, 2024                                Respectfully submitted,


/s/ *Steven M. Oster*
John P. Dean
D.C. Bar No. 362904
Steven M. Oster
D.C. Bar No. 376030
**THE OSTER LAW FIRM**
1320 19th Street, N.W., Suite 800
Washington, D.C. 20036
(202) 596-5291 (p)
(202) 747-5862 (f)
steve@osterlawfirm.com
johndean8@aol.com

*Counsel to Defendants*