## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHRISTOPHER CHANDLER,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )    **Case No. 1:18-cv-02136-APM** |
| | ) |
| **DONALD BERLIN, *et al*.,** | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## DEFENDANTS' REPLY IN SUPPORT
## OF THEIR MOTION FOR A NEW TRIAL

Defendants Donald Berlin and Investigative Consultants, Inc., respectfully submit this Reply in support of their Motion for a New Trial.

## I.    CHANDLER'S FILING AND CONCEALMENT OF HIS LAWSUIT AGAINST ERINGER DEPRIVED THE JURY OF MATERIAL EVIDENCE THAT REFUTED HIS POSITION ON THE STATUTE OF LIMITATIONS.

Defendants demonstrated that the newly discovered evidence of the lawsuit Chandler filed while he was testifying meets all the requirements for granting a new trial under Rule 59(a)(1)(A). (Dkt. 253 at 2-8.) That evidence would have established Defendants' statute of limitations defense because it destroyed Chandler's excuse for not filing suit against Robert Eringer. The facts supporting the statute of limitations defense are largely undisputed. Chandler does not take issue with Defendants' showing that he would have discovered Mr. Berlin's report years before the filing of this action if he had sued Eringer for the various defamatory statements that Eringer made between 2009 and 2015. (Dkt. 253 at 2-3.) Nor does Chandler contradict Defendants' showing that he claimed ***never*** to have received advice that a lawsuit against Eringer was available in the United States. (Dkt. 253 at 4.) As Chandler's memorandum in opposition now concedes, the filing of his

2024 complaint proved that testimony was false. (Dkt. 255 at 9; admitting that "a different group of lawyers" advised that suing Eringer was possible.)

Chandler offers no facts in rebuttal. Instead, he seeks refuge in the statement in *Diamond v. Davis,* 680 A.2d 364 (1996), that, even though a prospective plaintiff has a "duty to act reasonably under the circumstances in investigating matters affecting her affairs," sometimes "the relevant facts may be such that it may be reasonable to conduct no investigation at all." *Id*., at 372. Chandler asserts that legal advice he received about only one of Eringer's several defamatory publications — his 2009 California complaint against Prince Albert — supports his "no investigation" decision about all of those publications. But as shown below, and in Defendants' memorandum in support of their motion, (Dkt. 253,) that argument does not withstand scrutiny.

### A. Any Advice About the Litigation Privilege Was Not a Reasonable Basis for Chandler's Failure to Sue.

Chandler myopically focuses on the California complaint. He argues that his lawyer advised him that California's litigation privilege granted Eringer immunity for the statements in that complaint and that the advice was correct. (Dkt. 255 at 4-6.) That argument is specious, for several reasons. First, there is no evidence to support it. Chandler claimed not to remember anything specific about the lawyer's advice, including even the identity of the lawyer who offered it. (Dkt. 251-2 at 475:5-476:18.) Chandler even refused his counsel's invitation to testify that the lawyer's advice was based on the litigation privilege. (*Id*. at 578:2-18.)

Second, the litigation privilege does not explain Chandler's failure to sue Eringer for his blog posts or *The Spymaster of Monte Carlo,* the manuscript he posted on the internet. If Chandler in fact relied upon advice about the litigation privilege when he decided not to sue about those publications, that reliance was not a reasonable failure to investigate as referred to in *Diamond*. Nothing about the alleged immunity of statements in a court filing has any bearing on the availability of a lawsuit about statements having no connection to any court case. Like the

statements in Eringer's 2018 email, which forms the basis of Chandler's 2024 complaint, Eringer's internet postings are, in Chandler's own words, "materially different because they are not subject to the litigation privilege." (Dkt. 255 at 6.) Consequently, Chandler's argument that the 2024 complaint would not "tell the jury anything about the reasonableness" of his decision not to sue about **any** of Eringer's statements (Dkt. 255 at 7) is wrong. Chandler told the jury that the advice from the lawyer about Eringer's 2009 complaint was the reason why he declined to sue over Eringer's subsequent publications. (Dkt. 253 at 3-4.) The 2024 complaint, however, demonstrates that there never was any legal obstacle to suing Eringer for his repeated statements made in a non-litigation context.

Finally, the litigation privilege only applies to statements made in furtherance of litigation. To be eligible for the privilege, a statement " 'must function as a necessary or useful step in the litigation process and must serve its purposes' [citation omitted] and 'cannot be satisfied by communications which only serve interests that happen to parallel or complement a party's interests in the litigation,' including vindication in the court of public opinion." *Wynn v. Francis,* 2014 WL 2811692 at *6 (Cal. Ct. App. 6/23/14) (cited by Chandler; Dkt. 255 at 31) (quoting *Rothman v. Jackson,* 49 Cal. App. 4th 1134, 1146-47 (1996)). Chandler himself recognized that the claims in Eringer's complaint must have been disseminated for non-litigation purposes, thereby making those claims ineligible for the privilege. **(**Dkt. 251-10:"Pity to see this type of unfounded assertion/allegation in a court filing, effectively as a sworn statement. Not good for our reputation, even though we know it to be false. Makes me wonder if we should sue this guy (Robert Eringer) to force him to prove the comment or retract it. Clearly this court document is being publicly circulated if Jonathan McDonnell has a copy.")

For all these reasons, the litigation privilege, including any advice about that privilege, was not a reasonable basis for Chandler's failure to take any action against Eringer.

-3-

**B. Chandler Has Failed to Refute Defendants' Showing That Rule 59(a)(1)(A) Requires a New Trial.**

Defendants' motion describes the appropriate standard for granting a new trial based on newly discovered evidence. The evidence must be of facts existing at the time of trial; Defendants must have have been justifiably ignorant of the evidence despite exercising due diligence; the evidence must be admissible and of such importance that it probably would have changed the outcome, and it must not be merely cumulative or impeaching. (Dkt. 253 at 6-7, citing *James Madison Project v. Department of Justice,* 320 F. Supp.3d 143, 148 (D.D.C. 2018)). Defendants satisfied each of those requirements.

**1.   The Evidence Was "Newly Discovered."**

Chandler does not dispute that the evidence of his 2024 complaint, filed October 16, 2024, was in existence during the trial. But he attempts to claim that the evidence is not "newly discovered." His contention is meritless. The assertion that the complaint "was readily available through the D.C. court system," (Dkt. 255 at 8,) ignores the undisputed evidence that: (1) Chandler did not file the complaint until the afternoon of his testimony; (2) his attorneys filed the case in Superior Court, not this Court, to avoid the obligation imposed by Local Civil Rule 40.5(b)(3) to "immediately notify" Your Honor and opposing counsel of the filing of a related case in this Court; and (3) even after they filed the complaint, his attorneys repeatedly insisted that they never even threatened to sue Eringer. (*See* Dkt. 253 at 4-6.) Notably, he does not respond to Defendants' showing that they were "justifiably ignorant" of the filing of the suit and does not contend that "due diligence" would have required daily monitoring of the federal and local courts in at least three jurisdictions. (Dkt. 253 at 7.) [1]

---

[1] Indeed, since Eringer is a California resident and Mr. Berlin received the email that is the subject of Chandler's complaint in Virginia, it was unlikely that the District of Columbia would have been the forum for Chandler's suit.

Chandler further contends that "[c]ourts routinely hold that publicly available documents cannot qualify as newly discovered evidence." (Dkt. 255 at 8, citing *International Center for Tech. Assessment v. Leavitt,* 468 F. Supp. 2d 200, 207 (D.D.C. 2007).) But the cases the court relied on did not confront a situation remotely like this case, in which the public filing occurred during the trial, and contradicted the plaintiff's trial testimony, and his counsel endeavored to conceal it. *See Scutieri v. Paige,* 808 F.2d 785, 788, 793-94 (11th Cir. 1987) (trial in 1984; newly discovered evidence was from cases filed in 1972 and 1974); *Music Research, Inc. v. Vanguard Recording Soc'y.,* 547 F. 2d 192, 196 (2d Cir. 1976) (record released three months before trial). In *International Center* itself, the evidence consisted of published articles*,* with no indication of how long before the trial they were published. The result in each of these cases turned on the parties' diligence in discovering the publicly available documents, not simply their status as public documents. Indeed, in *Canady v. Erbe Elektromedizin GmbH,* 99 F. Supp.2d 37 (D.D.C. 2000), a case that Chandler relies upon, (Dkt. 255 at 7,) Judge Urbina, the author of *International Center,* granted relief based on newly discovered evidence consisting of publicly available documents in the United States Patent Office. 99 F. Supp.2d at 45-49.[2] *See also Cato Inst. v. FBI,* 2024 WL 95198 at *4 (D.D.C. 1/9/24) ("public availability of documents . . . is best considered a factor in the due-diligence analysis, not an absolute bar to relief.")

Chandler also claims that Defendants knew all along that he would sue Eringer, so evidence that he actually did so was of little consequence. However, he has no explanation for why Defendants should have known this when his own lawyers assured the Court that they never even threatened to sue. Eringer's testimony and defense counsel's closing argument both asked the jury to infer that Chandler's lawyers sent their threatening letter, (Dkt. 251-6; Dkt. 251-2 at 766:8-11,)

---

[2] The documents were filed in March and July 1997. 99 F. Supp.2d at 45. They became available to the public 18 months later. 35 U.S.C. § 122(b)(1); 37 C.F.R. Sect. 1.11(a).

to keep Eringer from testifying. Eringer regarded the letter as "an attempt to intimidate me," and believed Chandler's attorneys "either are considering a lawsuit against me or . . . they want to communicate to me that maybe it would be wise not to show up here as a witness this week." (Dkt. 252-1 at 632:15-16; 632:25-633:3.) Similarly, Defendants' closing argument said simply that Chanler's attorneys were threatening to sue in order to intimidate Eringer: "Now, are they going to sue him? I don't know. Maybe it's just an empty threat." (*Id*. at 766:8-9.)

The jury needed to evaluate the reasonableness of Chandler's years-long refusal to sue Eringer and, in particular, whether Chandler was reasonable in not filing suit for any of Eringer's previous defamatory publications. There is a world of difference between, on the one hand, asking the jury to draw an inference that Chandler's attorneys' letter threatened a suit to intimidate Eringer and, on the other hand, the irrefutable evidence that he actually filed suit, thereby demonstrating that suing Eringer was possible, regardless of whatever advice he received.

### 2.   The Evidence Was Admissible and Material.

The discussion above refutes Chandler's claims that the newly discovered evidence is inadmissible and not likely to lead to a different result. Chandler injected into the case the issue of whether it was reasonable for him not to sue Eringer and thereby forgo the opportunity to discover the documents in Eringer's possession, including Mr. Berlin's report. He supported his position by claiming he relied on legal advice. Defendants had the right to rebut that evidence by showing he acted unreasonably. Evidence that he acted inconsistently with the supposed advice is admissible to show that his earlier refusals to act were unreasonable. If there was no legal bar to his 2024 suit against Eringer, there most likely was no bar to any earlier suit, at least with respect to Eringer's non-litigation statements. Evidence of the 2024 suit, therefore, was relevant and admissible. Fed. R. Evid. 401 (Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action.")

Defendants have also met their burden of showing the materiality of the newly discovered evidence, *i.e.,* that it "is of such importance that it probably would have changed the outcome." *James Madison Project v. Department of Justice,* 320 F. Supp.3d 143, 148 (D.D.C. 2018). If the jury knew the truth — that Chandler had sued Eringer — they would have learned that the litigation privilege did not bar Chandler's 2024 lawsuit and that there was no material difference between Eringer's internet postings and his 2018 email. Neither were subject to the litigation privilege, which Chandler now claims was the only basis for his attorney's advice (even though he never said so at trial.) Because the 2024 complaint proves that suing Eringer for non-litigation statements was possible, it follows that suing him for his earlier non-litigation statements also was possible. The jury most likely would have concluded, therefore, that Chandler's failure to sue was not a reasonable failure to investigate as contemplated by *Diamond.*

### 3.   The Evidence Is Not "Merely Impeaching."

Chandler claims that the only purpose for introducing his 2024 complaint is "classic impeachment." (Dkt. 255 at 8.) Calling it "classic" does not make it so. His lawsuit is substantive evidence that suing Eringer was possible, thereby contradicting his argument that he acted reasonably when he declined to sue him earlier. Whether there was a legal obstacle to his suing Eringer was a contested issue at trial. The filing of the 2024 complaint is conclusive evidence refuting his claim that an action against Eringer was legally impossible.

To be sure, the evidence also shows that Chandler testified falsely when he said he never was advised that he could sue Eringer. But that does not mean Defendants' motion should be denied on the ground that the newly discovered evidence is "merely . . . impeaching." *See, e.g. James Madison Project v. Department of Justice,* 320 F. Supp.3d 143, 148 (D.D.C. 2018) (newly discovered evidence can not be "merely cumulative or impeaching.") Evidence contradicting one party's position often will impeach the credibility of that party's witnesses, but that does not mean

the evidence is only impeachment. For example, a plaintiff in an automobile accident case may testify that the traffic light was green. A defendant's evidence that the light was red is substantive evidence refuting the plaintiff's case, even though it also impeaches the plaintiff's credibility. Similarly, the evidence that Chandler did sue Eringer demonstrates that he could have sued earlier, even if it also shows that Chandler was not truthful. Because the evidence would have established a contested factual issue, it was not "merely impeaching." Rule 59 (a)(1)(A), therefore, allows this Court to rely on that evidence to order a new trial.

### C. Chandler Has No Persuasive Response to Defendants' Rule 60(b)(3) Argument.

Defendants demonstrated an alternative basis for granting a new trial based on Plaintiff's false testimony that he never was advised that he could sue Eringer. Rule 60(b)(3), which authorizes relief from judgment for "fraud, . . . misrepresentation, or misconduct by an opposing party," is an independent basis for granting this motion. (Dkt. 253 at 8-10.) Plaintiff's cursory response, (Dkt. 255 at 9,) misrepresents Defendants' argument and the record in this case and ignores relevant authority.

Contrary to Plaintiff's statement, the basis for relief under Rule 60(b) is not simply that Chandler falsely testified "that his lawyers in 2010 told him he could not sue Eringer for the statements in Eringer's 2009 California complaint." (Dkt. 255 at 9.)[3] Our Rule 60(b)(3) motion relies on Chandler's concededly false testimony that he never was advised that he could sue

---

[3] Chandler's claim that he "testified — truthfully, just as he had at his deposition years earlier" about the supposed advice from a lawyer, (Dkt. 255 at 9,) lacks any support in the record. Chandler admitted that his responses to deposition questions about his reasons for not suing Eringer never mentioned any advice from a lawyer. (Dkt. 251-2 at 563:22-564:12.) While he speculated that he said so in other portions of his deposition testimony, (*id.,* at 476:3-5,) his counsel never introduced any such deposition testimony on redirect. That's because no such testimony exists.

Eringer in the United States.[4] That testimony constitutes either fraud or misrepresentation under Rule 60(b)(3), and it prevented Defendants from fully and fairly presenting their statute of limitations defense. (Dkt. 23 at 9-10.) Plaintiff offers no response to the argument that Defendants actually made.

Plaintiff also fails to discuss the decision in *Cap Export, LLC v. Zinus, Inc.,* 996 F.3d 1332 (Fed. Cir. 2021). Like Chandler, a party in *Cap Export* gave "literally incorrect" testimony about a "highly material" issue. *Id.,* at 1342. The court affirmed the grant of Rule 60(b)(3) relief because the misrepresentation "prevented [the adverse party] from fully and fairly presenting its case." *Id.* As in *Cap Export,* Chandler's false testimony prevented Defendants from fully and fairly presenting their statute of limitations defense. If the jury knew the true facts, Defendants could have shown that there was no legal obstacle to suing Eringer for his previous defamatory statements. But Chandler's denial that he ever received advice that he could sue Eringer, coupled with his failure to give any details about the advice he received, prevented Defendants from fully and fairly presenting the jury with evidence that Chandler's failure to sue was unreasonable. Plaintiff's failure to discuss *Cap Export* in any way is powerful proof of that case's persuasive authority and we respectfully suggest that the Court should follow it.

## II.    CHANDLER FAILS TO DEMONSTRATE THE STATUTE OF LIMITATIONS INSTRUCTION WAS LAWFUL OR HARMLESS.

Defendants identified at least two material errors in the Chandler's statute of limitations instruction that are not harmless. Although he now attempts to retreat from his position, Chandler conceded the factual basis of Defendants' argument: that if Chandler had exercised reasonable diligence by suing Eringer when he had knowledge of injury, its cause, and some evidence of

---

[4] As noted above, Chandler has conceded that, contrary to his trial testimony, he **did** receive legal advice that a lawsuit against Eringer was possible. (Dkt. 255 at 9) (admitting that "a different group of lawyers," *i.e.,* his present counsel, advised that suing Eringer was possible.)

wrongdoing, he would have discovered the Limited Report. (Dkt. 253 at 2-3.) Furthermore, there can be no dispute that Chandler possessed each of these three elements that, according to District of Columbia law, commenced the statute of limitations on his claims on several separate occasions long before September 18, 2017. *Diamond v. Davis,* 680 A.2d 364, 372-81 (D.C. 1996) ("*Diamond*").

Because the instruction did not mention *Diamond's* three requirements, (while Defendants' proposed instruction expressly did), the jury was never instructed as to the basic requirement of District of Columbia law. Furthermore, the instruction failed to inform the jury that the *Diamond* factors imposed on Chandler a duty to investigate and, further, that the knowledge Chandler already had (Eringer's serial allegations of his criminal activity), or would have obtained through a reasonable investigation, were sufficient to put him actual or inquiry notice and commence the running of the statute of limitations no later than in 2015. (Dkt. 253 at 18.)

In his Opposition, Chandler makes two arguments; neither comes close to refuting Defendants' Motion. **First**, notwithstanding that the instruction largely ignores the seminal District of Columbia case on point, Chandler argues that the instruction "follows D.C. law." Chandler asserts the instruction gave the jury sufficient latitude to consider a constellation of factors in determining whether Chandler had a duty to act. (Dkt. 255 at 8-130.) However, these factors are not spelled out for the jury and the jury was left to guess which factors and which facts it would consider dispositive. Considering the straightforward language in *Diamond*, Chandler's vague instruction virtually guaranteed the jury was as likely to rely on irrelevant facts as on dispositive facts. **Second**, Chandler argues even if the instruction was erroneous, Defendants have failed to identify any prejudice caused by the erroneous instruction. (*Id*. at 13.) That argument is easily refuted and discussed below at II.B.

## A. THE JURY WAS NOT PROPERLY INSTRUCTED AS TO THE STATUTE OF LIMITATIONS.

In the absence of any reference to the guidelines in *Diamond,* Chandler is left to argue that his instruction "relieves the jury" of a "rigid duty." (Dkt. 255 at 9.) In fact, the instruction as written relieved the jury of any "duty" whatsoever, other than to decide if Chandler "acted reasonably[y]" under the circumstances. (*Id*.) This, Chandler argues, "fairly presents the applicable legal principals and standards." (*Id*, at 8.) To the contrary, the general statement that Chandler says summarizes the instruction fails to articulate any of the applicable principles and standards against which Chandler's actions should have been measured. This is true whether the focus is on what Chandler knew or what Chandler would have learned had he done a reasonable investigation.

Chandler relies on *Czekalski v. LaHood*, 589 F.3d 449, 455 (D.C. Cir. 2009), for this proposition, but that case does not inform the issue before the Court. There the plaintiff argued the trial court erred by refusing to give a "missing evidence" instruction. The Court of Appeals rejected her argument in the absence of any alleged missing evidence: "Czekalski has not shown that such an instruction would be apt in this case; she has not identified any evidence peculiarly available to the DOT—evidence which it did not produce—that would shed light on her claim." *Id*.

*Czekalski* does not apply here, where there was no disputing overwhelming evidence that Chandler had knowledge of injuries, their cause, repeated evidence of wrongdoing, and that Eringer had documents to support his statements. Nor does Eringer having been the source of the injury provide a safe harbor for Chandler. Had the jury been properly instructed as to Chandler's duty to investigate, it would have concluded that Chandler's proper discharge of his duty would have revealed not only Eringer's repeated publications, but Defendants' single publication to Eringer. Instead of being properly instructed that a reasonable investigation could have included a lawsuit, the instruction does not mention a lawsuit, instead referring only to whether Chandler was on inquiry notice of the Limited Report. But if a reasonable investigation included a lawsuit, and

-11-

a lawsuit would have revealed the Limited Report, this case is time-barred. *Estate of Chappelle v. Sanders*, 442 A.2d 157, 159 (D.C 1982).

Chandler repeatedly returns to the notion that because the reasonableness of the legal duty to investigate is "highly fact-bound," citing *Diamond*, (Dkt. 255), the jury did not need to be instructed as to the facts that, if found, constitute a minimum basis to commence a statute of limitations. Respectfully, that logic is backwards. Chandler dismisses the Court of Appeals' decision in *Chapelle* based on nothing more than the argument that just because one plaintiff had a duty to investigate a tortfeasor does not mean in another, different case, a different plaintiff would have such a duty. But that is exactly what *Chappelle* holds: "concealment of the identity of liable parties, unlike concealment of a claim, is insufficient to toll the statute of limitations." 442 A.2d at 159. Here, Defendants took no steps to conceal their identity, and every relevant consideration requires the conclusion that if Chandler had sued Eringer in 2010, 2011, 2012, or 2016, Chandler would almost immediately have received the Limited Report and learned Defendants' identity. Instead, he chose to "leave the curiosity to others" because at that time the scope of Eringer's publications were relatively minor. The only thing that changed in 2017 was the widespread publication of the same information. There is no authority for the proposition that a plaintiff can ignore its duty to act unless and until the damage becomes excessive. The extent of damage has no tolling effect on a statute of limitations, nor does it affect when a claim arises. Yet that is exactly what occurred in this case.

Chandler then pulls a sleight of hand by conflating knowledge of a tort that starts the statute running with knowledge of identity of the tortfeasor – he claims that *Chapelle* is distinguishable since there was "no question about when the plaintiff was aware of the underlying tort (the hit and run) giving her a cause of action. In this case, the jury did not buy … that Chandler was on notice of [the Limited Report.]" (Dkt. 255 at 12.) But there is no dispute that as early as 2010 Chandler

knew Eringer had defamed him, knew Eringer had documents, and if the jury had been properly instructed, it would have found Chandler had a duty to investigate the known harm and reveal the existence of the known documents.

Given that the instruction lacked any focus on Chandler's duty, its trigger, and its discharge, yet informed the jury that Chandler was permitted to make mistakes and need not have made a "superhuman effort," the jury was free to not even consider that Chandler knew he'd been defamed and had reason to believe Eringer was not the only potential defendant. The jury was not instructed that it could view these facts as putting Chandler on inquiry notice as to Berlin. Instead of undertaking any inquiry, Chandler affirmatively chose to do nothing and accepted the risk that, as Chandler himself put it, "[the defamation] would be [subsequently] circulated publicly for some time," (Dkt. 252-1 at 342:17-18), prompting him to change his mind about pursuing a lawsuit several years too late.

The other cases on which Chandler relies do not support the instruction that was given or do not inform the issues in this case. In particular, the Court of Appeals' decision in this case does not purport to state District of Columbia law for the purpose of drafting a jury instruction. To the contrary, the Court of Appeals' decision relies extensively on *Diamond*. In *Diamond*, however, the District of Columbia Court of Appeals *did* intend to state a "Single Standard for all Discovery Rule Cases."

> Once the plaintiff actually knows, or with the exercise of reasonable diligence would have known, of some injury, its cause-in-fact, and some evidence of wrongdoing, then she is bound to file her cause of action within the applicable limitations period, measured from the date of her acquisition of the actual or imputed knowledge. ***Not only is this identity of standard compelled by the policies that underlie our accrual rules, but we hope that in many cases it will eliminate***

> *much complex and confusing litigation concerning the characterization of the*
>
> *parties' conduct in committing, concealing and investigating wrongdoing*.

680 A.2d at 381 (emphasis added). Furthermore, at the time of the Court of Appeals' decision there was still a question of fact as to whether suing Eringer would have necessarily revealed the Limited Report. The Court of Appeals questioned whether application of the summary judgment standard permitted dismissal of Chandler's claims against Berlin based on, *inter alia*, the nature of Berlin's and Eringer's relationship and whether Chandler was on inquiry notice concerning Berlin. *Chandler v. Berlin*, 998 F.3d 965, 975 (C.A.D.C. 2021).

As conceded by Chandler, by the time the case went to the jury there was no question that a lawsuit would have revealed the Limited Report. A properly instructed jury would have found "reasonable diligence" on the part of Chandler would have required him to file a lawsuit years before he actually did. *Id*.

Accordingly, the jury instruction is so vague as to impose no standard that comes close to the law as set forth in *Diamond*. To the contrary, it provided the jury with no guidance on the two key questions: First, when does a claim arise, (when is a plaintiff on actual notice?) and second, when does a plaintiff have a duty of inquiry (when is a plaintiff on inquiry notice?). As instructed, the jury permitted Chandler to wait for nearly ten years despite repeated notice of his claim and that bringing the claim would have revealed information as to other defendants. By the time he acted, Chandler was caught up in a media circus. Only then did he exercise any diligence whatsoever. Had the jury been apprised of the express language in *Diamond* (as intended by the District of Columbia Court of Appeals), the jury's verdict would (and should) have been different.

## B. DEFENDANTS NEED NOT SHOW THEY WERE "PREJUDICED" BY THE ERRONEOUS INSTRUCTION.

Chandler's second argument erroneously equates a showing of prejudice with a showing that the jury instruction was not harmless. (Dkt. 255 at 13.) However, as Chandler concedes, it is

enough that it is highly probable that the erroneous instruction affected the outcome of the case. (*Id*.). First, Chandler argues that there were no juror comments that could indicate confusion in the jury. To the contrary, before rendering an extraordinarily high verdict, the jury asked whether they could recommend that Defendants apologize to Chandler. While some speculation is unavoidable, if the jury was unsure about the statute of limitations but nevertheless did not want to convey their agreement with Defendants' conduct, one possible compromise would be to find in favor of Defendants on statute of limitations grounds while recommending an apology by Berlin.

Chandler's second argument is simply a repeat of his main argument: that the instruction was correct and therefore cannot have caused "prejudice." Chandler argues if an objection was sufficient to demonstrate prejudice, then there would be no such thing as harmless error. That is a straw man argument. Defendants do not contend that because the instruction was objectionable, it cannot have been harmless. Instead, they argue the instruction was objectionable because it did not incorporate any of the rules the District of Columbia Court of Appeals clearly stated in *Diamond*. Without *Diamond's* rules as to when a duty to investigate arises and what constitutes a diligent inquiry, the instruction was not only erroneous but cannot be deemed harmless. Contrary to Chandler's argument, the instruction was inherently prejudicial, requiring a new trial.

## III.   CHANDLER'S OPPOSITION DOES NOT CHANGE THE ABSENCE OF ANY EVIDENCE THAT BERLIN REASONABLY FORESAW REPUBLICATION OF THE LIMITED REPORT TO THE CIA.

Chandler's Opposition does not identify any record evidence that Berlin foresaw republication of the Limited Report to the CIA. Instead, he relies on a tautology: the jury either thought republication was foreseeable or it did not think republication was foreseeable. Since, according to Chandler, the evidence was "capable of either of [these] two inferences," the jury must have chosen to believe republication was foreseeable, and it would be unlawful for this Court to "overrule" that inference. (Dkt. 255 at 16-17.) Had there been evidence from which the jury

-15-

could reasonably infer foreseeability, Chandler's argument might have some merit. However, Chandler introduced no evidence whatsoever that Berlin could have foreseen Eringer's republication to the CIA, nor did he introduce any evidence that republication to the CIA of some information in the Limited Report caused him any damage.

### A.  PUBLICATION TO THE CIA WAS NOT REASONABLY FORESEEABLE.

Chandler's argument rests on two wobbly legs. First, that because *some* republication may have been foreseeable (to Eringer's unknown "ultimate client") then *any* republication was foreseeable. Chandler argues "[t]his is tantamount to an admission that Berlin foresaw that the allegations would likely be passed along, because he knew Eringer was acting as an intermediary." (Dkt. 255 at 17.) Not surprisingly, Chandler cites no authority for this proposition, which, if adopted by the Court, renders *any* foreseeable republication sufficient to impose liability for *all* republications. That proposition was considered and rejected by the Court of Appeals. *Chandler*, 998 F.3d at 977.

Second, Chandler assembles bits of unrelated evidence (such as Claire George being a former CIA agent and a source of the information in the Limited Report, Eringer having had a relationship with the FBI, *etc*.) with evidence that Berlin did not give any thought to what Eringer would do with the Limited Report in an effort to cobble together an argument that disclosure to the CIA was foreseeable. However, the evidence does not support the weight Chandler would have the Court put on it. Just because Eringer may have been associated with the FBI does not make it foreseeable that he would republish the Limited Report to the CIA. Nor does Clair George's former position at the CIA make it any more or less likely what *Eringer* would do with the Limited Report.

The evidence on which Chandler relies, even when viewed in the aggregate, falls well short of the standard set out by the Court of Appeals in this case: "republication under circumstances at least roughly similar to what in fact occurred must have been foreseeable." *Chandler*, 998 F.3d at

977. There was no such evidence from which the jury could have concluded Berlin foresaw Eringer's republication to the CIA. Chandler points to no knowledge on the part of Berlin that is "roughly similar" to Eringer publishing the Limited Report to the CIA. Accordingly, pursuant to the law of the case and the District of Columbia cases on which the Court of Appeals relied, Eringer's publication to the CIA was not reasonably foreseeable to Berlin.

### B. WHERE, AS HERE, IT IS IMPOSSIBLE TO KNOW WHETHER THE JURY'S AWARD WAS BASED ON IMPERMISSIBLE GROUNDS, A NEW TRIAL IS WARRANTED.

Because there was no evidence that publication to the CIA was foreseeable to Berlin, the general verdict renders it impossible to know whether the jury impermissibly relied on that publication in rendering its verdict and award. (Dkt. 253 at 14.) The judgement must therefore be reversed and the case remanded. *Greenbelt Co-op Pub. Assn. v. Bressler*, 398 U.S. 6, 11 (1970). In his Opposition, Chandler cites several cases in which various courts decline to "parse" a general verdict in the absence of some other factor, such as an erroneous instruction. Here, the "other factor" is the amount of the award. In the absence of any evidence that Eringer's republication to the Prince caused Chandler any damage, the amount of the award is so great as to "shock the conscience." *Longvine v. District of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1987). When the amount of the award is considered, the absence of any damage attributable to publication to the Prince and the absence of any evidence Berlin reasonably could have foreseen publication to the CIA, it impossible to determine whether the jury's award relied on a publication that was not foreseeable to Berlin. The verdict, therefore, should be thrown out.

## IV. CHANDLER'S OPPOSITION DOES NOT SUPPORT THE JURY'S SHOCKING AWARD.

It is not surprising that Chandler's response to Defendants' arguments on damages selectively quotes from a passage in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974) describing the then-current state of defamation law. (Dk. 255 at 30.) He relies on the Court's statements that

a jury was permitted to "award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred," and that the jury's discretion was "largely uncontrolled." *Id.,* at 349. But the Court hardly delivered an unqualified endorsement of those principles.

> The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms. Additionally, the doctrine of presumed damages invites juries to punish unpopular opinions rather than to compensate individuals for injury sustained by the publication of a false fact. More to the point, ***the States have no substantial interest in securing for plaintiffs . . .gratuitous awards far in excess of any actual injury.***

*Id.,* at 349-50 (emphasis added.)

Defamation law in the District of Columbia in 2024 is a far cry from the law described by *Gertz* 50 years ago. Instead of "uncontrolled discretion," judges and juries must award damages in accordance with *Ingber v. Ross,* 479 A.2d 1256 (D.C. 1984). Although *Ingber* recognized that "the fact finder has substantial latitude in awarding compensatory damages," *id.,* at 1265, it established guidelines for the exercise of that discretion. The Court identified several factors to be considered, including "the seriousness of the defamatory charge, the extent of distribution of the defamation, the extent to which the communication was actually believed, and plaintiff's prominence and standing in the community." *Id*. (Citation omitted.)

Defendants showed that cases applying the *Ingber* factors consistently have awarded compensatory damages that are orders of magnitude lower than $4 million when the plaintiff did not prove actual harm. Chandler responds (1) that he did prove harm resulting from Mr. Berlin's

report; (2) that the cases cited by Defendants are distinguishable; and (3) that much larger awards in comparable cases have been upheld. None of these arguments withstand scrutiny.

### A. Chandler did not prove actual harm.

Chandler claims the republications to the CIA and Prince Albert resulted in "heightened scrutiny from police and customs officials," (Dkt. 255 at 25,) but ignores his own testimony that he has no idea why those encounters occurred and is aware of no reason why Mr. Berlin's report had anything to do with them. (*See* Dkt. 253 at 24.) He also ignores his testimony that the embarrassment and mental distress he suffered from reading Mr. Berlin's report was the result of Eringer's charges being "circulated publicly for some time. (Dkt. 253 at 25.) Defendants are not liable for any harm resulting from that public circulation, *Chandler v. Berlin,* 998 F.3d 965, 975-978 (D.C. Cir. 2021), and Chandler offered no evidence of any emotional injury arising out of the republications to either the CIA or Prince Albert, which occurred more than 10 years before the public circulation. Nor does he cite any evidence that Prince Albert or the CIA believed any of the information republished to them or that his reputation with them was damaged in any way. Chandler, therefore, was entitled only to presumed damages without proof of any actual harm.

### B. Nominal Damages Are Appropriate Compensation.

Chandler does not effectively rebut Defendants' showing that nominal damages are sufficient compensation for a successful defamation plaintiff who fails to prove: (1) that the defamatory statements caused actual harm; (2) that any recipient believed the statements; and (3) the statements were not widely disseminated. Instead, he ignores important authority and attempts to distinguish other cases on irrelevant grounds.

Chandler does not mention *Szymkowicz v. Frisch,* 2020 WL 4432240 (D.D.C. 7/3/20), which held that the plaintiff could not rely on presumed damages to meet the $75,000 jurisdictional amount for a diversity case in the absence of allegations explaining how he was harmed. Even

adding a claim for punitive damages was insufficient to meet the threshold. *Id.,* at *8-9. Without an explanation of "how he has suffered his alleged damages," *id*., at 6, it appeared to a legal certainty that the plaintiff's damages would not exceed $75,000. *Id.,* at *4-7. "Whereas plaintiff treats presumed damages as amounting to a blank check, in fact a 'nominal recovery' can be 'sufficient to vindicate injury to reputation.' " *Id.,* at *7, quoting *Grossman v. Goemans*. 631 F. Supp. 972, 974 (D.D.C. 1986) (discussed below.)

Defendants cited other cases in which a plaintiff relied solely on presumed damages with no proof of actual harm, no evidence of widespread dissemination, and no indication that the recipients of the defamatory statements believed them.  (Dkt. 253 at 26-28, citing *Grossman v. Goemans*. 631 F. Supp. 972 (D.D.C. 1986); *Lothschutz v. Carpenter,* 898 F.2d 1200 (6th Cir. 1990); and *Ayala v. Washington,* 679 A.2d 1057 (D.C. 1996). Chandler's discussion of those cases is a classic example of distinctions without any differences. For example, he complains that *Grossman* and *Lothschutz* were both bench trials. (Dkt. 255 at 29.) But there is no difference between the standards applied by judges and those applied by juries when awarding damages in defamation cases. *Grossman* expressly applied the *Ingber* factors in determining that only nominal damages were appropriate, 631 F. Supp. at 974, and *Lothschutz,* relied on *Grossman's* analysis in coming to the same conclusion. *Lothschutz,* 898 F.2d at 1204-05 ("While the plaintiffs may avail themselves of the presumption concerning general damages, the presumption entitles them to nothing more than what the district court ordered — nominal damages.") (citing *Grossman*.)

Chandler offers no other criticism of *Lothschutz.* He claims *Grossman's* damages analysis is superficial (Dkt. 255 at 29,) but he is wrong. Judge Gasch's opinion notes: (1) that plaintiffs offered no evidence that they suffered any harm; (2) that he would apply the *Ingber* standards to determine damages; (3) that the allegations against the plaintiffs were serious; (4) that the allegations were published to more than 170 persons; (5) as attorneys, plaintiffs had an interest in

maintaining their reputations; and (6) there was no evidence that anyone believed the defamatory statements. 631 F. Supp. at 974. Aside from the fact that the republications to Prince Albert and the CIA were not as widely distributed, the evidence discussed in *Grossman* is not materially different from the record in this case.

Chandler's attempt to distinguish *Ayala* fares no better. He claims that Ayala was accused of smoking marijuana, which he believes was a less serious offense than the money laundering described in Mr. Berlin's report. He neglects to mention that Ayala was a commercial airline pilot and any use of marijuana in violation of FAA regulations was "misconduct that could have a significant effect on public safety." 679 A.2d. at 1068. Ayala, therefore, was accused of misconduct at least as serious as Chandler's alleged financial misdeeds, yet the jury awarded only nominal damages due to his failure to prove that the recipients of the defamatory statements believed them. Paradoxically, Chandler attempts to distinguish *Ayala* on the ground that the FAA and Ayala's employer "determined that the drug-use allegations were not true," (Dkt. 255 at 30,) without acknowledging that he offered no proof that either the CIA or Prince Albert believed any of the republications that Eringer communicated to them.

Chandler also dismisses two cases cited by Defendants in which substantially lower damages were awarded to plaintiffs who, unlike Chandler, proved significant harm to their reputations. He says that because *LaRue v. Johnson,* 2018 WL 1967128 (D.D.C. 2/22/18) and *United States ex rel. Guo v. National Endowment for Democracy,* 2022 WL 503765 (D.D.C. 2/18/22) were default cases, "the damages were determined by the court without any proof at all." He is wrong. Both decisions discuss the specific proof that resulted in awards of $40,000 to the plaintiffs. *La Rue,* 2018 WL 1967128 at *9 (applying *Ingber* and awarding damages for widely disseminated false accusations that isolated plaintiff from friends and family and damaged her

reputation); *Guo,* 2022 WL 503765 at *14 (applying *Ingber* and awarding damages for widely disseminated statements that isolated plaintiff from both his business and personal communities.)

Chandler also provides a laundry list of cases that have awarded higher presumed damages in defamation cases, but none of those cases is comparable. The record in *Freeman v. Giuliani,* 732 F. Supp.3d 30 (D.D.C.2024) contained substantial evidence of "the abuse [plaintiffs] suffered as the result of Giuliani and his co-conspirators' defamatory statements." *Id.,* at 55. The plaintiffs described death threats, panic attacks, and harassment, *id.,* with more than 710,000 largely negative online references to them. *Id.,* at 59.

*Lafferty v. Jones,* 229 Conn. App. 487 (2024) was an action against Alex Jones and related companies by family members of the victims of the Sandy Hook school massacre. The plaintiffs were defamed by Jones' broadcasts that the massacre was a hoax. Unlike Chandler, they presented specific proof of the harm caused by Jones' repeated claims, including "traumatic threats and harassment," such as "death threats, claims that the plaintiffs were actors, and accusations that the deceased victims of the Sandy Hook massacre were not real or were still alive. Additionally, all of the plaintiffs testified to the mental anguish and emotional harm they suffered as the result of the harrowing threats they experienced." *Id.,* at 536. Data from social media platforms established that Jones' defamatory statements "reached a minimum audience of 550 million people between 2012 and 2018." *Id.*

*Hearts with Haiti, Inc. v. Kendrick,* 141 F. Supp.3d 99 (D.Me. 2015), is another case where the plaintiff, unlike Chandler, provided "overwhelming" evidence of serious harm resulting from the defamation. *Id.,* at 115. The defendant accused the plaintiff of sexually abusing multiple young boys in a Haitian orphanage. Those allegations were broadly disseminated in both the United States and Haiti over a period of years and resulted in government investigations, plaintiff's arrest and imprisonment for months in a Haitian jail, loss of contributions, and demonstrated harm to the

plaintiff's reputation. *Id*. Chandler proved nothing comparable. He identified no consequences from the limited republications to the CIA and Prince Albert. As described above, any harm to his reputation or any emotional distress was the result of publicity in 2017 and 2018 for which Mr. Berlin is not responsible.

The decision in *Wynn v. Francis,* 2014 WL 2811692 (Cal. App. 6/23/14) was not an appeal about the amount of damages, so the court did not give a complete description of whatever harm the plaintiff suffered. Nevertheless, the court noted that the defamatory statements were broadcast nationwide on both TMZ and Good Morning America, *id.,* at *4-*7, showing that they had a much broader audience than Mr. Berlin's report.

*Cantu v. Flanagan,* 705 F. Supp. 2d 220 (E.D.N.Y. 2010), also does not help Chandler, for several reasons. Although the court upheld an award of $150 million in non-economic damages, *Cantu* was not a case in which the plaintiff failed to prove actual harm. The court's primary reason for upholding the verdict was that plaintiff had suffered economic damages of $38 million, along with the loss of business contracts in excess of $300 million. *Id.,* at 230. Citing New York case law, the court concluded that an approximate 4:1 ratio between the $38 million economic loss and non-economic damage award was appropriate. *Id.,* at 230-31. Because Chandler did not prove ***any*** economic harm, *Cantu* is inapplicable. Moreover, the defamation was circulated world-wide, resulting in criminal investigations in both Mexico and the United States, and the plaintiff experienced significant damage to his reputation as the result of the defamation. *Id., at* 224, 228-229. Chandler made no comparable showing here as there is no evidence that the republications to the CIA or Prince Albert had any effect on his reputation.[5]

---

[5] Two other cases cited by Chandler have nothing to do with the issues in this case. *Anagnost v. Mortgage Specialists, Inc.*, 2017 WL 7690898 (N.H. Super Ct. 9/29/17) is simply a verdict form. It says nothing about the underlying facts of the case or whether damages were awarded in the absence of any proof of harm. And the recent controversial settlement between Donald Trump and

In *Eshelman v. Puma Biotechnology,* 2 F.4[th] 276 (4th Cir. 2021), the court vacated a damages award of more than $22 million because there was "no evidence whatsoever of actual harm sufficient to support the damages award." *Id.,* at 284. In arriving at that holding, it distinguished several of the cases that Chandler relies on here. *Id.* (discussing *Cantu, Anagost,* and *Wynn.*) We respectfully submit that this Court should follow the reasoning of that case and reach a similar conclusion.

### C. Chandler's Only Argument on Punitive Damages Ignores Controlling Authority.

Defendants showed that the jury's punitive damages award necessarily must be reduced if their motion to reduce the compensatory award is granted. (Dkt.253 at 30-32.) Chandler's only response is that the plurality opinion in *TXO Products Corp., v. Allied Resources Corp.,* 509 U.S. 443 (1993), affirmed a $10 million punitive damages award in a case in which the plaintiff recovered actual damages of only $19,000. (Dkt. 255 at 32.) He fails to acknowledge, however, that *State Farm Mut. Ins. Co. v. Campbell,* 538 U.S. 408 (2003), has significantly eroded the precedential value of *TXO.* After *State Farm,* ratios between punitive and compensatory damages greater than 4:1 are "close to the line of constitutional impropriety," and ratios in excess of single digits are rarely likely to meet due process standards. *Id.,* at 425. Chandler's failure even to mention *State Farm* is sufficient ground for rejecting his argument. Defendants also argued that the punitive damages award should not stand in light of Chandler's aggressive litigation strategy and his counsel's improper closing arguments. (Dkt. 253 at 31.) Chandler offers no response, and those arguments should be treated as conceded.

---

ABC News was likely prompted by the desire of Disney, ABC's parent, not to provoke the incoming President. Moreover, the statement at issue was broadcast nationwide, a far broader distribution than Eringer's republications to Prince Albert and the CIA.

## <u>CONCLUSION</u>

For all of the foregoing reasons, as well as those in their Opening Brief, Defendants respectfully request the Court order a new trial or in the alternative a remittitur of the damages to a nominal amount.

January 2, 2025                                                        Respectfully submitted,


                                                                        _***/s/ Steven M. Oster***_
                                                                        John P. Dean
                                                                        D.C. Bar No.   362904
                                                                        Steven M. Oster
                                                                        D.C. Bar No. 376030
                                                                        **THE OSTER LAW FIRM**
                                                                        1320 19th Street, N.W., Suite 800
                                                                        Washington, D.C. 20036
                                                                        (202) 596-5291 (p)
                                                                        (202) 747-5862 (f)
                                                                        steve@osterlawfirm.com
                                                                        johndean8@aol.com

                                                                        *Counsel to Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify I caused a true and correct copy of the attached Reply in Support of Defendants'

Motion for a New Trial and Supporting Papers to be filed using the Court's CM/ECF system,

thereby serving counsel of record.

January 2, 2025                                        *<u>/s/ Steven M. Oster</u>*
                                                           Steven M. Oster