**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                              )
**CHRISTOPHER CHANDLER,**                                     )
                                                              )
      **Plaintiff,**                           )
                                                              )
        **v.**                            )      **Case No. 18-cv-02136 (APM)**
                                                              )
**DONALD BERLIN, et al.,**                                    )
                                                              )
      **Defendants.**                          )
———————————————————————  )

**MEMORANDUM OPINION AND ORDER**

A jury in this matter returned a verdict in favor of Plaintiff Christopher Chandler on a single claim of defamation. It awarded $4,000,000 in compensatory damages and an additional $4,000,001 in punitive damages. Defendants Donald Berlin and Investigative Consultants, Inc. now ask the court to grant them a new trial. Defs.' Mot. for a New Trial, ECF No. 251 [hereinafter Defs.' Mot.]. For the reasons stated below, the motion is denied.[1]

**I.**

Defendants first submit that a new trial is warranted based on newly discovered evidence: namely, Plaintiff's mid-trial filing of a defamation suit in D.C. Superior Court against Robert Eringer ("2024 Lawsuit"). Plaintiff brought that action after the disclosure of a 2018 email from Eringer to Defendant Berlin in which Eringer accuses Plaintiff of "laundering money for the Russian mafia." Defs.' Mot., Defs.' Mem. in Supp. of Defs.' Mot., ECF No. 251-1 [hereinafter Defs.' Mem.], at 4. According to Defendants, the new suit, if known, would have been a game-changer for their statute-of-limitations defense. The reason why is complicated.

———————————————

[1] The court presumes the parties' familiarity with the evidentiary record and therefore recites it only as needed to resolve the motion.

The limitations period for a defamation claim under District of Columbia law is one year. *Chandler v. Berlin*, 998 F.3d 965, 971 (D.C. Cir. 2021) (citing D.C. Code § 12-301(a)(4)). That period begins to run when the plaintiff has actual knowledge of the claim or is on "inquiry notice" of such claim, that is, "notice which a plaintiff would have possessed after due investigation." *Id.* at 971–72 (internal quotation marks omitted). Defendants did not contend that Plaintiff had actual notice of the false report Defendants prepared and published to Eringer in 2003; rather, they asserted that he was on "inquiry notice" long before he filed suit in this court in 2018.

Their theory of inquiry notice rested on certain publications made by *Eringer*, not Defendants. In the years following his receipt of the report in 2003, Eringer made multiple false public statements about Plaintiff. The first came in 2009, when Eringer filed suit in California state court against his former client, Prince Albert of Monaco, to whom Eringer had disclosed the false information contained in Defendants' report. Eringer alleged that it was "suspected [the Chandlers] were engaged in money laundering for Russian interests" through an unregistered trading company headquartered in Monaco, and that he "possesse[d] documents on this matter." Defs.' Mot., Ex., ECF No. 251-2 [hereinafter Trial Tr.], at 316:24–317:6. Plaintiff learned of Eringer's suit in January 2010 at the latest. *See id.* at 464:22–472:5 (discussing PX-68). Eringer made similar false publications in 2014 and 2015.[2]

Eringer's publications, Defendants argued, triggered inquiry notice. In closing, Defendants asserted that Plaintiff had a duty to diligently investigate whether Eringer's false statements came from an independent source; a diligent investigation would have included a lawsuit against Eringer; and discovery in such suit would have revealed Defendants' identities as the publishers of the initial false statements to Eringer. *See* Trial Tr. at 776:9–780:18. If Plaintiff had acted

---

[2] *See* Trial Tr. at 319:24–323:15 (discussing an article called "The Art of the Ruse: Richard and Christopher Chandler"); *id.* at 492:11–501:22, 505:2–507:14 (testimony about the book *The Spymaster of Monte Carlo*).

diligently, Defendants urged, he would have possessed sufficient knowledge to file a defamation claim against Defendants more than one year before actually doing so. The suit therefore was time-barred.

Defendants maintain that the undisclosed 2024 Lawsuit would have advantaged them in two ways. One, it would have shown "that Chandler's main reason for not suing Eringer [was] false." Defs.' Mem. at 2, 7–8. Plaintiff testified that he did not sue Eringer in part because he had engaged a lawyer in 2010 who advised him that such a suit was not legally possible because "we [] did not have standing or the legal foundation on which to sue him." Trial Tr. at 474:1-5. According to Defendants, the 2024 Lawsuit would have shown that, contrary to his testimony, Plaintiff faced no legal impediment to bringing an earlier defamation claim against Eringer. Two, it would have shown that Plaintiff lied on the stand. Plaintiff testified on cross-examination that he could not recall having received legal advice that he *could* sue Eringer in the United States. Defs.' Mem. at 3–5. His filing of the 2024 Lawsuit, Defendants argue, would have proven that testimony to be false. As explained below, neither argument is persuasive.

### A.

The parties agree that to warrant a new trial under Federal Rule of Civil Procedure 59(a)(1)(A) based on newly discovered evidence, a moving party must show, among other things, that "the evidence is admissible and is of such importance that it probably would have changed the outcome." *Id.* at 6–7 (quoting *James Madison Project v. Dep't of Justice*, 320 F. Supp. 3d 143, 148 (D.D.C. 2018)); *see also* Pl.'s Opp'n to Defs.' Mot., ECF No. 255 [hereinafter Pl.'s Opp'n], at 2. The court assumes that the fact of the 2024 Lawsuit was admissible. That evidence, however, was not of "such importance that it probably would have" resulted in a defense verdict. The court so holds for four reasons.

*First*, the newly filed suit would not have contradicted Plaintiff's advice-of-counsel justification for not suing Eringer earlier. The court generally agrees with Plaintiff: "[t]he 2024 complaint, which was filed on the advice of different counsel, has nothing to do with the counsel Mr. Chandler received, fourteen years earlier, from different lawyers, in different circumstances, concerning different statements made in a different forum." Pl.'s Opp'n at 3. Or, put another way: "it is hard to see how the fact of the complaint from 2024 could tell the jury anything about the reasonableness of Mr. Chandler's understanding or thought process a decade earlier." *Id.* at 5. Even if the 2024 Lawsuit had some relevance, its power to contradict Plaintiff's testimony was minimal.

*Second*, the 2024 Lawsuit does nothing to upend Plaintiff's explanation that he also refrained from suing Eringer for reasons having nothing to do with legal advice, which, if credited, independently overcome the statute-of-limitations defense. Recall, the D.C. Circuit rejected this court's grant of summary judgment in favor of Defendants on limitations grounds because "Eringer's earlier publications do not necessarily suggest the existence of an independent source for Eringer's allegedly false statements." *Chandler*, 998 F.3d at 974. Critically, the court reasoned, "a plaintiff in Chandler's shoes might reasonably have concluded that, to the extent the [California state court complaint] statements themselves were fabrications, the intimations of sources of those claims were also fabrications" and, if a jury were to so conclude, Plaintiff would have had no legal duty to sue Eringer to preserve a cause of action against Defendants. *Id.* This rationale proved to be prescient. Plaintiff testified that he did not believe Eringer's claim that he possessed incriminating documents. Trial Tr. at 478:18-21. That "was a good reason" in his mind "for not suing Mr. Eringer." *Id.*; *see also id.* at 468:20–467:12 (stating he "put no weight" on Eringer's claimed possession of documents); *id.* at 473:3-12 (stating he believed the documents "did not

exist"). It was within the jury's province to credit this testimony. The 2024 Lawsuit—which, as noted above, pertains to a different publication that came much later in time—would not have undermined this independent reason for not suing Eringer.

*Third*, the jury already knew what Defendants claim the 2024 Lawsuit would have shown: "that suing Eringer was possible, thereby contradicting his argument that he acted reasonably when he declined to sue him earlier." Defs.' Reply in Supp. of Defs.' Mot., ECF No. 259 [hereinafter Defs.' Reply], at 7. At trial, Defendants introduced DX-165, a letter that Plaintiff's counsel sent to Eringer on October 12, 2024 ("October 12 Letter"), before filing the 2024 Lawsuit. Trial Tr. at 630:2–633:14 (discussing DX-165). Eringer described the October 12 Letter as "putting [him] on notice that [he] may be sued by Mr. Chandler." *Id.* at 630:3-4. Defendants then emphasized in closing that the October 12 Letter conveyed the message, "We're about to sue you. Save all your documents." *Id.* at 765:19-22. Thus, based on the October 12 Letter, the jury knew a suit against Eringer "was possible." Defs.' Reply at 7. To be sure, the 2024 Lawsuit would have established an additional fact—that Plaintiff had filed an action, as opposed to merely threatening it. But the actual suit's filing would have only added marginally to what already was before the jury.

*Finally*, the 2024 Lawsuit would not have shown that Plaintiff lied on the stand. The supposedly perjurious testimony occurred during the following exchange:

> Q: When did you receive advice that -- I'm not asking anything other than a timing question. When did you receive advice that it would be a good idea or you would be authorized to file a lawsuit -- did you ever receive advice that you would be able to sue Mr. Eringer for comments that he had made about you?
>
> [The court overruled an objection on relevance grounds. And the witness asked to repeat the question.]
>
> Q: Did you ever receive advice -- and I'm just asking -- well, did you ever receive advice, "yes" or "no," that it would be -- a

lawsuit against Mr. Eringer would be available to you in the United States?

A: *Not that I recall, no.*

Q: You obviously received advice that it would be a good idea or you would be able to sue Mr. Berlin, right?

A: That's correct.

Q: What's your understanding of the difference between Mr. Berlin's situation such that you could file lawsuit against Mr. Berlin?

A: The advice from my legal counsel.

Q: I'm sorry?

A: The advice from my legal counsel.

Q: Okay. So you perceived some difference between Mr. Berlin's situation and Mr. Eringer's; is that correct?

A: That's the advice I was given, yes.

Trial Tr. at 481:16–482:20 (emphasis added). According to Defendants, the 2024 Lawsuit would have shown that Plaintiff's italicized testimony above was false. It would have proven that Plaintiff "**did** receive advice that is was possible to sue Eringer in the United States and obviously believed it **was** possible to sue Eringer for accusing him of money laundering." Defs.' Mem. at 4.

Plaintiff's answer was not false, and the 2024 Lawsuit would not have shown otherwise. The question preceding Plaintiff's answer was ambiguous. It was not specific to either the timing of legal advice or a particular false statement made by Eringer. So, it is a stretch to suggest that defense counsel intended, and Plaintiff understood, the question to reach to his receipt of legal advice before filing the 2024 Lawsuit.[3]  Furthermore, the full context establishes Plaintiff was

---

[3] Defense counsel apparently did not think Plaintiff had lied at the time. If they had, they could have used the October 12 Letter to impeach him. Defendants cannot credibly assert that they came to believe Plaintiff's testimony was false only after learning of the 2024 Lawsuit.

testifying about the advice he received about Eringer's false statements in the 2009 lawsuit and later republications, *see* n.2 *supra*—not whether he had *ever* received advice that Eringer could be sued for defamation.  Before the quoted testimony above, the questioning related to Plaintiff's decision not to sue Eringer over his republications in 2009 and 2015.  *See* Trial Tr. at 476:2–481:9.  Then, counsel made a distinction between Plaintiff suing Defendant Berlin but not suing Eringer, and Plaintiff explained he perceived a difference between the two based on the advice of counsel.  This response was a clear reference to advice received about Eringer's earlier false publications— not the false statement that later came to light and led to the 2024 Lawsuit.  The 2024 Lawsuit therefore would not have shown that Plaintiff's "not that I recall" response was a lie.

In sum, Plaintiff's discovery of the 2024 Lawsuit does not warrant a new trial under Rule 59(a)(1)(A).

## B.

Alternatively, Defendants move for a new trial based on nondisclosure of the 2024 Lawsuit under Rule 60(b)(3).  Defs.' Mem. at 8–10.  Under that rule, the court may relieve a party from a final judgment based on "fraud . . . , misrepresentation, or misconduct by an opposing party."  Fed. R. Civ. P. 60(b)(3).  As Defendants admit, the Rule 60(b)(3) standard is "demanding."  Defs.' Mem. at 9.  "In addition to demonstrating misconduct, the movant must show the misconduct was prejudicial, foreclosing the 'full and fair preparation or presentation of its case.'"  *In re Hope 7 Monroe St. Ltd.*, 743 F.3d 867, 875 (D.C. Cir. 2014) (citation omitted).

Here, Defendants have shown neither misconduct nor prejudice.  Defendants have not identified any misrepresentation made by Plaintiff's counsel or Plaintiff (other than Plaintiff's testimony discussed above, which the court has determined was not untruthful), *see* Defs.' Mem. at 9–10, and they have not demonstrated that Plaintiff "had any independent obligation to disclose

the information absent a discovery request," *In re Hope 7 Monroe St. Ltd.*, 743 F.3d at 875.  And, for the reasons already discussed, Plaintiff's nondisclosure of the 2024 Lawsuit was not prejudicial.

## II.

Defendants next argue that a new trial is warranted because the court gave the jury an erroneous instruction on their statute-of-limitations defense.  Specifically, the court failed to properly instruct the jury on the discovery rule announced in *Diamond v. Davis*, 680 A.2d 364, 372–81 (D.C. 1996).  Defs.' Mem. at 1.  The delivered instruction, they say, wrongly "omits any mention of Chandler's duty to investigate," which under *Diamond* is triggered once the plaintiff "actually knows, or with the exercise of reasonable diligence would have known, of some injury, its cause-in-fact, and some evidence of wrongdoing."  *Id.* at 11–12 (quoting *Diamond*, 680 A.2d at 381).  A proper instruction would have told the jury that Plaintiff was duty "bound to file [his] cause of action within the applicable limitations period, measured from the date of [his] acquisition of the actual or imputed knowledge."  *Diamond*, 680 A.2d at 381.  Defendants reason that this failure left "the jury with the impression that Mr. Chandler was under no duty to act promptly upon repeated notices of his claims against Eringer, and left to speculate whether prompt action would have revealed the [report] among Eringer's documents."  Defs.' Mem. at 20–21.  The error, they claim, was not harmless.  *See id.* at 19–20.

"Jury instructions are proper if, when viewed as a whole, they fairly present the applicable legal principles and standards."  *Czekalski v. LaHood*, 589 F.3d 449, 453 (D.C. Cir. 2009) (cleaned up).  But even if erroneous, the harmless error rule applies.  *See* Fed. R. Civ. P. 61.  A new trial is required only if the error affected "any party's substantial rights."  *Id.*  That standard requires

the court to determine "the likelihood that the error affected the outcome of the case." *Williams v. U.S. Elevator Corp.*, 920 F.2d 1019, 1023 (D.C. Cir. 1990) (cleaned up).

Defendants have not established that the limitations instruction failed to "fairly present the applicable legal principles and standards." The court's instruction closely followed the D.C. Circuit's discussion of the discovery rule in *Chandler v. Berlin*. Consistent with that decision, the court instructed the jury that Defendants had the burden to "prove by a preponderance of the evidence that Mr. Chandler failed to file his lawsuit within one year after he was on 'inquiry notice' of Defendants' false statements." Jury Instructions, ECF No. 232 [hereinafter Jury Instructions], at 11.[4] The court then supplied a definition of "inquiry notice" that tracked the definition given in *Chandler*. *Compare id.* (defining "inquiry notice" to mean "the notice a plaintiff would have possessed of a defendant's actions if he had conducted a due investigation"), *with Chandler*, 998 F.3d at 972 (stating that "inquiry notice" is a "counterfactual in the sense that it refers to 'that notice which a plaintiff would have possessed after due investigation'" (citation omitted)). It then instructed that whether inquiry notice exists is "a highly fact-bound question." Jury Instructions at 11. Jurors had to "decide whether Mr. Chandler exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him," *id.*, a sentence taken directly from *Chandler*, *see* 998 F.3d at 972 (quoting *Ray v. Queen*, 747 A.2d 1137, 1141–42 (D.C. 2000)). The court then provided a definition of "reasonable diligence"—to which Defendants did not object—and explained, consistent with *Chandler*, that circumstances "may be such that a person is not required to conduct any investigation at all." Jury Instructions at 11; *Chandler*, 998 F.3d at 972 ("[T]he relevant facts may be such that it may be reasonable for a

---

[4] To the extent Defendants complain that the court omitted reference to actual notice as triggering the limitations period, *see* Defs.' Mem. at 11–12, 17–18, the court did not include such language because there was no evidence that Plaintiff had actual notice of Defendants' false statements more than one year before he filed suit. Nor did Defendants argue that he had actual notice.

plaintiff to conduct no investigation at all." (cleaned up) (quoting *Diamond*, 680 A.2d at 372)). Ultimately, the court instructed the jury that it had to evaluate "all relevant facts and circumstances" in deciding whether Plaintiff was "required to investigate and that, if he had investigated, whether he would have learned of Defendants' false statements." Jury Instructions at 11–12.

It is true that the court did not specifically tell the jury that Plaintiff had a "duty to investigate." Defs.' Mem. at 11. But that is because there is no absolute duty to investigate. As the D.C. Court of Appeals put it in *Diamond*: "Under our cases, the relevant facts may be such that it may be reasonable to conduct no investigation at all. Thus, where an exhaustive investigation would have uncovered the claim is not necessarily relevant, unless the only reasonable investigation under the circumstances would have been an exhaustive one." 680 A.2d at 372; *accord Chandler*, 998 F.3d at 972.

The court also did not, contrary to Defendants' wishes, instruct that "[a]s soon as the Plaintiff learns of some injury, its cause, and some evidence of wrongdoing, the discovery rule requires him to file suit within the applicable limitations period, in this case, one year." Defs.' Mem. at 15–16; *see Diamond*, 680 A.2d at 381 ("Once the plaintiff . . . with the exercise of reasonable diligence would have known[] of some injury, its cause-in-fact, and some evidence of wrongdoing, then she is bound to file her cause of action within the applicable limitations period . . . ."). The instruction, however, did direct the jury "to consider all relevant facts and circumstances when deciding whether Mr. Chandler was required to investigate and, if he had investigated, whether he would have learned of Defendants' false statements." Jury Instructions at 11–12. Defendants were thus free to contend that, based on Eringer's publications, Plaintiff was aware of some injury, its cause, and some wrongdoing and therefore was on inquiry notice long

before he filed suit.  And that is precisely what they did.  They argued that "Mr. Chandler had a duty, a duty to make reasonable investigation of his affairs, has to do it with reasonable diligence," and they urged the jury to reject Plaintiff's various excuses for not proceeding earlier with a suit against Eringer.  Trial Tr. at 776:9–780:18.  The jury was not persuaded.  But that does not make the instruction defective.

Nor have Defendants shown that the claimed instructional error "affected the outcome of the case."  *Williams*, 920 F.2d at 1023.  Their theory of harm starts from the premise that, as early as 2010, there was "overwhelming evidence that Chandler had knowledge of injuries, their cause, repeated evidence of wrongdoing, and that Eringer had documents to support his statements." Defs.' Reply at 11.  If the jury had been told that Plaintiff had a legal duty to investigate upon learning those facts, "it would have concluded that Chandler's proper discharge of that duty would have revealed not only Eringer's repeated publications, but Defendants' single publication to Eringer."  *Id.*  The jury therefore would have had to find that Plaintiff was on inquiry notice more than one year before he filed suit.  But the court's erroneous instruction, they claim, allowed the jury to excuse Plaintiff's lack of diligence.  As Defendants put it, "the jury was free to not even consider that Chandler knew he'd been defamed and had reason to believe Eringer was not the only potential defendant."  *Id.* at 13.

The problem with Defendants' theory of harm is that the D.C. Circuit rejected these very arguments when it reversed this court's grant of summary judgment in favor of Defendants on limitations grounds.  The D.C. Circuit held that a jury could conclude that a reasonable person in Plaintiff's circumstances had no duty to investigate because "Eringer's earlier publications *do not* necessarily suggest the existence of an independent source for Eringer's allegedly false statements."  998 F.3d at 974 (emphasis added).  As previously noted, Plaintiff testified that he did

11

not sue Eringer after learning of his publications both based on legal advice and because he did not believe that Eringer possessed any incriminating documents given the falsity of the allegations. *See supra* Section I.  The jury evidently credited those explanations over Defendants' argument that Eringer's publications placed Plaintiff on inquiry notice of a claim against them. *See Chandler*, 998 F.3d at 975 ("Whether Chandler should have known of such a claim [against Defendants] turns on whether reasonable diligence based on the facts before him at a certain point in time required that he then take steps that would have revealed Berlin's role.").  Defendants' preferred jury instruction would therefore have been unlikely to produce a different outcome.

The D.C. Court of Appeals' decision in *Estate of Chappelle v. Sanders* is inapposite. *See* Defs.' Mem. at 18–19.  In that case, the decedent's estate filed suit against the owner and driver of a car that caused the decedent's death in a traffic accident.  442 A.2d 157, 157–58 (D.C. 1982). The car's driver gave a false identity to the decedent, fled the accident scene, and did not file an accident report.  *Id.* at 157.  The driver of the decedent's car, however, noted the license plate of the car causing the accident and traced its ownership to the lead defendant.  *Id.* at 157–58.  The court held that the wrongful death suit, filed more than three years after the accident date, was untimely under the District's one-year limitations period for wrongful death actions.  *Id.* at 158– 59.  In so ruling, the court disagreed with the plaintiff's assertion that the limitations period tolled due to the defendant-driver's concealment of his identity.  *Id.*  As the court explained, the plaintiff "was well aware, not only of the existence of wrongful death and survival claims, but also of the [lead defendant's] identity as owner of the vehicle of that collided with defendant's car."  *Id.* at 159.

Here, unlike in *Estate of Chappelle*, Plaintiff did not have *actual* notice of a defamation claim based on knowledge of Defendants' report or their identities.  Defendants' theory was that

Plaintiff was on inquiry notice of a suit against Defendants based on Eringer's public statements, but the jury found otherwise.  There is no inconsistency between that outcome and the holding of *Estate of Chappelle.*

## III.

Next, Plaintiffs challenge the sufficiency of the evidence supporting the jury's damages award.  At trial, Plaintiff sought to hold Defendants accountable not only for their publication of false statements to Eringer, but also Eringer's republication of those statements to his client, Prince Albert of Monaco, and later to the Central Intelligence Agency (CIA).  These republications were "reasonably foreseeable" to Defendants, Plaintiff argued, so the jury could consider them in awarding damages.  Jury Instructions at 13–14 (instructing that the jury could consider "the extent of the distribution of the defamation" in deciding a damages amount and that reasonably foreseeable republications were relevant to that inquiry).  Defendants now insist that they are entitled to a new trial because "there was a complete failure of evidence as to whether Mr. Berlin foresaw republication of his report, or any of the information in the report, to the CIA."  Defs.' Mem. at 21–22.[5]

This argument is a nonstarter.  To begin, there was sufficient evidence from which the jury could conclude that Eringer's republication to the CIA was foreseeable.  *See Czekalsi*, 589 F.3d at 456 ("The jury verdict stands 'unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict.'" (citation omitted)).  Eringer testified that he never promised Defendants that he would not share the information contained in their report.  Trial Tr. at 644:23–645:1.  A self-described "intelligence advisor," Eringer knew high-ranking officials at the CIA, including the recently retired head of the

---

[5] Defendants make no similar sufficiency argument with respect to republication by Eringer to his "ultimate client," Prince Albert.  *See* Trial Tr. at 214:7-8.

"Russian desk," William Lofgren, *id.* at 593:20–595:13, and a former deputy director of operations, Clair George, who Eringer described as "very involved" in the Chandler matter, *id.*; *id.* at 613:5-10. Defendant Berlin knew these same individuals and had used them as sources to prepare the report for Eringer. *Id.* at 225:3–229:1. He also knew that Eringer had an "ultimate client," though not the client's identity. *Id.* at 213:19-24. From these facts, a jury could have reasonably inferred that Defendant Berlin would have known about Eringer's CIA connections and, because of the seriousness of the allegations made against the Chandlers, Eringer would have shared the information with the CIA. After all, that is precisely what Eringer did. Eringer testified that he had mentioned his investigation of the Chandler brothers to a high-level CIA contact, who naturally asked to see the work, and he passed it on. *Id.* at 613:19–614:4. The jury reasonably could have concluded that such information-sharing would have been reasonably foreseeable to Defendants.

In any event, a new trial is not warranted procedurally. The jury delivered a general verdict on liability and damages. The court cannot now parse that general verdict to determine what, if any, of the final award the jury attributed to republication to the CIA (as distinct from the original publication to Eringer and the republication to Prince Albert, *see* n.5 *supra*). Such relief would require the court to speculate about the jury's deliberations, which it cannot do. *See Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1239 (D.C. Cir. 1984) ("In reviewing the amount of the jury's award, we [] need not—and indeed cannot—reconstruct the precise mathematical formula that the jury adopted."). The court, however, can presume that the jurors followed the instructions that they were given, which was to award damages only for reasonably foreseeable republications. *See U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 906–07 (D.C. Cir. 2010); Jury Instructions at 13–14. A new trial therefore is not warranted on this ground.

# IV.

Finally, Defendants ask the court to award a new trial on damages unless Plaintiff agrees to an appropriate remittitur of the $4,000,000 compensatory damages award and $4,000,001 punitive damages award. Defs.' Mem. at 2, 22–23. Notably, Defendants do not argue that Defendants' initial publication did not cause injury. Rather, they contend only that Plaintiff offered no evidence of actual harm resulting from the *re*publications. *See id.* at 23–31.

When considering a sufficiency-of-the-evidence challenge to a jury's damages award, the court's "inquiry ends once [it is] satisfied that the award is within a reasonable range and that the jury did not engage in speculation or other improper activity." *Carter*, 727 F.2d at 1239. In assessing an award's reasonableness, a court "need not—and indeed cannot—reconstruct the precise mathematical formula that the jury adopted. Nor need [it] explore every possible quantitative analysis or compute the basis of each penny and dollar in the award." *Id.*

The court instructed the jury that it could award Plaintiff damages for "loss of reputation or standing in the community, mental or physical pain and suffering, or inconvenience or loss of enjoyment." Jury Instructions at 13. Consistent with the D.C. Court of Appeals' decision in *Ingber v. Ross*, 479 A.2d 1256, 1265 (D.C. 1984), the jury was informed that it could consider "(1) the seriousness of the defamatory charge, (2) the extent of the distribution of the defamation, (3) the extent to which the communication was actually believed, and (4) the plaintiff's prominence and professional standing in the community." Jury Instructions at 13. The jury reasonably could have concluded that these factors weighed in favor of a significant award.

First, the defamatory statements were extremely serious. Defendants falsely accused Plaintiff of, among other things, involvement in (1) "organized crime groups in Russia and elsewhere," (2) "a massive money-laundering scheme" to benefit "high-level political types in

Russia" and "organized crime groups in that country," and (3) running a "front company" that "pose[s] as foreign investors" to "buy up GazProm [(the Russian national oil company)] shares on behalf of GazProm senior executives." PX-1 at 6–7. Second, the statements were published not only to Eringer but republished to the CIA and Prince Albert of Monaco. Plaintiff lived in Monaco at the time. The jury could have viewed the extent of such distribution—to the head of state where Plaintiff resided and the U.S. intelligence service—as an aggravating factor. As discussed previously, these republications were foreseeable. Third, the jury was free to conclude that at least Eringer believed the truth of the falsehoods, based on his repetition of them in multiple private and public republications and given the status of the persons and entities to whom he passed on the information. And fourth, Plaintiff's prominence and community standing was well established. *See, e.g.*, Trial Tr. at 303:14-21 (describing accusations against Plaintiff by members of the British Parliament). Further, Plaintiff explained how he processed reading Defendants' report for the first time. Describing it as "gutting" and comparing it to a mugging, Plaintiff testified, "You feel that the safety and the world as you know it is no longer as you knew it. You no longer feel safe in the world. Everything is suddenly changed in a way that you can't change back." *Id.* at 342:11–343:11. The jury was well within its discretion to find that Defendants' falsehoods had a major effect on Plaintiff and to award a commensurate sum.

Defendants try to demonstrate the unreasonableness of the award by pointing to other defamation cases in which prevailing plaintiffs received lower amounts. *See* Defs.' Mem. at 26–31. But the D.C. Circuit has said that "it is awkward to discuss the size of an award through comparison with past decisions" because the circumstances of each case are unique. *Peyton v. DiMario*, 287 F.3d 1121, 1127 (D.C. Cir. 2002) (internal quotation marks and citation omitted). Further, courts "must be especially hesitant to disturb a jury's determination of damages in cases

involving intangible and non-economic injuries." *Vasquez v. District of Columbia*, 110 F.4th 282, 293 (D.C. Cir. 2024) (internal quotation marks and citation omitted).

Here, because the compensatory damages award was exclusively for non-economic injuries and "thus particularly within the province of the jury's subjective judgment," *id.*, and because the amount of the award is not so much as to "shock the conscience" or "so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate," *Peyton*, 287 F.3d at 1127, the court will not remit the award.  It also will not disturb the effectively single-multiple punitive damages award.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) (noting, without imposing "rigid benchmarks," that "[s]ingle-digit multipliers are more likely to comport with due process").

**V.**

For the foregoing reasons, Defendants' Motion for New Trial, ECF No. 251, is denied.

Date:  December 31, 2025

Amit P. Mehta
United States District Judge

17